IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CITY OF MIAMI GARDENS, a Florida
municipal corporation, and SKANSKA USA
BUILDING INC., a foreign corporation,

                            CIVIL ACTION

       Plaintiffs,

v.

                            Case No. 1:15cv23334

URS CORPORATION SOUTHERN,
a foreign corporation, URS CORPORATION,
a foreign corporation, and MARK
W. ZIMPELMAN, an individual,

       Defendants.

_____/

## AMENDED COMPLAINT

Plaintiffs, City of Miami Gardens (the "City"), and Skanska USA Building Inc. ("Skanska"), by and through their undersigned counsel, hereby sue Defendants, URS Corporation Southern ("URS Southern"), URS Corporation ("URS Corp."), and Mark W. Zimpelman ("Mr. Zimpelman"), and in support thereof, state as follows:

## PARTIES, JURISDICTION AND VENUE

1.      This is an action for damages in excess of $75,000.00, exclusive of interests, attorney's fees and costs.

2.      At all times material hereto, the City was a Florida municipal corporation authorized to and conducting business in Miami-Dade County, in the Southern District of Florida.

3.      At all times material hereto, Skanska was a foreign corporation incorporated in and under the laws of the State of Delaware and authorized to and conducting business in Miami-Dade County, in the Southern District of Florida.

4.      Upon information and belief, URS Southern is a foreign corporation incorporated in and under the laws of the State of California who is authorized to and conducted substantial and not isolated business in Florida.  URS Southern also committed tortious acts in the State of Florida and is subject to the jurisdiction of the Courts in the State of Florida.

5.      URS Southern is licensed by the State of Florida as an engineering firm engaged in, among other things, the business of providing professional architectural and engineering services for the construction of municipal facilities.

6.      Upon information and belief, URS Corp. is a foreign corporation incorporated in and under the laws of the State of Nevada who is authorized to and conducted substantial and not isolated business in Florida.  URS Corp. also committed tortious acts in the State of Florida and is subject to the jurisdiction of the Courts in the State of Florida.

7.      URS Corp. is licensed by the State of Florida as an engineering firm engaged in, among other things, the business of providing professional architectural and engineering services for the construction of municipal facilities.

8.      Upon information and belief, Mr. Zimpelman is an individual who resides in Virginia.  Mr. Zimpelman is licensed as a Registered Professional Engineer in Florida and has conducted substantial and not isolated business in Florida, including providing a portion of the design services that are at issue in this action.  Mr. Zimpelman has also committed tortious acts in the State of Florida and is subject to the jurisdiction of the Courts in the State of Florida.

9.      On September 3, 2015, Mr. Zimpelman filed a Notice of Removal [ECF No. 1] pursuant to 28 U.S.C. § 1441, asserting that the Court has subject matter jurisdiction over this matter based on the citizenship of the parties and the amount in controversy pursuant to 28

2

U.S.C. § 1332.[1] Venue for this action is proper in the Southern District of Florida where the contract at issue was to be performed and where the causes of action sued upon herein accrued.

## GENERAL ALLEGATIONS

### Project Background

10.     This action stems from the design and construction of the City of Miami Gardens Municipal Complex located in Miami Gardens, Florida (the "Project").

11.     The Project consisted of three overlapping phases as follows:

 a. Phase 1- Earthwork, including all necessary underground infrastructure and services;

 b. Phase 2 – City Hall Building and City Council Chambers, along with a Mechanical Building, Parking Garage and Off-site Road Work; and

 c. Phase 3 – Police Department Building.

12.     On or about February 25, 2009, the City entered into a Nonexclusive Continuing Professional Services Agreement with URS Southern (the "Professional Services Agreement"). A true and correct copy of the Professional Services Agreement is attached as Exhibit "1."

---

[1]      Mr. Zimpelman asserted that AECOM C&E, Inc., a non-diverse defendant was "fraudulently" joined to destroy diversity. Plaintiffs dispute this assertion.  Prior to filing this lawsuit, and as set forth in the affidavits of Carlos Garcia and John Mahoney attached to Mr. Zimpelman's Notice of Removal, a corporate merger occurred involving various affiliates and subsidiaries of "AECOM" and "URS", which Plaintiffs reasonably believed included the corporate entities involved in the project that is the subject of this action.  Plaintiffs' belief was based on the project personnel and their counsel, which is also Mr. Zimpelman's counsel in this action, referring to the entities in project records and communications as "AECOM formerly URS" without any further detail or information being provided.  It was only after Mr. Zimpelman submitted the Garcia and Mahoney affidavits with his Notice of Removal that Plaintiffs could understand the complex (convoluted) relationships between the post-merger identities of the entities and AECOM C&E, Inc.  It was based on this evidence, which was presented to Plaintiffs for the first time as part of Mr. Zimpelman's Notice of Removal, that Plaintiffs agreed to a dismissal of AECOM C& E, Inc., subject to the right to file this Amended Complaint against the URS entities named herein. As more fully set forth in this Amended Complaint, the use of the phrase "AECOM formerly URS" during the Project is not the only instance where Defendants have ignored the independent identities of the corporate entities involved in this action. Based upon information and belief, and representations by counsel for the Defendants, Plaintiffs have named herein a URS Corp. entity which was incorporated in Nevada as the company that provided professional services to the City. Defendants' counsel has represented that a separate URS Corp. entity which was incorporated in Delaware and subsequently merged into what ultimately became AECOM Global II, LLC, also a Delaware company, was not involved in the Project and provided no services to the City. Plaintiffs reserve the right to further amend this Amended Complaint to add AECOM Global II, LLC as the successor in interest to the Delaware URS Corp. entity should Plaintiffs discover that the Delaware URS Corp. entity was in fact the entity involved with the Project.

13.     Under the Professional Services Agreement, URS Southern agreed to provide the City with architectural, engineering and other professional design services on an ongoing basis for various projects located within the City.

14.     The Professional Services Agreement outlined the general terms of the relationship between the parties and contemplated that subsequent authorizations would be issued for specific scopes of design and/or construction administration services as necessary for a particular construction project.

15.     Although URS Southern executed the Professional Services Agreement, in or around July 2010, URS Corp. (and not URS Southern), pursuant to the Professional Services Agreement, submitted a proposal for a specific scope of design and construction administration services and fees associated with the design development and construction for the Project.

16.     On or about July 30, 2010, the City issued a Notice of Award to URS Corp. as written authorization to provide specific design services for the Project.  Thereafter, the parties agreed to Exhibit A (Scope of Work), Exhibit B (Fee Schedule), and Exhibit C (Area Requirements & Reporting) (collectively "Design Exhibits"), setting forth the specific design and construction administration services to be provided to the City on the Project.  True and correct copies of the Notice of Award and Exhibits are attached hereto as Composite Exhibit "2."

17.     In or around October 2011, the City and URS Corp. executed an Amendment (the "Amendment") to the Professional Services Agreement and Design Exhibits.  A true and correct copy of the Amendment is attached hereto as Exhibit "3," and is hereinafter referred to collectively with the Professional Services Agreement and Exhibits as the "Design Agreement."

18.     The Amendment only updated and amended the Professional Services Agreement and Design Exhibits and did not supersede or replace them.  By executing the Amendment, URS

4

Corp. bound itself to provide design and construction administration services for the Project in accordance with the terms of the Design Agreement.

19.     Under the Design Agreement, the design responsibility of URS Southern and URS Corp. on the Project extended to among other things, the architectural, landscape architectural, civil, structural, mechanical, electrical and plumbing designs for the Project.

20.     At all material times, Mr. Zimpelman was an employee of URS Southern and/or URS Corp.

21.     Mr. Zimpelman, as an agent or employee of URS Southern and/or URS Corp., was the Professional Engineer responsible for the structural design for the Project.

22.     On or about October 11, 2011, the City entered into a Construction Contract with Skanska wherein Skanska agreed to act as the general contractor for all Phases of the Project (the "Prime Contract").  A true and correct copy of the Prime Contract is attached as Exhibit "4."

23.     Under the Prime Contract, pricing for Skanska's work was broken down into two separate Guaranteed Maximum Prices ("GMP"), each applying to different scopes of work.

24.     GMP 1 was $1,421,270.00 and applied to the Phase 1 work.

25.     GMP 2 was for the work called for in Phases 2 and 3, but at the time the Prime Contract was executed, the City and Skanska agreed that the plans and specifications were not sufficiently complete so as to allow the parties to fix the amount of GMP 2.

26.     On or about February 20, 2012, the City and Skanska agreed to an addendum to the Prime Contract (the "First Addendum").  A true and correct copy of the First Addendum is attached hereto as Exhibit "5."

5

27.     On or about June 16, 2012, the City and Skanska established the GMP 2 in the amount of $40,749,383.00, which was the fully agreed upon value of the Prime Contract at the time Skanska's work on Phases 2 and 3 commenced.

## Commencement of the Work and Contract Time

28.     The City issued a Notice to Proceed to Skanska for Phase 1 on or about October 11, 2011.  A true and correct copy of the Notice to Proceed is attached hereto as Exhibit "6."

29.     Pursuant to the Prime Contract, Skanska was required to achieve Substantial Completion for Phase 1 within ninety (90) calendar days from the Notice to Proceed, and achieve final completion within fifty-six (56) days thereafter.

30.     On or about June 19, 2012, the City issued a second Notice to Proceed ("Second Notice to Proceed"), for the GMP 2 work.  A true and correct copy of the Second Notice to Proceed is attached hereto as Exhibit "7."

31.     Pursuant to the Prime Contract, Skanska was originally required to achieve Substantial Completion of Phase 2 within three hundred fifty (350) days of the Second Notice to Proceed, and achieve final completion within fifty-six (56) days thereafter, for a total of four hundred six (406) calendar days.

32.     Pursuant to the Prime Contract, Skanska was originally required to achieve Substantial Completion of Phase 3 within three hundred ninety-two (392) days of the Second Notice to Proceed, and achieve final completion within fifty-six (56) days thereafter, for a total of four hundred forty-eight (448) calendar days.

112724103.2

**Lack of Distinction Between URS Corp. and URS Southern**

33.     Throughout the Project, there was a lack of a distinction between the actions of URS Southern and URS Corp. such that the two companies were essentially acting in concert to perform the design and construction administration services called for on the Project.

34.     This lack of separation began when URS Corp. executed the Amendment and continued during the design and construction phases when the design professionals providing services under the Design Agreement would routinely and interchangeably communicate with the City and make representations on behalf of both URS Southern and URS Corp.

35.     By way of specific examples only, and not as a limitation, the following facts demonstrate how Project design personnel interchangeably acted and communicated on behalf of both URS Corp. and URS Southern:

  a. On or about October 14, 2011, URS Corp. issued the 100% Construction Documents for Phase 2 of the Project, which are incorporated by reference as if set forth herein.

  b. On or about October 14, 2011, URS Corp. issued the Project Specifications for the Project, which are incorporated by reference as if set forth herein.

  c. On or about November 11, 2011, URS Corp. issued the 100% Construction Documents for Phase 3 of the Project, which are incorporated by reference as if set forth herein.

  d. URS Corp., as the "Architect" executed change orders to the Prime Contract ("PCCO"), between the City and Skanska, including but not limited to, PCCO 26 adding to the scope of the Prime Contract based on drawing revisions.  A true and correct copy of PCCO 26 is attached hereto as Exhibit "8."

  e. URS Corp. responded to Requests for Information ("RFI") submitted by Skanska on the Project.  A true and correct copy of URS Corp.'s response to RFI 883 is attached hereto as Exhibit "9."

  f. Site Visit Reports submitted during the Project were executed by URS Corp.  A true and correct copy of the Site Visit Report issued on October 29, 2013 is attached hereto as Exhibit "10."

7

g.  URS Corp. responded to and commented on Skanska's submittals for the Project. A true and correct copy of the response for Submittal No. 00 03 3000 004 0 reviewed on August 12, 2012, is attached hereto as Exhibit "11."

h.  On February 3, 2014, Carlos Garcia sent a letter to the City Manager regarding the City's claims arising from Design Revision 20 (discussed in detail below). The letter was sent on URS Corp.'s letterhead but identified that it was being submitted by Mr. Garcia on behalf of URS Southern, as its Vice President and South Florida Office Manager. A true and correct copy of Mr. Garcia's letter is attached as Exhibit "12."

i.  On May 2, 2014, Greg Johnson, as URS Corp.'s Director of Facilities Engineering and Architectural Services for South Florida, issued a letter to the City on URS Corp.'s letterhead certifying, pursuant to the Professional Services Agreement, that Phase 2 of the Project had met the requirements of Substantial Completion as of May 2, 2014. A true and correct copy of Mr. Johnson's letter is attached as Exhibit "13."

j.  On August 6, 2014, Carols Garcia, sent the City a letter regarding claims for costs incurred by the City related to Design Revision 20 (discussed in detail below). Mr. Garcia's e-mail transmission indicated that he was sending the correspondence as the "South Florida Office Manager" of URS Southern; however, the attached August 6, 2014 letter was on URS Corp.'s letterhead and was executed by Mr. Garcia on behalf of URS Corp. as its "Vice President, South Florida Office Manager." True and correct copies of Mr. Garcia's email and letter are attached as Composite Exhibit "14."

k.  On January 7, 2015, the City received Invoice No. 38702039 seeking payment for alleged additional construction administration services provided on the Project. The invoice was certified by URS Southern, and it directed that checks should be made payable to URS Corp. The invoice also provided that payments sent by US mail should be delivered to URS Corp. However, payments sent by overnight courier or electronic funds transfer were to be delivered to URS Southern. A true and correct copy of the January 7, 2015 invoice is attached as Exhibit "15."

36.  Based on their joint execution of the Design Agreement and the manner in which design and construction administration services were provided to the City interchangeably by both URS Corp. and URS Southern, both URS Corp. and URS Southern are jointly responsible for the design and professional services provided to the City, including any material breaches, errors or omissions and the damages arising therefrom.

8

**<u>Design Errors and Omissions</u>**

37.     During construction of Phases 2 and 3, multiple errors and omissions were identified in the design provided by URS Southern and URS Corp., including the structural design that was prepared by Mr. Zimpelman.

38.     Some of the errors and omissions caused relatively smaller delays to the Project and smaller increases in the costs incurred by the City and Skanska to complete the Project.

39.     For example, such errors and omissions included, but were not limited to the following Cost Events ("CE"):

      a.  CE 33 - RFI 137 Response - Curb Detail at 3rd Floor

      b.  CE 38.001 - Parking Garage Foundations Additional VCV Probes

      c.  CE 48 - Lotspeitch Window Steel Framing

      d.  CE 60 - Steel Barrier Cables at Garage

      e.  CE 61 - CMU Wall Type Clarifications-PD

      f.  CE 69 - Lotspeitch Framing PH Louvers CH & PD

      g.  CE 70 - Lotspeitch Wall  Increase Framing PH CH & PD

      h.  CE 96 - Lotspeitch Wood Curbs at Penthouses

      i.  CE 113 - Champion Glass to 2x6 Steel Tube Frame at Soffits to Building

      j.  CE 123 - Plumbing Revision at CH & PD Roof Vents

      k.  CE 126 - Plumbing Pipe Revisions at Showers PD Lockers

      l.  CE 127 - Plumbing Pipe Revisions at CH Roof Drains

      m.  CE 129 - Council Chamber Roof Drain Size Increase

      n.  CE 130 - Plumbing Overflow Drain Relocation at PD SW Corner

      o.  CE 141 - City Hall Transfer Duct Additions

    p.  CE 156 - Council Chamber Ceiling Revisions

    q.  CE 160 - Added Galv. Mesh Panels at Garage

    r.  CE 166 - Elevated Bridge Walk Way Revisions

    s.  CE 168 - Drywall Headers at City Hall Windows

    t.  CE 169 - Mayor's Balcony Modifications

    u.  CE 176.1 - Window Sill Cover Carpentry (VJD)

    v.  CE 188 - Air Return Grilles Change

    w.  CE 268 - RFI 426- Galv. Steel Tube Frames & Mesh at Garage

    x.  CE 525 - Revision 25 at Parking Garage

    y.  CE 546 - CFO-61 Bridge Landing and Metal Work Modifications

40.    Although these errors and omissions individually caused delays and cost increases, they also had a significant cumulative effect on the Project budget and the progress of the work as Skanska was continually disrupted by conflicts in the drawings, omissions of important design details and other design deficiencies.  As a result, work on the Project could not be performed in an efficient and orderly manner as originally planned.

41.    Additionally, both the City and Skanska had to expend significant amounts of additional time and money to administer the Project and complete the additional and different work caused by the numerous design deficiencies.

42.    The impact of the errors and omissions was compounded by URS Corp.'s and URS Southern's repeated failure to timely and properly provide construction administration services as required by the Design Agreement, which included the failure to promptly respond to RFIs by Skanska, the failure to timely review and respond to shop drawings and submittals and the failure to promptly correct design deficiencies identified during the course of the work.

43.    There were also major deficiencies in the design which directly caused suspensions of the work, extended Project delays, and, as described in more detail hereinafter, millions of dollars in additional costs to both the City and Skanska.

### The Exterior Glass and Glazing System

44.    One significant design deficiency related to the exterior glass and glazing system (e.g., the windows) for City Hall and the Police Department Building ("PD Building").

45.    In the original construction documents prepared by URS Corp. and URS Southern, and published to bidders for the Project, URS Corp. and URS Southern specified a Kawneer IR-501 exterior glazing system (the "Kawneer System").

46.    In or around February 2012, Skanska submitted multiple RFIs related to the appropriateness of the Kawneer System and questioned whether the Kawneer System could meet the pressurization specifications set out in the plans and the windspeed requirements of the Florida Building Code (2007 Ed.).

47.    In or around March 2012, URS Corp. and URS Southern responded to those RFI's by changing the specifications to require that a Crawford Tracey Pro-Tech 45G exterior glazing system (the "Crawford System"), be installed on the Project instead of the Kawneer System.  The Crawford System was a sole-source proprietary system, which means that Skanska could only obtain the exterior glazing system from the specific manufacturer identified.

48.    After the switch to the Crawford System, in or around March 2012 Skanska notified URS Corp. and URS Southern that the installation and attachment detail for the Crawford System greatly differed from the attachment detail provided in the original plans for the Kawneer System.

49.     Since URS Corp.'s and URS Southern's design did not address this issue, Skanska noted in its GMP 2 Bid Assumptions and Clarifications that additional work would be needed to coordinate the original design with the newly selected Crawford System.

50.     Construction of the GMP 2 work commenced in or around August 2012, and at that time, it was determined that URS Corp. and URS Southern failed to take any action to update the attachment detail in the plans to accommodate the change to the Crawford System.

51.     On or about September 4, 2012, Skanska submitted RFI 66 requesting that the attachment detail be corrected for use of the Crawford System rather than the Kawneer System.

52.     URS Corp. and URS Southern did not provide the detail sought in RFI 66.

53.     In RFI 21, Skanska had also noted that the attachment methods depicted in the design did not fully adhere to the requirements of the Crawford System Notice of Acceptance ("NOA"), in that the plans failed to consider the minimum anchoring requirements needed to achieve the wind performance standards of the Crawford System.

54.     Specifically, the design called for the Crawford System to be installed into pre-cast concrete walls with a specified thickness of five inches (5").

55.     The Crawford System NOA called for a minimum distance of two and a half inches (2 ½") between the edge of the concrete wall and the location where the window anchors are installed into the concrete (the "Edge Distance").

56.     URS Corp.'s and URS Southern's design also specified that the windows themselves would be installed with a three-quarters inch (3/4") recess from the edge the concrete wall inward toward the building.

112724103.2

57.     Given those parameters, Skanska determined that the required minimum Edge Distance of the Crawford System could not be met because the pre-cast concrete wall design did not provide for sufficient depth of the walls.

58.     In order to meet the NOA requirements, the pre-cast concrete walls would need to be a minimum of six and three eighths inches (6 3/8") thick.

59.     The design thickness of the pre-cast concrete walls was another design issue that needed to be addressed concurrently with the deficient exterior glazing system design.

60.     Although URS Corp.'s and URS Southern's design initially called for pre-cast concrete wall panels to be five inches (5") thick, the General Notes set forth on drawing A606 included the following comment:

> PRECAST CONC. WALL PANELS ARE 5" THICK BASIS OF DESIGN. ACTUAL FINAL PANEL THICKNESS TO BE DETERMINED BY PRECAST MANUFACTURER.  BASED ON COMPONENT AND CLADDING DESIGN CRITERIA INDICATED ON STRUCTURAL DRAWINGS.

61.     Following those notes, Skanska's pre-cast manufacturer suggested that a seven-inch (7") wall panel be used to meet the design criteria with respect to the wind pressure tables, window support details, window pressure requirements and panel configuration.

62.     URS Corp. and URS Southern rejected the proposed 7" panels, and instead directed that the panels should be upsized to a thickness of six inches (6").

63.     The direction to proceed with a 6" pre-cast wall panel meant that the Crawford System could not be used on the Project because a panel wall with that depth did not provide the minimum Edge Distance clearance required by the Crawford System NOA.

64.     As a result of these continuing conflicts and design deficiencies in the exterior glazing design and the pre-cast concrete walls, in or around September 2012, URS Corp. and

13

URS Southern changed the specified exterior glazing system from the Crawford System to a Trulite 3100 system (the "Trulite System").

65.     While the selection of the Trulite System resolved the issue regarding the minimum Edge Distance requirements, the window head and sill attachment design detail provided by URS Corp. and URS Southern for the Trulite System conflicted with the design and finishing detail for the window openings in the pre-cast concrete walls.

66.     This conflict could not be determined until after the pre-cast wall panels were manufactured and delivered to the Project site.

67.     Throughout September and October 2012, URS Corp. and URS Southern, the City and Skanska met multiple times to discuss a resolution to the window installation issues.

68.     The City and Skanska reasonably believed URS Corp. and URS Southern recognized that because of the random placement pattern of the windows called for in the design, multiple solutions may be needed dependent on the location of each window being installed.

69.     The City and Skanska also believed that URS Corp. and URS Southern would provide sufficient direction on how to proceed with resolving this issue.

70.     However, at the end of October 2012, Construction Field Order 004.002 was issued and rather than presenting a clear design solution, URS Southern and URS Corp. ignored their obligations and attempted to shift the responsibility for a design resolution by directing Skanska to resolve the issue in the field and through the submission of shop drawings.

71.     To mitigate the impact that these design deficiencies were having on the Project, in the Spring of 2013 Skanska's glazing subcontractor ("Champion Glass") began installing a small portion of the glass panels that could be installed without further instruction from URS

Corp. and URS Southern, while at the same time, it began helping URS Corp. and URS Southern re-engineer the installation method for the balance of the Trulite System.

72.     After several exchanges between Champion Glass and URS Corp./URS Southern over proposed installation methods, in or around June 2013 Champion Glass created a mockup window installation using a "Z-clip" and installed it at the Project to demonstrate the efficacy of the proposed installation method to URS Corp. and URS Southern.

73.     Finally, on or about June 17, 2013, URS Corp. and URS Southern approved Champion Glass' proposed installation method for the Trulite System.

74.     Aside from the impacts that were caused by the lack of installation detail for the Trulite System, the switch from the Crawford System to the Trulite System also gave rise to an issue regarding the City's ability to maintain and service the top row of the exterior glazing system during the useful life of the Project.

75.     The Crawford System specified by URS Corp. and URS Southern was an externally glazed system.

76.     However, the Trulite System was an internally glazed system, which meant that once installed, the parapet wall of the building would totally shield a portion of the top row of windows where the glass was mechanically fastened to the building structure.

77.     As a result of this conflict, the top portion of the glass could not be accessed to perform maintenance or to replace any damaged window units without excessive deconstruction.

78.     The installation method for the top row of the Truelite System needed to be modified to address this issue, and in order to ensure that the modified installation method still met the performance criteria of the Truelite System, the City was required to obtain a "One-Time Notice of Acceptance" ("One-Time NOA") from Miami-Dade County.

15

79.     Skanska and Champion Glass could not order the materials needed to install the top row of glass until after they knew the One-Time NOA would be granted.

80.     Given the ongoing issues with the design of the exterior glazing system and the effect those issues already had on the Project, obtaining the One-Time NOA was the only way the City and Skanska could mitigate the impact of this design deficiency.

81.     The City authorized Skanska to proceed with obtaining the One-Time NOA from Miami-Dade County on or about March 22, 2013.

82.     Miami-Dade County issued the One-Time NOA on or about May 6, 2013.

**<u>Deficiencies in the Structural Design of the Police Department Building</u>**

83.     After the pre-cast concrete walls were erected, in or around March 2013 a walkthrough inspection by the City's threshold inspector, Wingerter Laboratories, Inc. ("WLI"), identified a series of structural cracks on the Eastern portion of the elevated concrete floor slabs (and some concrete columns) on the second floor, third floor and roof level of the PD Building.

84.     On or about March 28, 2013, the City notified URS Corp. and URS Southern of the cracks and requested that they immediately investigate the condition to advise the City on the impact of the concrete cracking.

85.     In its notification, the City further advised that this investigation needed to be done immediately to establish that the structural integrity of the PD Building remained safe for work to continue on that portion of the Project.

86.     On or about March 29, 2013, URS Corp. and URS Southern responded by advising the City that they had observed exposed rebar in the underside of the concrete cracks in the PD Building, and based on that observation, they suggested that the City consider issuing a stop work order while the cause of the concrete cracks was investigated.

16

87.     Following that recommendation, on or about March 29, 2013, the City issued a Stop Work Order for the PD Building directing that no further work proceed in the affected areas of the building while the cause of the structural concrete cracks was being assessed.

88.     Between April 2013 and July 2013, the City and Skanska each independently reviewed the structural design provided by URS Corp. and URS Southern for the PD Building and the work in place performed by Skanska and its subcontractors to investigate the cause of the structural cracks in the elevated concrete slabs and columns.

89.     Based on these investigations, it was determined that deficiencies in the structural design by URS Corp. and URS Southern directly contributed to the concrete cracking.

90.     In May of 2013, with the progress of the work on the PD Building stopped, Skanska notified the City that the delay was not only impacting Skanska's work on Phase 3, but would also impact Phase 2 (due to holding staffing levels longer than scheduled), and that the overall economic impact of these issues would amount to thousands of dollars per day in Skanska's extended general conditions along with whatever costs were ultimately necessary to repair the damaged work.  A true and correct copy of Skanska's May 14, 2013 notice is attached hereto as Exhibit "16."

91.     On or about June 27, 2013, URS Corp. and URS Southern issued Design Revision 11 ("Rev. 11") for the PD Building, which called for significant changes to the structural design needed to repair the cracked elements.

92.     On or about July 9, 2013, URS Corp. and URS Southern unilaterally issued Design Revision 14 ("Rev. 14"), adding to the scope of structural revisions provided in Rev. 11.

93.     URS Corp. and URS Southern then subsequently unilaterally issued Design Revision 17 ("Rev. 17") and Design Revision 19 ("Rev. 19"), both of which further modified the structural design of the PD Building.

94.     The issuance of Rev. 11, Rev. 14, Rev. 17, and Rev. 19, including the extensive design revisions included therein, is further evidence that URS Corp. and URS Southern considered the original structural design of the PD Building to be insufficient, requiring substantial revisions.

95.     Upon information and belief, Mr. Zimpelman was the design professional responsible for the original structural design and Rev. 11, Rev. 14, Rev. 17, and Rev. 19.

96.     Based on the investigations performed by Skanska and the City, it was determined by the beginning of August 2013 that structural concrete cracking in the PD Building was not an imminent safety threat, and as a result, the City lifted the Stop Work Order at that time.

97.     On or about September 24, 2013, the City issued Skanska written Notice to Proceed with the work needed to implement the revised structural plans provided by URS Corp. and URS Southern.  A true and correct copy of the Notice to Proceed is attached as Exhibit "17."

98.     Unbeknownst to the City and Skanska, even after the City authorized Skanska to proceed with the additional work called for in Rev. 11, Rev. 14, Rev. 17, and Rev. 19, URS Corp., URS Southern and Mr. Zimpelman were continuing to investigate the original structural design for the PD Building.

99.     Further compounding the impact of the previous design revisions to address the numerous design deficiencies already identified, in November 2013, URS Corp. and URS Southern unilaterally and independently issued Design Revision 20 ("Rev. 20"), for the PD Building, the construction of which was then approximately eighty percent (80%) complete.

100.     While URS Corp., URS Southern and Mr. Zimpelman had ongoing professional obligations to address errors and omissions in the structural design, Rev. 20 represented an acknowledgement that the original structural design was seriously deficient as it detailed significant additional revisions to multiple structural elements of the PD Building.

101.     Rev. 20 called for, among other things, the expansion of the footprint of the building foundations at the shear wall and stair tower footing along with an increase in both the height and mass of the building foundation in these areas.

102.     Implementing these additional design revisions had an extensive effect on the existing work in place at the PD Building at that time.

103.     To perform Rev. 20, Skanska was required to excavate and expose the below-grade concrete foundation that was in place (in some instances more than four feet below ground and three feet away from the building), install temporary shoring to support the excavated areas, cut the existing slabs and foundations to install additional structural steel and concrete, and then backfill the excavated areas to return the Project site to an even grade.

104.     Completing this work also required Skanska's electrical and plumbing subcontractors to perform additional work necessary to preserve and protect the underground utilities that were incorporated into the foundation of the PD Building.

105.     This resulted in Skanska having to temporarily disable the main electrical feed to the building and provide temporary electrical power and air conditioning at a time when multiple portions of the finishing work such as carpeting, millwork and trim were being installed.

106.     The Project is subject to the sustainable construction requirements of the U.S. Green Building Council's LEED program, which included certain criteria for maintaining the indoor environmental quality of the Project during construction.

107.   Because of the inherently dusty and dirty nature of the concrete cutting and excavation work associated with Rev. 20, to meet the LEED criteria, Skanska was required to take extensive measures to control dirt and debris movement, which included curtaining off areas of work, covering air ducts and continuously sweeping, dusting and cleaning the impacted areas.

108.   The initial estimates provided by Skanska for the cost of performing the Rev. 20 work exceeded $3,000,000.00, along with an estimated seven months of delay to the Project.

109.   On or about December 12, 2013, the City notified URS Corp. and URS Southern that there were no funds available in the Project budget to finance the Rev. 20 work, and because it could not lawfully agree to pay Skanska any additional money knowing the funds were unavailable, the City could not authorize Skanska to proceed.

110.   The City also demanded that URS Corp. and URS Southern agree to indemnify it for the Rev. 20 costs in accordance with the Design Agreement.  A true and correct copy of the December 12, 2013 demand is attached as Exhibit "18."

111.   On or about December 20, 2013, URS Corp. and URS Southern responded by rejecting the City's demand for indemnity and indicating that such request would not be considered until the full impact that Rev. 20 would have on the Project scope and schedule was determined.  A true and correct copy of the December 20, 2013 letter is attached as Exhibit "19."

112.   As a result of the City's inability to fund the Rev. 20 work, in the beginning of 2014, Skanska's Phase 3 work significantly slowed and ultimately decreased to the point that it effectively came to a stop.

113.   Throughout the first half of 2014, the City repeatedly requested that URS Corp. and URS Southern indemnify it for the costs of the Rev. 20 work, which requests were continuously rejected.

114.     Instead of upholding their indemnity obligations under the Design Agreement, URS Corp. and URS Southern ultimately suggested that the City either look for alternative funding or ask Skanska to finance the cost of the Rev. 20 work.  A true and correct copy of the August 6, 2014 correspondence is attached as Exhibit "20."

115.     Nearly 10 months after issuing Rev. 20, URS Corp. and URS Southern also still maintained that it was still too premature to acknowledge responsibility for the construction costs and delay costs associated with remedying the deficient structural design.  *See* Exhibit 20.

116.     Ultimately in November 2014, the City independently obtained additional financing and was able to authorize Skanska to proceed with the Rev. 20 work.

117.     At that time, and in order to mitigate its potential liability to Skanska for URS Corp.'s and URS Southern's defective design, the City reached an agreement with Skanska regarding the additional construction costs for the work associated with Rev. 20, which totaled more than $2,100,000.00, exclusive of delay costs.

118.     The City also agreed that Skanska was entitled to a 298-day extension of time to complete Phase 3.

### Completion of Phase 2 and Status of Phase 3

119.     Phase 2 was declared Substantially Complete on May 2, 2014.

120.     Phase 2 achieved Final Completion on December 9, 2014.

121.     On or about July 17, 2015, Skanska notified the City that it believed Phase 3 was Substantially Complete, with Final Completion scheduled for September 11, 2015.  As of the date of Skanska's notice, the duration of the Phase 3 work exceeded the Contract Time provided in the Prime Contract by more than 700 days.

112724103.2

122.     However, URS Corp. and URS Southern have contended that, contrary to the terms of the Design Agreement, they are not obligated to declare Substantial Completion.  As a result, URS Corp. and URS Southern have not yet certified Substantial Completion for Phase 3 as of October 7, 2015.

123.     All conditions precedent to the bringing of this action have been performed, have occurred, or have been waived.

## COUNT I - BREACH OF CONTRACT AGAINST URS SOUTHERN
## (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 4, 5 and 9 through 123, above as if fully set forth herein and further alleges:

124.     Pursuant to the Design Agreement, URS Southern was obligated to provide architectural and engineering services related to the design of the Project as well as to provide construction administration services during the construction phase of the Project.

125.     URS Southern materially breached the Design Agreement by failing to properly and timely provide architectural and engineering design services and construction administration services in accordance with the Design Agreement.

126.     The material breaches by URS Southern of its express and implied obligations under the Design Agreement included, but were not limited to:

   a.  The failure to properly specify the extent and scope of the work to be performed on the Project;

   b.  The failure to design the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

   c.  The failure to independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

22

d. The failure to guard against defects in its work and the work of its sub-consultants, if any;

e. The failure to prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

f. The failure to properly design the Project;

g. The failure to properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

h. The failure to timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

i. The failure to timely respond to requests for information and clarification sought during the construction phase of the Project;

j. The failure to timely correct defects and deficiencies in the design provided by URS Southern identified before and during the construction phase of the Project; and

k. The failure to properly provide construction administration services as required.

127.    As the sole result of URS Southern's material breaches, including the errors and omissions in the design provided for the Project, the City was forced to incur additional construction costs that exceeded five percent (5%) of the total construction cost of the Project.

128.    These additional construction costs would not have been incurred by the City but for URS Southern's failure to properly perform its obligations under the Design Agreement.

129.    As a result of the above listed material breaches of the Design Agreement, the City was damaged in excess of $6,000,000.00, the exact amount of which to be proven at trial.

130.    The City also incurred special damages as a result of URS Southern's material breaches, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and amount and to negotiate a resolution of Skanska's claims.

112724103.2

131.    URS Southern's material breaches also caused the City to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with URS Southern's design deficiencies.

132.    URS Southern is responsible to the City for all of the City's damages pursuant to Section 16.1 of the Professional Services Agreement.

133.    Pursuant to Section 10.3 of the Professional Services Agreement, URS Southern also agreed that it was responsible to the City for all damages resulting from the design documents prepared by URS Southern.

134.    The City has retained the undersigned firm to represent it in this matter and has obligated itself to pay a reasonable attorney's fee their services.  Pursuant to Article 18 of the Professional Services Agreement, URS Southern is liable for said attorney's fees.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays this Court enter judgment against Defendant, URS Corporation Southern, awarding general and special damages, pre-judgment interest, attorney's fees and court costs, along with such further relief as the Court deems just and proper.

## COUNT II - BREACH OF CONTRACT AGAINST URS CORP. (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 6-7 and 9 through 123, above as if fully set forth herein and further alleges:

135.    This count is brought against URS Corp. based on URS Corp. binding itself to the requirements of the Design Agreement by executing the Amendment and based on URS Corp. and URS Southern interchangeably providing design and construction administration services to the City under the Design Agreement.

24

136.    Pursuant to the Design Agreement, URS Corp. was obligated to provide architectural and engineering services related to the design of the Project as well as to provide construction administration services during the construction phase of the Project.

137.    URS Corp. materially breached the Design Agreement by failing to properly and timely provide architectural and engineering design services and construction administration services in accordance with the Design Agreement.

138.    The material breaches by URS Corp. of its express and implied obligations under the Design Agreement included, but were not limited to:

a.    The failure to properly specify the extent and scope of the work to be performed on the Project;

b.    The failure to design the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

c.    The failure to independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

d.    The failure to guard against defects in its work and the work of its sub-consultants, if any;

e.    The failure to prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

f.    The failure to properly design the Project;

g.    The failure to properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

h.    The failure to timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

i.    The failure to timely respond to requests for information and clarification sought during the construction phase of the Project;

25

> j.   The failure to timely correct defects and deficiencies in the design provided by URS Corp. identified before and during the construction phase of the Project; and

> k.   The failure to properly provide construction administration services as required.

139.   As the sole result of URS Corp.'s material breaches, including the errors and omissions in the design provided for the Project, the City was forced to incur additional construction costs that exceeded five percent (5%) of the total construction cost of the Project.

140.   These additional construction costs would not have been incurred by the City but for URS Corp.'s failure to properly perform its obligations under the Design Agreement.

141.   As a result of the above listed material breaches of the Design Agreement, the City was damaged in excess of $6,000,000.00, the exact amount of which to be proven at trial.

142.   The City also incurred special damages as a result of URS Corp.'s material breaches, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and amount and to negotiate a resolution of Skanska's claims.

143.   URS Corp.'s material breaches also caused the City to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with URS Corp.'s design deficiencies.

144.   URS Corp. is responsible to the City for all of the City's damages pursuant to Section 16.1 of the Professional Services Agreement.

145.   Pursuant to Section 10.3 of the Professional Services Agreement, URS Corp. also agreed that it was responsible to the City for all damages resulting from the design documents prepared by URS Corp.

146.   The City has retained the undersigned firm to represent it in this matter and has obligated itself to pay a reasonable attorney's fee their services.  Pursuant to Article 18 of the Professional Services Agreement, URS Corp. is liable for said attorney's fees.

112724103.2

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays this Court enter judgment against Defendant, URS Corporation, awarding general and special damages, pre-judgment interest, attorney's fees and court costs, along with such further relief as the Court deems just and proper.

## COUNT III – CONTRACTUAL INDEMNITY AGAINST URS SOUTHERN
## (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 4, 5 and 9 through 123, above as if fully set forth herein and further alleges:

147.    Pursuant to Section 16.1 of the Professional Services Agreement, URS Southern agreed as follows:

> Consultant shall indemnify and hold harmless the City and its officers, employees, agents and instrumentalities from any and all liability, losses or damages, including attorneys' fees and costs of defense, which the City or its officers, employees, agents or instrumentalities may incur as a result of claims, demands, suits, causes of actions or proceedings of any kind or nature arising out of, relating to or resulting from the negligent performance of this Agreement by the Consultant or its employees, agents, servants, partners, principals or sub-Consultants. Consultant shall pay all claims and losses in connection therewith and shall investigate and defend all claims, suits or actions of any kind or nature in the name of the City, where applicable, including appellate proceedings, and shall pay all costs, judgments, and attorney's fees which may issue thereon. Consultant expressly understands and agrees that any insurance protection required by this Agreement or otherwise provided by Consultant shall in no way limit the responsibility to indemnify, keep and save harmless and defend the City or its officers, employees, agents and instrumentalities as herein provided. One percent ( 1%) of the contract amount shall represent the consideration to be provided for this indemnification. Nothing contained herein shall be deemed a waiver of sovereign immunity.

148.    On repeated occasions, the City requested that URS Southern indemnify it for claims by Skanska arising out of URS Southern's errors, omissions, and negligence in designing and administering the Project.

27

149.    On repeated occasions, the City provided URS Southern with the reasonable opportunity to participate in the negotiations and settlement discussions with the City and Skanska regarding the claims arising out of URS Southern's errors, omissions, and negligence in designing and administering the Project.

150.    URS Southern breached its indemnity obligations by failing and refusing to indemnify the City for claims and damages which arose out of URS Southern's errors, omissions, and negligence in designing and administering the Project.

151.    URS Southern failed to fully participate in the negotiations and settlement discussions between the City and Skanska and failed to provide a full analysis of the additional time and costs claimed by Skanska against the City.

152.    Based upon URS Southern's refusal to agree to indemnify the City from such claims and damages as well as URS Southern's failure to provide a complete evaluation of Skanska's claims, the City and Skanska were forced to mitigate their respective damages by entering into a reasonable settlement with each other that covers the additional time and costs associated with URS Southern's deficient design and administration of Phase 2 and Phase 3.

153.    Skanska's claims against the City and the City's claims against URS Southern, all of which arose from the improper design and administration of the Project, were caused solely by the errors, omissions or negligence of URS Southern.

154.    URS Southern is responsible to indemnify the City for the entire amount of Skanska's claims against the City, plus any additional engineering and construction administration costs incurred by City.

155.    Based upon URS Southern's failure to discharge its contractual indemnity obligations to the City, the City incurred special damages, including but not limited to, legal fees

28

and consultant's fees to analyze Skanska's claims as to entitlement and amount and to negotiate a resolution of Skanska's claims.

156.    The City was also forced to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with URS Southern's design deficiencies.

157.    As a result of URS Southern's breach of its indemnity obligations, the City was damaged in excess of $6,000,000.00, the exact amount of which to be proven at trial.

158.    The City has retained the undersigned firm to represent it in this matter and has obligated itself to pay a reasonable attorney's fee their services.  Pursuant to Article 18 of the Professional Services Agreement, URS Southern is liable for said attorney's fees.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays this Court enter judgment against Defendant, URS Corporation Southern, awarding general and special damages, pre-judgment interest, attorney's fees and court costs, along with such further relief as the Court deems just and proper.

## COUNT IV – CONTRACTUAL INDEMNITY AGAINST URS CORP. (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 6-7 and 9 through 123, above as if fully set forth herein and further alleges:

159.    This count is brought against URS Corp. based on URS Corp. binding itself to the requirements of the Design Agreement by executing the Amendment and based on URS Corp. and URS Southern interchangeably providing design and construction administration services to the City under the Design Agreement.

160.    Pursuant to Section 16.1 of the Professional Services Agreement, URS Corp. agreed as follows:

Consultant shall indemnify and hold harmless the City and its officers, employees, agents and instrumentalities from any and all liability, losses or damages, including attorneys' fees and costs of defense, which the City or its officers, employees, agents or instrumentalities may incur as a result of claims, demands, suits, causes of actions or proceedings of any kind or nature arising out of, relating to or resulting from the negligent performance of this Agreement by the Consultant or its employees, agents, servants, partners, principals or sub-Consultants. Consultant shall pay all claims and losses in connection therewith and shall investigate and defend all claims, suits or actions of any kind or nature in the name of the City, where applicable, including appellate proceedings, and shall pay all costs, judgments, and attorney's fees which may issue thereon. Consultant expressly understands and agrees that any insurance protection required by this Agreement or otherwise provided by Consultant shall in no way limit the responsibility to indemnify, keep and save harmless and defend the City or its officers, employees, agents and instrumentalities as herein provided. One percent ( 1%) of the contract amount shall represent the consideration to be provided for this indemnification. Nothing contained herein shall be deemed a waiver of sovereign immunity.

161.    On repeated occasions, the City requested that URS Corp. indemnify it for claims by Skanska arising out of URS Corp.'s errors, omissions, and negligence in designing and administering the Project.

162.    On repeated occasions, the City provided URS Corp. with the reasonable opportunity to participate in the negotiations and settlement discussions with the City and Skanska regarding the claims arising out of URS Corp.'s errors, omissions, and negligence in designing and administering the Project.

163.    URS Corp. breached its indemnity obligation by failing and refusing to indemnify the City for claims and damages which arose out of URS Corp.'s errors, omissions, and negligence in designing and administering the Project.

164.    URS Corp. failed to fully participate in the negotiations and settlement discussions between the City and Skanska and failed to provide a full analysis of the additional time and costs claimed by Skanska against the City.

165.    Based upon URS Corp.'s refusal to agree to indemnify the City from such claims and damages as well as URS Corp.'s failure to provide a complete evaluation of Skanska's claims, the City and Skanska were forced to mitigate their respective damages by entering into a reasonable settlement with each other that covers the additional time and costs associated with URS Corp.'s deficient design and administration of Phase 2 and Phase 3.

166.    Skanska's claims against the City and the City's claims against URS Corp., all of which arose from the improper design and administration of the Project, were caused solely by the errors, omissions or negligence of URS Corp.

167.    URS Corp. is responsible to indemnify the City for the entire amount of Skanska's claims against the City, plus any additional engineering and construction administration costs incurred by City.

168.    Based upon URS Corp.'s failure to discharge its contractual indemnity obligations to the City, the City incurred special damages, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and amount and to negotiate a resolution of Skanska's claims.

169.    The City was also forced to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with URS Corp.'s design deficiencies.

170.    As a result of URS Corp.'s breach of its indemnity obligations, the City was damaged in excess of $6,000,000.00, the exact amount of which to be proven at trial.

171.    The City has retained the undersigned firm to represent it in this matter and has obligated itself to pay a reasonable attorney's fee their services.  Pursuant to Article 18 of the Professional Services Agreement, URS Corp. is liable for said attorney's fees.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays this Court enter judgment against Defendant, URS Corporation, awarding general and special damages, pre-judgment interest, attorney's fees and court costs, along with such further relief as the Court deems just and proper.

### COUNT V – COMMON LAW INDEMNITY AGAINST URS SOUTHERN (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 4, 5 and 9 through 123, above as if fully set forth herein and further alleges:

172.   As a licensed professional engineer, URS Southern had a duty to:

    a.   Properly specify the extent and scope of the work to be performed on the Project;

    b.   Design the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

    c.   Independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

    d.   Guard against defects in its work and the work of its sub-consultants, if any;

    e.   Prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

    f.   Properly design the Project;

    g.   Properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

    h.   Timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

    i.   Timely respond to requests for information and clarification sought during the construction phase of the Project;

    j.   Timely correct defects and deficiencies in the design provided by URS Southern identified before and during the construction phase of the Project; and

        k.   Properly provide construction administration services as required.

173.    URS Southern breached these duties by, among other things, failing to prepare adequate and accurate plans and specifications from which Skanska could properly construct the Project, failing to design the Project in accordance with applicable codes and within the standard of care applicable to similar design professionals providing similar services in the community where the Project is located, failing to timely and properly perform the construction administration responsibilities during the Project in accordance with the standard of care applicable to similar design professionals providing similar services in the community where the Project is located, and failing to timely and properly correct the improper design of the Project.

174.    As a result of these breaches, Skanksa incurred damages and claimed against the City, and therefore, URS Southern owed a duty to the City to indemnify the City from these claims and reimburse the City for damages incurred as a result of the breaches of its duties as a licensed design professional.

175.    URS Southern breached this duty by failing to discharge the City's liability to Skanska arising out of the deficient design and administration services provided by URS Southern to the City and by failing to reimburse the City for damages incurred as a result of URS Southern's design and administration deficiencies.

176.    Based upon URS Southern's failure to discharge its indemnity obligations to the City, the City was required to discharge URS Southern's obligations by reimbursing Skanska for the damages incurred as a result of URS Southern's improper design and administration services.

177.    In discharging its liability to Skanska resulting from URS Southern's design and administration deficiencies, the City was forced to incur additional costs, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and

amount.  The City was also forced to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with URS Southern's design deficiencies.  All of these costs are recoverable as special damages from URS Southern.

178.    The City's duty to discharge URS Southern's liability for the improper design and administration of the Project was solely the result of the City's vicarious, constructive, derivative or technical liability to Skanska, as URS Southern was solely responsible for the design and administration of the Project.

179.    The City is wholly without any fault for the deficient design and administration of the Project and for the damages claimed.

180.    The City suffered damages in excess of $6,000,000.00 by discharging the liability of URS Southern for the improper design and administration of the Project, the exact amount of which to be proven at trial.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays this Court enter judgment against Defendant, URS Corporation Southern, awarding general and special damages, interest and court costs, along with such further relief as the Court deems just and proper.

### COUNT VI – COMMON LAW INDEMNITY AGAINST URS CORP. (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 6-7 and 9 through 123, above as if fully set forth herein and further alleges:

181.    This count is brought against URS Corp. based on URS Corp. and URS Southern interchangeably providing design and construction administration services to the City on the Project.

182.    As a licensed professional engineer, URS Corp. had a duty to:

34

a.  Properly specify the extent and scope of the work to be performed on the Project;

b.  Design the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

c.  Independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

d.  Guard against defects in its work and the work of its sub-consultants, if any;

e.  Prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

f.  Properly design the Project;

g.  Properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

h.  Timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

i.  Timely respond to requests for information and clarification sought during the construction phase of the Project;

j.  Timely correct defects and deficiencies in the design provided by URS Corp. identified before and during the construction phase of the Project; and

k.  Properly provide construction administration services as required.

183.  URS Corp. breached these duties by, among other things, failing to prepare adequate and accurate plans and specifications from which Skanska could properly construct the Project, failing to design the Project in accordance with applicable codes and within the standard of care applicable to similar design professionals providing similar services in the community where the Project is located, failing to timely and properly perform the construction administration responsibilities during the Project in accordance with the standard of care applicable to similar design professionals providing similar services in the community where the Project is located, and failing to timely and properly correct the improper design of the Project.

184.     As a result of these breaches, Skanska incurred damages and claimed against the City, and therefore, URS Corp. owed a duty to the City to indemnify the City from these claims and reimburse the City for damages incurred as a result of the breaches of its duties as a licensed design professional.

185.     URS Corp. breached this duty by failing to discharge the City's liability to Skanska arising out of the deficient design and administration services provided by URS Corp. to the City and by failing to reimburse the City for damages incurred as a result of URS Corp.'s design and administration deficiencies.

186.     Based upon URS Corp.'s failure to discharge its indemnity obligations to the City, the City was required to discharge URS Corp.'s obligations by reimbursing Skanska for the damages incurred as a result of URS Corp.'s improper design and administration services.

187.     In discharging its liability to Skanska resulting from URS Corp.'s design and administration deficiencies, the City was forced to incur additional costs, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and amount.  The City was also forced to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with URS Corp.'s design deficiencies.  All of these costs are recoverable as special damages from URS Corp.

188.     The City's duty to discharge URS Corp.'s liability for the improper design and administration of the Project was solely the result of the City's vicarious, constructive, derivative or technical liability to Skanska, as URS Corp. was solely responsible for the design and administration of the Project.

36

189.    The City is wholly without any fault for the deficient design and administration of the Project and for the damages claimed.

190.    The City suffered damages in excess of $6,000,000.00 by discharging the liability of URS Corp. for the improper design and administration of the Project, the exact amount of which to be proven at trial.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays this Court enter judgment against Defendant, URS Corporation, awarding general and special damages, interest and court costs, along with such further relief as the Court deems just and proper.

## COUNT VII – PROFESSIONAL NEGLIGENCE AGAINST URS SOUTHERN (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 4, 5 and 9 through 123, above as if fully set forth herein and further alleges:

191.    URS Southern, as a licensed professional engineer, owed the City a duty to:

a.  Properly specify the extent and scope of the work to be performed on the Project;

b.  Design the Project within the standard of care of the industry and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

c.  Independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

d.  Guard against defects in its work and the work of its sub-consultants, if any;

e.  Prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

f.  Properly design the Project;

g.  Properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

37

      h.   Timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

      i.   Timely respond to requests for information and clarification sought during the construction phase of the Project;

      j.   Timely correct defects and deficiencies in the design provided by URS Southern identified before and during the construction phase of the Project; and

      k.   Properly provide construction administration services as required.

192.   URS Southern breached these duties by, among other things, failing to prepare adequate and accurate plans and specifications from which Skanska could properly construct the Project, failing to design the Project in accordance with applicable codes and within the standard of care applicable to similar design professionals providing similar services in the community where the Project is located, failing to timely and properly perform its construction administration responsibilities during the Project in accordance with the standard of care applicable to similar design professionals providing similar services in the community where the Project is located and failing to timely and properly correct its improper design of the Project.

193.   As a direct and proximate result of URS Southern's negligence, the City incurred special damages, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and amount and to negotiate a resolution of Skanska's claims. The City was also forced to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with the design deficiencies.

194.   As a direct and proximate result of URS Southern's breaches of its professional obligations, the City was damaged in excess of $6,000,000.00, the exact amount of which to be proven at trial.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays that this Court enter judgment against Defendant, URS Corporation Southern, awarding general  and special damages, interest, court costs and such further relief as the Court deems just and proper.

### COUNT VIII – PROFESSIONAL NEGLIGENCE AGAINST URS CORP.
### (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2, 6-7 and 9 through 123, above as if fully set forth herein and further alleges:

195.    This count is brought against URS Corp. based on URS Corp. and URS Southern interchangeably providing design and construction administration services to the City on the Project.

196.    URS Corp., acting as a licensed professional engineer, owed the City a duty to:

a.    Properly specify the extent and scope of the work to be performed on the Project;

b.    Design the Project within the standard of care of the industry and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

c.    Independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

d.    Guard against defects in its work and the work of its sub-consultants, if any;

e.    Prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

f.    Properly design the Project;

g.    Properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

h.    Timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

i.    Timely respond to requests for information and clarification sought during the construction phase of the Project;

j. Timely correct defects and deficiencies in the design provided by URS Corp. identified before and during the construction phase of the Project; and

k. Properly provide construction administration services as required.

197. URS Corp. breached these duties by, among other things, failing to prepare adequate and accurate plans and specifications from which Skanska could properly construct the Project, failing to design the Project in accordance with applicable codes and within the standard of care applicable to similar design professionals providing similar services in the community where the Project is located, failing to timely and properly perform its construction administration responsibilities during the Project in accordance with the standard of care applicable to similar design professionals providing similar services in the community where the Project is located and failing to timely and properly correct its improper design of the Project.

198. As a direct and proximate result of URS Corp.'s negligence, the City incurred special damages, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and amount and to negotiate a resolution of Skanska's claims. The City was also forced to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with the design deficiencies.

199. As a direct and proximate result of URS Corp.'s breaches of its professional obligations, the City was damaged in excess of $6,000,000.00, the exact amount of which to be proven at trial.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays that this Court enter judgment against Defendant, URS Corporation, awarding general and special damages, interest, court costs and such further relief as the Court deems just and proper.

112724103.2

## COUNT IX – PROFESSIONAL NEGLIGENCE AGAINST URS SOUTHERN
## (BY SKANSKA ONLY)

Skanska re-alleges paragraphs 1, 3-5 and 9 through 123, above as if fully set forth herein and further alleges:

200.    When URS Southern prepared the plans and specifications for the Project, it knew, or reasonably should have known, that the City would supply them to a contractor, such as Skanska, in order to prepare a bid and, if hired, construct the Project.

201.    When URS Southern prepared the plans and specifications for the Project, it knew, or reasonably should have known, that the contractor retained by the City, such as Skanska, would rely on the design to construct the Project.

202.    When URS Southern prepared the plans and specifications for the Project, it knew, or reasonably should have known, that the contractor retained by the City, such as Skanska, would be injured by the failure to provide adequate plans and specifications for the Project.

203.    URS Southern, acting as the licensed professional engineer responsible for the design and administration of the Project, owed Skanska a duty to:

     a.  Properly specify the extent and scope of the work to be performed on the Project;

     b.  Design the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

     c.  Independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

     d.  Guard against defects in its work and the work of its sub-consultants, if any;

     e.  Prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

     f.  Properly design the Project;

41

g.  Properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

h.  Timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

i.  Timely respond to requests for information and clarification sought during the construction phase of the Project;

j.  Timely correct defects and deficiencies in the design provided by URS Southern identified before and during the construction phase of the Project; and

k.  Properly provide construction administration services as required.

204.    Skanska reasonably relied on the plans and specifications prepared by URS Southern in the preparation and submission of its bid to the City for the Project and in its efforts to construct the Project.

205.    Under the Prime Contract, Skanska was obligated to construct the Project in accordance with the design documents prepared by URS Southern and was therefore justified in its reliance on the plans and specifications prepared by URS Southern.

206.    URS Southern breached its professional duties by failing to properly prepare the design of the Project and failing to timely and properly administer the construction of the Project.

207.    As a direct and proximate result of URS Southern's negligence, Skanska has suffered general and special damages in excess of $4,900,000.00, the exact amount of which to be proven at trial, including but not limited to the costs of removing and replacing work in progress, performing additional work, and re-sequencing work, as well as other damages for delays, impacts, disruptions, and inefficiencies in performing the work.

42

WHEREFORE, Co-Plaintiff, Skanska USA Building Inc., prays this Court enter judgment against Defendant, URS Corporation Southern, awarding general and special damages, interest, court costs and such further relief as the Court deems just and proper.

## COUNT X – PROFESSIONAL NEGLIGENCE AGAINST URS CORP.
## (BY SKANSKA ONLY)

Skanska re-alleges paragraphs 1, 3, 6-7 and 9 through 123, above as if fully set forth herein and further alleges:

208.   This count is against URS Corp. based on URS Corp. and URS Southern interchangeably providing design and construction administration services on the Project.

209.   When URS Corp. prepared the plans and specifications for the Project, it knew, or reasonably should have known, that the City would supply them to a contractor, such as Skanska, in order to prepare a bid and, if hired, construct the Project.

210.   When URS Corp. prepared the plans and specifications for the Project, it knew, or reasonably should have known, that the contractor retained by the City, such as Skanska, would rely on the design to construct the Project.

211.   When URS Corp. prepared the plans and specifications for the Project, it knew, or reasonably should have known, that the contractor retained by the City, such as Skanska, would be injured by the failure to provide adequate plans and specifications for the Project.

212.   URS Corp., acting as the licensed professional engineer responsible for the design and administration of the Project, owed Skanska a duty to:

   a.   Properly specify the extent and scope of the work to be performed on the Project;

   b.   Design the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

43

112724103.2

    c.   Independently perform a Quality Control review of the design for each design discipline prior to issuing final Construction Documents;

    d.   Guard against defects in its work and the work of its sub-consultants, if any;

    e.   Prepare proper and sufficient plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

    f.   Properly design the Project;

    g.   Properly coordinate each of the design disciplines constituting the different elements of the overall Project design to ensure that there were no conflicts between the various sets of drawings;

    h.   Timely revise the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

    i.   Timely respond to requests for information and clarification sought during the construction phase of the Project;

    j.   Timely correct defects and deficiencies in the design provided by URS Corp. identified before and during the construction phase of the Project; and

    k.   Properly provide construction administration services as required.

213.   Skanska reasonably relied on the plans and specifications prepared by URS Corp. in the preparation and submission of its bid to the City for the Project and in its efforts to construct the Project.

214.   Under the Prime Contract, Skanska was obligated to construct the Project in accordance with the design documents prepared by URS Corp. and was therefore justified in its reliance on the plans and specifications prepared by URS Corp.

215.   URS Corp. breached its professional duties by failing to properly prepare the design of the Project and failing to timely and properly administer the construction of the Project.

216.   As a direct and proximate result of URS Corp.'s negligence, Skanska has suffered general and special damages in excess of $4,900,000.00, the exact amount of which to be proven at trial, including but not limited to the costs of removing and replacing work in progress,

performing additional work, and re-sequencing work, as well as other damages for delays, impacts, disruptions, and inefficiencies in performing the work.

WHEREFORE, Co-Plaintiff, Skanska USA Building Inc., prays this Court enter judgment against Defendant, URS Corporation, awarding general and special damages, interest, court costs and such further relief as the Court deems just and proper.

## COUNT XI -- PROFESSIONAL NEGLIGENCE AGAINST MR. ZIMPELMAN (BY THE CITY ONLY)

The City re-alleges paragraphs 1, 2 and 8 through 123, above as if fully set forth herein and further alleges:

217. Mr. Zimpelman, acting as a licensed Professional Engineer responsible for the structural design of the Project, owed the City a duty to:

    a. Properly specify the extent and scope of the structural work to be performed on the Project;

    b. Design the structural elements of the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

    c. Prepare proper and sufficient structural plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

    d. Properly design the structural elements of the Project;

    e. Timely revise the structural design of the Project to respond to comments provided by the Authorities Having Jurisdiction over the Project;

    f. Properly respond to requests for information and clarification sought during the construction phase of the Project regarding structural elements of the Work; and

    g. Timely correct defects and deficiencies in the structural design that were identified before and during the construction phase of the Project.

218. Mr. Zimpelman breached these duties by, among other things, failing to prepare adequate and accurate structural plans and specifications from which Skanska could properly

112724103.2

construct the Project, failing to design the structural elements of the Project in accordance with applicable codes and within the standard of care applicable to similar design professionals providing similar services in the community where the Project is located, failing to properly respond to requests for information and clarification regarding the structural elements of the Work, and failing to timely and properly correct his improper structural design of the Project.

219.   As the direct and proximate result of Mr. Zimpelman's negligence, the City incurred special damages, including but not limited to, legal fees and consultant's fees to analyze Skanska's claims as to entitlement and amount and to negotiate a resolution of Skanska's claims. The City was also forced to incur additional administrative costs, extended bond and insurance costs, additional financing costs, additional rental costs and other miscellaneous costs associated with the structural design deficiencies.

220.   As a direct and proximate result of Mr. Zimpelman's breaches of his professional obligations, the City was damaged in excess of $6,000,000.00, the exact amount of which to be proven at trial.

WHEREFORE, Co-Plaintiff, The City of Miami Gardens, prays that this Court enter judgment against Defendant, Mark W. Zimpelman, awarding general and special damages, interest, court costs and such further relief as the Court deems just and proper.

## COUNT XII -- PROFESSIONAL NEGLIGENCE AGAINST MR. ZIMPELMAN (BY SKANSKA ONLY)

Skanska re-alleges paragraphs 1, 3 and 8 through 123, above as if fully set forth herein and further alleges:

221.   When Mr. Zimpelman prepared the structural plans and specifications for the Project, he knew, or reasonably should have known, that the City would supply them to a contractor, such as Skanska, in order to prepare a bid and, if hired, construct the Project.

222.    When Mr. Zimpelman prepared the structural plans and specifications for the Project, he knew, or reasonably should have known, that the contractor retained by the City, such as Skanska, would rely on his structural design to construct the Project.

223.    When Mr. Zimpelman prepared the structural plans and specifications for the Project, he knew, or reasonably should have known, that the contractor retained by the City, such as Skanska, would be injured by the failure to provide adequate plans and specifications.

224.    Mr. Zimpelman, acting as the licensed professional engineer responsible for the structural design of the Project, owed Skanska a duty to:

      a.  Properly specify the extent and scope of the structural work to be performed on the Project;

      b.  Design the structural elements of the Project within the standard of care of the industry in the locale of the Project and in accordance with all governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements;

      c.  Prepare proper and sufficient structural plans and specifications for Skanska and its subcontractors to rely upon in performing the work to construct the Project;

      d.  Properly design the structural elements of the Project;

      e.  Timely revise the structural elements of the Project design to respond to comments provided by the Authorities Having Jurisdiction over the Project;

      f.  Properly respond to requests for information and clarification sought during the construction phase of the Project regarding structural elements of the Work; and

      g.  Timely correct defects and deficiencies in the structural design provided by URS identified before and during the construction phase of the Project.

225.    Skanska reasonably relied on the structural plans and specifications prepared by Mr. Zimpelman in the preparation and submission of its bid to the City for the Project and in its efforts to construct the Project. Skanska also reasonably relied upon Mr. Zimpelman's responses to requests for information and clarification regarding structural elements of the Work.

226.    Under the Prime Contract, Skanska was obligated to construct the Project in accordance with the design documents prepared by Mr. Zimpelman for URS Corp. and/or URS Southern, including such responses, and was therefore justified in its reliance on the plans, specifications, and responses prepared by Mr. Zimpelman.

227.    Mr. Zimpelman breached his professional duties by failing to properly prepare the structural design of the Project and failing to properly respond to requests for information and clarification regarding the structural elements of the Work.

228.    As a direct and proximate result of Mr. Zimpelman's negligence, Skanska has suffered general and special damages in excess of $4,900,000.00 the exact amount of which to be proven at trial, including but not limited to the costs of removing and replacing work in progress, performing additional work, and re-sequencing work, as well as other damages for delays, impacts, disruptions, and inefficiencies in performing the work.

WHEREFORE, Co-Plaintiff, Skanska USA Building Inc., prays this Court enter judgment against Defendant, Mark W. Zimpelman, awarding general and special damages, interest, court costs and such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The City and Skanska hereby demand a jury trial for all issues so triable.

Respectfully submitted this 15th day of October, 2015.

> Arnstein & Lehr LLP
> Attorneys for Co-Plaintiff,
> *City of Miami Gardens*
> 200 E. Las Olas Blvd., Suite 1000
> Ft. Lauderdale, FL 33301
> Telephone:    954-713-7600
> Email:        glbrown@arnstein.com
>               jmatlas@arnstein.com
>               lkdunne@arnstein.com

48

jgutierrez@arnstein.com
FTL-ctdocs@arnstein.com

By: /s/ Joshua M. Atlas
      Gary L. Brown
      Florida Bar No. 0054585
      Joshua M. Atlas
      Florida Bar No. 0790761
*and*

May, Meacham & Davell PA
Attorneys for Co-Plaintiff,
*Skanska USA Building Inc.*
One Financial Plaza, Suite 2602
Ft. Lauderdale, FL 33394
Telephone: 954-763-6006
Email:      wdavell@mmdpa.com
             cbarber@mmdpa.com
             lpriddie@mmdpa.com

By: /s/ William C. Davell
      William C. Davell
      Florida Bar No. 210481
      Christopher D. Barber
      Florida Bar No. 909051

112724103.2

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that on October 15, 2015, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Arnstein & Lehr LLP
Attorneys for Co-Plaintiff,
*City of Miami Gardens*
200 E. Las Olas Blvd., Suite 1000
Ft. Lauderdale, FL 33301
Telephone:    954-713-7600
Email:          glbrown@arnstein.com
                   jmatlas@arnstein.com
                   lkdunne@arnstein.com
                   jgutierrez@arnstein.com
                   FTL-ctdocs@arnstein.com


By: /s/ Joshua M. Atlas
       Gary L. Brown
       Florida Bar No. 0054585
       Joshua M. Atlas
       Florida Bar No. 0790761
*and*


May, Meacham & Davell PA
Attorneys for Co-Plaintiff,
*Skanska USA Building Inc.*
One Financial Plaza, Suite 2602
Ft. Lauderdale, FL 33394
Telephone: 954-763-6006
Email:          wdavell@mmdpa.com
                   cbarber@mmdpa.com
                   lpriddie@mmdpa.com


By: /s/ William C. Davell
       William C. Davell
       Florida Bar No. 210481
       Christopher D. Barber
       Florida Bar No. 909051

112724103.2

## <u>SERVICE LIST</u>

***Counsel for Mark W. Zimpelman***
Brian A. Wolf, Esq.
Gene Polyak, Esq.
Daniel M. Carrico, Esq.
**SMITH, CURRIE & HANCOCK LLP**
101 N.E. Third Avenue, Suite 1910 Fort
Lauderdale, Florida 33301
E-mail: bawolf@smithcurrie.com
E-mail: dmcarrico@smithcurrie.com
E-mail: epolyak@smithcurrie.com
E-mail: rweiner@smithcurrie.com
E-mail: tbrown@smithcurrie.com
E-mail: lcherubin@smithcurrie.com
E-mail: ftlpleadings@smithcurrie.com

112724103.2

# CITY OF MIAMI GARDENS
## NONEXCLUSIVE CONTINUING PROFESSIONAL SERVICES AGREEMENT

THIS AGREEMENT is entered into this 25TH day of FEBRUARY , 2009, between the City of Miami Gardens, a Florida municipal corporation, (City), and URS Corporation Southern, a California for profit Corporation (Consultant).

### WITNESSETH:

WHEREAS, the City desires to hire the Consultant on a continuing, nonexclusive basis to provide continuing architectural; civil; environmental; electrical and mechanical; structural; traffic; survey and planning services (Services) as expressed in the City's Request for Qualifications No.08-09-006, which was advertised on September 16, 2008, and to which Consultant responded a copy of which is also incorporated herein by reference and as more particularly described below; and

WHEREAS, the Consultant has expressed the capability and desire to perform the Services described in Exhibit "1" attached hereto and by this reference incorporated herein as described in the City's Request for Qualifications and Consultant's response thereto; and

WHEREAS, the City's Request for Qualifications No. 08-09-006 was undertaken in accordance with Section 287.055, Florida Statutes, Florida's Consultant Competitive Negotiation Act and the parties hereto have complied with all the requirements therein.

WHEREAS, the Consultant and City desire to enter into the foregoing Agreement.

NOW, THEREFORE, in consideration of the mutual terms and conditions, the Parties agree as follows:

## ARTICLE 1

1.1    The following documents are incorporated and made part of this Agreement:

- Specifications prepared by the City in its Request for Qualifications No. 08-09-006 (Exhibit 1).

- Proposal for the City prepared by the Consultant dated October 16, 2008 (Exhibit 2).

- The above Recitals are incorporated herein by reference.

RFP#08-09-006
Non-exclusive Contract

1.2     All exhibits may also be collectively referred to as the "Documents". In the event of any conflict between the Documents or any ambiguity or missing specification or instruction, the following priority is established:

- Specific direction from the City Manager (or designee).

- This Agreement and any attachments.

- Exhibit 1

- Exhibit 2

## ARTICLE 2
## SERVICES AND RESPONSIBILITIES

2.1     General

2.1.1     The Consultant agrees, upon issuance of a written work authorization, to perform for the benefit of the City part or all of the Services set forth and described in this Agreement and as provided for in Sections 2 through 5 and the Documents including, but not limited to, traffic, environmental, architectural, civil engineering services, surveying and landscape architectural services, on various projects within the City. Consultant shall perform the Services in accordance with standard industry practice. The Consultant shall guard against defects in its work or its consultants or sub-consultants work.

2.2     Preliminary Services

2.2.1     The Consultant shall, when so directed and as authorized by the City, prepare preliminary studies and reports, feasibility studies, utility rate studies, financial and fiscal studies and evaluation of existing facilities; preparation of schematic layouts and sketches where required; opinions of Construction Cost, and shall consult and confer with the City as may be necessary for the City to reach decisions concerning the subject matter. The Consultant shall attend meetings with the City Council and City staff as may be required.

During this phase, the Consultant shall advise the City, based on Consultant's professional opinion and the current project conditions and reasonably foreseeable conditions, of the completeness of existing data and its suitability for the intended purposes of the project; advise the City on the necessity to obtain data from other sources; identify and analyze requirements of governmental authorities having jurisdiction to approve the design of the project; provide analyses of the City's needs for surveys, site evaluations and comparative studies of prospective sites

and solutions; and prepare and furnish six (6) copies of a report setting forth the Consultant's findings and recommendations.

2.2.2   Preliminary design services to be performed by the Consultant shall include consultation and advice concerning the extent and scope of proposed work and preparation of preliminary design documents consisting of design criteria, preliminary drawings, and outline specifications as well as preliminary estimates of probable Construction Costs. This phase will also include preparation of a preliminary site plan or schematic drawings when appropriate.  Up to six (6) copies of the preliminary design documents shall be furnished to the City, the exact number needed shall be determined by the City.

2.2.3   Upon authorization of the City, the Consultant will provide advice and assistance relating to operation and maintenance of project or other systems; evaluate and report on operations; assist the City in matters relating to regulatory agency operations review or operating permit noncompliance; assist with startup and operator training for newly installed or modified equipment and processes, and in the preparation of operating, maintenance and staffing manuals for the project.

2.3   Basic Services

2.3.1   The Consultant shall, when so directed and authorized by the City, consult and advise the City in the following manner:  specifying the extent and scope of the work to be performed;  preparing detailed construction drawings and specifications;  revising and updating, where necessary, previously designed construction plans and specifications, whether in whole or in part, to be incorporated into the proposed work, and preparing contract documents and a final estimate of Construction Cost. The final design services shall be provide in an electronic format, and shall also include furnishing up to (6) copies of plans and specifications to the City; the exact number needed shall be determined by the City.

Final design services shall also include preparation of permit applications as may be required by such agencies as have legal review authority over the project. These applications shall include, but not be limited to site plan approvals, driveway permits or other permits and work efforts  and shall also consist of meeting at the staff level and  meetings with the appropriate governing body and the City.  Unless specifically provided for under the final design phase, permit application services do not include applications requiring environmental impact statements or environmental assessments, consumptive use permits or landfill permits.

2.3.2   The Consultant, based upon the approved Design Documents and any adjustments authorized by the City in each Project, project schedule or construction budget, shall prepare, for approval by the City, Design Development Documents consisting of drawings and other documents to fix and describe the size and character of each Project's architectural, structural, mechanical and electrical systems and any other requirements or systems, materials and such other elements as may be appropriate.   The Consultant shall also advise the City of any adjustments to the preliminary estimate of Construction Costs.

2.3.3   The Consultant, based upon City approved Design Development Documents and any further adjustments in the scope or quality of each Project or in the construction budget, shall prepare Construction Documents within the number of calendar days specified within any notice issued by the City.  The Construction Documents shall consist of Drawings and Specifications setting forth in detail the requirements for the construction of each Project.

2.3.4   The Consultant shall assist the City in the preparation of the necessary proposal information and forms.

2.3.5   The Consultant shall advise the City of any adjustments to previous preliminary estimates of Construction Costs indicated by changes in requirements or general market conditions.

2.3.6   The Consultant shall submit to the City, for each project, electronic format and six (6) copies of the Construction Documents, and a further revised estimate of total Construction Cost.

2.3.7   Consultant shall include in the Construction Documents a requirement that the Construction Contractor shall provide a final as-built survey of each Project by a Registered Surveyor, and provide marked up construction drawings to Consultant so that the Consultant can prepare and deliver to the City the record drawings in the form required by the City and as required.

2.3.8   Prior to final approval of the Construction Documents by the City, the Consultant shall conduct a preliminary check of any Work Products to ensure compliance with requirements of any local, state or federal agency from which a permit or other approval is required.  The Consultant shall insure that all necessary approvals have taken place.

2.3.9   The Consultant shall signify responsibility for the Construction Documents and drawings prepared pursuant to this Agreement by affixing a signature, date and seal as required by Chapters 471 and 481, Florida Statutes, if applicable. The

Consultant shall comply with all of its governing laws, rules, regulations, codes, directives and other applicable federal, state and local requirements.

2.4     The Consultant, following the City's approval of the Construction Documents and of the latest preliminary estimate of Construction Cost, shall, when so directed and authorized by the City, assist the City in obtaining bids or negotiated proposals and assist in awarding and preparing contracts for construction.

2.4.1   The Consultant shall review and analyze the proposals received by the City, and shall make a recommendation for any award based on the City's Procurement Ordinance.

2.4.2   Should the lowest responsible, responsive proposal, as recommended by Consultant, exceed the Estimated Total Construction Cost of the Final Design Plan exceed 25% for small projects (equal to or less than $1 million) or 10% for large projects (more than     $1 million), Consultant, at no additional cost to the City, shall meet with the City's representatives to identify ways to reduce costs to bring the Project cost to within the Estimated Total Construction Cost of the Final Design Plan. Should the lowest responsible, responsive proposal, as recommended by Consultant, exceed 25% for small projects or 10% on large projects, Consultant shall meet with the City to identify ways to reduce costs to bring the Project cost within the Estimated Total Construction Cost, and if after meeting with the City, the City determines that they can not identify ways to reduce costs, Consultant will be required to redesign portions of the Project to bring the cost of the Project within the Estimated Total Construction Cost of the Final Design Plan, at no additional expense to the City. If the Project is not advertised for bids within 3 months after delivery of Final Design Plans, through no fault of Consultant or if industry-wide prices are changed because of unusual or unanticipated events affecting the general level of prices or times of delivery in the construction industry, the established Construction Cost limit may be adjusted as determined by the City's representative and as approved by the City if necessary. If a Project scope of work is expanded by the City after the Consultant renders the Estimated Construction Cost of the Final Design Plans, the Consultant shall not be responsible for any redesign without compensation which shall be mutually agreed to by the parties hereto. Under no circumstances shall the Consultant be held liable for damages or be required to perform any services without compensation if the lowest responsive proposal is less than the Estimated Total Construction Cost of the Final Design Plan.

2.4.3   The Consultant shall provide the City with a list of recommended, prospective bidders.

2.4.4   The Consultant shall attend all pre-proposal conferences.

2.4.5  The Consultant shall recommend any addenda, through the City's representative, as appropriate to clarify, correct, or change Proposal Documents.

2.4.6  If Pre-Qualification of bidders is required as set forth in the Request for Proposal, Consultant shall assist the City, if requested, in developing qualification criteria, review qualifications and recommend acceptance or rejection of the bidders.

2.4.7  If requested, Consultant shall evaluate proposals and bidders, and make recommendations regarding any award by the City.

2.5  The City shall make decisions on all claims regarding interpretation of the Construction Documents, and on all other matters relating to the execution and progress of the Work after receiving a recommendation from the Consultant. The Consultant shall check and approve samples, schedules, shop drawings and other submissions for conformance with the concept of each Project, and for compliance with the information given by the Construction Documents. The Consultant shall also prepare Change Orders, assemble written guarantees required of the Contractor, and approve progress payments to the Contractor based on each Project Schedule of Values and the percentage of Work completed.

2.5.1  The City shall maintain a record of all change orders which shall be categorized according to the various types, causes, etc. that it may be determined are useful and necessary for its purpose. Among those shall be change orders which are identified as architectural/engineering errors or omissions. An error determined to be caused solely by the Consultant and the costs of which would not otherwise have been a necessary expense to the City for the project, shall be considered for purposes of this agreement to be an additional cost to the City which would not be incurred without the error.

If the Consultant is not the Construction Manager for the construction, the City shall notify the Consultant within 3 days of the discovery of any architectural/engineering error or omission so that the Consultant can be part of the negotiations resolving the claim between the City and the Contractor. So long as the total additional cost of construction for all errors caused solely by the Consultant remain less than Five Percent (5%) of the total construction cost of the project, the City shall not look to the Consultant and/or its insurer for reimbursement for additional costs caused by errors and omissions. However, the Consultant shall be required to provide, at no cost to the City, services including redesign if necessary to resolve the error or omission. Should the sum of the additional construction costs for errors in total exceed Five Percent (5%) of the total construction cost, the City shall be entitled to recover the full and total additional cost to the City as a result of Consultant errors and omissions from the Consultant. To obtain such recovery, the

City shall deduct from the Consultant's fee a sufficient amount to recover all such additional cost to the City up to the amount of the Consultant's insurance deductible. Should additional costs incurred by the City exceed the Consultant's insurance deductible, the City shall look to the Consultant and the Consultant's insurer for the remaining amount of additional construction costs incurred by the City. The recovery of additional costs to the City under this paragraph shall not limit or preclude recovery for other separate and/or additional damages which the City may otherwise incur.

2.6     The Consultant shall carefully review and examine the Contractor's Schedule of Values, together with any supporting documentation. The purpose of such review and examination will be to protect the City from an unbalanced Schedule of Values which allocates greater value to certain elements of each Project than is indicated by industry standards, supporting documentation, or data. If the Schedule of Values is not found to be appropriate, it shall be returned to the Contractor for revision or supporting documentation. After making such examination, when the Schedule of Values is found to be appropriate, the Consultant shall sign the Schedule of Values indicating informed belief that the Schedule of Values constitutes a reasonable, balanced basis for payment of the Contract price to the Contractor.

2.7     The Consultant shall perform on-site construction observation of each Project based on the Construction Documents in accordance with Paragraph 2.12 of this Agreement. The Consultant's observation shall determine the progress and quality of the work, and whether the work is proceeding in accordance with the Construction Documents. The Consultant will provide the City with a written report of each site visit in order to inform the City of the progress of the Work. The Consultant shall endeavor to guard the City against defects and deficiencies in the work of Contractors, and make written recommendation to the City where the Work fails to conform to the Construction Documents. Based on such observation and the Contractor's Application for Payment, the Consultant shall determine the amount due to the Contractor and shall issue Certificates for Payment in such amount. These Certificates will constitute a representation to the City, based on such observations and the data comprising the Application for Payment that the work has progressed to the point indicated. By issuing a Certificate for Payment, the Consultant will also represent to the City that, to the best of its information and belief, based on what its observations have revealed, the work is in accordance with the Construction Documents. The Consultant shall conduct observations to determine the dates of substantial and final completion and issue a recommendation for final Payment.

2.8     The Consultant shall revise the Construction Drawings and submit record or corrected drawings to the City to show those changes made during the construction process, based on the marked up prints, drawings and other data furnished by the Contractor.

2.9     The Consultant shall attend regularly scheduled progress meetings on site.

2.10    The Consultant shall prepare construction Change Orders for the City's approval. Consultant shall not authorize any changes in the work or time, no matter how minor, without prior written approval of City.

2.11    Each project's construction or demolition shall be considered complete upon compilation of a punch list by Consultant, written notification to Contractor by Consultant of all releases of lien and written recommendation by Consultant of final payment to the Contractor, which shall be the sole decision of the City.

2.12    Resident Project Services.  During the construction progress of any work the Consultant will, if authorized by the City, provide resident project inspection services to be performed by one or more authorized employees ("Resident Project Representative") of the Consultant. Resident project representatives shall provide extensive inspection services at the project site during construction. The Resident Project Representative will endeavor to provide protection for the City against defects and deficiencies in the work of the Contractor(s).  Resident project inspection services shall include, but is not limited to, the following:

❑  Conducting all preconstruction conferences;

❑  Conducting all necessary construction progress meetings;

❑  Observation of the work in progress, to the extent authorized by the City;

❑  Receipt, review coordination and disbursement of shop drawings and other submittals;

❑  Maintenance and preparation of progress reports;

❑  Field inspection and approval of materials for conformance to the specifications;

❑  Field observation and verification of quantities of equipment and materials installed;

❑  Verification of contractors' and subcontractors' payrolls and records for compliance with applicable contract requirements;

❑  Maintenance at each Project site, on a current basis, of all drawings, specifications, contracts, samples, permits, and other Project related documents, and at the completion of each Project, deliver all such records to the City;

- ❑ Preparation, update and distribution of a Project Budget with each Project Schedule;

- ❑ Notification to the City immediately if it appears that either each Project Schedule or each Project Budget will not be met;

- ❑ Scheduling and conducting monthly progress meetings, at which City, Engineer, General Contractor, Trade Contractor, Utilities Representative, Suppliers, can jointly discuss such matters as procedures, progress, problems and scheduling;

- ❑ Recommending courses of action, and enforcing courses selected by the City, if so directed by the City, if the General and/or Trade contractors are not meeting the requirements of the plans, specifications, and construction contract;

- ❑ Development and implementation of a system for the preparation, review, and processing of Change Orders;

- ❑ Maintenance of a daily log of each Project;

- ❑ Recording the progress of each Project, and submission of written monthly progress reports to the City, including information on the Contractors' Work, and the percentage of completion;

- ❑ Determination of substantial and final completion of work and preparation of a list of incomplete or unsatisfactory items and a schedule for their completion;

- ❑ Securing and transmitting to the City required guarantees, affidavits, releases, key manuals, record drawings, and maintenance stocks; and

- ❑ Providing artwork, models, or renderings as requested by the City.

The Resident Project Representative shall also investigate and report on complaints and unusual occurrences that may affect the responsibility of the Consultant or the City in connection with the Work.   The Resident Project Representative shall be a person acceptable to the City, and the City shall have the right to employ personnel to inspect the work in progress, provided, however, that such personnel as are employed by the City and such personnel will be responsible directly to the City in the performance of work that would otherwise be assumed and performed by the Consultant.

## **ARTICLE 3**

### **ADDITIONAL SERVICES**

3.1    When authorized pursuant to a written Work Authorization, the Consultant shall furnish the following additional services:

❑ Preparation of applications and supporting documents for private or governmental grants, loans or advances in connection with any particular project.

❑ Services to make measured drawings of or to investigate existing conditions or facilities, or to verify the accuracy of drawings or other information furnished by or to the City.

❑ Services resulting from significant changes in the general scope, extent or character of any particular project or its design including, but not limited to, changes in size, complexity, the City's schedule, character of construction or method of financing, and revising previously accepted studies, reports, design documents or Construction Contract Documents when such revisions are required by changes in laws, rules, regulations, ordinances, codes or orders enacted subsequent to the preparation of such studies, reports or documents, or are due to any other causes beyond the Consultant's control.

❑ Providing renderings or models for the City's use.

❑ Preparing documents for alternate bids requested by the City for work which is not executed or documents for out-of-sequence work.

❑ Investigations and studies involving, but not limited to, detailed consideration of operations, maintenance and overhead expenses; providing value engineering during the course of design; the preparation of feasibility studies, cash flow and economic evaluations, rate schedules and appraisals; assistance in obtaining financing for a project; evaluating processes available for licensing and assisting the City in obtaining process licensing; detailed quantity surveys of material, equipment and labor, and audits or inventories required in connection with construction performed by the City.

❑ Assistance in connection with bid/proposal protests, rebidding or renegotiating contracts for construction, materials, equipment or services, unless the need for such assistance is reasonably determined by the City to be caused by the Consultant (e.g., defective plans and/or specifications which inhibit contractors from submitting bids), in which event there shall be no additional cost for the provision of such services.

❑ Providing any type of property surveys or related engineering services needed for the transfer of interests in real property, and field surveys for design purposes and engineering surveys and staking to enable Contractor to proceed with their work, and providing other special field surveys.

&#9633;  Preparing to serve or serving as a Consultant or witness for the City in any litigation, arbitration or other legal or administrative proceeding.

&#9633;  Additional services in connection with a project not otherwise provided for in this Agreement.

&#9633;  Services in connection with a work directive change or change order requested by the City.

3.2   When required by the Construction Contract Documents in circumstances beyond the Consultant's control, and upon the City's authorization, it will furnish the following additional services:

&#9633;  Services in connection with work changes necessitated by unforeseen conditions encountered during construction.

&#9633;  Services after the award of each contract in evaluating and determining the acceptability of an unreasonable or excessive number of claims submitted by Contractor, except to the extent such claims are caused by the errors or omissions of the Consultant.

&#9633;  Additional or extended services during construction made necessary by (1) work damaged by fire or other cause during construction, (2) a significant amount of defective or negligent work of any Contractor, (3) acceleration of the progress schedule involving services beyond normal working hours, or (4) default by any Contractor; provided, however, if a fire occurs as a direct result of errors or omissions in the design by the Consultant or if the Consultant negligently fails to notify the Contractor of the status of their workmanship pursuant to Consultant's duties as described in the Contract Documents, the Consultant's additional construction services related to the remedy shall be deemed part of Basic Services and compensated as such.

&#9633;  Services in connection with any partial utilization of any part of a project by City prior to Substantial Completion.

&#9633;  Services to evaluate the propriety of substitutions or design alternates proposed by the Contractor and involving methods of construction, materials, or major project components either during Bidding and/or Negotiation services or Construction Contract Award. The cost of such services shall be borne by the Contractor, and this requirement shall be included in the construction contract.

&#9633;  Services in making revisions to Drawings and Specifications occasioned by the acceptance of substitutions proposed by the Contractor, unless such substitutions are

due to a design error by the Consultant, in which case such services shall be deemed Basic Services. Except when caused by a design error by the Consultant, the cost of such services shall be borne by the Contractor, and this requirement shall be included in the construction contract.

3.3     Miscellaneous Architectural Services.  From time to time the City may require assistance from the Consultant for miscellaneous small projects, inspections and attendance at meetings if requested by the City, which are unrelated to any ongoing project for which a Work Authorization has been approved, and to review developers' plans, or on other matters.  The Consultant will provide these services only when authorized by the City Manager or his designee. The Consultant shall invoice the City on a monthly basis for such miscellaneous services.

## ARTICLE 4

## CITY'S RESPONSIBILITIES

4.1     The City shall do the following in a timely manner so as not to delay the services of the Consultant:

4.1.1   Designate in writing a person to act as the City's representative with respect to the services to be rendered under this Agreement. Such person shall have complete authority to transmit instructions and receive information with respect to the Consultant's services for a particular project.

4.1.2   Provide all criteria and full information as to the City's requirements for the Project, including design objectives and constraints, space, capacity and performance requirements, flexibility and expandability, and any budgetary limitations.

4.1.3   Assist the Consultant by placing at the Consultant's disposal all available information pertinent to the Project including previous reports and any other data relative to design or construction of the Project.

4.1.4   Furnish to the Consultant, if required for performance of the Consultant's services (except where otherwise furnished by the Consultant as Additional Services), the following:

4.1.4.1   Data prepared by, or services of others, including without limitation borings, probings and subsurface explorations, hydrographic surveys, laboratory tests and inspections of samples, materials and equipment;

4.1.4.2   Appropriate professional interpretations of all of the foregoing;

4.1.4.3    Environmental assessment and impact statements;

4.1.4.4    Property, boundary, easement, right-of-way, topographic and utility surveys;

4.1.4.5    Property descriptions;

4.1.4.6    Zoning, deed and other land use restrictions;

4.1.4.7    Approvals and permits required in the City's jurisdiction and those from outside agencies unless such approvals and permits are the responsibility of the Consultant, all of which the Consultant may use and rely upon in performing services under this Agreement; and

4.1.4.8    Arrange for access to and make all provisions for the Consultant to enter upon the City's property as required for the Consultant to perform services under this Agreement.

## ARTICLE 5

### SEQUENCE OF SERVICES AND TIME FOR PERFORMANCE

5.1    This Agreement shall commence upon the execution by both parties and shall continue for an initial period of three (3) years, unless terminated sooner as provided for in this Agreement.   The Consultant understands and acknowledges that the Services to be performed during the three (3) year term will be governed by this Agreement, and that there is no guarantee of future work being given to the Consultant.

5.2    Parties agree and understand that this Agreement shall be renewable after the expiration of the initial three (3) year period with terms and conditions to be agreed upon by City and Consultant.

5.3    Following receipt of any written work authorization the Consultant shall submit to the City, at least five (5) days prior to actually commencing services, a schedule of services and expenses for approval by the City before any services commence.  The City reserves the right to make changes to the sequence as necessary to facilitate the services or to minimize any conflict with operations.

Work authorizations will be issued to the Consultant in the order in which the City wishes, and shall be performed and completed in the order they are issued, unless otherwise specifically permitted by the City. Minor adjustments to the timetable for

completion approved by City in advance, in writing, shall not constitute non-performance by Consultant pursuant to this Agreement.

5.4     When the City issues work authorizations to the Consultant, each authorization will contain a stated completion schedule.  Failure of the Consultant to meet the stated schedule will constitute a default, for which payment for services may be withheld until default is cured.   Time extensions will be reviewed, upon request, for extenuating circumstances.

It is anticipated and intended that the Consultant will be authorized to begin new work authorizations on a "rolling" basis, as some already assigned work authorizations near timely completion.  If a subsequent work authorization is issued to the Consultant before it has competed the current work authorization, the completion date for each work authorization will remain independent of each other, so that the Consultant will prioritize the uncompleted work authorization from the first work authorization and finish them as soon as practical.  Failure to complete these "older" work authorizations in a timely manner may adversely impact upon continued early authorization to start a subsequent work.

5.5     When the Consultant has exceeded the stated completion date, including any extension for extenuating circumstances which may have been granted, a written notice of Default will be issued to the Consultant and payment for services rendered shall be withheld.

5.6     Should the Consultant exceed the assigned completion time of an individual work authorization, the City reserves the right not to issue to the Consultant any further work authorizations until such time as there is no longer in a Default and the Consultant has demonstrated, to the City's satisfaction, that the reasons for tardy completion have been addressed and are not likely to be repeated in subsequent work authorizations.  This restricted issuance provision may result in the Consultant not being issued all of the planned work the City anticipated in this Agreement.  The Consultant shall have no right to the balance of any work, nor to any compensation associated with these non-issued work authorizations, due to the Consultant being in Default.

5.7     Should the Consultant remain in Default for a time period of fifteen (15) consecutive calendar days, the City may, at its option, retain another Consultant to perform any Work arising out of this Agreement and/or terminate this Agreement.

## ARTICLE 6

### DELAY IN PERFORMANCE/SUSPENSION OR ABANDONMENT

6.1     City shall be entitled to withhold progress payments to Consultant for services rendered until completion of services to the City's satisfaction.

6.2    A delay due to an Act of God, fire, lockout, strike or labor dispute, manufacturing delay, riot or civil commotion, act of public enemy or other cause beyond the control of Consultant, or by interruption of or delay in transportation, labor trouble from whatever cause arising and whether or not the demands of the employees involved are reasonable and with City's power to concede, partial or complete suspension of City's operations, compliance with any order or request of any governmental officer, department, agency, or committee shall not subject City to any liability to Consultant. At the City's option, the period specified for performance of services shall be extended by the period of delay occasioned by any such circumstance, and services omitted shall be made or performed during such extension, or the services so omitted shall extend this Agreement for a period equal to such delay.   During this period such delay shall not constitute a delay by the Consultant.

6.3    If a project is suspended for the convenience of the City for more than six months, or abandoned in whole or in part for the convenience of the City under any phase, the City will give written notice to the Consultant of such project abandonment or suspension. The Consultant will be compensated only for work completed prior to abandonment or suspension. The City will not be liable for stand-b7, overhead, or any other cost direct or indirect, that the Consultant may incur outside of any direct costs associated with a project. If a project is resumed after having been suspended for an excess of six months, the Consultant's further compensation may be renegotiated, but the City shall have no obligation to complete the project.

## ARTICLE 7

### COMPENSATION AND METHOD OF PAYMENT

7.1    City agrees to compensate Consultant for the services performed pursuant to the provisions of this Agreement based on the hourly rates, a copy of which is attached as **Exhibit "A"**, or as otherwise agreed to between the parties and set forth in a written amendment to this Agreement.

7.2    The Consultant shall submit to the City for approval, prior to actual performance, the anticipated number of hours to be expended and the personnel to be assigned to each Project. If the services are performed in accordance with the City's approved expenditure of hours and utilization of personnel, the Consultant shall be entitled to invoice for work authorizations as they are completed. The Consultant shall submit an original invoice and one copy to the City. This will be considered the official request for payment. The invoices shall include the following information:

Invoice number for each work order and date;

Amount previously billed;

Amount due this invoice.

7.3    The City shall pay Consultant within thirty (30) days of receipt of any invoice the total shown to be due on such invoice, provided the City has accepted the Consultant's performance.

## ARTICLE 8
### OWNERSHIP OF DOCUMENTS

8.1    All documents, design plans and specifications resulting from the professional services rendered by the Consultant under this Agreement shall be deemed the sole property of the City, and the City shall have all rights incident to the sole ownership. Reuse of any such documents, design plans and specifications by the City or any project not covered by this Agreement without the written authorization of Consultant shall be at City's sole risk. Consultant agrees that all documents maintained and generated pursuant to this contractual relationship between City and Consultant shall be subject to all provisions of Chapter 119.01 et. seq. Florida Statutes.

8.2    The Consultant shall agree to indemnify and hold harmless the City, from liabilities, damages, losses, and costs, including but not limited to, reasonable attorneys' fees, to the extent caused by the negligence, recklessness, or intentionally wrongful conduct of the Consultant and other persons employed or utilized by the Consultant.

## ARTICLE 9
### COURT APPEARANCE, CONFERENCES AND HEARINGS

9.1    This Agreement shall obligate the Consultant to prepare for and appear in litigation or any other proceeding on behalf of the City for any dispute arising out of this Agreement. Except for litigation caused by errors or omissions of the Consultant, Consultant shall be compensated for such litigation support services at its prevailing rates for such services.

9.2    The Consultant shall confer with the City during the performance of the Services regarding the interpretation of this Agreement, the correction of errors and omissions, the preparation of any necessary revisions to correct errors and omissions or the clarification of service requirements, all without compensation.

## ARTICLE 10

## REPRESENTATIONS

10.1   The Consultant shall furnish all services, labor, equipment, and materials necessary and as may be required in the performance of this Agreement and all services performed under this Agreement shall be done in a professional manner.

10.2   The Consultant represents, with full knowledge that the City is relying upon these representations when entering into this Agreement with the Consultant, that the Consultant has the professional expertise, experience and manpower to perform the services as described in this Agreement.

10.3   The Consultant shall be responsible for technically deficient designs, reports or studies due to Consultant's errors and omissions, for four years after the date of final acceptance of the Services by the City or as provided under Florida law, which ever is greater.  The Consultant shall, upon the request of the City, promptly correct or replace all deficient work due to errors or omissions which fall below the recognized standard of care, without cost to City.  The Consultant shall also be responsible for all damages resulting from the Consultant's documents.  Payment in full by the City for services performed does not constitute a waiver of this representation.

10.4   All services performed by the Consultant shall be to the satisfaction of the City.  In cases of disagreement or ambiguity, the City shall decide all questions, difficulties and disputes of whatever nature that may arise under this Agreement.  All disputes will be decided by a court of competent jurisdiction.

10.5   The Consultant warrants and represents that all of its employees, other consultants and sub-consultants are treated equally during employment or retention without regard to race, color, religion, gender, age or national origin.

10.6   The Consultant represents that it has not employed or retained any company or person, other than a bona fide employee working solely for the Consultant, to solicit or secure this contract and that it has not paid or agreed to pay any company or person other than a bona fide employee working solely for the Consultant any fee, commission, percentage fee, gifts or any other considerations contingent upon or resulting from the award or making of this contract.  For breach or violation of this representation, the City shall have the right to cancel this Agreement without liability to the Consultant or any third party.  Execution of this Agreement by Consultant shall act as the execution of a truth-in-negotiation certificate certifying that wage rates and costs used to determine the compensation provided for in this Agreement are accurate, complete, and current as of the date of this Agreement

## ARTICLE 11

## NOTICES

All notices or other communications which shall or may be given pursuant to this Agreement shall be in writing and shall be delivered by personal service, or by registered mail addressed to the other party at the address indicated or as may be changed from time to time.  Such notice shall be deemed given on the day on which personally served, or if by mail, on the date of actual receipt.

|                   |                                        |
|-------------------|----------------------------------------|
| Consultant:       | Michael Nardone, PG                    |
|                   | URS Corporation Southern               |
|                   | 7650 Corporate Center Drive Suite 401  |
|                   | Miami, FL 33126                        |
| City:             | City of Miami Gardens                  |
|                   | 1515 N W 167th Street; Bldg. 5   Suite 200 |
|                   | Miami Gardens, Florida 33169           |
|                   | Attention:  City Manager               |
| With a copy to:   | City Attorney                          |
|                   | 1515 N W 167th Street; Bldg. 5  Suite 200 |
|                   | Miami Gardens, Florida 33169           |

## ARTICLE 12

## AUDIT RIGHTS

The City reserves the right to audit the records of the Consultant covered by this Agreement at any time during the execution of the Services and for a period three (3) years after final payment is made for any Work performed.

## ARTICLE 13

## SUBCONTRACTING

13.1   No Services shall be subcontracted, assigned, or transferred under this Agreement without the prior consent of the City, which consent maybe withheld.

13.2   The Consultant shall be fully responsible to the City for all acts and omissions of any agents or employees, or approved subcontractors.  Subcontractors shall have appropriate general liability, professional liability, and workers' compensation insurance, or be covered by Consultant's insurance.  Consultant shall furnish the City with appropriate proof of insurance and releases from all subcontractors in connection with the work performed.

## ARTICLE 14

## TERMINATION

14.1    The City retains the right to terminate Consultant's services and/or this Agreement, with or without cause, upon ten (10) days written notice, at any time prior without penalty. City shall only be responsible to pay the Consultant for any service actually rendered up to the date of termination.   Consultant shall not be entitled to any other amounts or damages, including but not limited to anticipated profits or consequential damages, special damages or any other type of damages upon termination by the City pursuant to this Article.

14.2    It is understood by the City and Consultant that any payment to Consultant shall be made only if Consultant is not in default under the terms of this Agreement.

14.3.   Upon receipt of a Termination Notice and except as otherwise directed by the City, Consultant shall:

14.3.1    Stop work on the date and to the extent specified.
14.3.2    Terminate and settle all orders relating to the terminated work.
14.3.3    Transfer all work in progress, completed work, and other materials related to the terminated work to the City.

## ARTICLE 15

## DEFAULT

15.1    An event of default shall mean a breach of this Agreement by the Consultant. Without limiting the generality of the foregoing and in addition to those instances referred to as a breach, an event of default shall include the following:

Consultant has not performed services on a timely basis;

Consultant has refused or failed to supply enough properly skilled Personnel;

Consultant has failed to make prompt payment to subcontractors or suppliers for any services after receiving payment from the City for such services or supplies;

Consultant has failed to obtain the approval of the City where required by this Agreement;

Consultant has failed in any representations made in this Agreement; or

Consultant has refused or failed to provide the Services as defined in this Agreement.

Consultant has filed bankruptcy or any other such insolvency proceeding and the same is not discharged within 90 days of such date.

15.2    In an Event of Default, the Consultant shall be liable for all damages resulting from the default, including:

❑    The difference between the amount that has been paid to the Consultant and the amount required to complete the Consultant's work, provided the fees by the firm replacing the Consultant are reasonable and the hourly rates do not exceed the Consultant's rates.  This amount shall also include procurement and administrative costs incurred by the City.

❑    Consequential damages and Incidental damages.

15.3    The City may take advantage of each and every remedy specifically existing at law or in equity.  Each and every remedy shall be in addition to every other remedy given or otherwise existing and may be exercised from time to time and as often and in such order as may be deemed expedient by the City.  The exercise or the beginning of the exercise of one remedy shall not be deemed to be a waiver of the right to exercise any other remedy.  The City's rights and remedies as set forth in this Agreement are not exclusive and are in addition to any other rights and remedies available to the City in law or in equity.

## ARTICLE 16

## INDEMNIFICATION

16.1    Consultant shall indemnify and hold harmless the City and its officers, employees, agents and instrumentalities from any and all liability, losses or damages, including attorneys' fees and costs of defense, which the City or its officers, employees, agents or instrumentalities may incur as a result of claims, demands, suits, causes of actions or proceedings of any kind or nature arising out of, relating to or resulting from the negligent performance of this Agreement by the Consultant or its employees, agents, servants, partners, principals or sub-Consultants. Consultant shall pay all claims and losses in connection therewith and shall investigate and defend all claims, suits or actions of any kind or nature in the name of the City, where applicable, including appellate proceedings, and shall pay all costs, judgments, and attorney's fees which may issue thereon. Consultant expressly understands and agrees that any insurance protection required by this Agreement or otherwise provided by Consultant shall in no way limit the responsibility to indemnify, keep and save harmless and defend the City or its officers, employees, agents and instrumentalities as herein provided. One percent ( 1%) of the

contract amount shall represent the consideration to be provided for this indemnification. Nothing contained herein shall be deemed a waiver of sovereign immunity.

## ARTICLE 17

## INSURANCE

17.1    Throughout the term of this Agreement, the Consultant shall maintain in force at its own expense, insurance as follows:

17.1.1  Workers' Compensation:  Workers' Compensation Insurance with statutory limits, including coverage for Employer's Liability, with limits not less than $1,000,000.

17.1.2  General Liability:   Commercial General Liability with limits not less than $1,000,000 each occurrence combined single limit for Bodily Injury and Property damage including coverage for contractual liability, personal injury, broad form property damage, products and completed operations.  This coverage is required by the Consultant and any subcontractor or anyone directly or indirectly employed by either of them.  The City shall be named additional insured.

17.1.3  Automobile Liability:   Comprehensive or Business Automobile Liability Insurance with not less than $500,000 each occurrence combined single limit for Bodily Injury and Property Damage including coverage for owned, hire and non-owned vehicles as applicable.   The Consultant and any of its approved subcontractors shall take out and maintain this insurance coverage against claims for damages resulting from bodily injury, including wrongful death and property damage which may arise from the operations of any owned, hired or non-owned automobiles and/or equipment used in any endeavor in connection with the carrying out of this Agreement.  The City shall be named as an additional insured.

17.1.4  Professional Liability:  The Consultant, its officers, employees and agents will provide the City a Certificate of Insurance evidencing professional liability insurance with limits of not less than $1,000,000 aggregate with respect to acts, errors or omissions in connection with professional services to be provided under this Agreement with the deductible amount not to exceed $25,000 for each claim. Consultant represents it is financially responsible for the deductible amount.

The Consultant shall maintain professional liability insurance during the term of this Agreement and for a period of four (4) years from the date of completion of each Project.  In the event that Consultant goes out of business during the term of this Agreement or the four (4) year period described above, Consultant shall purchase Extended Reporting Coverage for claims arising out of Consultant's negligent acts errors and omissions during the term of the Professional Liability Policy.

17.1.5  Subcontractors Insurance:  Each subcontractor shall furnish to the Consultant two copies of the Certificate of Insurance and Consultant shall furnish one copy of the Certificate to the City, and shall name the City as an additional insured.

17.2   All insurance policies required of the Consultant shall be written by a company with a Best's rating of B+ or better and duly authorized and licensed to do business in the State of Florida and be executed by duly licensed agents upon whom service of process may be made in Miami-Dade County, Florida. The City may accept coverage with carriers having lower Best's ratings upon review of financial information concerning Consultant and the insurance carrier.

17.3   The required insurance shall be proved under occurrence based policies, which Consultant shall maintain continuously throughout the term of this Agreement

17.4   Any deductibles or self-insured retentions must be declared to and approved by the City Manager or designee prior to the start of work under this Agreement.  The City reserves the right to request additional documentation, financial or other such documentation as well as such additional insurance as the City Manager deems appropriate, prior to giving approval of the deductible or self-insured retention and prior to executing the Agreement.  The City manager or designee, prior to the change taking effect, must approve any changes to the deductibles or self-insured retentions made during the term of this Agreement or during the term of any policy.

## ARTICLE 18

### ATTORNEYS FEES

If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees, expenses and court costs, including appellate fees incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled.

## ARTICLE 19

### CODES, ORDINANCES, AND LAW

The Consultant shall abide and be governed by all applicable local, state and federal codes, ordinances, and laws, rules, regulations and directives regarding the Consultant's Services.

## ARTICLE 20

## ENTIRETY OF AGREEMENT

This Agreement and its attachments constitute the sole and only Agreement of the parties and sets forth the rights, duties, and obligations of each party. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force or effect.

## ARTICLE 21

## NON-EXCLUSIVE AGREEMENT

The professional services to be provided by the Consultant pursuant to this Agreement shall be nonexclusive, and nothing shall preclude the City from engaging other firms to perform similar professional services.

## ARTICLE 22

## GOVERNING LAW; VENUE

This Agreement shall be construed and enforced according to the laws of the State of Florida. Venue shall be in Miami-Dade County, Florida.

## ARTICLE 23

## INDEPENDENT CONTRACTOR

Consultant and its employees and agents shall be deemed to be independent contractors, and not City agents or employees. The Consultant, its employees or agents shall not attain any rights or benefits under the City's retirement plan nor any rights generally afforded the City's classified or unclassified employees. The Consultant shall not be deemed entitled to the Florida Workers' Compensation benefits as a City employee.

## ARTICLE 24

## NONDISCRIMINATION

Consultant agrees that it shall not discriminate as to race, sex, color, creed, national origin, or disability, in connection with its performance under this Agreement.

## ARTICLE 25

## AMENDMENTS

No amendments to this Agreement shall be binding on either party unless in writing and signed by both parties.

## ARTICLE 26

### CONDUCT/CONFLICT OF INTEREST

Consultant covenants that no person under its employ who presently exercises any functions or responsibilities on behalf of the City in connection with this Agreement has any personal financial interest, direct or indirect, with contractors or vendors providing professional services on projects assigned to the Consultant, except as fully disclosed and approved by the City. Consultant further covenants that, in the performance of this Agreement, no person having such conflicting interest shall be employed.

## ARTICLE 27

### OTHER PROVISIONS

27.1    Title and paragraph headings are for convenient reference and are not a part of this Agreement.

27.2    No waiver or breach of any provision of this Agreement shall constitute a waiver of any subsequent breach of the same of any other provision, and no waiver shall be effective unless made in writing.

27.3    Should any provision, paragraph, sentence, word or phrase contained in this Agreement be determined to be invalid, illegal or otherwise unenforceable under the laws of the State of Florida by a court of competent jurisdiction, such provision, paragraph, sentence, word or phrase shall be deemed modified in order to conform with Florida law.  If not modifiable to conform with such law, then it shall be deemed severable, and in either event, the remaining terms and provisions of this Agreement shall remain unmodified and in full force an effect.

27.4    This Agreement is binding upon the parties hereto their heirs, successors and assigns.

27.5    This Agreement shall not be construed against the party who drafted the same as all parties to this Agreement have had legal and business advisory's review the adequacy of the same.

27.6    This Agreement may not be assigned by the Consultant without the express written consent of the City, which consent may be withheld.

IN WITNESS WHEREOF, this Agreement is effective as of the date first written above.

Consultant:   URS CORPORATION SOUTHERN

By: _____

Name:   Michael J. Nardone

Title:   Vice President

WITNESS:

_____

Corporate Secretary

Kristin L. Jones

CITY OF MIAMI GARDENS

By: _____

City Manager

ATTEST:

_____

City Clerk

APPROVED AS TO FORM:

_____

City Attorney

## EXHIBIT "A"

### CONSULTANT COMPENSATION RATES

1. Fee estimate for projects with a total construction cost up to $1,000,000.00 for project profiles as stated in the scope of projects:

    Civil Engineering – Roads, Parking Lots, Utilities – **9** % Lump Sum of the Construction Cost

    New Construction/Buildings – **10** % Lump Sum of the Construction Cost

    Renovations/Buildings – **14** %Lump Sum of the Construction Cost

    Fee estimate for projects with a total construction cost in excess of $1.2 million up to $10 million for project profiles as stated in the scope of projects:

    New Construction/Buildings - **9** % of Lump Sum of the Construction Cost

2. Hourly rate schedule for personnel including overhead and profit.

    | | |
    |---|---|
    | Principals | **$0** |
    | Project Manager | **$130** |
    | Consultant/Engineer | **$100** |
    | CADD Operator | **$55** |
    | Junior Consultant/Engineer | **$65** |
    | Drafting | **$55** |
    | Clerical | **$39** |

    Subconsultant @ cost +5% overhead & 5% profit

Please add personnel not included above    Project Architect  $120
Senior Mechanical/Electrical/Structural Engineer  $130
Planner  $115
Professional Surveyor/Mapper  $141
Survey Consultant  $100
Survey Tech  $61
Three (3) Person Survey Crew  $126

No reimbursement for normal office procedures including but not limited to facsimiles, photo copies, regular postage, local mileage, blueprints and digital copies.



### *City of Miami Gardens*
1515 N.W. 167th Street: Bldg. 5, Suite 200
Miami Gardens, Florida 33169

July 30, 2010

Mr. Lewis Robinson
URS Corporation
Suite 300
2020 K Street NW
Washington, DC 20006

NOTICE OF AWARD

RE: Work Order City Hall Complex Project

Dear Mr. Robinson:

Congratulations!! On July 28, 2010, the City Council authorized the City Manager to issue a work order to your company for design services related to the design and construction of a city hall complex, in accordance with the continuing contract, in the amount of $3,352,271.00.

Your official Notice to Proceed is August 1, 2010.

Please forward to my office, within ten days the Professional Liability Insurance in the agreed upon amount.

Again congratulations and we are looking forward to working with you and your company.

Sincerely,

*Pam Thompson*

Pam Thompson, CPPO,CPPB
Procurement Manager

cc: Dr. Danny Crew, City Manager

Exhibit "2"

1515 N.W. 167th STREET, BUILDING 5 • SUITE 200 • MIAMI GARDENS, FL 33169 • PH: 305-622-8031 • FAX: 305-474-1285



**EXHIBIT "A"**
**30 July 2010**

SCOPE OF WORK

URS' Scope of Work consists of architectural and engineering services which include the design and construction administration for a New City Hall complex consisting of a new City Hall, a Police Building, a 500 car multi story parking garage, and public areas.

URS understands that it is the City's goal to obtain a LEED Platinum rating for the new buildings and will employ best practices to achieve a LEED Platinum level during the design process. The LEED Scoring process and practice to be employed during the design and construction process is preliminary in nature, and will be suitable only for accessing the feasibility of obtaining such a rating. Achieving actual LEED certification will depend on several factors, including budgetary decisions by the City, proper documentation by the designer, and the project's Developer/GC[1], as well as acceptance of all documented credits by the USGBC. Because many of the factors are not under URS' control, URS cannot guarantee that the project will obtain the LEED certification level desired by the City.

1. **PROGRAM VERIFICATION**:

URS will take the preliminary space planning program document provided by the City and proceed to not only validate the preliminary program provided but expand the preliminary program to collect the necessary information required to identify working relationships, space requirements for each department and group, special equipment requirements, furniture requirements, power and data requirements, and any special mechanical or electrical needs within departments and individual spaces.

    1.1. URS will use the Preliminary Space Planning Program document provided by the City, dated Revised October 16, 2009, as a starting point. URS will confirm with the City the foundation and supplementary information previously gathered to prepare this document and any additional functional information, but not made part of the October 16, 2009 document, to be used as part of the Program Verification process.

    1.2. After meeting with the City to discuss the foundation of the October 16, 2009 preliminary space planning program document URS will hold a minimum of two "workshops" of which the first will be a series of meetings which the principal stakeholders representing every department within City Hall and the Police group which will occupy the two buildings will attend. The second will be a meeting with the department heads to review the final program based on the information collected and obtain their signoff.

    1.3. URS will distribute programming forms to each stakeholder group. Each group will return its completed forms to URS within 5 Working days to prepare a preliminary Program of Requirements (POR). These forms will include space requirements for each individual space requirements for furniture, power, telecommunications, projection, personal filing, department filing, team spaces, and reception area functions among many other things.

    1.4. URS will assist in the preparation of a POR to define functions, FF&E needs and other requirements for the Project.

---

[1] The term Developer/GC is used in anticipation of the City retaining a development team pursuant to RFPCN 10-09-063. In the event that the City does not retain a development team for the project, then this term shall mean Construction Manager ('CM').

URS Corporation
7650 Corporate Center Drive
Suite 410, Miami, FL 33126
Tel: 305.884.8900
Fax: 305.884.2665

1.5. Review the POR with City to determine current and future goals and functions for their work areas, adjacencies, anticipated growth, aesthetic needs or desires and shall verify completeness of the Furniture requirements. This review includes surveying existing spaces and work methods and documenting file and storage requirements.

1.6. Adjust program accordingly with City's approval. If the Program results indicate a building size greater than the Preliminary Space Planning Program provided by the City, the City will be advised and provided the opportunity to adjust their space standards.  URS will list all potential furniture, power, telephone, and equipment needs for the Project.

1.7. Develop preliminary adjacency and stacking diagrams from the information obtained.

1.8. URS will both meet with the City to review the URS Preliminary Program and submit a signed off copy when the programming phase is complete for their review and approval.

1.9. During the Program Verification phase, URS will provide an assessment and inventory of the City's existing office furniture with recommendations for relocation, re-use or disposal.  Based on this assessment and program requirement review, will provide the City with suggested office/workspace sizes based on need and current industry standards.

1.10.        A preliminary LEED worksheet will be prepared at the conclusion of the Program Verification phase and presented to the City identifying the feasibility of attaining a LEED Platinum designation for the project.  This document is preliminary and advisory in nature and will be suitable only for accessing the feasibility of obtaining such a rating.  Achieving actual certification will depend on several factors, including budgetary decisions by the City, proper documentation by the designer, and the project's Developer/GC, as well as acceptance of all documented credits by the USGBC.

1.11.        URS will submit six (6) copies of the Program Verification Report.

## 2. SCHEMATIC DESIGN PHASE

2.1. URS will review the approved program and project budget with the City to confirm the requirements of the project and will arrive at a mutual understanding of the requirements with the users.  URS will also review with the City and City Developer/GC the alternative approaches to design and construction as they relate to the approved budget and program.

2.2. Based on mutually approved program, budget and schedule, by the City and the Developer/GC, URS will prepare for approval the Schematic Design Documents consisting of drawings and other documents illustrating the scale and relationship of project components.  URS will prepare up to two (2) schemes for presentation.

2.3. As part of the FF&E portion of the services, URS will generate generic office and system furniture layouts and identify potential areas of furniture and equipment procurement.

2.4. In further development of the drawings and specifications during this and subsequent phases of design, URS will rely on estimates of Construction costs which are to be provided by the Developer/GC under the Developer/GC's agreement with the City.

2.5. The Preliminary LEED worksheet will be reviewed and updated at the conclusion of the Schematic Design Phase and presented to the City identifying the current feasibility of achieving a LEED Platinum designation for the project.

2.6. URS will submit six (6) sets of documents required under this Phase

2.7. Upon completion of the Schematic Design Phase, URS will provide drawings and other documents for the City's approval and the Developer/GC's information and pricing per the City's agreement with the Developer/GC.

3. **DESIGN DEVELOPMENT**

3.1. Before URS starts Design Development, a major review meeting with the Developer/GC will be scheduled to review the Schematic Design program, address on construction methods/costs trade-offs, high value LEED items, the preferred approach to the design and construction of the parking garage and set an agenda to resolve these during Design Development.

3.2. Based on approval by the City of the Schematic Design and any adjustments to the program, construction costs as prepared by the City's Developer/GC, and schedule approved by the City, URS will prepare for approval of the City, Design Development Documents consisting of drawings and other documents to fix and describe the size and character of the project as to the architectural, mechanical, and electrical systems, materials and such elements which might be appropriate for the Developer/GC's review and pricing and the City's approval.  The Design Development drawings will be based upon the data and estimates prepared by the Developer/GC and consist of the drawings and other documents that establish and describe the size and character of the project.

3.3. URS will provide drawings and other documents which depict the current status of the design development for the City's review and the Developer/GC's information.

3.4. URS will submit six (6) sets of documents required under this Phase.

3.5. Quality Control (QC) will be performed by independent QC reviewers for each discipline at this phase prior to issuing final Design Development documents.

3.6. The Preliminary LEED worksheet will again be updated at the conclusion of the Design Development Phase and presented to the City identifying the current feasibility of attaining LEED Platinum for the project.  This document is preliminary in nature, and will be suitable only for accessing the feasibility of achieving such a rating.  Achieving actual certification will depend on several factors, including budgetary decisions by the City, proper documentation by the designer, and the project's Developer/GC/Contractor, as well as acceptance of all documented credits by the USGBC.

3.7. Upon completion of the Design Development Phase URS will provide drawings and other documents for the City's approval and the Developer/GC's information and pricing per the City's agreement with the Developer/GC.


4. **CONSTRUCTION DOCUMENTS**

4.1. Based on the approved Design Development documents and any further adjustments authorized by the City in the scope, program, quality of the project or in the construction budget, URS, utilizing product/systems data and estimates prepared by the Developer/GC will prepare for approval by the City, Construction Documents consisting of drawings and specifications setting forth in detail the requirements for the construction of the project.  URS will coordinate with the Developer/GC on building systems and materials to be used on the project.  As part of the continuing LEED process to attain the Platinum level, URS, along with the enhanced commissioning agent, will continue to offer material suggestions of building systems and materials which will help achieve that level.

4.2. At intervals mutually agreed to with the City, Developer/GC and URS, URS will provide drawings and other documents which depict the current status of the Design Development for the City's review and the Developer/GC's information.

4.3. URS will provide the Developer/GC progress drawings and other documents at 50% and 85% stages of the Construction Documents for the City's review and the Developer/GC's information and pricing per the City's agreement with the Developer/GC.

4.4. Quality Control (QC) will be performed by independent QC reviewers for each discipline during this phase prior to issuing final Construction Documents.

4.5. Upon completion of the Construction Document Phase, URS will provide drawings and other documents for the City's review and the Developer/GC's information and pricing per the City's agreement with the Developer/GC.

4.6. The Preliminary LEED worksheet will be reviewed and updated at the conclusion of the Construction Document Phase and presented to the City identifying the current feasibility of attaining LEED Platinum for the project.

4.7. URS will submit six (6) sets of 50% documents and six (6) sets of 100% documents including Project Manual.

5. **BIDDING**

5.1. URS will assist the City and the Developer/GC in attending any pre-bid conferences, responding to bidder's written questions and issuing any subsequent Addenda required.

5.2. URS will assist the City and the Developer/GC in determining the equality of any suggested substitutions of products prior to the City's acceptance.

5.3. Issuance of multiple bid packages is not part of the Basic Services. If desired after the Developer/GC is engaged, a detailed fee proposal will be provided for the Additional Service.


**CONSTRUCTION:**

6. **CONSTRUCTION ADMINISTRATION**

URS' Construction Administration Services will be provided in conjunction with the City's Developer/GC yet to be designated. URS will submit to the City for approval and the Developer/GC for information, a schedule for the performance of the services below.

6.1 Upon acceptance of the GMP and award of the construction contract, URS will commence their Construction Administration services for the Construction phase.

6.2 URS will provide administration of the contract for construction in cooperation with the City Developer/GC subject to mutually agreeable defined responsibility and scope of work by both parties. Based on URS' defined role, per section 6.3 and 6.4 below during the Construction Administration Phase, URS will perform periodic on-site construction observation of the Project based on the Construction documents. Their observations shall determine the general progress and quality of work, and whether the work is progressing in accordance with the Construction documents. URS will provide the City with a written report of each site visit in order to inform the City of the progress of the Work. URS will endeavor to guard the City against defects and deficiencies in the work of the Developer/GC, and make written recommendations to the City where the Work fails to conform to the Construction Documents. When notified by the Developer/GC of proposed Substantial completion, URS will conduct a site visit to determine the date(s) of substantial and final completion. A recommendation of final payment will be issued

**URS**

upon successful performance by the Developer/GC of providing complete close out documents according to the Contract Documents.

6.3 URS will visit the site once per month to observe the progress of construction for duration of sixteen (16) months per City's direction. In addition to the monthly site visit, two (2) additional site visits per discipline are included during construction.

6.4 In addition to the monthly visit, URS will attend milestone inspections, (1) Stakeout, (2) Foundations, (3) Framing, (4) Envelope, (5) Mechanical Systems Commissioning, (6) Interior Finishes installation. Because the City by code is required to obtain a third party, Special Inspector, to attend and certify many of these inspections, and some of these events are on going for extended periods of time, URS will attend one (1) each of these as part of their Construction Administration fee.

6.5 Resident Project Services are not included as part of the Construction Administration fees or scope of work.

6.6 URS will attend a Pre-Construction meeting for the project as well as for LEED issues.

6.6 During the Construction Phase, URS's LEED team will work with the Developer/GC to review their LEED Implementation Plan and provide a general rating to the City and Developer/GC as "accept/not accept". The LEED Implementation Plan will be reviewed three (3) times as part of the fee and any subsequent reviews will be considered Additional Services.

6.7 The Developer/GC will be responsible for completing and updating the LEED Letter Templates in LEED online throughout the construction contract. Additional submittals required by LEED 2.2 Documentation Requirements and Submittal Checklists will be uploaded for the applicable credits in LEED Online by the Developer/GC. The LEED Team will review updated LEED Templates, including the additional submittals, and provide comments regarding LEED compliance on a monthly basis.

6.8 The LEED team will also compare documentation progress in LEED Online to the schedule in the Developer/GC's LEED Project Checklist. This plan will be similar to the LEED Implementation Plan. URS will review up to three (3) credits being changed by the Developer/GC as part of their fee and any additional changed credit reviews will be considered Additional Services.

6.9 URS will prepare a composite punch list after receiving the Developer/GC's preliminary punch list stating that the project is substantially complete and ready to punch. URS will review the URS completed punch list one (1) time after the Developer/GC has verified the punch list has corrections made. Punch listing will be conducted by each discipline and compiled in a composite document.

6.10     URS will be available by telephone and field visit if required to consult with the Developer/GC on issues which arise in the field.

6.11     URS will not be responsible for verifying or signing the monthly construction payment requisition.

6.12     Commissioning will be done by the City/Developer/GC.

6.13     URS will review and approve shop drawings as called for within the Construction Documents. URS will review two (2) submittals of the same shop drawing as part of the negotiated Construction Administration fee and any additional reviews will be considered an Additional Service.

6.14    RFI's will be responded to within five (5) working days when submitted by the contractor.   It is expected that the contractor perform reasonable review of the Construction Documents prior to issuing an RFI.

6.15    ASI's will be prepared and issued as required as supplemental information to the field when questions arise or as part of response to RFI's.

6.16    Change Proposals will be reviewed twice if required and upon the City's approval, Change Orders will be prepared and issued.  Any Change Proposal or Change Order which does not directly affect construction cost or contract time, URS will, at no cost, correct the documents and notify the Developer/GC.  URS shall only be responsible for those change orders where customary industry standard of care has not been met.

6.17    Review Developer/GC produced Closeout Documents and Record Drawings.


**ADDITIONAL SERVICES**

**7.   AGREED TO ADDITIONAL SERVICES**

**7.1 Civil Engineering**

SCOPE OF SERVICES

URS Boca Raton will perform the following scope items. The scope of work will consist of performing professional services as described below and will be coordinated with the project team and designed in an effort to meet the project's Platinum LEED certification objectives.

Task 1 - Paving, Grading and Drainage Plans

Paving, grading and drainage design of the access driveway(s), all site areas (except areas within the building envelope, including any at grade or below natural grade parking areas) will be provided based upon preliminary engineering design to meet the minimum elevations for flood protection.   No modifications to adjacent roadways (additional turn lanes, etc.) are included in this scope of services. Traffic studies and topographic surveys required to support these improvements are not included in this scope of services. If requested, URS Boca Raton can provide these services under a separate services agreement

URS Boca Raton will design the storm water treatment/attenuation facilities to be contained on-site together with an onsite outfall system to a point of discharge to the City drainage system (if allowed). Additional storm water quality treatment by exfiltration trench and storm water collection system may be required for this development and will be designed under this task.  The total required length of exfiltration trench will be determined and the final trench design together with potential underground storm sewer collection/storage systems will be incorporated into the development of the final plan.

A Storm Water Management Plan will be prepared in accordance with the requirements of the Miami-Dade Department of Environmental Resource Management and the South Florida Water Management District.

The paving, grading and drainage components will be coordinated with the project team and designed in an effort to meet the project's Platinum LEED certification objectives.

Task 2 – Potable Water, Fire Protection and Sanitary Sewer Plans

<u>Potable Water/Fire Protection</u>

Final Design for potable water and fire protection distribution systems will be provided for the master pipe network required to service the entire site including the points of connection to existing mains within the adjacent street right-of-ways. The lateral extensions to serve the buildings will be incorporated into the development of the final site infrastructure plans in this scope of services. Appropriate DDCVs (fire lines), fire department connections (dry or wet system to be coordinated with City's MEP Consultant's) or fire hydrants and BFPs (potable water) with water meters will be provided in the design. All services will be designed to within 5' of the edge of the proposed buildings.

<u>Sanitary Sewer Collection</u>

Final design for the sanitary sewer collection system will be provided for the gravity sanitary sewer system to service the entire parcel including the point of connection to the existing gravity sanitary sewer system within the adjacent road right-of-way.  It is assumed that the connection will be to an existing gravity sanitary sewer line and/or manhole abutting the property and that the existing sanitary system is adequate to handle flows from the total development. This assumption will be verified with the utility City, prior to beginning design work. The lateral extensions to serve the buildings will be incorporated into the development of the final site infrastructure plans in this scope of service. All services will be designed to within 5' of the edge of the proposed buildings.

The water and sanitary sewer system components will be coordinated with the project team and designed in an effort to meet the project's Platinum LEED certification objectives.

Task 3 – Pavement Marking and Signage Plans

URS Boca Raton shall provide final design plans and specifications for all onsite pavement markings and traffic related signage.  All directional, entrance and commercial signage is not a part of this scope of services.

Task 4 – Erosion Control Plan

URS Boca Raton will develop plans to identify applicable soil erosion control measures to be implemented prior to construction.  The soil erosion control plan or storm water pollution prevention plan is intended to be utilized by others to obtain the Florida Department of Environmental Protection (FDEP) National Pollutant Discharge Elimination System (NPDES) permit for construction.

Task 5 – Site Civil Opinion of Probable Construction Costs

URS Boca Raton shall prepare an opinion of probable construction cost (OPCC) in the preliminary design phase and update the OPCC at the final design phase.

Task 6 – Permitting Support

URS Boca Raton will provide support for permitting activities with the following agencies or government departments:

- City of Miami Gardens Building Department

- Miami-Dade County Health Department
- Miami-Dade County Water and Sewer Department
- Miami-Dade County Department of Environmental Resource Management
- South Florida Water Management District
- Florida Department of Transportation

Permitting Support is limited to attendance at three (3) total permit review meetings and responses to one (1) round of municipal agency permit application review requests for additional information (RAI's). Any responses to additional RAI's (after the first set of comments) would be considered as Additional Services.

## Task 7 – Construction Administration

URS Boca Raton will provide construction phase services for the site/civil components of the work, in an effort to meet the project's Platinum LEED certification objectives, including:

- Attendance at the Pre- Construction Meeting
- Review Shop Drawings
- Conduct no more than 7 site visits, as the activity requires, to inspect site/civil components
- Address Contractor RFI's
- Conduct Pre-Final Inspection
- Prepare Punch List
- Conduct Final Inspection
- Review Contractor's Record Drawings
- Construction Completion Documents and Final Certification Letter

Additional Services

Services not identified in the scope of services and performed at the request of the City will be considered Additional Services.  Additional Services are typically resultant from extensive revisions or significant change requests generated by the City or a regulatory agency. If any of the following services are required or any variations in the scope of services, URS Boca Raton will either provide these services on a time charge basis or, if requested, will prepare a separate proposal for the work. These services may include, but not be limited to, items such as:

- Surveying services for boundary, topography, elevations and tree surveys;
- Special requests by lending institutions or other parties not essential to completing the work described in the scope of services;
- Concurrency approval for utilities, storm water, traffic, etc. with municipal agencies including Miami-Dade Water and Sewer, Miami-Dade Department of Environmental Resource Management, Miami-Dade County, the Florida Department of Transportation.
- Offsite utility extensions and offsite infrastructure design;
- Design of water wells, retaining walls, bridges or signage;
- Design of a sanitary sewer lift station;
- Easement or right-of-way vacation or dedication services,
- Storm water modeling,
- Planning or engineering services associated with planning reviews such as an application for development approval (ADA/DRI) or site plan review by the Miami Gardens Development Review Committee (DRC);

- Redesign services, including revisions to analysis or plans due to revisions dictated by the City after URS Boca Raton work has been completed;
- Services associated with the fast tracking of the planning, design, permitting or construction of the project; this would include extra meetings and coordination, early and/or extra submittals, issuance of separate construction plan packages, etc.;
- Variances or special approvals;
- Services associated with the preparation, submission, and processing of any permit application.

URS Boca Raton will notify the City in advance of any efforts that are outside the scope of services for this project and will provide an estimate to complete the Additional Service task(s).

City Responsibilities

The City will be responsible for providing the following:

- Legal description, boundary and topographic survey (including tree survey) of the property.
- Final draft of proposed site plan.
- Permit application fees.
- Legal services, if required.
- Cityship and encumbrances report.
- Final coordination and contractual arrangements with the appropriate utility companies as required for the design and installation of telephone, electric, gas and cable television services.
- Dimensional plans of proposed building structures.
- Program development, project criteria or proposed design requirements.
- Available site data, including all relevant site plans (AutoCAD 2005), as-built surveys and soils data if available.
- City's project development schedule/timeline including submittal milestones (see Contract Period below).
- Property City name, including individual, corporation name, signatory title, corporate officer, partnership information, etc. as required.
- Name of association responsible for common areas, maintenance, etc.
- Name of Mortgage holders and names of officers of that institution that are responsible or authorized to execute the mortgages consent. This requires a minimum of one Vice President and one other officer.
- Name of attorney and title insurance company representative who will sign the title certification.
- All information supplied by the City will be assumed to be complete and accurate.

**7.2 Traffic Analysis –**

**PURPOSE**

The purpose of this document is to describe in general the broad scope of work and the responsibilities of URS in connection with the preparation of a traffic study to evaluate the traffic impact associated with the proposed New City Hall.

**STUDY OBJECTIVE**

In order to analyze the traffic associated with the proposed New City Hall we propose to perform the following tasks:

1.     Data Collection:

**URS**

    a.      Four-hour turning movement counts (TMC), including pedestrian movements at selected street intersections,

    b.      Twenty four-hour directional approach counts along selected street corridors,

    c.      Coordination with your office and other members of the city staff,

    d.      Coordination with City for review and permitting requirements, and

    e.      Field review of the site and surrounding areas.

    2.      Determine the projected traffic growth for the future years using the historic traffic growth patterns and reasonable assumptions.

    3.      Perform capacity analysis of street links and intersections using Synchro traffic analysis software.

    4.      Calibrate and refine the traffic analysis by collecting travel time data.

    5.      Assist with public meeting by preparing and presenting the findings.

    6.      Prepare a report summarizing our methodology, analyses and conclusions for your use in submitting to Miami-Dade Public Works Department.

Note the number of meetings is restricted to 'three'; attendance at any additional meetings shall be negotiated as a supplement to this proposal.

**End Products**
URS shall submit to the City five (5) copies of the Traffic Impact Study.

**7.3 Surveying Services –**

Boundary Survey

**1.0 Horizontal Control & 27.02 Vertical Control**
- Horizontal Control will be established on the Florida State Plane Coordinate System,      East Zone, and North American Datum (NAD) of 1983 / 1990 Adjustment.
- Vertical Control will be established on NGVD 1929 vertical datum.

**2.0 Topographic and Boundary Survey**
- A boundary survey will be performed as per approved boundary limits. All parcels, easements, etc. as shown on recorded plats will be plotted. All boundary lines will be identified and monumented as per above-mentioned standards.
- The topographic portion of the Boundary survey will include all specific items stated on scope of services on attached PDF including all above ground features and improvements will be located including: fences, walls, buildings, and appurtenances, fire hydrants, manholes, catch basins, meters, valve boxes, existing lighting, pavement markings, trees, visible above ground utilities, and drainage structures (including rim elevations), etc.
- Tree survey will be performed for all trees with 4" caliper. Tree spread, height and common name (if known) will be shown.

**3.0 Cross Sections**
- Elevations will be established on a 50-ft grid along the entire property and including crown of road on all adjacent streets. The existing building finish floor elevation will be obtained.

**4.0 Drainage Survey**
- Drainage structures will be located. The survey will identify the type of structure, rim elevation, pipe invert elevation, pipe materials, direction, size and condition.

*Note: In cases were structure is full of water and or sediment, MGV will visit said structures a maximum of 2 visits; if structures is still un-accessible, said structure will be noted as such in survey.*



**Cardno TBE will perform utility designations and locates with the blue boundary as depicted within "Survey City Hall Area pdf" provided by M.G. Vera and Associate**s.

1.0 Utility **Designation**

- Cardno TBE will horizontally mark and identify known underground utilities that are represented on as-built plans (if available), above ground appurtenances, and other miscellaneous utility records within the project site. Conductive utilities will be marked utilizing geophysical prospecting techniques in conjunction with electromagnetic equipment utilizing radio and audio frequencies. Known nonconductive utilities and/or structures will be marked utilizing 2-d radar, above ground features, professional judgment, utility plats and/or as-builts.

2.0 Utility **Locating**

- Cardno TBE will perform test holes (up to 10) at locations to be determined by the design engineer. Cardno TBE will notify Sunshine One-Call 48 hours in advance of excavation. Vacuum Excavation will be utilized to expose utilities to minimize any potential for damage. Test holes performed will be of minimum size (usually 1' by 1'). These Test holes will provide horizontal coordinates, vertical elevations, size, type, and material (Test Hole Report). Backfill of test holes will be performed utilizing material removed, if suitable. Areas will be restored back as close as possible to their original condition. Test holes performed in the street/parking lot will be patched using cold patch. Basic maintenance of traffic (signs, cones) will be included.

**7.4 Geotech – New Miami Gardens City Hall**

**1.0 INTRODUCTION**

The URS Boca Raton office will perform a Preliminary and updated Final Geotechnical Investigation for the proposed Miami Gardens City Hall, Miami Gardens, Fl.  This proposal is of an initial preliminary nature at this stage of the project development as the nature and the footprint of the new structure is yet undefined.  The recommendations to be initially provided will be of sufficient extent so as to allow the project conceptual and preliminary structural design to proceed.  This report will be capable of being upgraded to a final report at a later date once the project design, building footprint and structural loading information become well defined.  Initial indications are that the structure will likely be no more than 4 stories in height with an attached parking garage.  LEED certification may well result in the roofs or the upper levels of the structures being used for green space applications.

**2.0 SCOPE OF WORK**

The purpose of our geotechnical investigation is to explore the subsurface conditions underlying the project site, and to develop preliminary and final recommendations for foundation design for the proposed structures.  Our initial preliminary phase study will include the following tasks:

**2.1      Field Investigation**

For the initial geotechnical study, we propose to drill a total of five (5) borings to a depth of 60 feet each. We plan to drill four borings in the corners of the existing site and one in the center of the project area, albeit drill rig access and utility conflicts permitting.


The borings will be drilled with a truck-mounted drill rig using rotary wash methods. In each boring, continuous soil samples will be recovered within the upper 10 feet, and every 5 feet thereafter using a Standard Penetration Test (SPT) split-spoon sampler. Soil and rock samples obtained throughout the field program will be examined in order to establish site stratigraphy. Groundwater levels will be measured at the completion of drilling operations at each boring location. Borings will be grouted up upon completion of the drilling and sampling activities.

We will administer the drilling subcontract and provide a senior engineering inspector to observe drilling and field classify retrieved soil and or rock samples.

Our proposal assumes that the proposed boring locations will be accessible to a truck-mounted drill rig, and that City access to the site and boring locations will be provided to us at no additional cost. We assume also that the right-of-entry to the property has been secured from the present City(s). URS will clear boring locations prior to drilling as required by state FAC regulations.

## 2.2    Preliminary Engineering Analysis and Report Preparation

To begin the engineering portion of the work, URS will review the site Phase 1 report and any other geotechnical related information available for the site.

Based upon the results our field investigation, we will perform engineering analyses and develop preliminary engineering conclusions and recommendations regarding the geotechnical aspects of site development and foundation design and construction. The results of our study will be presented in a written preliminary report that will address the following:

- Subsurface conditions at the site including ground water levels measured at the time of drilling.
- Preliminary recommendations for feasible foundation types for the proposed building and parking structure, as well as for any associated lightly loaded structures such as privacy walls signage and miscellaneous fountains.
- Discussions of structural foundation settlement and anticipated foundation performance.
- Site preparation and grading recommendations including the use of on-site material.
- Construction considerations such as existing foundation removal, subgrade preparation for floor slabs, dewatering and excavation safety.
- Dewatering considerations including actions necessary to mitigate dewatering related impacts to any nearby offsite environmental contamination source.
- Recommendations for pavement designs.

## 2.3    Final Engineering Report Preparation

As the project design evolves and once structural foundation designs and loadings become well defined, URS will review foundation loading and design information provided by the buildings structural engineer and will update our preliminary Geotechnical report to a Final status for the more current data.

Based on our extensive south Florida experience, we do not anticipate the need for any additional site borings for the Final report however, we reserve the right to recommend such additional work as a change in scope/cost to this proposal should site conditions uncovered by the preliminary phase work indicate significantly variable conditions exist on the site.

We will prepare and submit a Final Geotechnical Report suitable for building permitting support purposes with the applicable building departments. This report will be signed and sealed by a registered

professional in the state of Florida highly experienced in the foundation design requirements for such structures

**7.5 FF&E – New Miami Gardens City Hall**

**1.0  FF&E Scope of Work[2]**

1.1        <u>PROGRAMMING AND PROJECT ORIENTATION PHASE</u>

1.1.1     Assist in the preparation of a Program of Requirements (POR) to ascertain functions, FF&E needs and other requirements for the Project.  As a part of development of the POR, URS will provide guidance on appropriate office standards for functional configuration, office size, adjacencies, and furniture/equipment standards. The standards will become a part of the Project Planning documentation and will be used in developing and confirming the parameters of the overall Project Program.

1.1.2     Review the POR with City to determine current and future goals and functions for their work areas, adjacencies, anticipated growth, aesthetic needs or desires and shall verify completeness of the Furniture requirements. This review includes surveying existing spaces and work methods and documenting file and storage requirements. In addition, existing furniture and equipment will be inventoried potential for re-use documented.

1.1.3     Adjust program.  List all Furniture needs for the Project.

1.2        <u>SCHEMATIC DESIGN PHASE</u>

1.2.1     Establish overall direction for project furnishings with planning team members.

1.2.2     SD plans consisting of 1/4" or 1/8" scale floor plans and information indicating the planning of all Using Agency functions and design intents.  Draft CAD floor plans.

1.2.3     Conduct working sessions with the identified user representatives to review the floor plans and revise the drawings as required

1.3        <u>DESIGN DEVELOPMENT PHASE</u>

1.3.1     Develop the design for the Project and make initial furniture selections for each product type.  Conduct working sessions with the identified user representative(s) to review proposed furniture items for the project.

      A.     DRAWINGS

- Space planning layouts depicting all furniture items.
- Select elevations and other drawings indicating the location of all FF&E items.
- Indicate all new versus existing FF&E and all other items needed for planning reference within the interior space.

      B.     FURNITURE SELECTIONS –

- Develop recommendations for selections of furnishings including fabrics and finish options for all furniture.
- Coordinate with Building materials and finishes.

1.3.2     Develop outline specifications of all new furniture items.
The specifications shall indicate all quantities, room assignments, sizes, options, finish selections, and all other pertinent information.

---

[2] The following scope of work assumes URS is involved performing FF&E work as the project is being designed. the City does not exercise this Additional Service at the start of the project, the individual line items will change to reflect the state of the project at that time.  Some decisions made in the early stages of design regarding office space standards may have an adverse impact on FF&E selections.

1.3.3      Coordinate and organize Furniture presentations including presentation boards, mockups, site tours, manufacturer presentations or combinations of the above or whichever may be necessary to make selections for FF&E.

1.3.4      Provide information to the City regarding furniture cost estimate.

1.3.5      City meeting to obtain signature approval on the final DD documents.

*** Per direction provided during the fee negotiation, the City may desire to procure final design services for procurement of the FFE for the Project from another source. As a result the following services are not included in the fee proposal. If desired these services can be provided for an equitable adjustment in fee.

2.1      <u>CONTRACT DOCUMENTS PHASE</u>

2.1.1      FF&E DRAWINGS –
           Final furniture plans for all new Furniture; reference within the interior space, keyed to specifications.

2.1.2      FURNITURE SPECIFICATIONS -
           Final furniture specifications started in the DD and shall include all information regarding complete product numbers, options, finishes and materials.

2.1.3      Develop furniture cut sheet and furniture material documentation.

2.1.4      City meetings to obtain signature approval on the final Contract Documents

2.1.5      Issue final Contract Documents

2.1.6      Coordinate with City regarding telephone and communication

2.1.7      Coordinate with teammates regarding data and electrical

2.1.8      Coordinate with teammates regarding all other architectural issues

2.2      <u>BIDDING AND NEGOTIATION PHASE</u>

2.2.1      Issue requisitions for purchase, and distribute Drawings and specifications to prospective bidders.

2.2.2      Respond to questions from bidders.

2.2.3      Preparation of any addenda

2.2.4      Review bids/ quotes for compliance with specifications.  Check item quantities and parts for completeness on all orders.

2.2.5      Summarize bids and package for submittal to City for City processing of purchase orders.

2.3      <u>CONTRACT ADMINISTRATION</u>

2.3.1      Contract Administration will commence with the award of the Contracts and terminate after the furniture punch list is complete.

2.3.2      Visit the construction site to observe details affecting the later installation of Furniture and to observe finish material installations and other construction details affecting the FF&E work.  Communicate and coordinate any conditions and concerns affecting the work.

2.3.3      Review and approve all shop drawings, sample submittals and other submissions of the Vendor and take appropriate action regarding these.

2.3.4      Monitor the status of Furniture orders with each Vendor and shall schedule all installations in accordance with the schedule of the Construction Completion.

2.3.5      Conduct a pre-installation meeting with all vendors prior to the installation.  Review the delivery schedule, delivery procedures, access to the site and the building, review of installation drawings, review of conditions at the site, parking and any revisions which have occurred.

2.3.6      Oversee the Furniture installations and check each for conformance with the Contract Documents.

**URS**

2.3.7     Prepare written punch lists showing items that require correction or completion by the Vendor.  Upon completion, provide written documentation that the work has been completed and final payment should be approved for each Contract.

2.3.8     Conduct closeout inspections and walk the site with the City for final inspection.

2.3.9     <u>OTHER ADDITIONAL SERVICES</u>

- Providing special product analysis or post occupancy evaluations.

- Preparing drawings, specifications and other supporting data in connection with the preparation of Change Orders that are required by causes not within the control of the Interior Designer.

- Providing professional services made necessary by the default of the Contractor/Vendor in the performance of the work or by major defects or deficiencies in the work of the Contractor/Vendor.

- Providing services with respect to the project after final payment to the Contractor/Vendor.

- Providing selection or specification services related to building materials and finishes.

- Providing professional services regarding equipment and non-furniture items including but not limited to artwork and signage.

**7.6 LEED Certification – New Miami Gardens City Hall**

**LEED Certification Process Management**

Based on direction provided during fee negotiation, URS will provide management and oversight of the process of preparing and submitting the LEED Certification Application for the Miami Gardens City hall project.

The LEED Certification Process Management will include the following minimum scope of work:

Goal:  To establish project design criteria and to coordinate the preparation and submittal of LEED Certification documentation application required to obtain LEED Platinum Certification from the U.S. Green Building Council for the Project.

**ACTIVITIES:**

1.0 ENERGY MODELING

1.1 Assess the energy and economic performance of a number of energy saving design features that could be integrated into the proposed design.  These energy saving design alternatives will be identified during the Programming process.  Activities will include:

a. Create an energy model of the building as a means of defining the baseline energy performance of the building.

b. Individually incorporate potentially viable energy saving design strategies, identified during the Project Definition meeting or conference call, and calculate the annual energy savings resulting from these energy saving design strategies.

c. Create a number of design "packages" based on the individual measure analysis conducted in previous activity b, and calculate the annual energy savings resulting from each package of energy saving design strategies.

d. Organize the results of the individual and package analysis of the energy saving design strategies into a brief report or PowerPoint presentation for presentation to the designated stakeholders in the Project.

e. Present the results of the individual and package analysis of the energy saving design strategies, and determine which individual or package of measures is most appropriate for inclusion in the recommended design solution.

f. Incorporate the selected energy saving design strategies (from previous activity "e") into a new energy model and calculate its performance and energy savings compared to the baseline building and to ASHRAE 90.1 – 2004 Appendix G.

g. Prepare a report that summarizes the results of the preliminary design of the building.

## 2.0 PROGRAMMING, SCHEMATIC AND DESIGN DEVELOPMENT PHASES

Activities will include the development and refinement of the sustainable design strategies, and the definition / specification of the targeted LEED credits.  Inclusion of the selected sustainable design strategies (applicable LEED credits) in the plans and specifications and tracking of individual LEED credit compliance will be initiated.

2.1 Organize and conduct a meeting, or conference call, to address the LEED assessment of the current design; to make recommendations for achieving additional LEED credits; to develop a plan for evaluating and integrating those LEED criteria deemed appropriate and achievable for the project; and to make a presentation of LEED Certification documentation requirements.

2.2 Identify specific Design Team responsible parties/contacts and a delivery schedule for each phase providing documentation demonstrating compliance with each selected LEED criterion.

2.3 Develop a comprehensive LEED task list assigning responsible parties and identifying critical dates, deliverables, actions associated with all targeted LEED credits.

2.4 Conduct assigned special investigations and analyses in support of the sustainable design of the design solutions.

2.5. Assist the Design Team members in understanding where to integrate the targeted LEED criteria into the revised plans and specifications and provide tools to perform preliminary calculations substantiating compliance with the LEED criteria.

2.6 Review plans and specifications throughout each phase to ensure proper implementation and documentation of the selected and integrated sustainable design features.  Send comments and recommendations to the Design Team.

2.7 Set up the LEED online webpage for the project.

## 3.0 CONSTRUCTION DOCUMENT PHASE:

The Construction Documents Phase activities focus on the integration of the selected sustainable design and construction strategies into the plans and specifications and the preparation of other documentation--narrative, calculations, templates - which substantiates compliance with the targeted LEED criteria. Additionally, at the conclusion of the Construction Documents Phase, the "Design Phase" LEED Certification Application is prepared and submitted to the USGBC through the LEED on-line submittal process.

3.1. Participate in a Construction Documents Phase Kick-off Meeting, or conference call, with the Design Team to review the overall design--architectural, structural, mechanical, electrical, and sustainable design; to confirm the LEED Scorecard and Certification documentation requirements; to assign/review on-going responsibility for providing/revising documentation which demonstrates compliance for each LEED criterion; and to establish a LEED Certification process time-line during the Construction Documents and Construction Phases of the project.

3.2  Review plans and specifications throughout Construction Documents preparation to ensure adequate documentation of the selected and integrated sustainable design features.  Send comments and recommendations to the Design Team.

3.3  Assist selected Design Team members to prepare other required LEED Certification submittals, not normally included in traditional construction documents.  Provide examples of the LEED Certification documentation to facilitate the efficient preparation of the requested information.

3.4  Assist the design team in assembling final "Design Phase" LEED Certification documentation into the USGBC's LEED on-line platform, and review for completeness and quality.  Where information is found to be missing or quality lacking, contact the responsible individual to resolve the deficiency.

3.6  Prepare a final "Design Phase" LEED Scorecard based on prepared Design Phase Certification documentation which reflects the sustainable design features integrated into the final design solution.

3.7  Officially submit via LEED on-line, the completed "Design Phase" LEED Certification Application to the U.S. Green Building Council.

3.8  Coordinate Design Team responses to questions or clarification requests from the U.S. Green Building Council LEED review team.  Where possible, URS staff will formally respond to questions or requests from the USGBC review team.

**4.0 CONSTRUCTION ADMINISTRATION PHASE:**

The Construction Administration Phase activities are concerned with the construction team's compliance with the LEED criteria and review and submittal of the "Construction Phase" LEED Certification Application to the USGBC through the LEED on-line submittal process.

4.1  Conduct a site visit early during the construction process to meet with the on-site Project Team representative, the DEVELOPER/CM, and appropriate subcontractors to review the targeted LEED criteria and to ensure proper documentation is and will be maintained.  Project Team construction administration and design staff will be responsible for gathering all required information from the general contractor (and installing subcontractors) needed to substantiate compliance with each construction related LEED criterion. In particular, the DEVELOPER/CM will be responsible for maintaining and  completing the LEED calculator for the Material and Resource credits. However, URS LEED Certification  coordination staff will work with the DEVELOPER/CM and other team members to ensure that all required LEED related documentation is being properly collected and documented. URS' responsibility will be to inform the DEVELOPER/CM and City Representative of non-compliant performance.   The DEVELOPER/CM will be responsible for implementing corrective action in this phase.

4.2  Coordinate with the assigned individual from the DEVELOPER/CM all design-related, site-related and construction-related LEED Certification requirements.  The General Contractor will need to establish policies and procedures to capture and record information needed to demonstration compliance with the construction-related LEED criteria.

**URS**

4.3 Respond to subcontractors questions as needed regarding directions for completion of LEED Submittal Cover Sheets and information requested by the DEVELOPER/CM.

4.4  Review preparation by the DEVELOPER/CM of all "Construction Phase" LEED Certification documentation, and advise of non-compliance if necessary. The DEVELOPER/CM will be responsible for corrective action that may be required.

4.5 The DEVELOPER/CM will assemble all "Construction Phase" LEED Certification documentation into the LEED Certification Application on-line platform, and review for completeness and quality.

4.6 The DEVELOPER/CM will submit via LEED on-line, the completed "Construction Phase" LEED Certification Application to the U.S. Green Building Council.

4.7 Coordinate Construction Team responses to questions or clarification requests from the U.S. Green Building Council LEED review team. The DEVELOPER/CM or URS will be responsible for responding  to USGBC review comments as appropriate.


**5.0 DELIVERABLES:**

Energy Modeling:
5.1 Prepare a written report or PowerPoint presentation on the individual and package energy saving strategy analysis results.

5.2. Prepare a summary report on the results of the energy analysis undertaken on the preliminary design of the building.

Design Development Phase:
5.3. Prepare meeting minutes from all meetings and telephone calls.

5.4. Prepare letter reports summarizing comments and recommendations on plans and specifications in regards to compliance with each LEED criterion and proper documentation of compliance with each LEED criterion.

5.4 Prepare a LEED Design Development Phase task list with responsible parties for Design Phase LEED credit documentation activities.

Construction Documents Phase
5.5 Prepare a timeline for LEED Certification documentation preparation, and Project Team responsibilities for preparing and providing documentation demonstrating compliance to each LEED criterion.

5.6 Prepare letter reports summarizing comments and recommendations on plans and specifications in regards to compliance with each LEED criterion, and proper documentation of compliance with each LEED criterion.


5.7. Update the LEED Scorecard and to include recommendations for maximizing LEED credits achievable.

5.8 Submit (via on-line platform) the "Design Phase" LEED Certification Application to the U.S. Green Building Council to formally review documentation for LEED Certification.

5.9 Prepare formal responses to U.S. Green Building Council questions or requests for additional information during the formal LEED compliance review process.

Construction Administration Phase

**URS**

5.10    Review general contractor-developed LEED Construction – related documentation to substantiate compliance with the LEED criteria, with specific comments and recommendations back to the responsible project team member.


Schedule:

5.11    Prepare a complete schedule for completing all LEED defined activities in cooperation with the City Project Manager.


**7.7 Enhanced Commissioning – New Miami Gardens City Hall**

**Scope:  Project: Miami Gardens New City Hall/Police Building: LEED Commissioning ("Project")**

The Spinnaker Group, Inc. ("Consultant") is pleased to provide a proposal to provide Professional Services for URS Corporation. ("City") concerning the Project by providing **LEED credit EAc2 - Enhanced Commissioning or LEED Prerequisite Fundamental Commissioning.** Commissioning will be performed on the entire Project including, but not limited to, the Project's systems which are defined as energy using systems by USGBC. The Commissioning Services will consist of the following, which are broken down between Fundamental Commissioning and Enhanced Commissioning. The City can elect whether it wishes to obtain Fundamental Commissioning or Enhanced Commissioning. Such election should be made by not later than Design Development

**Project Understanding**
New City Hall: 63, 024 sf. -New Police Building: 58,189 sf. -New Multistory Parking Garage for approximately 500 vehicles.

The Fundamental Commissioning Services of the Commissioning Services consist of:

1.0 Develop Commissioning Requirements for the Project. It is not the responsibility of the Consultant to incorporate the Commissioning Requirements into the Project plans.

2.0 Meet with the Project general contractor, design architect and City to explain the commissioning process for the Project, including:
        (i) Provide written answers to questions from the City, design architect and contractor on commissioning questions prior to City's execution of the contract of construction for the Project;
        (ii) Provide answers to questions from the City, design architect and contractor after execution of the contract of construction for the Project.

3.0 Develop a Commissioning Plan for the Project which will incorporate comments from the City, the design architect and all other consultants involved in the design and development of the Project (the "Design Team") and the Project contractor.

4.0 Verify that Energy Consuming Systems (HVAC, lighting, domestic hot water) Installation of the Project meet requirements of the USGBC, including:
        (i) Development of Pre-Functional Tests;
        (ii) Development of Functional Tests;
        (iii) Observation and acceptance of Pre-Functional Tests;
        (iv) Observation and acceptance of Functional Tests; and
        (v) TAB (Test and Balance) reports;

5.0  Prepare Commissioning Management Report (Commissioning Final Report). The Report shall include an executive summary, list of participants and their roles, brief description of the Project, and thorough text on each of the following sections:

      (i) Design Intent;
      (ii) Basis of design;
      (iii) Pre-functional checklists are complete;
      (iv) Functional checklists are complete;
      (v) TAB (Test and Balance) reports;
      (vi) System schematics;
      (vii) Control strategies and set points; and
      (viii) Deficiency Log.

The Enhanced Commissioning Services of the Commissioning Services consist of:

6.0 Document City's Project Requirements and Basis of Design;

7.0 Perform a focused design review which shall include the following:

      a) input regarding making the Project easier to commission;
      b) how building maintenance can be made easier (accessibility and system control, etc.);
      c) are systems consistent with design intent and
      d) how utility usage and Indoor Environmental Quality can be improved;

8.0 Meet with the Project general contractor, design architect and City to explain the commissioning process for the Project, including:

      (i) Provide written answers to questions from the City, design architect and contractor on commissioning questions prior to City's execution of the contract of construction for the  Project
      (ii) Provide answers to questions from the City, design architect and contractor after execution of the contract of construction for the Project.

9.0 Review and recommend for approval, disapproval or conditional approval submittals by the Project general contractor, applicable to systems being commissioned for compliance with Commissioning needs;

10.0 Develop a Systems Manual and deliver same to City;

11.0 Develop Re-Commissioning Manual for future City occupants to ensure systems continue to operate in optimal conditions;

12.0 Verify Training of Systems Operating Personnel and of Tenant Space Occupants; and

13.0 Provide a contract for post occupancy review.

      (ii) Development of Functional Tests;
      (iii) Observation and acceptance of Pre-Functional Tests;
      (iv) Observation and acceptance of Functional Tests; and
      (v) Observation of Test and Balance.

The Consultant agrees to provide the Commissioning Services in a timely manner so as not to cause the Project to be delayed because of the Commissioning Services. Smoke Evacuation system testing and life safety system are specifically excluded from this contract.



**7.8 Landscape – New Miami Gardens City Hall**

LANDSCAPE ARCHITECTURAL SERVICES

URS landscape architectural staff will utilize principles of sustainable planning and design (e.g.: water and energy conservation; alternative energy sources; natural cooling and ventilation; water re-use; recycled local materials; renewable resource materials; etc.), principles of Crime Prevention Through Environmental Design (CPTED: e.g.: natural surveillance, territorial reinforcement, and glare-free, natural color security lighting, etc.) and principles of universal access  (the more stringent mandated Florida Building Access Code requirements) throughout the planning and design process. The scope of the landscape architect's work may include, but not be limited to: exterior ground plane treatments; plantings, site furnishings (bicycle racks, drinking fountains, bollard, lights, signs, benches, trash receptacles, flag poles, sculpture, food concession facilities, etc.) green walls, green roofs, irrigation, exterior evaporative cooling techniques, rain harvesting, daylight harvesting; channeling of cooling breezes, reduction of urban heat island effect, solar and wind powered lighting, creation of places for people and their desired activities (people watching, sitting, playing, shopping, eating) and public places that symbolize the City's unique sense of place, and the values of its residents and leaders, and the image and identity ( the diverse vibrancy of a "Miami "and the scale, beauty and ecological  sustainability of "Gardens") that the City wants to project to its guests and visitors. The major phases of the landscape architectural work shall include, but not be limited to:

**Task 1 - Preliminary Development Program and Site Review**

URS landscape architectural staff will review the City of Miami Gardens Development Program and assess the site's physical conditions, utilities, existing vegetation, and relationship to adjacent, or nearby land uses, features and facilities. URS landscape architectural staff will also assess the land development and environmental regulatory opportunities and constraints that relate to the site. During this phase and subsequent phases public area design approaches and standards proposed by the Developer/GC (and adopted by the City) for an cohesive linkage of physical spaces between public and private development areas will reflected in the landscape services to be performed.

**Task 2 - Schematic Design Development**

URS landscape architectural staff will collaborate and coordinate with project architect, site civil engineers and the City's designated Developer/GC to develop, up to three, alternative landscape architectural conceptual plans.  Particular attention will be paid to the potential connectors to the adjacent sites, public access points, plans, and overall urban public space design guidelines/standards adopted by the City in conjunction with the anticipated collateral private redevelopment of the adjacent shopping center property. An order-of-magnitude opinion of probable construction costs will be developed for each plan alternation. The alternatives will be presented to the City for review, evaluation and selection. All schemes will incorporate features which try to assist in the goal of attaining the City's goal of LEED Platinum certification. URS landscape architectural staff will use the approved selected preferred alternative conceptual plan and develop a schematic landscape architectural plan that will begin to establish construction requirements to achieve the desired results illustrated in the conceptual plan. A preliminary outline of specifications will also be developed. The opinion of probable landscape architectural construction costs will be updated. The schematic package of drawings and cost estimate will be submitted for review and approval in coordination with all other URS services.

**Task 3 - Landscape Architectural Design Development**

Using the approved schematic plans, URS landscape architectural staff will develop the final 100% complete Design Development plans, details and specifications, and prepare an updated opinion of probable landscape architectural construction costs. The 100% complete package will be submitted for review and approval in coordination with all other URS services.

**Task 4 - Landscape Architectural Construction Documents**

Using the approved Design Development plans, URS landscape architectural staff will develop the final 100% complete Construction Documents, details and specifications, and prepare an updated opinion of probable landscape architectural construction costs. The 100% complete package will be submitted for review and approval in coordination with all other URS services.

**Task 5 – Permitting**

It is our understanding no specific landscaping permit is required.  URS landscape architectural staff will, if such additional services are required and authorized: by the City, collaborate and coordinate with project team members and assist, as required, with scoping meetings; preparation of permit applications; pre-submittal meetings; and respond  to agency Requests for Additional Information (RAIs).

**Task 6 - Landscape Architectural Construction Services**

URS landscape architectural staff will provided responses to landscape architectural questions that may be raised at a pre-bid conference (8 hours). The bids received shall be reviewed and recommendation submitted (8 hours).  A pre-construction meeting for the selected contractor awarded the work will be attended by one of URS' landscape architectural staff (8 hours).  Approved suitable plant material will be tagged at nurseries (24 hours). Shop drawings for landscape architectural elements shall be reviewed (40 hours).  The testing of the irrigation system will be observed (8 hours). The location, depth and condition of planting pits and beds will be observed prior to plant installation (8 hours). Installed plant materials shall be observed (24 hours). Prepared pavement sub-bases will be observed prior to paving (24 hours). The staked location of site features and furnishings will be observed prior to installation (24 hours). Landscape architectural work punch lists will be prepared (24 hours). Landscape architectural project close down will be completed (24 hours).

**Additional Services**

Professional services that are not specifically identified in the above scope of professional services are not covered under this agreement, but may be authorized in writing to be provided as additional services. If any of the following services are required or any variations in the scope of services, URS will either provide these services on a time charge basis or, if requested, will prepare a separate proposal for the work. These services may include, but not be limited to, items such as:

- Scoping, preparation and processing of an Application for Development Approval for a Development of Regional Impact (ADA/DRI);
- Development Review Committee (DRC) process (preparation of preliminary site plan, existing site conditions, and proposed development exhibits; and participation in informal preliminary DRC meeting and formal DRC presentation);
- LEED certification services and the design of any non-standard, innovative, sustainable facilities and/or systems;

- Community Involvement Program (CIP) development, implementation, and/or facilitation;
- Florida Department of Transportation (FDOT) permit applications and/or processing for landscape, irrigation, lighting, utility, driveway and/or drainage;
- South Florida Water Management District (SFWMD) permit applications and/or processing for storm water drainage and/or consumptive water use.
- Miami-Dade County (MDC) Department of Environmental Resources Management (DERM) permits for storm water drainage, wells, and/or tree removal;
- Meeting and coordination with highway and transit professionals regarding the integration of traffic and transit facilities with the project;
- Work outside the property's legal boundaries;
- User Identification, user needs identification, program development; and
- Overall conceptual plan development.
- Surveying services for boundary, topography, elevations and tree surveys;
- Special requests by lending institutions or other parties not essential to completing the work described in the scope of services;
- Easement or right-of-way vacation or dedication services,
- Mechanical, electrical, or structural engineering services,
- Wetland related services; this could include actual delineations and surveys for agency review/approval as well as any mitigation design/permitting;
- Redesign services, including revisions to analysis or plans due to revisions dictated by the City, URS, or other consultants (MEP engineer, etc.) after work described above has been completed;
- Services associated with the fast tracking of the planning, design, permitting or construction of the project; this would include extra meetings and coordination, early and/or extra submittals, issuance of separate construction plan packages, etc.;
- Variances or special approvals;
- Services associated with the preparation, submission, and processing of any permit, that includes, but not limited to tree removal permits; driveway permits; utility permits, environmental resource permits and building permits.

URS will notify the City in advance of any efforts that are outside the scope of services for this project and will provide an estimate to complete the Additional Service task(s).

City Responsibilities

The City will be responsible for providing the following:

- Legal description, boundary and topographic survey (including tree survey) of the property.
- Permit application fees.
- Legal services, if required.
- Final coordination and contractual arrangements with the appropriate utility companies as required for the design and installation of telephone, electric, gas and cable television services.
- Available site data, including all relevant site plans (AutoCAD 2005), as-built surveys and soils data if available.

All information supplied by the City will be assumed to be complete and accurate.

**7.9 Local Artist Allowance Account – New Miami Gardens City Hall**
An Account Allowance has been set up in the event the City wishes to engage a local artist to design a piece of art which would be incorporated into the final building design.  URS will coordinate with the artist to the extent the piece is incorporated into the final design.  This account is drawn upon only with the City's permission.

**7.10 Radon Testing Allowance Account – New Miami Gardens City Hall**
 An Account Allowance has been set up in the event the City wishes to have the buildings tested.  This account is drawn upon only with the City's permission.

## PROJECT MANAGEMENT

**8.   PROJECT MANAGEMENT ADMINISTRATION**

8.1 URS' Project Management Administration is provided with one concise point of communication. The URS Project Manager will be the focal point of communication between the City and the Developer/GC for the entire project.   Each design entity has a specific department head who reports to the Project Manager.

8.2 The project Management Team will be as follows: Project Manager, Ty Shinaberry, Lead Designer, Jim Brennan, Project URS, Phil Paulin, Structural Engineer, Mark Zimpelman, Mechanical Engineer, Mike Wood, Electrical Engineer, Ashok Maheshwari, Civil Engineer, Brett Oldford, Landscape, Chris Masey, and Geotech, Tom Mullin.

8.3 The URS Project Management Administration team shall be vested with the authority to act on behalf of URS.  If any person is unfit for their duties, or the City, in its reasonable discretion, deems any person unfit for their duties, then URS will remove that person from the project upon demand from the City.  The replacement for person(s) so removed shall be subject to City's prior written approval, which shall not reasonably be withheld.

## DEPARTMENT OF ENERGY REQUIREMENTS

**9.  URS will comply with ARRA requirements per attached Exhibit C**

## NOTICES

**For this engagement only all notices will be issued to the following:**

> Lewis Robinson
> URS Group
> Suite 300
> 2020 K Street NW
> Washington, DC 20006



MIAMI GARDENS CITY HALL PROJECT
PRELIMINARY PROJECT SCHEDULE

EXHIBIT "B"
20-Jul-10
Fee Schedule

**Work Phases**

| | | |
|---|---|---|
| Programming/Due Diligence Phase | $ | 168,000.00 |
| Schematic Design Phase | $ | 315,000.00 |
| Design Development Phase | $ | 525,000.00 |
| Construction Documents Phase | $ | 1,050,000.00 |
| Bidding Phase | $ | 42,000.00 |
| Construction Phase | $ | 400,000.00 |
| Total Fees | $ | 2,500,000.00 |
| Direct Cost | $ | 22,300.00 |

1. Fees are to be invoiced and paid by Phase. Any Phase extending past 30 days will be invoiced monthly, pro rata to work then completed.
2. The City shall retain 10% of each invoice, until completion of each specified Phase of the Scope of Work.
3. Once a Phase has been completed and the City has accepted the work product, URS will invoice for the retention.
4. Direct costs will be invoiced pro rata monthly by Design, $1,250/month for 10 months and Construction, $595/month for 16 months.
5. Fees for "Additional Services" are to be invoiced and paid consistent with 1-3 above, except where there are specific work products to be provided (e.g. Traffic, Site Survey, and Geotechnical); where specific work products are to be provided, invoicing and payment, without a retention, shall occur after submission and acceptance of the work product.
6. Direct Costs include Internet Document Control WebSite, printing, reproduction plots, scans and standard form documents except six sets at milestone events, postage handling and delivery, and project related expences.
7. E&O Insurance will be increased from $1M to $2 M.

| | | |
|---|---|---|
| Traffic Study/Signalization | $ | 35,000.00 |
| Civil Engineering | $ | 221,600.00 |
| Security/EOC Technology Design | $ | 62,000.00 |
| LEED Certification (Platinum 80 points +) | $ | 87,000.00 |
| FF&E | $ | 106,000.00 |
| Landscape Design | $ | 135,300.00 |
| Enhanced Commissioning | $ | 69,471.00 |
| Site Survey | $ | 13,400.00 |
| Geotechnical work | $ | 18,500.00 |
| Local Artist (Allowance Account) | $ | 100,000.00 |
| Radon Testing (Allowance Account) | $ | 4,000.00 |
| Total | $ | 852,271.00 |

3

EXHIBIT "B"
20-Jul-10
Fee Schedule

| | |
|---|---|
| 1 | This fee schedule is based on the following assumptions: The hard construction budget for the Project has been defined by the City as a maximum of $36,500,000. In the event that a higher level of design and associated increase in construction cost is desired and approved, and to the extent that those increased budget criteria affect the AE effort, an equitable adjustment in fee will be negotiated. The City has also indicated that the Design Phase should be 40 weeks (10 months) in duration and Construction will be 64 weeks (16 months) in duration. All fee elements that include periodic meetings or site visits are based on those durations. We have included fees for attendance by AE design staff at a weekly coordination conference call, during design, with a duration of 2 hours. We have included fees for site visits during construction based on a single person one day observation visit per month, two single person visits per discipline to review construction progress and one single person, two day punch list visit per discipline. |
| 2 | It has been assumed that the Contract Documents will be issued as a single "For Construction" set. If multiple bid packages are required (Mass Excavation/Site Prep, foundations, long lead equipment, etc.) there are additional tasks, packaging and document control efforts that will be required. In the event that the City's Developer/GC determines that multiple bid packages are required, URS will evaluate the additional effort required and prepare a detailed proposal of additional labor and direct costs for review by the City. It is assumed that an equitable adjustment will be made to the Work Order to accommodate any additional effort associated with these tasks. Depending on the size, scope and complexity of these packages the additional costs could range from $10k to $30k. |
| 3 | URS has included effort for estimating/quantity take offs in support of a third party Developer/estimating process. We have assumed that URS will provide estimates (with appropriate levels of contingencies) at the completion of Program Validation and an 85% level of completion of the CD submittal. It is assumed that major design revisions will not be required after the DD level of completion as a result of any on-going developer budget validation process. After that level of design completion, the estimated construction cost reductions will include the costs of the associated changes in design work or redesign. |
| 4 | It is assumed that weekly team meetings will be held by conference call during design and construction phases. The PM will be available for all conference calls. Additional architectural and engineering attendance will be available if required. Milestone reviews (Concept, SD, DD and CD) will be held in the URS Miami office. URS will attend a Kick-off meeting site visit. |
| 5 | To facilitate coordination, reviews and team coordination, URS proposes use of an internet project management and document control system. To that end, we have included costs (in the Estimated Direct Costs page) to cover costs of a file server such as Prolog or Buzzsaw for the duration of the Project. This duration, from start of design to completion of construction is anticipated to be 26 months. (10 months of design and 16 months of construction). This is shown as a line item in the Direct Costs summary. In the event that this service is not desired or will be provided by the Developer/GC, this item will be deleted. |
| 6 | Traffic Study is limited to impacts caused by the Project under this scope of work |
| 7 | Items listed as Allowance Accounts are estimates only, to be confirmed with additional definition of scope. These costs will not be expended or exceeded without prior approval by the Client |

3

EXHIBIT "B"
20-Jul-10
Fee Schedule

| | |
|---|---|
| 8 | For the purposes of developing this fee schedule, the design fees indicated include design of parking control components consisting of ticket dispenser, traffic control arms and parking attendant booth. Additional automated parking controls are considered an additional service and can be provided with an equitable adjustment in the fee, if required. |
| 9 | Fees presented here include efforts associated with the design of LEED Platinum components of the Project. A LEED Checklist will be developed in the Concept Design Phase defining credits targeted by the design to achieve the 80 credits necessary for Platinum Accreditation. As not all checklist items are approved by USGBC upon their review, an additional number of credits "targets" will be identified. While URS will work diligently with the Developer, Contractors, the City and USGBC, this proposal does not constitute a guarantee of LEED Platinum Accreditation. |
| 10 | In the interest of providing the most economical design fee possible, URS anticipates that the parking garage will be a precast structure and design will include functional layout, geometry, and performance specifications for the precaster. Detailed design of CIP superstructure and PC elements will be a part of the performance specifications. Detailed design for foundation and grade supported structures/pavements will be included in the URS Contract Documents. |
| 11 | The fee for FF&E covers preparation of office planning standards for use in Programming with regard to efficient office layouts by function. The FF&E work will include concept development for generic systems furniture layouts and identification of necessary equipment acquisition. An assessment and inventory of existing furniture will be performed along with recommendations for relocation/reuse of suitable existing furniture. It is understood that the City may want to contract with a 3rd party for completion of FF&E procurement documentation. In the event that the City decides to request the completion of these design services from URS, a detailed proposal will be prepared for review and an equitable adjustment in AE fees will be made. |
| 12 | The additional services itemized above as "Additional Services" are anticipated to be included in the URS Contract. Compensation for those services with a approved written scope and fee will be added to the Work Order with a 5% processing fee added for only subconsultants. For those additional services which are noted as Allowance Account, any work listed under those will be done with express direction not to be exceeded without prior written approval by the City. The Civil Engineering fee is based on the assumption that adequate utility infrastructure is available at the boundaries of the site. Sanitary, storm, water and other utilities extensions design beyond the limits of work are not part of the scope. |
| 13 | The current URS Contract with the City of Miami Gardens (Nonexclusive Continuing Professional Agreement) includes requirements for Resident Project Inspection Services as defined by paragraph 2.12. This fee schedule is based on the description of Construction Administration support services described in the proposal and includes periodic site observation services in the frequency described in this Scope of Work. Resident Engineer Inspection Services are not included in this fee schedule. |
| 14 | The fee proposal includes estimated amounts for Direct Costs (reproduction, travel, etc.) itemized below the fees. Exact quantities are not known at this time. These direct costs are an estimate and will not be exceeded without prior written approval |
| 15 | We have no known program requirement, at this time, for provision of any food service facilities. As a result we have not included fees associated with providing design for any concession/food service facility or associated specialty design. If this should be required, we can provide an appropriate fee proposal based on some additional definition of scope. |
| 16 | We have no known requirement for supplemental Project support associated with Public Hearings, Community presentations, etc. that might be associated with a Public outreach effort. If this is required, we can provide an appropriate fee proposal based on some additional definition of scope. The scope of work does include up to four (4) presentations to City Council as requested by the City. |

3

Exhibit C

## ARRA REQUIREMENTS & REPORTING.

The funding for this project is provided in whole by the Federal Government as a portion of the American Recovery Reinvestment Act (ARRA) of 2009. The Recovery Act's purposes are to stimulate the economy and to create and retain jobs. As such, qualifiers hereby agree to the following stipulations by submitting their bids, and the stipulations below shall be a part of the resulting contract with the successful bidder.

**1)  Jobs Data Reporting under the American Recovery and Reinvestment Act of 2009.**
The requirements of Section 1512 of the Recovery Act are summarized below.

Contractors and Sub-recipients must maintain current registrations in the Central Contractor Registration (http://www.ccr.gov) at all times during which they have active contracts or awards funded with Recovery Act funds. A Dun and Bradstreet Data Universal Numbering System (DUNS) Number (http://www.dnb.com) is one of the requirements for registration in the Central Contractor Registration.

Contractors will be required to submit a Jobs Reporting Form at least quarterly and at the completion of the contract. Included in the Jobs Reporting Form is a section to report the contractors DUNS number.

All data submitted to the City of Miami Gardens on the creation and retention of jobs shall be cumulative for the quarter. For example, if you are submitting your report in July 2010, the jobs data will only include hours worked from April 1 – June 30, 2010. When you report the next quarter in October 2010, your jobs data shall only include the hours for July 1 – September 30, 2010.

**2)  Access to Records under the American Recovery and Reinvestment Act of 2009.**
With respect to each financial assistance agreement awarded utilizing at least some of the funds appropriated or otherwise made available by the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, any representative of an appropriate inspector general appointed under section 3 or 8G of the Inspector General Act of 1988 (5 U.S.C. App.) or of the Comptroller General is authorized --
    (1) to examine any records of the contractor or grantee, any of its subcontractors or subgrantees, or any State or local agency administering such contract that pertain to, and involve transactions relation to, the subcontract, subcontract, grant, or subgrant; and
    (2) to interview any officer or employee of the contractor, grantee, subgrantee, or agency regarding such transactions.

**3)  Whistleblower Protections Under the American Recovery and Reinvestment Act of 2009.**
The requirements of Section 1553 of the Recovery Act are summarized below. They include, but are not limited to:

*Prohibition on Reprisals*: An employee of any non-Federal employer receiving covered funds under the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing, including a disclosure made in the ordinary course of an employee's duties, to the Accountability and Transparency Board, an inspector general, the Comptroller General, a member of Congress, a State or Federal regulatory or law enforcement agency, a person with supervisory authority over the employee (or other person working for the employer who has the authority to investigate, discover or terminate misconduct, a court or grant jury, the head of a Federal agency, or their representatives information that the employee believes is evidence of:
• gross management of an agency contract or grant relating to covered funds;
• a gross waste of covered funds
• a substantial and specific danger to public health or safety related to the implementation or use of covered funds;
• an abuse of authority related to the implementation or use of covered funds; or
• as violation of law, rule, or regulation related to an agency contract (including the competition for or negotiation of a contract) or grant, awarded or issued relating to covered funds.

Exhibit C

*Agency Action:* Not later than 30 days after receiving an inspector general report of an alleged reprisal, the head of the agency shall determine whether there is sufficient basis to conclude that the non-Federal employer has subjected the employee to a prohibited reprisal. The agency shall either issue an order denying relief in whole or in part or shall take one or more of the following actions:
• Order the employer to take affirmative action to abate the reprisal.
• Order the employer to reinstate the person to the position that the person held before the reprisal, together with compensation including back pay, compensatory damages, employment benefits, and other terms and conditions of employment that would apply to the person in that position if the reprisal had not been taken.
• Order the employer to pay the employee an amount equal to the aggregate amount of all costs and expenses (including attorneys' fees and expert witnesses' fees) that were reasonably incurred by the employee for or in connection with, bringing the complaint regarding the reprisal, as determined by the head of a court of competent jurisdiction.

*Nonenforceability of Certain Provisions Waiving Rights and remedies or Requiring Arbitration:* Except as provided in a collective bargaining agreement, the rights and remedies provided to aggrieved employees by this section may not be waived by any agreement, policy, form, or condition of employment, including any predispute arbitration agreement. No predispute arbitration agreement shall be valid or enforceable if it requires arbitration of a dispute arising out of this section.

*Requirement to Post Notice of Rights and Remedies:* Any employer receiving covered funds under the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, shall post notice of the rights and remedies as required therein. Copies of the notices/posters can also be downloaded from, http://www.recovery.gov/CONTACT/REPORTFRAUD/Pages/WhistleBlowerInformation.aspx

**4)   False Claims Act Under the American Recovery and Reinvestment Act of 2009.**
Recipient and sub-recipients shall promptly refer to the DOE or other appropriate Inspector General any credible evidence that a principal, employee, agent, contractor, sub-grantee, subcontractor or other person has submitted a false claim under the False Claims Act or has committed a criminal or civil violation of laws pertaining to fraud, conflict or interest, bribery, gratuity or similar misconduct involving those funds.




## Jobs Reporting Form
## City of Miami Gardens – *[Green City Hall Design]*

The funding for this Project is from the American Recovery and Reinvestment Act of 2009 (Recovery Act) *[Energy Efficiency and Conservation Block Grant Program]*.  Section 1512 of the Recovery Act requires that for activities carried out with Recovery Act funds, consultants and contractors **must report on the number of jobs created or retained that are directly funded by the contract for the quarter indicated below.**  This form must be filled out completely.  Please provide the following information.

* Denotes Required Information.            **\*Quarter ending:**   March 30      June 30      Sept. 30      Dec 31
                                                  (Please circle only one)

**\*Company Name** _____

**\*Contact Person** _____ Title _____

HQ Address _____ City _____ St _____ **\*Zip+4** _____

**\*Primary Phone** _____ Alternate Phone _____ **\*DUNS Number** _____
(It is a requirement of the Recovery Act that all sub-grantees and contractors obtain a Data Universal Numbering System (DUNS) Number.)

1.  **\*During the quarter did you hire any new employees or pay any existing employees whose wages were paid directly from the funding of this contract?** ☐ No   ☐ Yes

        If yes, please fill in the information in the chart below <u>for the entire quarter indicated above:</u>

| Employee Name (Last, First Initial) | Job Title | # of hrs in a Full-Time work quarter | # of hrs worked in the quarter funded by the contract | Length of Employment | Miami Gardens Resident |
|---|---|---|---|---|---|
| Smith, J. | Project Manager | 520 (based on 40 hr work wk) | 280 | Permanent | Yes |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

(If additional space is need, please continue on the back of this document.)

_____      _____      _____      _____
Signature of Authorized Individual                Title                                Date

_____
Print Name

Sworn to and subscribed before me
This _____ day of                    Place Notary Stamp Here          Notary Public
_____, 20_____                                                            State of_____

If you need assistance filling out this form, please contact Laurin Yoder at (305) 622-8000, ext. 2694.

# URS

June 29, 2010                                                *Rev 2: 12-10-10*

Dr. Danny O. Crew
City of Miami Gardens City Manager
1515 NW 167 St. Building 5, Suite 200
Miami Gardens, FL 33169

RE:  Proposal for A/E services related to the Demolition plans and Technical
Specifications for 18601 NW 27 Ave. Miami Gardens, FL.

Dear Mr. Crew:

URS Corporation (URS) is pleased to submit this proposal for professional A/E Services
to develop plans and specifications for the demolition of the building located at 18601
NW 27 Ave. Miami Gardens, FL.

**Project understanding:**
URS understands the scope of work to be complete demolition of all vertical structures
(including foundations), pavement, cut and cap all utility lines overhead and
undergrounds. The final site is to be level graded and fenced. All curb cuts, approaches,
all sidewalk curbs and street drainage to remain as is. We understand that the future
facilities to be build at this site will be LEED Platinum certified.

**Project approach:**
Based on the survey's underground utilities line location, URS will prepare the plans and
specifications for the cutting and capping of said lines. Concurrently URS will prepare
the demolition plans and specifications of the building and related site improvements.
URS will prepare a LEED report to be included with the contract documents, including an
analysis of the existing structure to determine what elements can reuse or recycle. The
report will also include an itemized list of the major elements contained in the building
and direction to the contractor as of how the elements need to be disposed, recycled or
stored on site for future reuse.

*URS understands that existing drawings of the building are not available. URS will
include a note in the demolition drawings indicating that contractor shall be responsible
for visual field verification of conditions and quantities. A site visit by the contractor shall
be mandatory.*

URS Corporation
7850 Corporate Center Drive
Suite 401, Miami, Fl
33126-1220
Tel: 305-884-8900
Fax: 305-884-2665
www.urscorp.com

**URS**

**Professional fees:**

The Lump sum fee required to accomplish this task (through 100% design) is $ 24,100.
Payment for this job will be paid upon deliverables as shown below:
- 50% CD's (21 calendar days) :  $ 10,100.00
- 100% CD's (21 calendar days): $ 14,000.00
  $ 24,100.00

Deliverables include 4 sets of drawings at 50% CD's for owner's review and 4 signed and sealed copies of drawings for dry run permit submittal at 100% CD's. *URS will provide electronic files of the final approved plans.*

**Assumptions:**
- USGBC registration process or registration fee is not part of this proposal.
- This proposal does not include construction oversight staff "on site" throughout the entire demolition phase.
- Owner's permit expeditor will usher or walk-through the permit documents through the applicable regulatory agencies.
- Work under this proposal will commence upon receipt of site survey and asbestos survey.

We understand that time is of the essence and URS stands ready to help the City of Miami Gardens immediately implement this project. Should you have any question regarding this proposal, or require additional information, please do not hesitate to contact us.

Sincerely,

Michael J. Nardone, PG
Vice President, Office Manager
URS Corporation

**ACORD** | **CERTIFICATE OF LIABILITY INSURANCE** Page 1 of 3 | DATE (MM/DD/YYYY) 09/01/2010

| PRODUCER | 877-945-7378 |
|---|---|
| Willis Insurance Services of California, Inc.<br>26 Century Blvd.<br>P. O. Box 305191<br>Nashville, TN 37230-5191 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURERS AFFORDING COVERAGE | NAIC# |
|---|---|
| INSURED URS Corporation Southern<br>7650 Corporate Center Drive, Suite 401<br>Miami, FL 33126 | |
| INSURER A: National Union Fire Ins Co of Pittsburgh | 19445-100 |
| INSURER B: Zurich American Insurance Company | 16535-100 |
| INSURER C: Insurance Company of the State of PA | 19429-100 |
| INSURER D: Lloyd's of London & British Companies | 15792-004 |
| INSURER E: Lexington Insurance Company | 19437-000 |

**COVERAGES**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE X OCCUR<br>X XCU, BFPD<br>X Contractual Liability<br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X PRO-JECT ☐ LOC | GL4376534 | 5/1/2010 | 5/1/2011 | EACH OCCURRENCE | $ 2,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 2,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| B | X | **AUTOMOBILE LIABILITY**<br>X ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS<br>☐ NON-OWNED AUTOS | BAP938521501 | 5/1/2010 | 5/1/2011 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC<br>AUTO ONLY: AGG | $<br>$ |
| | | **EXCESS / UMBRELLA LIABILITY**<br>☐ OCCUR ☐ CLAIMS MADE<br>☐ DEDUCTIBLE<br>☐ RETENTION $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| C<br>A<br>C | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE Y/N<br>OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under SPECIAL PROVISIONS below | WC6988231<br>WC6988234<br>WC6988230/WC6988232 | 1/1/2010<br>1/1/2010<br>1/1/2010 | 1/1/2011<br>1/1/2011<br>1/1/2011 | X WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 2,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |
| D<br>E | | **OTHER**<br>Professional Liability<br>w/Limited Contractual -<br>Claim Made Policy | PE0801821/PE0801657<br>015438088 | 5/1/2010<br>5/1/2010 | 5/1/2011<br>5/1/2011 | $2,000,000 Each Claim<br>$2,000,000 Aggregate | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
THIS VOIDS AND REPLACES PREVIOUSLY ISSUED CERTIFICATE DATED: 5/5/2010 WITH ID: 14188749

The Workers' Compensation coverage shown above does not apply in monopolistic states.  In the States of ND, OH, WA and WY, Workers' Compensation coverage is provided by the State Fund.  In those States, the above-referenced policies provide Stop-Gap Employers' Liability only.

See Attached

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Miami Gardens<br>Attn: Pam Thompson, CPPO, CPPB<br>Procurement Manager<br>1515 N.W. 167th Street, Bldg. 5, Suite 200<br>Miami Gardens, FL 33169 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br><br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2009/01)    Coll:3114777 Tpl:1085486 Cert:14612311    © 1988-2009 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

## DISCLAIMER

This Certificate of Insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

| **Willis** | **CERTIFICATE OF LIABILITY INSURANCE** Page 2 of 3 | DATE 09/01/2010 |
|---|---|---|

| PRODUCER | 877-945-7378 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|---|
| Willis Insurance Services of California, Inc. 26 Century Blvd. P. O. Box 305191 Nashville, TN 37230-5191 | | **INSURERS AFFORDING COVERAGE** | NAIC# |

| INSURED | URS Corporation Southern 7650 Corporate Center Drive, Suite 401 Miami, FL  33126 |
|---|---|

| | | NAIC# |
|---|---|---|
| INSURER A: | National Union Fire Ins Co of Pittsburgh | 19445-100 |
| INSURER B: | Zurich American Insurance Company | 16535-100 |
| INSURER C: | Insurance Company of the State of PA | 19429-100 |
| INSURER D: | Lloyd's of London & British Companies | 15792-004 |
| INSURER E: | Lexington Insurance Company | 19437-000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS

```
Self-Insured Retention(SIR)/Deductible(s):
$25,000 SIR - Professional Liability

Workers Compensation - Texas
Carrier:  Illinois National Insurance Co.
Policy No.: WC6988236
Effective Dates:  1/1/2010 - 1/1/2011
Statutory Limits:   $2,000,000 EL Each Accident
                    $2,000,000 EL Disease - Each Employee
                    $2,000,000 EL Disease - Policy Limit

Re: The City of Miami Gardens Request for Qualifications (RFQ) #08-09-006 - for Architectural,
Engineering, Surveying and Planning Services

The City of Miami Gardens is included as an Additional Insured as respects the General Liability
and Auto Liability policies, where required by written contract.
```

Coll:3114777  Tpl:1085486  Cert:14612311

**Amendment**
**Architectural and Engineering Services**
**for Municipal Complex**

Purpose and Scope

1. This agreement between The City of Miami Gardens, FL ('the City) and URS Corporation ("URS') is to update and amended previous Exhibits and Purchase Orders ("POs") with regard to A/E services, fees and schedule associated with the City's Municipal Complex, under a Non Exclusive Professional Services Agreement (PFQ 08-09-006). Specifically, this agreement amends, as described herein, Exhibit "A" (Scope of Services) and Exhibit "B" (Fees); these are also described on PO 10-3523 (Basic Services) and PO 10-0354 (Additional Services).

2. In the event of a conflict in terms, the order of precedence and control is: the Non-Exclusive Professional Services Agreement, the Exhibits and the POs. Notwithstanding anything to the contrary contained herein or in any other document: (i) when different or additional terms exist between Exhibit "A" and any other document, except additions and deletions to Exhibit "A' specified in this amendment, Exhibit "A" shall control and (ii) POs issued under the Non Exclusive Professional Services Agreement are used solely as a procurement document and any terms and conditions contained in such POs shall not apply.

Amended Scope of Services

1. The City and URS agree that the following items are deleted or revised as follows:

   a. Cost estimates (reference Exhibit B, footnote 3) terminate as completed though 5/2011; no additional services are to be provided by URS.
   b. Document Control Web site (reference # 6, Terms and Conditions, Exhibit "B" is discontinued as of 8/1/2011.
   c. Bidding Phase( reference Exhibit "A" No 5):
      i. 5.3 is deleted. A separate Earthwork Package was provided by URS in April of 2011 and a 'split package' for the vertical Construction Documents was agreed upon and authorized in a PO on 8/3/2011 pursuant to URS's proposal of July 10, 2011.
      ii. Any additional services to be performed under "Bidding" shall be at the City's request and shall be invoiced based on professional time incurred at hourly standard rates. RFI's issued by the City's General Contractor shall not be construed as 'Bidding Services' and are to be performed under URS's Construction Documents and Construction Administration Services.

2. EOC/Security. The City and URS agree that a specific scope of services has not been previously provided by URS nor agreed upon by the City. The City acknowledges URS has performed certain EOC/Security design services to date. In order the complete the overall design and associated Construction Documents, URS will provide experienced personnel to assist in developing program

1 | Page

Amendment
Architectural and Engineering Services
for Municipal Complex

requirements, physical features, and technological support required for the Emergency Operations
and Call Centers and security systems of the Municipal Center buildings and site as follows:

a.  URS will meet with select City personnel to develop an understanding of the City's
    current emergency operations and what improvements the City would like to see. URS
    will use these meetings to identify current and preferred equipment providers. URS will
    introduce alternatives and advise based on its past experience and understanding of
    'best practices'.

b.  Based on multiple meetings and discussions with City Hall and Police Department
    personnel, URS will develop the requirements for appropriate and applicable levels of
    hardening and the security features necessary to detain and resist entry, monitor,
    secure, and protect specific areas and individuals within the new facilities. Additionally,
    URS will address communication and observation capabilities to support and facilitate
    safety and security procedures within the buildings and parking structure.

c.  URS will attend meetings and collaborate with Miami Gardens staff to develop program
    and security needs for the Police Department (PD) related to-
    i.    Building Access
    ii.   Emergency Operations Center
    iii.  Call Center (Dispatch)
    iv.   Sallyport and Holding
    v.    Evidence
    vi.   Interview
    vii.  Armory
    viii. Front Desk

d.  URS will attend meetings and collaborate with Miami Gardens staff to develop security
    needs for City Hall (CH) related to:
    i.   Building Access
    ii.  Main lobby (night operations)
    iii. Elevators

e.  URS will attend meetings and collaborate with Miami Gardens staff to develop security
    needs for the Parking Garage(PG) include:
    i.  Access to various levels (PD and CH)
    ii. Elevators

f.  URS will develop recommendations for security systems serving the PD, CH, PG and site,
    including operating functions, alarm/monitoring locations, and equipment. Based on
    discussions with staff, Miami Gardens' preferences will be identified determined for the
    following systems and controls:
    i.   Duress
    ii.  Acess
    iii. Interior CCTV
    iv.  Exterior CCTV

Amendment
Architectural and Engineering Services
for Municipal Complex

      v.  Recording (audio visual)
      vi.  Elevator controls

g.  URS will also provide design recommendations and identify Miami Gardens' preferences for the following unique areas and essential features:

      i.  Kennels (CCTV and HVAC alarms)
      ii.  Emergency power
      iii.  Special hardware applications
      iv.  Positions for hardened construction
      v.  Radio antenna locations
      vi.  Redundancy provisions
      vii.  Detention equipment
      viii.  Security doors and lockers

h.  Based on the agreed performance criteria, URS' specification and design of the requested and required systems and components will be developed and documented in the 85% drawings and specifications. Following the City's review and comments, URS will make required modifications and finalized the Construction Documents to the 100% level. The systems and components will be delineated in Specification sections for hardware, secure furnishings, CCTV, intercom, and access control. The systems and components will be delineated in the form of drawings by, depicting hardening of appropriate areas by specific construction methods; schedules as necessary to expand specific detail on each device, plan views identifying locations of devices for all noted systems; riser diagrams of systems showing overall layout and connectivity; and details as necessary for depicting special construction, mounting, or wiring.

i.  URS has made recommendation on all security related items. "Preferences", as stated, will be based on input from the City related to specific preferred manufacturer, model, or features, such as: preferred types of keying and or hardware; preferred -types or functions of cameras; preferred locations of devices based on local experience; preferred vendors that are compatible with existing equipment; and for preferred system/device locations based on approved policies and procedures.

j.  Deliverables are as noted above in identified system specifications and incorporated on the low voltage series of electrical drawings. Other security related items and associated input will be incorporated in the following areas of the Construction Documents: door schedule; hardware schedule; interior elevations; floor plans; wall types; site plans; garage layout; structural details; mechanical details electrical details; window details; and in multiple Specification sections ( e.g. Pick-proof caulk in the sealants section, for use in cell areas; Hollow Metal Doors and Frames, Glazing, Lockers, Rolling Grilles, FF & E, etc.)

Amendment
Architectural and Engineering Services
for Municipal Complex

3.  The City  and URS agree the following are an expansion of and additive to services under Exhibit
"A", No 6, Construction Administration:

   a.  URS shall provide a monthly review and signed certificates for payment in response to
       the City's General Contractors applications for payment, which applications shall utilize
       the American Institute of Architects (AIA) forms G702 and G703. URS shall also perform
       a monthly update and verification of the Schedule of Values of construction completion.
       The City shall coordinate and facilitate the monthly review. The monthly review shall be
       performed consistent with the terms of the City's Construction Contract with the
       General Contractor. Paragraph 6.11 of Exhibit A, July 2010 is deleted.

   b.  The existing baseline for Site Visits/Observations under paragraph 6.3 and 6.4 of Exhibit
       "A" is set forth in the table below. Additive to the baseline are an additional 347 Site
       Visits/Observations, increasing the total number to 409.

| Discipline | Baseline | Baseline Add Services | Additional | Total |
|---|---|---|---|---|
| Mechanical | 4 | | 61 | 65 |
| Electrical | 2 | | 63 | 65 |
| Plumbing | 2 | | 63 | 65 |
| Civil | 2 | 9 | 54 | 65 |
| Architecture | 20 | | 45 | 65 |
| Structural | 4 | | 61 | 65 |
| Landscape | 2 | 17 | -- | 19 |
| Total | 36 | 26 | 347 | 409 |

   c.  Except for the 6 'milestone' Site Visits/Observations to be performed by URS specified
       under paragraph 6.4 of Exhibit "A", all Site Visits/Observations shall be performed on an
       'as requested' basis by the City. The 6 milestone Site Visits/Observations to be
       performed by URS shall be scheduled in accordance with the City's General Contractor
       completion of the milestone events.

   d.  URS agrees that the total of 409 Site Visits/Observations are a 'bank' from which the
       City may withdraw Site Visits/Observations of any discipline 'as need and as requested'.
       The first 62 are included in URS's previous Construction Administration fees. After the
       first 62 have been performed, URS shall invoice at the rate of $520.00 per
       Inspection/Observation in the normal monthly billing cycle, after the applicable service
       has been performed.

   e.  Site Visits shall be scheduled generally each month in advance during construction;
       however, URS shall be available for Site Visits/Observations 'as needed' throughout the

Amendment
Architectural and Engineering Services
for Municipal Complex

construction period. For each Site Visit/Observation completed, URS shall provide the
City a summary report of findings.

f.   URS designates the following professionals as having primary responsibility (90% or
more) for conducting Site Visits/Observations:

| Discipline | Name | URS Office Location |
|---|---|---|
| Mechanical | Greg Johnson | Miami |
| Electrical | Greg Johnson | Miami |
| Plumbing | Tom Hempstead | Miami |
| Civil | David Soler | Miami |
| Architecture | Tim Currey | Miami |
| Structural | Jim Nadasky | Boca Raton |
| Landscape | Jim Santiago | Miami |

g.   URS agrees that each of the professionals designated above shall be fully conversant
with and maintain up to date knowledge on Shop Drawing issued by the City's General
Contractor as they pertain to their respective disciplines.

h.   The parties agree that URS shall not have control over, charge of, or responsibility for
the construction means, methods, techniques, sequences or procedures, or for safety
precautions and programs in connection with the General Contractor's.

i.   Notwithstanding anything to the contrary contained in Exhibit "A", the term "ensure"
shall only require URS to perform its services in accordance with the standard of care set
forth in Article 2.1.1 of the Non Exclusive Professional Services Agreement.

4.   The City accepts and has approved an extension of FF&E Additional Services to included selected
services for Construction Documents as follows: URS shall design typical "Open Office Furniture"
layouts from the Design Development submittal that is approved by the City. URS shall meet
with the City staff to review and modify the proposed Open Office Furniture layouts. The
Architectural and Engineering construction documents will be coordinated and revised to
accommodate the approved layouts. URS shall Incorporate Furniture Floor Plans and technical
specifications for the City Hall and Police Department Building into the construction documents
for the Open Office Furniture systems. The furniture construction documents and specifications
will be revised to address all code issues and City comments. .

5.   URS has reviewed the City's required increase in Site Visits/Observations and determine there is
no effect or change required to the previously agreed upon LEED scope of services.

5 | P a g e

**Amendment**
**Architectural and Engineering Services**
**for Municipal Complex**

6.  URS has reviewed the City's Construction Contract and agrees that the services and responsibilities of the "Architect" as set forth therein are accepted and consistent with URS's Construction Administration services. (The General Conditions section of the Construction Contract are attached to this contract amendment for reference at the request of URS.)

Amended Fees for Services

1.  The City and URS agree that Exhibit "B" of July 20, 2010 is superseded by Exhibit "B1", attached and incorporated as a part of this agreement.

2.  URS agrees that that Exhibit "B1" reflects the full fee compensation for the agreed upon architectural and engineering services for the Municipal Complex, including all Purchase Orders issued by the City to date.

3.  The City and URS acknowledge that the requirement for URS to deliver 50% Construction Documents as specified in Exhibit "A" and Exhibit "C" was waived by the City and not delivered by URS. The City acknowledges that URS has made an adjustment in fees as reflected in ExhibitB1 and this adjustment is acceptable to the City as an offset for the 50% Construction Documents not delivered.

4.  The City acknowledges that during construction, Change Orders initiated by the General Contractor or the City may result in an increase in fees payable to URS. Change Orders requested by the General Contractor to expedite schedule or reduce costs shall include A/E fees for required document revision/re-submission and shall be payable by the General Contractor. Change Orders requested by the City increasing project scope are an Additional Services and A/E fees are to be priced to the level of effort required in accordance with the URS's hourly fee schedule.

Updated Schedule

1.  URS and the City affirm the Schedule set forth on Exhibit "C" of July 20, 2010 is applicable for contractual purposes, notwithstanding the City and URS have agreed to and are proceeding with an updated Schedule.

2.  URS and the City agree that the date for completion of signed and sealed 100% Construction Documents and associated Specification is October 12, 2011. Complete sets of the signed and sealed 100% Construction Documents and Specifications are to be delivered to the City no later than October 14, 2011.

Amendment
Architectural and Engineering Services
for Municipal Complex

3.  The City acknowledges and accepts the notification from URS that the final, 100 percent
    Construction Drawings for the Parking Garage cannot be completed until engineering
    specifications are provided by the City's General Contractor. Upon receipt to the engineering
    specification for the Parking Garage, URS will finalize the 100 percent Construction Drawings for
    the Parking Garage and deliver them signed and sealed to the City within 21 days.

4.  The City acknowledges that URS has previously prepared and delivered, at the City's request,
    100% Construction Documents for the earthwork ("Earthwork Package"). URS is currently
    revising the Earthwork Package for final permitting purposes.

5.  The City and URS acknowledge that the Construction Period dates and durations as reflected in
    the Exhibit "C" Schedule prepared July 2010 were conceptual in nature and subject to
    modification when the City entered into a Construction Contract with a General Contractor. The
    City is currently in process of negotiating a Construction Contract. A revised schedule for the
    Construction Period, sequence of construction and Final Completion dates will be incorporated
    into the Construction Contract. URS agrees that it has been continuously advised of anticipated
    changes to the Construction Schedule and its fees and services reflect the currently anticipated
    schedule. Once the Construction Schedule is finalized, URS agrees to perform its services in
    accordance with the final Construction Schedule. If there are material changes to the
    Construction Schedule during construction, and in the event that these changes create
    additional work or costs to URS, an equitable adjustment in fee will be addressed.

6.  URS agrees that the Construction Period dates and durations shown on Exhibit "C" shall become
    void and replaced by Construction Schedule agreed upon between the City and its General
    Contractor upon the effective date of the Construction Contract between the City and its
    General Contractor. The City shall provide URS with a current copy of the Construction Schedule
    and updates or revisions as they may occur during the Construction Period.

ACCEPTED AND AGREED:

City of Miami Gardens                              URS Corporation

Dr. D. Crew, City Manager                         Michael Nardone, Vice President

Date: __10/17/11__                                Date: __10.14.11__

EXHIBIT "B"
Fee Schedule

| Work Phases | As of 7/28/2010 | Change | Revised | Comments and Notes |
|---|---|---|---|---|
| Programming/Due Diligence Phase | $ 168,000.00 | | $ 168,000.00 | |
| Schematic Design Phase | $ 219,000.00 | | $ 219,000.00 | |
| Design Development Phase | $ 523,000.00 | | $ 523,000.00 | |
| Construction Documents Phase | $ 1,296,000.00 | $ 98,000.00 $ (20,000.00) $ (2,000.00) | $ 1,086,000.00 | Added fee for "Split Package" for revised LEED Credit hold fee over contract of 2.4% Credit hold fee for 90% (De not prepare) |
| Bidding Phase | $ 42,000.00 | | $ 42,000.00 | Only as requested by the City on standard growth rate |
| Construction Phase | $ 450,000.00 | | $ 400,000.00 | |
| Construction Administration Add | | $ 175,000.00 | $ 175,000.00 | Increased inspections and month per sqr mgr |
| **Total Fees** | **$ 2,590,000.00** | **$ 211,000.00** | **$ 2,711,000.00** | |
| Direct Cost | $ 22,340.00 | $ (5,000.00) | $ 17,340.00 | Reimburse per Was hourly rates |
| **Additional Services** | | | | |
| Traffic Study/Signalization | $ 24,000.00 | | $ 24,000.00 | |
| Civil Engineering | $ 227,636.00 | | $ 227,636.00 | |
| Security/EMCT Technology Design | $ 62,932.00 | | $ 62,932.00 | |
| LEED Certification (Platinum 30+ point) | $ 80,000.00 | | $ 87,000.00 | $8,300 in additional CA services not yet authorized |
| FF&E | $ 106,200.00 | $ 26,895.00 | $ 134,000.00 | |
| Landscape Design | $ 135,300.00 | | $ 135,300.00 | |
| Enhanced Commissioning | $ 83,471.00 | | $ 83,471.00 | |
| Site Survey | $ 13,402.00 | | $ 13,402.00 | |
| Geotechnical work | $ 18,900.00 | | $ 18,900.00 | |
| Demo Package | | $ 24,100.00 | $ 24,100.00 | See FO 1840824 for scope of work |
| Civil NW 33S Terrain | | $ 26,850.00 | $ 26,850.00 | See FO 1840824 for scope of work |
| Tree Removal/Retention Inspections | | $ 1,908.00 | $ 1,908.00 | See FO 1840824 for scope of work |
| Demo CM Services | | $ 18,500.00 | $ 18,500.00 | See FO 1840824 for scope of work |
| Local Art (Allowance Account) | $ 100,000.00 | | $ 100,000.00 | |
| Radon Testing (Allowance Account) | $ 4,000.00 | | $ 4,000.00 | |
| **Total** | **$ 442,371.00** | **$ 99,298.00** | **$ 541,283.00** | |
| **Grand Total** | **$ 3,374,571.00** | **$ 295,298.00** | **$ 3,669,569.00** | |

Conditions/Terms:
1. Fees are to be invoiced and paid by Phase. Any Phase exceeding four 30 days will be invoiced monthly, pro rata to work, then completed
2. The City shall retain 10% of each invoice, until completion of each specified Phase of the Scope of Work.
3. Once a Phase has been completed and that the City has accepted the work product, URS will invoice due the retention
4. Direct costs will be invoiced per max monthly, for 16 months at $1,390 per month
5. Fees for "Additional Services" are to be invoiced and paid consistent with 1-3 above, except where there are specific work products to be provided, e.g. Traffic, Site Survey, Geotechnical, where specific work products are to be provided, invoicing and payment, without a retention, shall occur after submission and acceptance of the work product.
6. Direct Costs include Internet Document Center, Website, printing, reproduction plots, scans and standard form documents except tax and, at minimum events, postage handling and delivery, and project related expenses.
7. URS Insurance will be increased from $1M to $2 M.
8. Written authorized from the City is required to commence each phase of the work, phases or commence additional services.

## CITY OF MIAMI GARDENS
## CONSTRUCTION CONTRACT

THIS CONTRACT made as of this ⎵11th⎵ day of ⎵Oct⎵, 2011, by and between Skanska Building USA, Inc hereinafter referred to as the CONTRACTOR, and the CITY OF MIAMI GARDENS, FLORIDA, a Florida municipal corporation, hereinafter referred to as the CITY.

WITNESSETH, that whereas, the CITY has awarded to the CONTRACTOR the Work of performing certain construction:

NOW, THEREFORE, the CITY and the CONTRACTOR, for consideration hereinafter named, agree as follows:

### ARTICLE 1 - CONTRACT DOCUMENTS

1.1 Enumeration of Contract Documents:

The Contract Documents comprise the entire agreement between CITY and CONTRACTOR and consist of the following:

> (1) This Agreement with General Conditions and Special Conditions
>
> (2) Construction performance bond.
>
> (3) Construction payment bond.
>
> (4) Insurance certificate(s).
>
> (5) Notice to Proceed.
>
> (6) Final Construction Documents shall be added to this agreement when completed by URS Corporation ("Architect") via a Guaranteed Maximum Price ("GMP") Change Order and shall be substituted for the Contract Documents. .
>
> (7) All Exhibits to this Agreement.

The aforementioned documents are hereby incorporated herein by reference, and made a part hereof. Any amendments executed by the CITY and the CONTRACTOR shall become part of this Agreement. Documents not included in this Article do not, and shall not, form any part of this Agreement . In the event of any conflict between the documents or any ambiguity or missing specification or instruction, the following priority is established:

> a. Specific direction from the City Manager (or designee).
>
> b. This Agreement dated Oct 11, 2011 and all Exhibits.

1.2 Conflict, Error or Discrepancy:

Exhibit "4"

If, during the performance of the Work, CONTRACTOR finds a conflict, error or discrepancy in the Contract Documents, CONTRACTOR shall so report to the CITY in writing at once and before proceeding with the Work affected shall obtain a written interpretation or clarification from CITY.

In the event of any conflict among the Contract Documents, the following order of precedence shall apply, with the lower number being the higher precedence:

1. Modifications after the date of the Agreement, including a GMP Change Order;

2. Exhibit ___, the Qualifications and Clarifications;

3. This Agreement;

4. All other exhibits to this Agreement;

5. The General and Special Conditions to this Agreement;

6. The Specifications;

7. The Plans, with larger scale controlling over smaller scale.


1.3     Representation of CONTRACTOR:

Execution of the Contract by the CONTRACTOR is a representation that CONTRACTOR has visited the Work site and is familiar with the local conditions under which the Work is to be performed.

1.4 Any deletion, oversight or misstatement of the Specifications shall not release the Contractor from the responsibility of supplying a complete and operational project, together with all appurtenances as shown in or as reasonably inferable from the Contract Documents in order to produce the indicated results. The apparent silence of the Specifications as to any details or the omission from them of a detailed description concerning any point, shall be regarded as meaning that customary commercial practices are to prevail and that materials of good quality and correct type, size and customary design are to be used.

1.5 Project Management Plan:

CONTRACTOR shall prepare a Project Management Plan, and when accepted by the CITY, the Project Management Plan shall be attached and incorporated into this Agreement. The Project Management Plan shall consist of the following elements:

1.     Narrative reporting, on a monthly basis.

2.     Schedule control, on a monthly basis.

3.     Cost Control, on a monthly basis.

4.     Project Accounting and associated system/procedures.

5.     Monitoring and reporting on LEED compliance and protocols, including coordination with the City's LEED Commissioning Agent and commissioning/close-out, on a monthly basis.

6.     Monitoring and accounting of sales tax 'savings', on a monthly basis.

7.     Monitoring and achievement of local preference, minority and disadvantaged business subcontracting, on a monthly basis.

8. Action reports

If there is a conflict between this Agreement and the Project Management Plan, this Agreement with its General and Special Conditions shall take precedence. The Project Management Plan shall be added as an Exhibit to this Agreement.

### ARTICLE 2. SCOPE OF WORK

The CONTRACTOR hereby agrees to furnish all of the materials, tools, equipment, labor, services, incidentals and everything necessary to perform; and shall perform, all of the Work, herein referred to as Work in accordance with the Contract Documents. This Project is located at NW 187th Street and NW 27th Avenue, Miami Gardens, Florida. See Drawings for specific location. The Project consists of the construction of the Earthwork, a City Hall Building, a Council Chambers Building, a Police Department Building, a Mechanical Building, a Parking Garage and Off-site Road Work (collectively "the Municipal Complex"). The Project is to be priced for Guaranteed Maximum Price ("GMP") purposes in two (2) parts: GMP1 and GMP2. GMP1 is the Earthwork Package and Specifications, and GMP2 is the remainder of the Work, including Plans and Specifications for the City Hall Building, Council Chambers Building, the Mechanical Building, the Parking Garage, the Police Department Building and the Off-site Road Work. The Work is to performed in overlapping Phases consisting of: first, the Earthwork (Phase 1); second, the City Hall Building and Council Chambers Building, together with the Mechanical Building, the Parking Garage and Off-site Road Work (Phase 2); and third, the Police Department Building (Phase 3).

### ARTICLE 3. CONTRACT TIME

3.1     CONTRACTOR shall commence scheduling activities and permit applications within five (5) calendar days after receipt of the Notice to Proceed. The Notice to Proceed and Purchase Order will not be issued until CONTRACTOR'S submission to CITY of all required documents including, but not limited to: Performance and Payment Bonds, Insurance Certificates and a fully executed Contract.

CONTRACTOR has received the Construction Documents for the Earthwork. The City shall cause the remainder of the Construction Documents to be delivered to the CONTRACTOR in accordance with the following schedule: within two (2) calendar days after Notice to Proceed for 80% Construction Documents and within sixty (60) calendar days for 100% Construction Documents for City Hall; Mechanical Building; site and Off-Site, with the exception of the Parking Garage; the 100% Construction Documents for the Parking Garage shall be delivered to the CONTRACTOR within twenty -one (21) calendar days after CONTRACTOR provides the CITY with final engineering design specifications and ninety (90) calendar days for 100% construction documents for the Police Department Building. The remainder of the Construction Documents include: Plans and Specifications for the City Hall Building, the Council Chambers Building, the Mechanical Building, the Parking Garage, the Police Department Building and the Off-site Road Work.

Provided the CONTRACTOR has meet all the requirements of Section 3.3., in the event that the CITY does not issue a Notice to Proceed on each of the foregoing phases on or before the date specified, then the CONTRACTOR shall be granted a day-for-day extension of the Contract Time until such Contract Documents are delivered to CONTRACTOR. The Notice to Proceed may not be issued by the CITY until the CONTRACTOR and CITY have executed a mutually acceptable GMP Change Order, as hereinafter defined.

3.2 The receipt of all necessary permits by CONTRACTOR and acceptance of the full construction schedule in accordance with general terms and conditions section, submittal schedule and schedule of values is a condition precedent to the issuance of the Notice to Proceed to mobilize on the Project site and commence with the Work. The CONTRACTOR shall submit all necessary documents required by this provision within fifteen (15) calendar days of the issuance of Notice of Award.

3.3 The Work must begin within ten (10) calendar days from Notice to Proceed or the date fixed in the Notice to Proceed, whichever is later. The CONTRACTOR shall be substantially complete with the Earthwork (Phase 1) within ninety (90) calendar days and with final completion fifty-six (56) calendar days thereafter, for a total of one hundred forty-six (146) calendar days from issuance of Notice to Proceed. The CONTRACTOR shall be substantially complete the City Hall Building, the Chambers Building, the Mechanical Building, the Parking Garage, and the Off-site Road Work (Phase 2) within three hundred and fifty (350) calendar days and with final completion fifty-six (56) calendar days thereafter, for a total of four hundred four (404) calendar days from the issuance of the Notice to Proceed. The CONTRACTOR shall be substantially complete with the Police Department Building (Phase 3) within three hundred and ninety-two (392) calendar days and final completion fifty-six (56) calendar days thereafter, for a total of four hundred forty-eight (448) calendar days from the issuance of a Notice to Proceed.

3.4 Upon failure of CONTRACTOR to substantially complete the WORK, herein referred to as Substantial Completion (as further defined in the Special Conditions), within the specified period of time, plus any approved time extensions, the CONTRACTOR shall pay to CITY the sum of Three Thousand dollars ($3,000.00) for each calendar day after the time specified for the Earthwork (Phase 1) City Hall, Chambers Building, Mechanical Building, Parking Garage and the Off-site Road Work (Phase 2), and Two Thousand dollars ($2,000.00) for the Police Department Building (Phase 3). These amounts are not a penalty, but as liquidated damages to CITY for its inability to obtain occupancy and use of the Project. Liquidated damages are hereby fixed and agreed upon between the parties, recognizing the impossibility of precisely ascertaining the amount of damages which the CITY will suffer as a result of the CONTRACTOR's failure to perform and that will obviate a formal resolution concerning the amount of said damages and the cost and effect of the failure of CONTRACTOR to complete the Contract within the contract time periods required hereunder.

3.5   CITY is authorized to deduct liquidated damages from monies due to CONTRACTOR for the Work under this Contract.

### ARTICLE 4. COMPENSATION

4.1 CITY shall pay CONTRACTOR as full compensation for the all material, services, labor and performance, including overhead and profit, associated with completion of all the Work in full conformity with the requirements as stated. CONTRACTOR'S compensation for GMP1 (the Earthwork) is One Million Four Hundred Twenty-One Thousand Two Hundred and Seventy dollars ($1,421,270.00). It is agreed that the Construction Documents for GMP2 are not complete as of the date of  his Agreement. The CONTRACTOR and CITY recognize that, subsequent to the execution of this   greement, the ARCHITECT shall prepare and deliver to CONTRACTOR and the CITY eighty percent (80%) complete Construction Documents, which shall be priced by CONTRACTOR for GMP2 in accordance herewith. GMP2 shall be added by Change Order to the GMP upon the CITY'S acceptance of GMP2. Complete, one hundred percent (100%) Construction Documents shall be provided by the CITY in accordance with Article 3. It is further agreed that if the final Construction Documents are not consistent with the previous Plans and Specifications and cannot be built by the CONTRACTOR within the GMP2 within the Contract Time, the CITY shall (1) revise the final Construction Documents to achieve the required consistency, or (2) acknowledge that there is a change in the Work and authorize by Change Order an equitable adjustment in the GMP2 and Contract Time. The maximum cost to the CITY, including the Cost of the Work and the CONTRACTOR'S Overhead, Fee, and General Conditions is guaranteed not to exceed the GMP. When adjusted via Change Order, the GMP shall increase or decrease for Changes in the Work as provided in Article 8 of the General Conditions.

CONTRACTOR acknowledges and accepts the CITY will employ a baseline cost estimate for GMP2 prepared by the CITY'S independent estimator. The CITY shall have the right to review the detail of the GMP2 when presented by the CONTRACTOR.If the CITY determines there is a material variance between the CITY'S baseline cost estimate for GMP2 and the GMP2 price submitted by the CONTRACTOR, the CITY may, in its sole discretion, reject the CONTRACTOR's GMP2. In the event the CITY rejects GMP2 initially submitted by the CONTRACTOR, the CITY may request the CONTRACTOR to re-price and to subr    a revised GMP2 or remove the Work associated with GMP2 from this Contract and seek new comp  titive bids for this Work.

4.2  In consideration of the performance of this Agreement, the CITY agrees to pay the CONTRACTOR in current funds, as compensation for his services, the Guaranteed Maximum Price (GMP1 and GMP2), which shall be calculated in accordance with this Contract and Article 8 of the General Conditions and the Special Conditions, less any Savings, as that term is defined. The CONTRACTOR shall accept payments via the CITY'S Sun Trust Bank VISA Program.

4.3  For Changes in the Work, the General Conditions percentage, and CONTRACTOR Fee, and Overhead shall be adjusted by the actual cost of the Change, including all materials, labor, subcontract and equipment cost, times the General Conditions of  Six point Six-Five percent (6.65%), and  the Contractor's Fee of Two point Five percent (2.5%), plus the CONTRACTOR'S Overhead of One point Five percent (1.5%). Costs for Changes in the Work are either additive or deductive to the GMP. (Refer to Special Conditions for additions and clarifications.)

4.4  The CONTRACTOR shall be paid  the proportional amount of its Fee and Overhead with each progress payment  as specified in Article 5,  except as otherwise provided  herein. The balance of the Fee and Overhead  shall be paid in accordance with Article 5 a   he time of Substantial Completion, Completion and Final Payment, subject to the provisions of release the. .of as provided in other sections of this Contract and the General Conditions.

4.5  In no event shall the CITY be liable to the CONTRACTOR under this Contract for any amount greater than the Guaranteed Maximum Price (GMP1 and GMP2), except for additions and deductions made to the Contract GMP made in accordance with this Contract, the General Conditions and the Special Conditions.

4.6  CONTRACTOR may earn a Completion Bonus if Substantial Completion for Phase 2 (City Hall, the Council Chambers, the Mechanical Building, the Parking Garage and the Off-site Road Work) is achieved before three hundred and fifty- days (350) after the Notice to Proceed, adjusted for any approved extensions. The CONTRACTOR's Completion Bonus shall be based on a listed schedule as follows: Ten Thousand dollars ($10,000.00) if Substantial Completion is achieved within three hundred and forty-five (345) calendar days to three hundred forty nine (349) calendar days; Twenty-five Thousand dollars ($25,000.00) if Substantial Completion is achieved within three hundred and forty (340) calendar days to three hundred forty-four (344) calendar days; Forty-five Thousand dollars ($45,000.00) if Substantial Completion is achieved within three hundred and thirty-five (335) calendar days to three hundred thirty-nine (339) calendar days; Seventy-five Thousand dollars ($75,000.00) if Substantial Completion is achieved within three hundred and thirty (330) calendar days to three hundred thirty-four (344) calendar days; and One-hundred Twenty Thousand  dollars ($120,000.00) if Substantial Completion is achieved on or before three hundred and twenty-nine (329) calendar days. CONTRACTOR shall received payment of the Completion Bonus, less any liqui  ed damages due the CITY pursuant to Article 3.4 of this Agreement, at Final Payment.

### ARTICLE 5. PROGRESS PAYMENTS

CONTRACTOR may make Application for Payment for Work completed, at intervals of not more than once a month. However, the CITY shall not pay more than ninety percent (90%) of the total Contract Price as progress payments, with retainage to be held and released in accordance with other provisions hereof. The CONTRACTOR'S application shall show a complete breakdown of the Project components

as mutually agreed to by the CITY, including an updated Schedule of Values showing the quantities completed and the amount requested, together with such supporting evidence as may be required by the CITY. CONTRACTOR shall submit with each Application for Payment, an updated Progress Schedule and Technical Specifications to the CITY as required by the General Conditions, a release of liens relative to the Work, which is the subject of the Application, and all monthly reports as specified in the CONTRACTOR'S Project Management Plan. Each Application for Payment shall be submitted in triplicate to the CITY. The CITY shall make payment to the CONTRACTOR within thirty (30) calendar days after submission by the CONTRACTOR of a proper Application for Payment.

The CITY shall hold retainage until the Work is fif. percent (50%) complete on the basis of the Schedule of Values, at which time, if the Project is on schedule and generally on budget, the CITY shall reduce the retainage to five percent (5%). At Substantial Completion, the CITY shall make payment to CONTRACTOR of seventy percent (70%) of the retainage withheld; at Completion, the CITY shall make payment to CONTRACTOR of twenty percent (20%) of the retainage, with the exception of an amount equal to two hundred (200%) percent of the value of any remaining incomplete Work (Punchlist). All remaining retainage shall be paid the Contractor at Final Payment.

The CITY may withhold, in whole or in part, payment to such extent as may be necessary to protect itself from loss because of:

a. Defective Work not remedied.
b. Claims filed or reasonable evidence indicating probable filing of claims by other parties against the CONTRACTOR.
c. Failure of the CONTRACTOR to make payments properly to Sub-Contractors or for material or labor.
d. Damage to another CONTRACTOR not remedied.
e. Liquidated damages and costs incurred by CITY for extended construction administration damages.

When the above grounds are removed or resolved or CONTRACTOR provides a surety bond or a consent of Surety, satisfactory to the CITY, which will protect the CITY in the amount withheld, payment may be made in whole or in part.

### ARTICLE 6. ACCEPTANCE AND FINAL PAYMENT

Upon receipt of written notice from CONTRACTOR that all Work is fully complete and ready for final inspection and acceptance, CITY shall, within fourteen (14) calendar days, make an inspection thereof. The CONTRACTOR shall only receive Final Payment when the Work is fully complete in accordance with the Contract, the requisite documents have been submitted to the CITY, the requirements of the Contract Documents are fully satisfied, CONTRACTOR'S responsibilities and performance of all LEED protocols and reporting procedures have been accepted by the CITY's LEED

Commissioning Agent, and all conditions of the permits and regulatory agencies have been met to the extent that the conditions are the responsibility of CONTRACTOR under this Contract. The ARCHITECT and CITY'S Representative will submit a statement stating such to the CITY Manager.

In exchange for Final Payment, CONTRACTOR shall deliver to CITY a complete waiver of lien(s) or release of all lien(s), as applicable, arising out of this Contract, or receipts in full for all Work; and an Affidavit certifying that all suppliers and Sub-Contractors have been paid in full, or will be paid in full from the proceeds of the Final Payment, and that all other indebtedness connected with the Work has been paid, or will be paid in full from the proceeds of the Final Payment.

Final payment constituting the entire unpaid balance of the Contract sum shall be paid by CITY to the CONTRACTOR within thirty (30) calendar days after completion of all Work, the Contract fully performed and a final certificate for payment has been issued by the CITY'S representative. CONTRACTOR acknowledges and accepts completion of the Work includes CONTRACTOR'S duties and responsibilities associated with LEED commissioning, including coordination with and support of the CITY's LEED Commissioning Agent and associated LEED protocols.

ARTICLE 7. MISCELLANEOUS

7.1     Conflict: If there is a conflict between any provision set forth within the Contract Documents, which cannot be reconciled with reference to the order of precedence clause, above, and a more stringent state or federal provision, which is applicable to this Project, the more stringent state or federal provision shall control.

7.2     Independent Contractor: CONTRACTOR is an independent contractor under this Contract. Services provided by CONTRACTOR pursuant to this Contract shall be subject to the supervision of CONTRACTOR. In providing such services, neither CONTRACTOR nor its agents shall act as officers, employees, or agents or sub-contractors of the CITY and CONTRACTOR shall be responsible for any actions of its officer, employees, agent and subcontractors. This Contract shall not constitute or make the parties a partnership or joint venture.

7.3     Qualifications: CONTRACTOR, and the individual executing this Contract on behalf of the. CONTRACTOR, warrants to the CITY that the CONTRACTOR is a corporation in good standing, and that the CONTRACTOR has all the required licenses and certifications of competency required by the State of Florida and the County of Miami-Dade to perform the Work herein described. CONTRACTOR shall insure that all Sub-Contractors have all required licenses and certifications of competency required by the State of Florida and the County of Miami-Dade to perform the Work herein described.

7.4     Entire Contract – Modification:  No statements, representations, warranties, either written or oral, from whatever source arising, except as expressly stated in this Contract, shall have any legal validity between the parties or be binding upon any of them.  The parties acknowledge that this Contract contains the entire understanding of the parties.  No modifications hereof shall be effective unless made in writing and executed by the parties hereto with the same formalities as this Contract is executed. If any term in the CONTRACTOR'S proposal appears to be in direct or apparent conflict with the Contract, then the terms of the Contract shall control.

7.5 Third Party Beneficiaries:  Neither CONTRACTOR nor CITY intends to directly or substantially benefit a third party by the provision or requirement of any term of this Contract. The parties expressly acknowledge that it is not their intent to create any rights or obligations in any third person or entity under this Contract Therefore, the parties agree that there are no third-party beneficiaries to this Contract and that no third-party shall be entitled to assert a claim against either of them based upon this Contract.

7.6     Notices:  All notices required in this Contract shall be sent by certified mail, return receipt requested and, if sent to the CITY shall be mailed to:

City of Miami Gardens

>           Attn:  City Manager
>           1515 NW 167th Street, Suite 200
>           Miami Gardens, FL 33169

With a Copy to: City Attorney

>           C/O City of Miami Gardens
>           1515 NW 167th Street, Suite 200
>           Miami Gardens, FL 33169

And if sent to the CONTRACTOR shall be mailed to:

>           Russell T. Sheppard
>           Senior Vice President, South Florida Operations
>           Skanska USA Building
>           1815 Griffin Road, Suite 204
>           Dania Beach, FL 33004

With a Copy to:  Corporate Counsel
>           Tim Harvey
>           4030 Boy Scott Blvd. Suite 200
>           Tampa, FL 33607

7.7     Assignment and Performance:  Neither this Contract nor any interest herein shall be assigned, transferred, or encumbered by either party. In addition, CONTRACTOR shall not subcontract any portion of the Work required by this Contract except as authorized in the General Conditions. CONTRACTOR represents that all persons delivering the services required by this Contract have the knowledge and

skills, either by training, experience, education, or a combination thereof, to adequately and competently perform the duties, obligations, and services set forth in the Scope of Work and to provide and perform such services to CITY'S satisfaction for the agreed compensation.

CONTRACTOR shall perform its duties, obligations, and services under this Contract in a skillful and respectable manner. The quality of CONTRACTOR'S performance and all interim and final product(s) provided to or on behalf of CITY shall be comparable to the best local and national standards, as specified in the Contract Documents.

7.8 Materiality and Waiver of Breach: CITY and CONTRACTOR agree that each requirement, duty, and obligation set forth in these Contract Documents is substantial and important to the formation of this Contract and, therefore, is a material term hereof. CITY'S or the CONTRACTOR's failure to enforce any provision of this Contract shall not be deemed a waiver of such provision or modification of this Contract. A waiver of any breach of a provision of this Contract shall not be deemed a waiver of any subsequent breach and shall not be construed to be a modification of the terms of this Contract.

7.9 Severance: In the event a portion of this Contract is found by a court of competent jurisdiction to be invalid, the remaining provisions shall continue to be effective, unless CITY or CONTRACTOR elects to terminate this Contract. An election to terminate this Contract based upon this provision shall be made within seven (7) days after the finding by the court becomes final.

7.10 Applicable Law and Venue: This Contract shall be enforceable in Miami-Dade County, Florida, and if legal action is necessary by either party with respect to the enforcement of any or all of the terms or conditions herein exclusive venue for the enforcement of same shall lie in Miami-Dade County, Florida. **By entering into this Contract, CONTRACTOR and CITY hereby expressly waive any rights either party may have to a trial by jury of any civil litigation related to, or arising out of the Project. CONTRACTOR shall specifically bind all Sub-Contractors to the provisions of this Contract.**

7.11 Enforcement Costs: If any legal action or other proceeding is brought for the enforcement of this Contract, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Contract, the prevailing party or parties she be entitled to recover reasonable attorney's fees, expert witness fees, expenses and court costs, at trial or appellate levels incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled.

7.12 Amendments: No modification, amendment, or alteration in the terms or conditions contained herein shall be effective unless contained in a written document prepared with the same or similar formality as this Contract and executed by the CITY and CONTRACTOR.

7.13    Prior Contracts: This document incorporates and includes all prior negotiations, correspondence, conversations, Contracts, and understandings applicable to the matters contained herein and the parties agree that there are no commitments, Contracts or understandings concerning the subject matter of this Contract that are not contained in this document. Accordingly, the parties agree that no deviation from the terms hereof shall be predicated upon any prior representations or Contracts, whether oral or written. It is further agreed that no modification, amendment or alteration in the terms or conditions contained herein shall be effective unless set forth in writing in accordance with Section 8.11 above.

7.14    Future Litigation: CONTRACTOR certifies that it shall notify the CITY within five (5) days of the receipt of any claims (in excess of $250,000), lawsuits, or actions filed against CONTRACTOR relating to any construction projects, work or tasks either performed by CONTRACTOR or to be performed by CONTRACTOR.

7.15    Risk of Loss; Ownership: The risk of loss, injury or destruction of any personal property, including but not limited to the Work, shall be on CONTRACTOR until acceptance of the Work by CITY. Title to the Work shall pass to CITY upon final acceptance of the Work by CITY.

7.16    Indemnification: CONTRACTOR shall indemnify and hold harmless the CITY and its officers, employees, and instrumentalities from any and all liability, losses or damages, including attorneys' fees and costs of defense, which the CITY or its officers, employees, or instrumentalities may incur as a result of claims, demands, suits, causes of actions or proceedings for personal injury or property damage (other than to the Work itself) arising out of, relating to or resulting from the negligent or intentionally wrongful performance of this Agreement by the CONTRACTOR or its employees, agents, servants, partners, principals or subcontractors ("Claims"). CONTRACTOR shall pay all Claims in connection therewith and shall investigate and defend all such Claims in the name of the CITY, where applicable, including appellate proceedings, and shall pay all costs, judgments, and attorney's fees, which may issue thereon. CONTRACTOR expressly understands and agrees that any insurance protection required by this Agreement or otherwise provided by CONTRACTOR shall in no way limit the responsibility to indemnify, keep and save harmless and defend the CITY or its officers, employees, agents and instrumentalities as herein provided. One percent (1%) of the contract amount shall represent the consideration to be provided for this indemnification. Nothing contained herein shall be deemed a waiver of sovereign immunity.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as follows:

WITNESSES:                                    CONTRACTOR:

_William Garcia_                              By: _Russell Sheppard_

Print Name: _William Garcia_                  Print Name: _Russell Sheppard_

                                              Title: _Senior Vice President_

Approved as to form:

_____
Sonja K. Dickens, City Attorney              Seal:

ATTEST:                                       CITY OF MIAMI GARDENS

_____                    _Danny O. Crew_
        Cl   Clerk                            By: _____
                                                    City Manager

# GENERAL CONDITIONS

**TABLE OF ARTICLES**

**1. GENERAL PROVISIONS**

    1.1 Basic Definitions
    1.2 Specifications and Drawings
    1.3 Required Provisions Deemed Inserted
    1.4 Provisions to the Bid
    1.5 Bid Tabulations
    1.6 Applicable Law and Venue
    1.7 Clarification and Addenda to Bid Specifications
    1.8 Contract Award
    1.9 Tied Bids
    1.10 Unbalanced Bid

**2. CITY**

    2.1 Information and Services Required of the City
    2.2 City's Right to Stop the Work
    2.3 City's Right to Carry Out the Work
    2.4 Clarifications and Interpretations
    2.5 Extent of City Rights

**3. CONTRACTOR**

    3.1 Contractor's Warranty
    3.2 Compliance with Laws, Permits, Regulations and Inspections
    3.3 Anti-Kickback
    3.4 Supervision and Construction Procedures
    3.5 Contractor's Employees
    3.6 Use of Site
    3.7 Security
    3.8 Review of Contract Documents and Field Conditions by Contractor
    3.9 Cleaning and Removal
    3.10 Cutting and Patching
    3.11 Indemnification
    3.12 Patents and Royalties
    3.13 Materials, Labor, and Workmanship
    3.14 Approved Equal
    3.15 Shop Drawings, Product Data and Samples
    3.16 Record Drawings
    3.17 Operating Instructions and Service Manual
    3.18 Taxes
    3.19 Contractor's Construction Schedules
    3.20 Weather-Hurricane Precautions

**4. ADMINISTRATION OF THE CONTRACT**

4.1 Rights of the City
4.2 Architect
4.3 Review of the Work
4.4 Resolution of Disputes

5. SUBCONTRACTORS

5.1 Award of Sub-Contracts
5.2 Sub-Contractual Relations
5.3 Contingent Assignment of Sub-Contract

6. SEPARATE CONTRACTS AND COOPERATION

6.1 City's Right to other Contracts
6.2 Communication
6.3 Neglect
6.4 Damages
6.5 Delay
6.6 Progress Schedule
6.7 Refusals

7. FIELD ORDERS AND SUPPLEMENTAL INSTRUCTIONS

8. CHANGE ORDERS

9. NOTIFICATION AND CLAIM FOR CHANGE OF CONTRACT TIME OR CONTRACT PRICE

9.1 Change if Contract Time
9.2 No Damages for Delay
9.3 Excusable Delay
9.4 Progress and Completion
9.5 Liquidated Damages

10. PAYMENTS AND COMPLETION

10.1 Commencement, Prosecution and Completion
10.2 Contract Sum
10.3 Schedule of Values
10.4 Applications for Payment
10.5 Approval for Payment
10.6 Decisions to Withhold Approval
10.7 Progress Payments
10.8 Failure of Payment
10.9 Substantial Completion
10.10 Partial Occupancy or Use
10.11 Final Completion and Final Payment
10.12 No Interest
10.13 Purchasing Card Program

11. PROTECTION OF PERSONS AND PROPERTY

    11.1 Safety Precautions and Programs
    11.2 Safety of Persons and Property


12. INSURANCE & BONDS

    12.1 Insurance
    12.2 Commercial General Liability
    12.3 Licensed for Use Vehicle Liability
    12.4 Workers' Compensation Insurance
    12.5 Liability Insurance General Requirements
    12.6 Builder's Risk Insurance
    12.7 Products and Completed Operations Insurance
    12.8 Bonds

13. UNCOVERING AND CORRECTION OF THE WORK

    13.1 Uncovering of the Work
    13.2 Correction of the Work
    13.3 Acceptance of Nonconforming Work


14. MISCELLANEOUS PROVISIONS

    14.1 Written Notice
    14.2 Rights and Remedies
    14.3 Tests and Inspections
    14.4 Records
    14.5 Codes and Standards
    14.6 General Provisions
    14.7 Anti-Discrimination
    14.8 Non-Collusion


15. TERMINATION OR SUSPENSION OF THE CONTRACT

    15.1 Termination by City for Cause
    15.2 Suspension by the City for Convenience
    15.3 Termination by the City for Convenience


16. OVERSIGHT/SILENCE OF SPECIFICATIONS

    16.1 Oversight of Specifications
    16.2 Silence of Specifications

## ARTICLE 1
## GENERAL PROVISIONS
### Basic Definitions

As used in the Contract Documents, the following terms shall have the meanings and refer to the parties designated in these definitions.

**1.1.1   Architect** When the term "Architect " is used herein, it shall refer to the Architect of Record specified and designated by this Contract.

**1.1.2   Acceptance**

The formal written acceptance by the CITY of the completed Work Acceptance shall mean that all of the Work required by the Contract or individual work orders issued are fully executed and completed in accordance to the Construction Documents so that no Work remains to be completed. No further performance of Work shall be required except in regards to the correction of latent defects, gross mistakes and fraud. This shall require that all close-out documentation be fully completed, submitted, and approved.

**1.1.3   City/Owner**

The City/Owner shall mean the City of Miami Gardens, a Florida municipal corporation, having principal offices at 1515 NW 167th Street, Miami Gardens, Florida 33169, which is a party hereto and/or for which this Contract is to be performed.   In all respects hereunder, City's performance is pursuant to City's position as the owner of this construction project.  In the event City exercises its regulatory authority as a governmental body, the exercise of such regulatory authority and the enforcement of any rules, regulations, laws and ordinances shall not be attributable in any manner to City as a party to this Contract.

**1.1.4   Elected Body**

The Mayor and City Council are the governing and legislative body of the City.

**1.1.5   Administration**

The City Manager, City Administration and/or the Office of the City Attorney of the City of Miami Gardens, Florida.

**1.1.6   City's Representative**

The City's Representative is authorized by the City as the administrator of the Contract and will represent the City as it relates to all issues regarding the Project during the progress of the Work. Communications from the ARCHITECT to the Contractor and from the Contractor to the ARCHITECT shall be through the City's Representative, unless otherwise indicated in the Contract Documents. Any notice or other communication with the City shall be made to the City through the City's Representative and any notice or other communication required of Contractor hereunder that is delivered to the City's Representative shall be as binding upon the City as if delivered to the City in accordance with the Contract.

**1.1.7   Architect**

The Architect is to provide professional services on this project for the City of Miami Gardens, Florida.

### 1.1.8   Contract

The Contract Documents form the Contract and are the exclusive statement of agreement between the parties. The Contract represents the entire and integrated agreement between the parties hereto including, but not limited to, contract time and liquidated damages, and supersedes prior representations or agreements, either written or oral. The Contract Documents shall not be construed to create a Contractual relationship of any kind between the City and a Sub-Contractor or any lower-tier Sub-Contractor.

### 1.1.9   Contractor

The Contractor is the individual, firm, incorporated or unincorporated business entity or corporation with whom the City has entered into the Contract for Construction. The term "Contractor" means the Contractor or the Contractor's authorized representatives.

### 1.1.10   Contract Documents

Contract Documents -- The Contract Documents shall consist of the Contract, Drawings, Plans and Specifications, General Conditions, Invitation, Payment and Performance Bonds and any additional documents, which are required to be submitted under the Contract, and all amendments, modifications and supplements, change orders and work directive changes issued on or after the effective date of this Agreement.

### 1.1.11   Contract Price

The original amount established in the GMP Change Order to complete the work, as may be amended by an eligible and authorized Change Order.

### 1.1.12   Contract Time

The original time between commencement   final completion, including any milestone dates thereof, established in ARTICLE 2 of the Contract, as may be amended by Change Order.

### 1.1.13   Change Order

A document which is signed by the City and authorizes an addition, deletion or revision in the Work to be performed pursuant to this Contract, within the general scope of this Contract, or an adjustment in the term of compensation or an adjustment in time, issued on or after the effective date of the Contract. A change order must comply with the Contract Documents and the Procurement Ordinance of the City.

### 1.1.14   Field Order

A written order which orders minor changes in the Work, but which does not involve a change in the Contract price or Contract time.

### 1.1.14   Day

The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

### 1.1.15   Drawings

The drawings which show the character and scope of the Work to be performed and which are referred to in Section 1.2.

### 1.1.16  Final Completion

The date when all punch list items are completed, including all closeout requirements, submittals and approval by the ARCHITECT, is given to the City in writing.

**1.1.17  Knowledge.** The terms "knowledge," "recognize" and "discover," and their respective derivatives and similar terms in the Contract Documents, as used in reference to the Contractor, shall be interpreted to mean that which the Contractor knows or should know, recognizes or should recognize and discovers or should discover in exercising the care, skill, and diligence of a diligent and prudent Contractor familiar with the Work. Analogously, the expression "reasonably inferable" and similar terms in the Contract Documents shall be interpreted to mean reasonably inferable by a diligent and prudent Contractor familiar with the Work.

### 1.1.18  N | ice To Proceed

A written i ̱ tice given by CITY to CONTRACTOR fixing the date on which the Work shall commence and the CONTRACTOR begins to perform its obligations under the Contract Documents.

### 1.1.19  Project

ENTIRE PROJECT INCLUDING PHASES AS INDICATED IN THE CONTRACT DOCUMENTS PER ARCHITECT and drawings he prepared.

### 1.1.20  Punch List

"Punch List" means the list of items, prepared in connection with the inspection of the Project by the City's Representative and the ARCHITECT in connection with Substantial Completion of the Work or a portion of the Work, which the City's Representative or ARCHITECT has designated as remaining to be performed, completed or corrected before the Work will be accepted by the City. The preparation of a complete Punch List for the area or building to be occupied as agreed upon between the City and Contractor by the City shall be an absolute condition precedent to the City's occupancy of any portion of the Project.

### 1.1.21  Substantial Completion

The terms "Substantial Completion" or "substantially complete" as used herein shall be construed to mean the completion of the entire Work in accordance with the Contract, including all submittals required under the Contract Documents, necessary to achieve a temporary certificate of occupancy, with the only remaining incomplete work to be minor "Punch List" items which will not interfere with the use of the facilities for the purposes intended. Refer to SPECIAL CONDITIONS FOR AMENDED DEFINITIONS APPLICABLE for purpose of the Contract Agreement.

### 1.1.22  Supplemental and Special Conditions

The terms "Supplemental Conditions" or "Special Conditions" shall mean the part of the Contract Documents which amend, supplement, delete from, or add to these General Conditions.

### 1.1.23  Work/Material

Work shall mean supervision, labor, equipment, tools, material, supplies, incidentals, operations and activities required by the Contract Documents or reasonably inferable by Contract as necessary to produce the results intended by the Contract Documents in a safe, expeditious, orderly, and workmanlike manner, and in the best manner known to each respective trade.

### 1.1.24  Inspector

An authorized representative of ARCHITECT or City assigned to make necessary inspections of material furnished by Contractor and of the work performed by Contractor.

### 1.1.25 Sub-Contractor

A person, firm, entity or corporation having a direct contract with Contractor at any tier, other than employees of the Contractor, including one who furnishes material worked to a special design according to the Contract Documents, but does not include one who merely furnishes materials not so worked.

### 1.1.26 Surety

The surety company or individual, authorized to transact surety ship in the State of Florida, which is bound by the performance bond and payment bond with and for Contractor who is primarily liable, and which surety company or individual is responsible for Contractor's satisfactory performance of the work under the Contract and for payment of all debts pertaining thereto, in accordance with Section 255.05, Florida Statutes.

### 1.1.27 Substitution

A substitution is a Contractor proposal of an alternate product or method in lieu of has been spec ....ed or shown in the Contract Documents, which is not an "or equal" as set forth in Section 3.13.1.

### 1.1.28 Shop Drawings

Shop Drawings are drawings, diagrams, schedules and other product data specifically prepared for the Work by the Contractor or a Sub-Contractor, sub-Sub-Contractor, manufacturer, supplier or distributor to illustrate the specific requirements for some portion of the Work. The ARCHITECT's construction drawings shall not be used as Shop Drawings.

### 1.1.29 Product Data

Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

### 1.1.30 Samples

Samples are physical samples, which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

### 1.2    Contract Documents, Specifications and Drawings

1.2.1 The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, construction system, standards and workmanship and performance of related services for the Work identified in the Contract. Specifications are separated into titled divisions for convenience of reference only. Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Sub-Contractors or in establishing the extent of Work to be performed by any trade. Such separation will not operate to make the City or the ARCHITECT an arbiter of labor disputes or work agreements.

1.2.2 The drawings herein referred t., consist of drawings prepared by the ARCHITECT and are enumerated in the Contract Documents.

1.2.3 Drawings are intended to show arrangements, design, and dimensions of Work and are graphic, and pictorial. Dimensions shall not be determined by scale or rule. If figured dimensions are lacking, they shall be supplied by the ARCHITECT on the Contractor's written request (RFI) to the ARCHITECT and City's Representative.

1.2.4 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complimentary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required

only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

1.2.6 In the event of inconsistencies within or between parts of the Contract Documents, or between the Contract Documents and applicable standards, codes and ordinances, the Contractor shall (1) provide the better quality or greater quantity of Work or (2) comply with the more stringent requirement; either or both in accordance with the ARCHITECT's interpretation. On the Drawings, given dimensions shall take precedence over scaled measurements, and large scale drawings over small scale drawings. Before ordering any materials or doing any Work, the Contractor and each Sub-Contractor shall verify field measurements at the Work site and shall be responsible for the correctness of such measurements. Any difference, which may be found, shall be submitted to the City's Representative and ARCHITECT for resolution before proceeding with the Work.

1.2.7 Only work included in the Contract Documents is au , orized, and the Contractor shall do no work other than that described therein.

1.2.8 Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents. Contractor represents that it has performed its own investigation and examination of the Work site and its surroundings and satisfied itself before entering into this Contract as to:

.1 conditions bearing upon transportation, disposal, handling, and storage of materials;

.2 the availability of labor, materials, equipment, water, electrical power, utilities and roads;

.3 uncertainties of weather, flooding and similar characteristics of the site;

.4 conditions bearing upon security and protection of material, equipment, and Work in progress;

.5 the form and nature of the Work site, including the surface and known sub-surface conditions;

.6 the extent and nature of Work and materials necessary for the execution of the Work and the remedying of any defects therein; and

.7 the means of access to the site and the accommodations it may require and, in general, shall be deemed to have obtained all information as to risks, contingencies and other circumstances.

The City assumes no responsibility or liability for the physical condition or safety of the Work site or any improvements located on the Work site. The Contractor shall be solely responsible for providing a safe place for the performance of the Work. The City shall not be required to make any adjustment in either the Contract Sum or Contract Time concerning any failure by the Contractor or any Sub-Contractor to comply with the requirements of this Paragraph.

1.3    Required Provisions Deemed Inserted

1.3.1 Each and every provision of law and clause required by law to be inserted in this Contract shall be deemed to be inserted herein, and the Contract shall be read and enforced as though it were included herein; and if through mistake or otherwise any such provision is not inserted, or is not correctly inserted, then upon the written application of either party the Contract shall forthwith be physically amended to make such insertion or correction.

### ARTICLE 2
### CITY REQUIREMENTS

## 2.1    Information and Services Required of the City

2.1.1 The Contractor will secure and pay for necessary approvals, easements, assessments, and charges required for construction, use or occupancy of permanent structures, or for permanent changes in existing facilities. The City shall reimburse the Contractor promptly upon separate invoice therefore for all permits necessary approvals, easements, assessments, impact fees and charges required for construction, use or occupancy of permanent structures, outside of the GMP. The Contractor or any subcontractor shall be responsible for all fees associated with changes in the Project documents cause by the Contractor or subcontractor.

2.1.2 When requested in writing by the Contractor, information or services under the City's control, which are reasonably necessary to perform the Work, will be furnished by the City with reasonable promptness to avoid delay in the orderly progress of the Work.

## 2.2    City's Right to Stop the Work

2.2.1 If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents or fails to carry out Work in accordance with the Contract Documents, the City's Representative may order the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the City to stop the Work will not give rise to a duty on the part of the City to exercise this right for the benefit of the Contractor or any other person or entity.

## 2.3    City's Right to Carry Out the Work

2.3.1 If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents, and fails within a seven (7) day period after receipt of a written notice from the City to correct such default or neglect, the City may, without prejudice to other remedies the City may have, correct such default or neglect. In such case, an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the cost of correcting such deficiencies, including compensation for the ARCHITECT's additional services and expenses made necessary by such default or neglect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to City.

2.3.2 In the event the Contractor has not satisfactorily completed all items on the Punch List within thirty (30) days of its receipt, or by the Final Completion Date, whichever is latest, the City reserves the right to complete the Punch List without further notice to the Contractor or its surety. In such case, City shall be entitled to deduct from payments then or thereafter due the Contractor the cost of completing the Punch List items. If payments then or thereafter due Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to City.

## 2.4    Clarifications and Interpretations

2.41. The City shall issue, with reasonable promptness, such written clarifications, RFI responses or interpretations of the Contract Documents as it may determine necessary, which shall be consistent with or reasonably inferable from the overall intent of the Contract Documents. Should Contractor fail to request interpretation of questionable items in the Contract Documents, City shall not entertain any excuse for failure to execute the work in a satisfactory manner.

2.4.2  The City shall interpret and decide matters concerning performance under the requirements of the Contract Documents, and shall make decisions on all claims, disputes or other matters in question. Written notice of each claim, dispute or other matter will be delivered by claimant to the other party but in no event later than five (5) days after the occurrence of the event, and written supporting data will be submitted to the other party within five (5) calendar days after such occurrence. All written decisions of the City on any claim or dispute will be final and binding. The ARCHITECT shall interpret the intent in matters regarding technical requirements of the drawings and specifications

Case 1:15-cv-23334-KMW Document 21 Entered on FLSD Docket 10/15/2015 Page 146 of 235

2.4.3 The Contractor shall perform the Work in accord with the Contract Documents. In cases of disagreement or ambiguity, the City shall decide all questions, difficulties, and disputes of whatever nature, which may arise under or because of this Contract, or the quality, amount and value of the work and the City's decisions on all claims, questions and determination are final. While the Contractor shall follow all decisions by the City in accordance with the foregoing, nothing herein shall constitute appointment of the City as an arbitrator to decide any issues or disputes between the Contractor and the City.

## 2.5    Extent of City Rights

2.5.1 The rights stated in this Article 2 and elsewhere in the Contract Documents are cumulative and not in limitation of any rights (1) granted in the Contract Documents, (2) at law or (3) in equity.

2.5.2 In no event shall the City, City's Representative, City's Consultant nor the ARCHITECT shall have control over, charge of, or any responsibility for construction means, methods, techniques, sequences or procedures or for safety precautions and programs in connection with the Work, notwithstanding any of the rights and authority granted the City in the Contract Documents.

## ARTICLE 3
## CONTRACTOR RESPONSIBILITIES

## 3.1    Contractor's Warranty

3.1.1 The Contractor warrants all equipment and materials furnished, and work performed, under this Contract, against defective materials and workmanship for a period of _1 year_ after Substantial Completion as provided in this Contract, unless a longer period is expressly specified in the Contract Documents, regardless of whether the same were furnished or performed by the Contractor or any Sub-Contractors of any tier. Upon written notice from the City of any breach of warranty during the applicable warranty period due to defective material or workmanship, the affected part or parts thereof shall be repaired or replaced by the Contractor, at no cost to the CITY. Should the CONTRACTOR fail or refuse to make the necessary repairs, replacements, and tests when requested by the CITY, the CITY may perform, or cause the necessary work and tests to be performed, at the Contractor's expense, or exercise the CITY's rights under Article 14 of these Conditions. The CITY may charge the CONTRACTOR for all direct costs of such removal, repairs and/or replacement (including, but not limited to, fees and charges of engineers, architects, attorneys and other professionals) and, at the CITY's election, deduct these cost from the CONTRACTOR's retainage held by the CITY.

3.1.2 Should one or more defects mentioned above appear within the specified period, the CITY shall have the right to continue to use or operate the defective part or apparatus until the CONTRACTOR makes repairs or replacements or until such time as it can be taken out of service without loss or inconvenience to the CITY.

3.1.3 The above warranties are not intended as a limitation, but are in addition to all other express warranties set forth in this Contract. The CONTRACTOR shall be liable for the satisfaction and full performance of the warranties set forth herein.

3.1.4 Neither the final payment nor any provision in the Contract Documents nor partial or entire occupancy of the premises by the CITY, nor expiration of warranty stated herein, will constitute an acceptance of Work not done in accordance with the Contract Documents or relieve the CONTRACTOR of liability in respect to any responsibility for non-conforming Work. The CONTRACTOR shall immediately remedy any defects in the Work and pay for any damage to other Work resulting there from upon written notice from the CITY. Should the CONTRACTOR fail or refuse to remedy the non-conforming Work, the CITY may perform, or cause to be performed the work necessary to bring the work into conformance with the Contract Documents at the CONTRACTOR's expense.

Page 22 of 64

## 3.2    Compliance with Laws, Permits, Impact Fees, Regulations and Inspections

3.2.1 The CONTRACTOR shall, without additional expense to the CITY, comply with all applicable laws, ordinances, rules, statutes, and regulations governing the performance of the Work.

3.2.2 All licenses required by municipality, governmental agency, or political subdivision shall be obtained by and paid for by the CONTRACTOR. The CONTRACTOR, of its own expense, is responsible to ensure that all inspections required by said permits or licenses on property, easements, or utilities are conducted as required. All connection charges, assessments or transportation fees as may be imposed by any utility company or others shall be at the Contractor's sole expense.

3.2.3   Impact fees levied by the CITY and/or Miami-Dade County shall be paid by CONTRACTOR. CONTRACTOR shall be reimbursed only for the actual amount of the impact fee levied by the municipality as evidenced by an invoice or other acceptable docur. ,station issued by the municipality. Reimbursement to CONTRACTOR in no event shall include profit ·. overhead of CONTRACTOR and shall be promptly reimburse by the CITY without retainage and outsid.: of the GMP.

3.2.4   CONTRACTOR shall verify all locations of underground utilities with all of the proper entities.

3.2.5   It is not the CONTRACTOR's responsibility to ascertain that the Contract Documents are in accordance with applicable Regulations, unless such Regulations bear upon CONTRACTOR's method of performance of the Work.  However, if the CONTRACTOR has knowledge that any Contract Documents are at variance with any Regulations, including Americans with Disabilities Act - Accessibility Guidelines (ADA-AG), ordinances, rules, regulations or building codes applying to the Work, CONTRACTOR shall promptly notify the ARCHITECT and the CITY's Representative, in writing, and any necessary changes will be adjusted as provided in Contract Documents.

## 3.3    Anti-Kickback

3.3.1 No member of the City Council, employee or officer of the City, shall be admitted to any share or part of this Contract or to any benefit that may arise there from, but this provision shall not be construed to extend to this Contract if made with a corporation for its general benefit.

3.3.2 No official of the CITY who is authorized in such capacity and on behalf of the CITY to negotiate, make, accept or approve, or to take part in negotiating, making, accepting, or approving any ARCHITECT, engineering, inspection, construction, or material supply contract or any subcontract of any tier in connection with the construction of the Work shall have a financial interest in this Contract or in any part thereof, any material supply contract, subcontract of any tier, insurance contract, or any other contract pertaining to the Work.

## 3.4    Supervision, and Construction Procedures

3.4.1 The CONTRACTOR shall supervise and direct the Work, using the CONTRACTOR's best skill and attention. The CONTRACTOR shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures and for coordinatin :, all portions of the Work under the Contract.  The CONTRACTOR shall supply sufficient and compete. supervision and personnel, and sufficient material, plant, and equipment to prosecute the Work with diligence to ensure completion thereof within the time specified in the Contract Documents, and shall pay when due any laborer, Subcontractor of any tier, or supplier.

3.4.2 The CONTRACTOR shall give an adequate amount of personal supervision by an executive officer, as reasonably determined by the CITY.

3.4.3 The CONTRACTOR shall be represented at the site by a competent superintendent from the beginning of the Work until its final acceptance, unless otherwise permitted in writing by the CITY's

Representative. The superintendent for the CONTRACTOR shall exercise general supervision over the Work and such superintendent shall have decision making authority of the CONTRACTOR. Communications given to the superintendent shall be binding as if given to the CONTRACTOR. CONTRACTOR's superintendent shall speak competent English.

3.4.4 The CONTRACTOR shall establish and maintain a permanent bench mark to which access may be had during progress of the Work, and CONTRACTOR shall establish all lines and levels, and shall be responsible for the correctness of such. CONTRACTOR shall be fully responsible for all layout work for the proper location of Work in strict accordance with the Contract Documents.

3.4.5 The CONTRACTOR shall establish and be responsible for wall and partition locations. If applicable, separate Contractors shall be entitled to rely upon these locations and for setting their sleeves, openings, or chases.

3.4.6 The CONTRACTOR's scheduled outage/tie-in plan, time, and date is subject to approval by the CITY's Representative. Failure of CONTRACTOR to comply with the provisions of this Paragraph shall cause CONTRACTOR to forfeit any right to an adjustment of the Contract Sum or Contract Time for any postponement, rescheduling or other delays ordered by CITY in connection with such Work. The CONTRACTOR shall follow the following procedures for all utility outages/tie-ins or disruption of any building system:

.1 All shutting of valves, switches, etc., shall be by the CITY's personnel.

.2 The CONTRACTOR shall request an outage/tie-in meeting at least two weeks before the outage/tie-in is required.

.3 The CITY's Representative will schedule an outage/tie-in meeting at least one week prior to the outage/tie-in.

3.4.8 The CONTRACTOR shall coordinate all Work so there shall be no prolonged interruption of existing utilities, systems and equipment of CITY. Any existing plumbing, heating, ventilating, air conditioning, or electrical disconnection necessary, which affect portions of this construction or building or any other building, must be scheduled with the CITY's Representative, to avoid any disruption of operation within the building under construction or other buildings or utilities. In no case shall utilities be left disconnected at the end of a work day or over a weekend. Any interruption of utilities, either intentionally or accidentally, shall not relieve the Contractor from repairing and restoring the utility to normal service. Repairs and restoration shall be made before the workers responsible for the repair and restoration leave the job.

3.4.9 The CONTRACTOR shall be responsible for repair of damage to property on or off the project occurring during construction of project, and all such repairs shall be made to meet code requirements or to the satisfaction of the City's Representative if code is not applicable.

3.4.10 The CONTRACTOR shall be responsible for all shoring required to protect its work or adjacent property and shall pay for any damage caused by failure to shore or by improper shoring or by failure to give proper notice. Shoring shall be removed only after completion of permanent supports.

3.4.11 The CONTRACTOR shall maintain at its own cost and expense, adequate, safe and sufficient walkways, platforms, scaffolds, ladders, hoists and all necessary, proper, and adequate equipment, apparatus, and appliances useful in carrying on the Work and which are necessary to make the place of Work safe and free from avoidable danger, and as may be required by safety provisions of applicable laws, ordinances, rules regulations and building and construction codes.

3.4.12 During the performance of the Work, the CONTRACTOR shall be responsible for providing and maintaining warning signs, lights, signal devices, barricades, guard rails, fences, and other devices appropriately located on site, which shall give proper and understandable warning to all persons of danger of entry onto land, structure, or equipment.

3.4.13 The CONTRACTOR shall pump, bail, or otherwise keep any general excavations free of water. The Contractor shall keep all areas free of water before, during and after concrete placement. The Contractor shall be responsible for protection, including weather protection, and proper maintenance of all equipment and materials installed, or to be installed by Contractor.

**3.4.14** The CONTRACTOR shall be responsible for care of the Work and must protect same from damage or defacement until acceptance by the CITY. All damaged or defaced Work shall be repaired or replaced to the CITY's satisfaction, without cost to the CITY.

3.4.15 When requested by the City's Representative, the Contractor, at no extra charge, shall provide scaffolds or ladders in place as may be required by the ARCHITECT or the City for examination of Work in progress or completed.

3.4.16 The Contractor shall be responsible to the City for negligent acts and omissions of the Contractor's employees, Sub-Contractors of any tier and their agents and employees, and any entity or other persons performing portions of the Work.

3.4.17 The Contractor shall not be relieved of its obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the City's Representative or ARCHITECT in their respective administrations of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

**3.4.18** The Contractor shall be responsible for inspection of portions of the Work already performed under this Contract to determine that such portions are in proper condition to receive subsequent Work.

3.4.18 The Contractor shall be responsible to provide trained personnel to assure the orderly flow of vehicular traffic during construction.

3.4.20 Contractor shall submit a Maintenance of Traffic Plan (MOT) for review and acceptance by the City. Upon completion of work each day, the lanes shall be opened to traffic. The Contractor shall be responsible to ensure that lane closure procedures shall be in accordance to the F.D.O.T.

3.5     Contractor's Employees

3.5.1  Contractor shall be responsible for the appearance of all working personnel assigned to the Project (clean and appropriately dressed at all times). Personnel must be able to supply proper identification at all times.

3.5.2  All employees of the Contractor shall be considered to be at all times the sole employees of the Contractor, under the Contractor's sole direction and not an employee or agent of the City. Contractor shall supply competent, suitable qualified and physically capable employees, the City may require the Contractor to remove any employee it deems careless, incompetent, insubordinate or otherwise objectionable and whose presence on City property is not in the best interest of the City. City shall not have any duty to im _ament or enforce such requirements.

3.5.3  Each emplo: :o of the Contractor shall be citizen of the United States or an alien who has been lawfully admitted for permanent residence as evidence by an Alien Registration Receipt Card. The Contractor agrees not to employ any person undergoing sentence of imprisonment except as provided by Public Law 89-176, September 10, 1965, (18 USC4082)(c)(2).

3.6     Use of Site

3.6.1 The Contractor shall limit operations and storage of material to the area within the Work limit lines shown on Drawings, except as necessary to connect to exiting utilities, shall not encroach on neighboring property, and shall exercise caution to prevent damage to existing structures. The Contractor shall, locate

field offices, material storage and equipment service, temporary toilets, and storage on the Project Site. The Contractor shall maintain these areas in a clean, orderly condition so as not to cause a nuisance in the area. The Contractor shall restore the staging area to its original or better condition, with all its appurtenances, in kind, to the satisfaction of the City.

3.6.2 Only materials and equipment, which are to be used directly in the Work, shall be brought to and stored on the Work site by the Contractor. After equipment is no longer required for the Work, it shall be promptly removed from the Work site. Protection of construction materials and equipment stored at the Work site from weather, theft, damage and all other adversity is solely the responsibility of the Contractor.

3.6.3 No project signs shall be erected without the written approval of the City's Representative, which permission may be given or withheld in the absolute discretion of the City.

3.6.4 The Contractor shall ensure that the Work is at all times performed in a manner that affords reasonable access, both vehicular and pedestrian, to the site of the Work and all adjacent areas. The Work shall be performed, to the fullest extent reasonably possible, in such a manner that public areas adjacent to the site of the Work shall be free from all debris, building materials and equipment likely to cause hazardous conditions. Without limitation of any other provision of the Contract Documents, Contractor shall not interfere with the occupancy or beneficial use of (1) any areas and buildings adjacent to the site of the Work or (2) the Work in the event of partial occupancy. Contractor shall assume full responsibility for any damage to the property at the site of the Work or to the City or occupant of any adjacent land or areas resulting from the performance of the Work.

3.6.5 The Contractor shall not permit any workers to use any existing facilities at the Work site, including, without limitation, lavatories, toilets, entrances, and parking areas other than those designated by City. The Contractor, Sub-Contractors of any tier, suppliers and employees shall comply with instructions or regulations of the City's Representative governing access to, operation of, and conduct while in or on the premises and shall perform all Work required under the Contract Documents in such a manner as not to unreasonably interrupt or interfere with the conduct of City's operations. Any request for Work, a suspension of Work or any other request or directive received by the Contractor from occupants of existing buildings shall be referred to the City's Representative for determination.

3.6.6 Contractor shall provide own construction office or facility and supply its workers and Sub-Contractors of any tier with lavatories, toilets, etc. at Contractor's expense. Contractor shall also provide office space for City Representative.

3.6.7 All work will be performed Monday through Saturday, excluding City holidays, from 6:30 a.m. to 7:00 p.m., unless prior written approval is provided by City.

3.6.8 The Contractor and the Sub-Contractor of any tier shall have its' name, acceptable abbreviation or recognizable logo and the name of the city and state of the mailing address of the principal office of the company, on each motor vehicle and motorized self-propelled piece of equipment which is used in connection with the project. The signs are required on such vehicles during the time the Contractor is working on the project.

### 3.7    Security

3.7.1  The Contractor is responsible for Project security. Contractor shall protect and secure the Work site( including staging area and off-site work areas), materials, and equipment from theft and damage, by whatever means deems effective, at Contractor's expense.

### 3.8    Review of Contract Documents and Field Conditions by Contractor

3.8.1 The Contractor shall carefully study and compare the Contract Documents with each other and with information furnished by the ARCHITECT and City and shall report, at once, in writing to the ARCHITECT

and City's Representative any errors, inconsistencies or omissions discovered. Contractor shall have fifteen (15) days following the date of a Notice to Proceed under this Contract, or following the discovery of any error, inconsistency or omission, to report to the ARCHITECT and the City, errors, inconsistencies or omissions therein. Thereafter, if the Contractor discovers any errors, omissions or inconsistencies, Contractor shall promptly inform the ARCHITECT and the City in writing. If the Contractor performs any construction activity which it knows or should have known involves a recognized error, inconsistency or omission in the Contract Documents without such written notice to the ARCHITECT and City's Representative, the Contractor shall assume full responsibility for such performance and shall bear the full amount of the attributable costs for correction.

3.8.2 The Contractor shall take field measurements and verify field conditions and shall carefully compare such field measurements and conditions and other information known to the Contractor with the Contract Documents before commencing activities. Errors, inconsistencies or omissions discovered shall be reported in writing (RFI) to the ARCHITECT and City's Representative within twenty-four (24) hours. During the progress of work, Contractor shall verify all field measurements prior to fabrication of building components or equipment, and proceed with the fabrication to meet field conditions. Contractor shall consult all Contract Documents to determine the exact location of all work and verify spatial relationships of all work. Any question concerning said location or spatial relationships shall be submitted to the City's Representative and ARCHITECT. Specific locations for equipment, pipelines, ductwork and other such items of work, where not dimensioned on plans, shall be determined in consultation with City's Representative and ARCHITECT. Contractor shall be responsible for the proper fitting of the Work in place.

3.8.3 The Contractor shall provide, at the proper time, such material as required for support of the Work. If openings or chases are required, whether shown on Drawings or not, the Contractor shall see they are properly constructed. If required openings or chases are omitted, the Contractor shall cut them at the Contractors own expense, but only as directed by the ARCHITECT, through the City Representative.

3.8.4 Should the Contract Documents fail to particularly describe materials or goods to be used, it shall be the duty of the Contractor to inquire of the ARCHITECT and the City's Representative what is to be used and to supply it at the Contractor's expense, or else thereafter replace it to the City's Representative's satisfaction. At a minimum, the Contractor shall provide the quality of materials as generally specified throughout the Contract Documents.

3.8.5 Contractor shall not be entitled to an adjustment in the Contract time or an adjustment in the Contract Sum if a change in Work is required due to an error, inconsistency, omission or violation that the Contractor failed to timely report.

3.8.6 Contractor shall be responsible for inspection of portions of Work already performed under Contract to determine that such portions are in proper condition to receive subsequent Work.

3.9    Cleaning and Removal

3.9.1 The Contractor shall keep the Work site, staging area and surrounding areas free from accumulation of waste materials, rubbish, debris, and dirt resulting from the Work and shall clear the Work site and surrounding areas as requested by the ARCHITECT and the City's Representative, including mowing of grass greater than 8 inches high. The Contractor shall be responsible for the cost of clean-up and removal of debris from premises. The building and premises shall be kept clean, safe, in a workmanlike manner, and in compliance with OSHA and LEED standards at all times. At completion of the Work, the Contractor shall remove from and about the Work site tools, construction equipment, machinery, fencing, and surplus materials. Further, at the completion of the Work, all dirt, stains, and smudges shall be removed from every part of the building, all glass in doors and windows shall be washed, and entire Work shall be left broom clean in a finished state ready for occupancy. The Contractor shall advise his Sub-Contractors of any tier of this provision, and the Contractor shall be fully responsible for leaving the premises in a finished state ready for use to the satisfaction of the City's

Representative. If the Contractor fails to comply with the provisions of this paragraph, the City may do so and the cost thereof shall be charged to the Contractor.

3.9.2 Contractor shall dispose of all excess materials at an appropriate legal site in accordance with LEED protocols and requirements. City may request copies of disposal receipts and LEED documentation records; if requested, Contractor will furnish the same within five (5) days.

3.9.3 Contractor will have no more than 72-hour notice to clear work site of rubbish, debris and other work site materials and to restore or replace distributed, displaced or damaged property. If Contractor fails to comply, the City may employ labor or equipment as it deems necessary to clear the site at Contractor's expense. If a dispute arises among the Contractor, the City's Contractors as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the City may clean up and allocate the cost among those responsible as the City's Representative determines.

3.9.4 All salvageable material and/or equipment removed from the existing construction for which specific use, relocation or other disposal is not specifically noted on the Drawings or otherwise specified, will remain the property of the City and be turned over to the City. All material and/or equipment not in salvageable condition as determined by the City's Representative must be disposed of by the Contractor. The actual storage site for salvageable material will be designated by the City. (If applicable).

3.9.5 Contractor shall control dust by watering and sweeping at end of each work day or as directed by City Representative. Dust control must meet City's Public Works standard and satisfaction or City will control dust by whatever means deemed necessary and the Contractor shall pay all expenses incurred by the City associated with dust and erosion control.

3.9.6 Contractor shall have appropriate spill control measures and equipment at the site. Contractor shall contact the appropriate authority and physically protect existing drainage and drainage under construction if a spill event occurs. All excess excavated material and debris not required for backfill (unless otherwise noted), broken pipe, sidewalks, curbs and other concrete items, together with all roots, boards and other debris are to be disposed of by the Contractor at an appropriate legal site in compliance with LEED protocols and requirements.

3.10    Cutting and Patching

3.10.1 The Contractor shall be responsible for cutting, fitting, or patching required to complete the Work or to make its parts fit together properly.

3.10.2 The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the City or separate Contractors by cutting, patching, or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the City or a separate Contractor except with written consent of the City and of such separate Contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the City or a separate Contractor the Contractor's consent to cutting or otherwise altering the Work.

3.10.3 If the Work involves renovation and/or alteration of existing improvements, Contractor acknowledges that cutting and patching of the Work is essential for the Work to be successfully completed. Contractor shall perform any cutting, altering, patching, and/or fitting of the Work necessary for the Work and the existing improvements to be fully integrated and to present the visual appearance of an entire, completed, and unified project. In performing any Work, which requires cutting or patching, Contractor shall use its best efforts to protect and preserve the visual appearance and aesthetics of the Work to the reasonable satisfaction of both the City's Representative and ARCHITECT. The Contractor shall not cut any structural members without the prior written approval of the ARCHITECT.

3.11    Indemnification

3.11.1 Indemnification provision is contained at Section 7.16 of the Contract.

3.11.2 The official title of the City is "City of Miami Gardens". This official title shall be used in all insurance, or other legal documentation. City of Miami Gardens is to be included as "Additional Insured" with respect to liability arising out of operations performed for City of Miami Gardens by or on behalf of Contractor or acts or omissions of Contractor in connection with such operation.

## 3.12    Patents and Royalties

3.12.1 The Contractor, without exception, shall indemnify and save harmless the City of Miami Gardens, Florida, and its employees from liability of any nature or kind, including cost and expenses for, or on account of, any copyrighted, patented, or unpatented invention, process, or article manufactured or used in the performance of the Contract, including its use by the City of Miami Gardens, Florida. If the Contractor uses any design, device or materials covered by letters, patent, or copyright, it is mutually understood and agreed, without exception, that the Contract prices shall include all royalties or cost arising from the use of such design, device, or materials in any way involved in the work.

3.12.2 If the Contractor uses any design, device, or material covered by letters patent or copyright, he shall provide for such use by suitable agreement with the City of such patented or copyrighted design, device, or material. Without exception, the Contract Sum includes, and the Contractor shall pay, all royalties, license fees or costs arising from the use of such design, device, or material in any way involved in the Work. The Contractor and/or sureties shall indemnify and save harmless the City from any and all claims for infringement by reason of the use of such patented or copyrighted design, device, or material or any trademark or copyright in connection with Work agreed to be performed under this Contract and shall indemnify the City for any cost, expense, or damage it may be obligated to pay by reason of such infringement at any time during the prosecution of the Work or after completion of the Work.

## 3.13    Materials, Labor, and Workmanship

3.13.1 Materials and equipment incorporated into the Work shall comply without material deviation from the Contract Documents and representations and approved Samples provided by Contractor and shall be of the specified grade of their respective kinds for their respective uses, and shall be fit and sufficient for the purpose intended, new material, and free from defect not inherent in the material specified. Workmanship shall be in accordance with the specified standard or if not specified in accordance with good industry standard in accordance with the Contract Documents.

3.13.2 The Contractor shall carefully examine the Contract Documents and shall be responsible for the proper fitting of his material, equipment, and apparatus into the building.

3.13.3 Materials and workmanship shall be subject to inspection, examination, and test by the ARCHITECT and the City's Representative via a City authorized testing lab at any and all times during manufacture, installation, and construction of any of them, at places where such manufacture, installation, or construction is performed.

3.13.4 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

3.13.5 Unless otherwise specifically noted, the Contractor shall provide and pay for supervision, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for the proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.13.7 Substitutions**

**3.13.7.1** Contractor may make a proposal to the ARCHITECT and the City's Representative to use substitute products or methods as set forth herein, but the ARCHITECT's and the City's Representative's decision concerning acceptance of a substitute shall be final. If the Contractor, in good faith believes that there is a problem with the requirements of the Contract Documents, Contractor shall notify the City of such concern. The Contractor must do so in writing within forty-five (45) days after the commencement of the Work and setting forth the following:

.1 Full explanation of the proposed substitution and submittal of all supporting data including technical information, catalog cuts, warranties, test results, installation instructions, operating procedures, and other like information necessary for a complete evaluation of the substitution,

.2 Reasons the substitution is advantageous and necessary, including the benefits to the City and the Work in the event the substitution is acceptable,

.3 The adjustment, if any, in the Contract Sum, in the event the substitution is acceptable.

.4 The adjustment, if any, in the time of completion of the Contract and the construction schedule in the event the substitution is acceptable.

.5 An affidavit stating that (a) the proposed substitution conforms to and meets all of the Contract Documents, except as specifically disclosed and set forth in the affidavit and (b) the Contractor accepts the warranty and correction obligations in connection with the proposed substitution as if originally specified by the ARCHITECT.

.6 Proposals for substitutions shall be submitted to the ARCHITECT and City's Representative in sufficient time to allow the ARCHITECT and City's Representative no less than ten (10) working days for review. No substitution will be considered or allowed without the Contractor's submittal of complete substantiating data and information as stated herein.

**3.13.7.2** Substitutions may be rejected without explanation in City's sole discretion and will be considered only under one or more of the following conditions:

.1 Required for compliance with interpretation of code requirements or insurance regulations then existing;

.2 Unavailability of specified products, through no fault of the Contractor;

.3 Material delivered fails to comply with the Contract Documents;

.4 Subsequent information discloses inability of specified products to perform properly or to fit in designated space;

.5 Manufacturer/fabricator refuses to certify or guarantee performance of specified product as required; or

.6 When in the judgment of the City or the ARCHITECT, a substitution would be substantially to the City's best interests, in terms of cost, time, or other considerations.

**3.14    Approved Equal**

**3.14.1** Whenever in the Contract Documents any article, appliance, device, or material is designated by the name of a manufacturer, vendor, or by any proprietary or trade name, the words "or approved equal," shall automatically follow and shall be implied unless specifically indicated otherwise. The standard products of manufacturers other than those specified will be accepted when, prior to the ordering or use thereof, it is proven to the satisfaction of the City's Representative and the A/E they are equal in design, appearance, spare parts availability, strength, durability, usefulness, serviceability, operation cost,

maintenance cost, and convenience for the purpose intended.  Any general listings of approved manufacturers in any Contract Document shall be for informational purposes only, and it shall be the Contractor's sole responsibility to ensure that any proposed "or equal" complies with the requirements of the Contract Documents.

3.14.2 The Contractor shall submit to ARCHITECT and City's Representative a written and full description of the proposed "or equal", including all supporting data, including technical information, catalog cuts, warranties, test results, installation instructions, operating procedures, and similar information demonstrating that the proposed "or equal" strictly complies with the Contract Documents.  The ARCHITECT or City's Representative shall take appropriate action with respect to the submission of a proposed "or equal" item.  If Contractor fails to submit proposed "or equals" as set forth herein, it shall waive any right to supply such items.  The Contract Sum and Contract Time shall not be adjusted as a result of any failure by Contractor to submit proposed "or equals" as provided for herein.  All documents submitted in connection with preparing an "or equal" shall be clearly and obviously marked as a proposed "or equal" submission.

3.14.3 Contractor shall not propose "or equal" items in connection with Shop Drawings or other Submittals, and Contractor acknowledges and agrees that no approvals or action taken by the ARCHITECT or City's Representative with respect to Shop Drawings or other Submittals shall constitute approval of any "or equal" item or relieve Contractor from its sole and exclusive responsibility. Any changes required in the details and dimensions indicated in the Contract Documents for the incorporation or installation of any "or equal" item supplied by the Contractor shall be properly made and approved by the ARCHITECT at the expense of the Contractor.  No "or equal" items will be permitted for components of or extensions to existing systems when, in the opinion of the ARCHITECT, the named manufacturer must be provided in order to ensure compatibility with the existing systems, including, but not limited to, mechanical systems, electrical systems, fire alarms, smoke detectors, etc.

## 3.15    Shop Drawings, Product Data and Samples

3.15.1 Shop Drawings, Product Data, Samples and similar submittals (collectively referred to as "Submittals") are not Contract Documents.  The purpose of their submittals is to demonstrate for those portions of the Work for which submittals are required the way the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents.

3.15.2 Within forty-five (45) calendar days after the GMP Change Order, Contractor shall submit to ARCHITECT a complete list of preliminary data and submittal schedule on items for which Shop Drawings are to be submitted and shall identify the critical items. Approval of this list by ARCHITECT shall in no way relieve Contractor from submitting complete Shop Drawings and providing materials, equipment, etc., fully in accordance with the Contract Documents.  This procedure is required in order to expedite final approval of Shop Drawings

3.15.3 Contractor shall submit to ARCHITECT for review and approval seven (7) copies of all Shop Drawings for all equipment, apparatus, machinery, fixtures, piping, wiring, fabricated structures and manufactured articles.  The purpose of the Shop Drawing is to show the suitability, efficiency, technique of manufacture, installation requirements, and details of the item and evidence of compliance with the Contract Documents.  The data shown on the Shop Drawings will be complete with respect to quantities, dimensions, specified performance and design criteria, materials and similar data to enable ARCHITECT to review the information as required. Any resubmissions of Shop Drawings shall be made in the same quantity until final approval is obtained.

3.15.4 No approval will be given to partial submittals of Shop Drawings for items, which interconnect and/or are interdependent where necessary to properly evaluate the design.   It is the Contractor's responsibility to assemble the Shop Drawings for all such interconnecting and/or interdependent items, check them and then make one submittal to ARCHITECT along with its comments as to compliance, noncompliance, or features requiring special attention.

3.15.5 The Contractor, at its own expense, shall submit Samples required by the Contract Documents with reasonable promptness as to cause no delay in the Work or the activities of separate Contractors and no later than thirty (30) days before materials are required to be ordered for scheduled delivery to the Work site. Samples shall be labeled to designate material or products represented, grade, place of origin, name of producer, name of Contractor and the name and number of the City's project. Quantities of Samples shall be twice the number required for testing so that ARCHITECT can return one set of the Samples. Materials delivered before receipt of ARCHITECT's approval may be rejected by ARCHITECT and in such event, Contractor shall immediately remove all such materials from the Work site. When requested by ARCHITECT or City's Representative, samples of finished masonry and field applied paints and finishes shall be located as directed and shall include sample panels built at the site of approximately twenty (20) square feet each.

3.15.6 Contractor shall submit three (3) copies of all material color charts, color chips or color samples within sixty (60) days after start of construction to allow for selection, color coordination and final acceptance by the City. Color charts, chips or color samples shall be manufacturer's full color range and of standard sizes unless specified otherwise.

3.15.7 The Contractor shall perform no portion of the Work requiring submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the ARCHITECT. Such Work shall be in accordance with approved submittals.

3.15.8 By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents such Submittals comply with the requirements of the Contract Documents and that the Contractor has determined and verified field measurements and field construction criteria related thereto, that materials are fit for their intended use and that the fabrication, shipping, handling, storage, assembly and installation of all materials, systems and equipment are in accordance with best practices in the industry, manufacturer's printed and approved instructions, and are in strict compliance with any applicable requirements of the Contract Documents. Contractor shall also coordinate each Submittal with other Submittals.

3.15.9 Contractor shall be responsible for the correctness and accuracy of the dimensions, measurements and other information contained in the Submittals.

3.15.10 Each Submittal will bear a stamp or specific indication that the Submittal complies with the Contract Documents and Contractor has satisfied its obligations under the Contract Documents with respect to Contractor's review and approval of that Submittal. Each Submittal shall bear the signature of the representative of Contractor who approved the Submittal, together with the Contractor's name, City's name, number of the Project, and the item name and specification section number. Approval of Submittals by the ARCHITECT will be within <u>fifteen (15) calendar days from date of receipt and twenty-one calendar days from date of receipt by the City.</u>

3.15.11 The Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the ARCI℄ECT's approval of Shop Drawings, Product Data, Samples or similar submittals. The Contractor sha℄ not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the ARCHITECT's approval thereof. Specifically, but not by way of limitation, Contractor acknowledges that ARCHITECT's approval of Shop Drawings shall not relieve Contractor for responsibility for errors and omissions in the Shop Drawings, since Contractor is responsible for the correctness of dimensions, details and the design of adequate connections and details contained in the Shop Drawings.

3.15.12 The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the ARCHITECT on previous Submittals.

3.15.13 The Contractor represents and warrants that all Shop Drawings shall be prepared by persons and entities possessing expertise and experience in the trade for which the Shop Drawing is prepared and, if required by the ARCHITECT or applicable Regulations, by a licensed engineer or other design professional.

3.15.14 Any cost to City for the ARCHITECT to review and approve Shop Drawings submitted more than twice will be at Contractor's expense.

## 3.16   Record Drawings

3.16.1 The Contractor shall maintain a set of Redline Drawings on site in good condition and shall use colored pencils to mark up said set with "record information" in a legible manner to show: (1) bidding addendums, (2) executed change orders, (3)deviations from the Drawings made during construction; (4) details in the Work not previously shown; (5) changes to existing conditions or existing conditions found : \ differ from those shown on any existing drawings; (6) the actual installed position of equipment, pipi . . conduits, light switches, electric fixtures, circuiting, ducts, dampers, access panels, control valves, drai|  ., openings, and stub-outs; and (7) such other information as either City or ARCHITECT may reasonably request. During construction, redline drawings shall be review the ARCHITECT as a condition of payment for the Contractor's pay requests. A complete set of "redline" prints shall be provided by Contractor to the ARCHITECT at the completion of construction in order that the ARCHITECT may create a record set of drawings. Final payment and any retainage shall not be due and owing to Contractor until the final Record Drawings marked by Contractor as required above are delivered to City.

## 3.17   Operating Instructions and Service Manuals

3.17.1 Prior to Completion, the Contractor shall submit five (5) volumes of operating instructions and service manuals to the ARCHITECT. Operating instructions and service manuals shall contain:

.1 Start-up and Shutdown Procedures: Provide a step-by-step write up of all major equipment. When manufacturer's printed start-up, trouble shooting and shut-down procedures are available, they may be incorporated into the operating manual for reference.

.2 Operating Instructions: Written operating instructions shall be included for the efficient and safe operation of all equipment.

.3 Equipment List: List of all major equipment as installed shall include model number, capacities,

flow rate, and name-plate data.

.4 Service Instructions: The Contractor shall be required to provide the following information for all pieces of equipment.

(a) Recommended spare parts including catalog number and name of local suppliers or factory representative.

(b) Bolt sizes, types, and lengths.

(c) Wiring diagrams.

.5 Manufacturer's Certificate of Warranty: Manufacturer's certificates of warranty shall be obtained for all major equipment. Warranty shall be obtained for at least one year from the date of Substantial Completion. Where longer period is required by the Contract Documents, the longer period shall govern. Warranties shall be submitted as listed in Section 10.9.3.

.6 Parts catalogs: For each piece of equipment furnished, a parts catalog or similar document shall be provided which identifies the components by number for replacement ordering.

.7 Contractor shall provide a minimum of two (2) training classes for City staff on the operation and maintenance of all equipment. Classes shall be performed at the convenience of the City.

### 3.17.2  Submission

.1 Manuals shall be bound into volumes of standard 8 1/2" x 11" hard binders.  Large drawings too bulky to be folded into 8 1/2" x 11" shall be separately bound or folded and in brown envelopes, cross-referenced and indexed with the manuals.

.2 The manuals shall identify the City's project name, project number, and include the name and address of the Contractor and major Sub-Contractors of any tier who were involved with the activity described in that particular manual.

.3 At completion of all punch list items for the Work in entirety, the Contractor shall perform a commissioning of the Work whereby the City and its personnel shall be trained in the operation and maintenance of the Work.  A record shall be made of such commissioning in order to assist the City in future maintenance and operation of the Work.

### 3.18    Taxes

3.18.1 CONTRACTOR shall pay all applicable sales, consumer, use and other taxes required by law.  CONTRACTOR is responsible for reviewing the pertinent state statutes involving state taxes and complying with all requirements.

3.18.2 Contractor will make a provision for City direct purchasing plan with sales tax savings to be credited against the GMP..

3.18.3 Contractor and City shall meet after commencement of the and jointly prepare a list of direct purchase items to allow the City to gain maximum practical sales tax savings for the Work.

### 3.19    Contractor's Construction Schedules

3.19.1  The Contractor, within fifteen (15) days after the issuance of the Notice of Award, shall prepare and submit for the City's and ARCHITECT's information Contractor's construction schedule for the Work and shall set forth interim dates for completion of various components of the Work and Work Milestone Dates as defined herein.  The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work, and shall provide for expeditious and practicable execution of the Work.  The Contractor shall conform to the most recent schedule.

3.19.2 The construction schedule shall be in a detailed format satisfactory to the City's Representative and the ARCHITECT. If the City's Representative or ARCHITECT has a reasonable objection to the schedule submitted by the Contractor, the construction schedule shall be promptly revised by the Contractor. The Contractor shall monitor the progress of the Work for conformance with the requirements of the construction schedule and shall promptly advise the City of any delays or potential delays.  The Contractor shall submit two (2) week "Look Ahead" schedules to the City's Representative and ARCHITECT at every construction meeting. The Contractor shall revise his schedule to reflect revisions and/or recovery actions and submit it to the City for review and approval.  Additional costs resulting there from will be borne by the Contractor.

3.19.3 In the event the City's Representative or ARCHITECT determines that the performance of the Work, as of a Milestone Date, has not progressed or reached the level of completion required by the Contract Documents, the Contractor shall take corrective measures necessary to expedite the progress of construction, including, without limitation, (1) working additional shifts or overtime, (2) supplying additional manpower, equipment, facilities, (3) expediting delivery of materials, (4) resequencing the Work and (4) other similar measures (hereinafter referred to collectively as Extraordinary Measures).  Such Extraordinary Measures shall continue until the progress of the Work complies with the stage of completion required by the Contract Documents. The City's right to require Extraordinary Measures is

solely for the purpose of ensuring the Contractor's compliance with the construction schedule. The Contractor shall not be entitled to an adjustment in the Contract Sum concerning Extraordinary Measures required by the City under or pursuant to this Paragraph 3.19.3. The City may exercise the rights furnished the City under or pursuant to this Paragraph 3.19.3 as frequently as the City deems necessary to ensure that the Contractor's performance of the Work will comply with any Milestone Date or completion date set forth in the Contract Documents.

**3.20    Weather – Hurricane Precautions**

3.20.1 Extensions to the Contract time for delays caused by the effects of inclement weather shall be submitted as a request for a change order in the Contract time pursuant to Article 6.5. These time extensions are justified only when rains or other inclement weather conditions or related adverse soil conditions prevent Contractor from productively performing controlling items of work identified on the accepted schedule or updates resulting in requests for extensions of construction time due to adverse weather conditions shall include U.S. Weather Bureau Climatological Reports for the months involved plus a report indicating the average precipitation, temperature, etc., for the past ten (10) years from the nearest reporting station. Extensions of time may be requested for any month of construction for days lost due to adverse weather in excess of the normally expected lost time; provided, however, if the City determines that the seasonal average of adverse weather days during construction is less than would be normally expected, no Change Order shall be issued and the request for extension of time shall be denied:

.1  Contractor being unable to work at least fifty percent (50%) of the normal workday on controlling items of work identified on the accepted schedule or updates due to adverse weather conditions; or

.2  Contractor must make major repairs to the Work damaged by weather. Providing the damage was not attributable to a failure to perform or neglect by Contractor, and providing that Contractor was unable to work at least fifty percent (50%) of the normal workday on controlling items of work identified on the accepted schedule or updates.

3.20.2 Hurricane -Within thirty days of the date of Notice to Proceed (NTP), Contractor shall submit to the ARCHITECT a Hurricane Preparedness Plan for approval. The plan should outline the necessary measures that the Contractor proposes to perform at no additional cost to the City in case of a hurricane warning or watch to protect the Work site and surrounding area. The plan shall detail these measures with specific action items defining responsible personnel.

3.20.3 During such periods of time as are designated by the National Oceanic and Atmospheric Administration's, National Weather Service as being a hurricane, hurricane warning, or alert, the Contractor shall take all precautions necessary to secure the Work site and surrounding area in response to all threatened storm events, regardless of whether the City has given the Contractor notice of same.

.1  Contractor's compliance with any specific hurricane warning or alert precautions will not constitute "Additional Work" pursuant to the Contract.

.2  Additional work relating to hurricane warning or alert at the Work site will be addressed by a Field Order in accordance with Article 7 – Field Order.

.3  Suspension of the Work caused by a threatened or actual storm event, regardless of whether the City has directed such suspension, will entitle the Contractor additional Contract time as non-compensable, excusable delay and shall not give rise to a claim for compensable delay.

.4  In the event of inclement weather, or whenever the City shall direct, Contractor will cause Sub-Contractors to protect the Work and materials against damage or injury from the weather.

**ARTICLE 4**
**ADMINISTRATION OF THE CONTRACT**

## 4.1 Rights of the City

4.1.1 The City's Representative will administer the Construction Contract. The ARCHITECT and the City's on-site Representative will assist the City's Representative with the administration of the Contract as indicated in these Contract Documents.

4.1.2 The City's Representative, by written notice, may, require a Contractor to remove from involvement with the Work, any of Contractor's personnel or the personnel of its Sub-Contractors of any tier whom the City's Representative may deem abusive, incompetent, careless, or a hindrance to proper and timely execution of the Work. The Contractor shall comply with such notice promptly, but without detriment to the Work or its progress.

4.1.3 The City shall schedule Work status meetings that shall be attended by representatives of the Contractor and appropriate Sub-Contractors of any tier. Material supplier . . hall attend status meetings if required by the City's Representative. These meetings shall include but : t be limited to preconstruction meetings.

## 4.2 Architect

4.2.1 ARCHITECT will not have control over or charge of and will not be responsible for construction means, methods, techniques, sequences or procedures or for safety measures and programs in connection with the Work since these are solely the Contractor's responsibilities.

4.2.2 ARCHITECT will have the authority to recommend to the City the rejection of Work, which does not conform to the Construction Documents. ARCHITECT will recommend to the City, if in their professional judgment, defects and deficiencies in the construction warrant that Work be stopped.

4.2.3 ARCHITECT will review and approve or take other appropriate action upon Contractor's submittals, such as Shop Drawings, Product Data and Samples, for information given and the design concepts expressed in the Construction Documents. If the ARCHITECT is required to review a submittal more than two (2) times due to incomplete or incorrect submittals by Contractor, an appropriate Change Order may be issued by the ARCHITECT deducting a sum reasonably sufficient to compensate ARCHITECT from payments due or become due to Contractor as compensation for ARCHITECT's additional expenses and services made necessary by the Contractor's incomplete or incorrect submittals.

4.2.4 The ARCHITECT will interpret requirements of the Contract Documents with respect to the quality, aesthetics, quantity and other technical requirements of the Work itself within a reasonable time after written request of the Contractor. Contractor shall provide City's Representative a copy of such written request.

## 4.3 Review of the Work

4.3.1 The ARCHITECT, and the City's representatives shall, at all times, have access to the Work; and the Contractor shall provide proper and safe facilities for such access.

4.3.2 The City's Representative shall have authority to reject Work that does not fully comply with the requirements of the Contract Documents. Whenever the City's Representative considers it necessary or advisable for implementation of the intent of the Contract Documents, City's Representative shall have the authority to require additional inspection or testing of the Work, whether or not such Work is fabricated, installed or completed.

4.3.3 The fact that the ARCHITECT or the City's Representative observed, or failed to observe, faulty Work, or Work done which is not in accordance with the Contract Documents, regardless of whether or not the City has released final payment, shall not relieve the Contractor from responsibility for all damages and additional costs of the City as a result of defective or faulty Work.

4.3.4  All tests and analyses, which are called for in the Specifications and/or Drawings which shall include soil testing and density testing (one soil test- two density testing) to be performed by an independent Testing Laboratory, as stated in Contract and will be paid for by the City of Miami Gardens. The Contractor is responsible for payment of any failed tests that do not meet contract requirements. In the event that the City orders additional testing after a passing retest, the City shall pay for such testing.

### 4.4 Resolution of Disputes

4.4.1 To attempt to prevent all disputes and litigation, it is agreed by the parties hereto that City's Representative] shall decide all questions, claims, difficulties and disputes of whatever nature which may arise relative to the technical interpretation of the Contract Documents and fulfillment of this Contract as to the character, quality, amount and value of any work done and materials furnished, or proposed to be done or furnished under or, by reason of, the Contract Documents and City's Representative's estimates and decisions upon all claims, questions, difficulties and disputes shall be final and binding to the extent provided herein, but subject to Contractor's or City's right to contest in litigation. Any claim, question, difficulty or dispute that cannot be resolved by mutual agreement of City and Contractor shall be submitted to City's Representative in writing within twenty-one (21) calendar days. Unless a different period of time is set forth herein, City's Representative requires additional time to gather information or allow the parties to provide additional information. All non-technical administrative disputes shall be determined by the City Manager pursuant to the time periods provided herein. During the pendency of any dispute or after a determination thereof, Contractor and City shall act in good faith to mitigate any potential damages including utilization of construction schedule changes and alternate means of construction.

4.4.2 In the event the determination of a dispute under this Section is unacceptable to either party hereto, the party objecting to the determination must notify the other party in writing within ten (10) days of receipt of the written determination. The notice must state the basis of the objection and must be accompanied by a statement that any Contract price adjustment claimed is the entire adjustment to which the objecting party has reason to believe it is entitled to as a result of the determination. Within one hundred twenty (120) days after Final Completion of the Work, the parties shall participate in mediation to address all objections to any determinations hereunder and to attempt to prevent litigation. The mediator shall mutually agreed upon by the parties. Should any objection not be resolved in mediation, the parties retain all their legal rights and remedies provided under State law. A party objecting to a determination specifically waives all of its rights provided hereunder, including its rights and remedies under State law, if said party fails to comply in strict accordance with the requirements of this Section.

### ARTICLE 5
### SUBCONTRACTORS

### 5.1  Award of Sub-Contracts

5.1.1 Pursuant to Article 10, the Contractor shall furnish the City and the ARCHITECT, in writing, with the name, and title for each Sub-Contractor and the names of all persons or entities proposed as manufacturer of products, materials and equipment identified in the Contract Documents and where applicable, the name of the installing Contractor. The City's Representative will reply to the Contractor in writing if the City has reasonable objection to any such proposed person or entity. The Contractor shall not Contract with a proposed person or entity to which the City has made reasonable and timely objection.

5.1.2 The Contractor shall be responsible to the City for acts, defaults, and omissions of its Sub-Contractors of any tier.

### 5.2  Sub Contractual Relations

5.2.1 By appropriate agreement, written where legally required for validity, all subcontracts shall be in substantially the form attached hereto as Exhibit _____.

5.2.2 Contractor shall use good faith efforts to achieve the City's local business preferences pursuant to the Project Management Plan.

## ARTICLE 6
## SEPARATE CONTRACTS AND COOPERATION

6.1 The City reserves the right to let other Contracts in connection with the Project to Separate Contractors.

6.2 The Contractor shall cooperate with the City's Separate Contractors in order to schedule Work, locate storage facilities, etc., in a manner that will permit all Contractors to work in harmony in order that Work may be completed in the manner and within the time specified in the Contract Documents.

6.3 Contractor shall delay City's Separate Contractors by neglecting to perform their work at the proper time previously agreed to by Contractor. The Contractor and City's Separate Contractors shall be required to cooperate to afford reasonable opportunity for execution of their work. Any costs caused by defective or ill- timed work, including actual damages and liquidated damages for delay, if applicable, shall be borne by the Contractor responsible therefore.

6.4 Contractor and each of the City's Separate Contractors shall be responsible for damage to City's or other party's property done by such Contractor and each of the City's Separate Contractors or persons in his employ, through his or their fault or negligence. If any Contractor shall cause damage to any other Contractor, the Contractor causing such damage shall upon notice of any claim, settle with such Contractor.

6.5 The Contractor shall not claim from the City money damages or extra compensation under this Contract when delayed in initiating or completing his performance hereunder, when the delay is caused by labor disputes, acts of God, where any such cause is beyond the City's reasonable control.

6.6 Progress schedule of the Contractor for the Work shall be submitted to other contractors as necessary to permit coordinating their progress schedules.

6.7 If Contractors or Sub-Contractors of any tier refuse to cooperate with the instructions and reasonable requests of the City's Separate Contractors performing work for the City under separate contract, in the overall coordinating of the Work, the City's Representative may take such appropriate action and issue such instructions as in his judgment may be required to avoid unnecessary and unwarranted delay.

## ARTICLE 7
## FIELD ORDERS AND SUPPLEMENTAL INSTRUCTIONS

7.1The City's Representative or ARCHITECT shall have the right to approve and issue Field Orders setting forth written interpretations of the intent of the Contract Documents and ordering minor changes in Work execution.

7.2 The City shall have the right to approve and issue Supplemental Instructions setting forth written orders, instructions, or interpretations concerning the Contract Documents or its performance, provided such Supplemental Instruction involve no change in the Contract price or Contract time.

## ARTICLE 8
## CHANGE ORDERS

8.1 The City, may authorize written Change Orders regarding changes in, extensions of time, or additions to Work to be performed or materials to be furnished pursuant to the provisions of the Contract.

8.2 A GMP Change Order shall be submitted by the Contractor to the City within forty two (42) days after receipt by the Contractor of the 80% completed Contract Documents in accordance with section 3.1 of the Contract. The Contractor shall prepare GMP1 and GMP2 based upon the following:

8.2.1     The total estimated Cost of the Work including all subcontracts, all third party cost, and all cost of labor and materials for the construction of the Work, including reasonable waste ("Cost of the Work");

8.2.2     General Conditions at a rate of Six point Six-Five percent (6.65%) of the Cost of the Work; Wages or salaries of the Contractor's supervisory and administrative personnel when stationed at the site with the Owner's prior approval. The wages and salaries included in this Section 8.2.2 ("General Conditions Costs") shall include and be limited to all salary and wages cost associated with the Contractor's on-site staff, including but not limited to Superintendents, Project Engineers, Project Managers, and all other on-site technical and administrative staff when assigned and working on the project required to complete the Work. General Conditions Costs will be inclusive of all salaries, payroll taxes and insurance (except Builders Risk and the Payment and Performance Bond) and employee benefits for such personnel Fringe benefits and labor burden related to such costs including but not limited to payroll taxes, vacation, health insurance benefits, and worker's compensation shall be fixed at 43.25% of the W-2 cost for all salaried employees and 32% for hourly employees. General Conditions shall also include: (i) costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities (including project field offices, furniture and fixtures), temporary utilities, machinery, equipment, and hand tools not customarily owner by construction works, which are provide the Contractor at the Project site and fully consumed in performance of the work; (ii) rental charges at standard rates in Miami-Dade County for temporary facilities, machinery, vehicles, equipment, and hand tools not customarily owned by construction workers, which are provided by the Contractor at the Project site; (iii) cost of removal and proper disposal of debris from the Project site compliant with LEED protocols; (iv) all communication services and related costs; (v) fees and assessments, permit costs, licenses and inspections which the Contractor is required by the Contract to pay;(vi) fees for testing required by the Contract; (vii) legal, mediation and arbitration costs, other than those arising from disputes between the City and the Contractor; (vii) costs incurred in repairing or correcting damage or nonconforming Work executed by the Contractor or its subcontractors or suppliers provided that such damage; (viii) all costs associated with site safety and security; (ix) all costs of documentation (including LEED protocol compliance), inspection, and testing as required by the Contract; (x) all costs associated with Quality Control of the Work; (xi) all bonds and insurance premiums as required by the Contract, excluding Builders Risk and Payment and Performance Bonds which shall treated as a separate, directly reimbursable line item from the CITY; and (xii) all costs to protect the Work and adjacent properties from loss or damage. See Special Conditions for clarifications and modifications applicable to this Agreement.

8.2.3     CONTRACTOR'S Overhead at a rate of one point five percent (1.5%) of the Cost of the Work; See Special Conditions for clarifications and modifications applicable to this Agreement.

8.2.4     CONTRACTOR'S Profit (or Fee) at a rate of two point five percent (2.5%) of the Cost of the Work; See Special Conditions for clarifications and modifications applicable to this Agreement.

8.2.5     The Project Contingency of two point five percent (2.5%) of GMP2 as defined in the Article 4 of the Contract. The Project Contingency shall be used by the CITY for changes in scope required by third parties (e.g. inspections, approvals or permits) and changes in prices for identified

allowances or omissions in the Construction Documents or Specifications by the ARCHITECT i or the CONTRACTOR, with the CITY'S approval, to pay any costs incurred by the CONTRACTOR in connection with the performance of the Work, which are not specifically covered by any line item in the Schedule of Values. Any Savings from the Project Contingency shall be shared Seventy-Five percent 75 % to the CITY and Twenty-Five percent 25 % to the CONTRACTOR.

8.3 On approval of any Contract change increasing the GMP, payment and performance bonds shall provide that the penal sums thereof are increased to the same extent.

8.4 The amount of adjustment in the Contract price for authorized Change Orders will be agreed upon before such Change Orders becomes effective and will be determined as follows:

.1 By an acceptable unit price or lump sum proposal from the Contractor and the Sub-Contractors of any tier. Breakdowns s., ill be of sufficient detail to allow evaluation by the City and ARCHITECT and include a listing of u, ch item of material with unit prices and number of hours of labor for each task.

.2 By a time and material basis with or without a specified maximum, including all overhead and profit, total cost not to exceed maximum specified. The City's Representative will approve daily the Contractor's time and material for the Work. Time must be submitted on daily time sheets.

.3 By unit prices contained in the Contract. Unit prices contained in the Contract include the Contractor's Overhead and Profit. If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order that application of such unit prices to quantities of the Work proposed will cause substantial inequity to the City or to the Contractor, the applicable unit prices shall be equitably adjusted.

.4 The Contractor shall submit labor rates for all Sub-Contractors as provided herein.

8.5 Overhead and Profit on Change Orders shall be applied as follows:

.1 The Overhead and Profit charged by the Contractor shall be considered to include, job site office expense, normal hand tools, incidental job supervision, and payroll costs for employees not employed on the Project Site. Company benefits shall include salaries and wages plus the cost of fringe benefits which shall include social security contributions, unemployment, excise and payroll taxes, workers' compensation, health and retirement benefits, sick leave, vacation and applicable holiday pay. The percentages for Overhead and Profit charged on Change Orders shall be in accordance with the Contract:

.2 The Cost of Work shall NOT include any of the following:

- Payroll costs and other compensation of Contractor's officers, executives, principals, general managers, engineers, architects, estimators, attorneys, auditors, accountants, purchasing and Contracting agents, expediters, timekeepers, clerks and other personnel employed by Contractor whether at the site or in Contractor's principal or a branch office for general administration of the Work and not specifically included in the agreed upon schedule of job classifications all of which are to be considered administrative costs covered by Contractor's fee.

- Any part of Contractor's capital expenses, including interest on Contractor's capital employed for the Work, and charges against Contractor for delinquent payments.

- Cost of premiums for all Bonds and for all insurance whether or not Contractor is required by the Contract Documents to purchase and maintain the same, except for additional bonds and insurance required because of changes in the Work

- Costs due to the negligence of Contractor, any Sub-Contractor, or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable, except ordinary waste including but not limited to, the correction of defective Work, disposal of materials or equipment wrongly supplied and making good any damage to property.

- Other home office overhead or general administrative expense costs of any kind and the cost of any item not expressly included above.

.3 On Change Orders covering both increases and decreases in the amount of the Contract, the application of overhead and profit shall be on the net change in direct cost for the Contractor or Sub-Contractor of any tier performing the Work.

.4 The percentages for Overhead and Profit credited to the City on Change Orders that are strictly decreases in the quantity of work or materials shall be negotiated and may vary according to the nature, extent, and complexity of the Work involved.

8.6 The Contractor shall provide Change Order pricing and backup in a timely manner. No claim for an addition to the Contract sum will be valid unless authorized in writing by the City. In the event that none of the foregoing methods are agreed upon, the City may direct the Work to be performed by force account or accounts. The cost of such Work will be determined by the Contractor's actual labor and material cost to perform the Work plus applicable overhead and profit as outlined above.

8.7 No changes or additions to work to be performed, materials to be furnished, or in the provisions of the Contract will be authorized until execution and delivery by the City to the Contractor of the written order referred to in this paragraph. Any work completed by the Contractor outside the original project scope without written approval or written directive from the City will be deemed as a waiver by the Contractor for additional compensation for said work.

8.8 Each Change Order must state within the body of the Change Order whether it is based upon unit price, negotiated lump sum or "cost of the work".

## ARTICLE 9
### NOTIFICATION AND CLAIM FOR CHANGE OF CONTRACT TIME OR CONTRACT PRICE

9.1 Any claim for a change in the Contract Time or Contract Price shall be made by written notice by the Contractor to the City's Representative and ARCHITECT within five (5) business days of the commencement of the event giving rise to the claim and stating the general nature and cause of the claim. Thereafter, within twenty (20) calendar days of the termination of the event giving rise to the claim, written notice of the extent of the claim with supporting information and documentation shall be provided unless City allows an additional period of time to ascertain more accurate data in support of the claim and such notice shall be accompanied by Contractor's written notarized statement that the adjustment claimed is the entire adjustment to which the Contractor has reason to believe it is entitled as a result of the occurrence of said event. All claims for changes in the Contract Time or Contract Price shall be determined by City in accordance with Se tion 4.4 hereof, if City and Contractor cannot otherwise agree. IT IS EXPRESSLY AND SPECIFICALLY GREED THAT ANY AND ALL CLAIMS FOR CHANGES TO THE CONTRACT TIME OR CONTRACT PRICE SHALL BE WAIVED IF NOT SUBMITTED IN STRICT ACCORDANCE WITH THE REQUIREMENTS OF THIS SECTION. Each claim the Contractor makes for a Contract change for any cause shall be accompanied by a revised schedule reflecting the effects and proposals to minimize these effects on the project.

9.2 The Contract time will be extended in an amount equal to time lost on the Critical path of the Schedule due to delays beyond the control of and through no fault or negligence of Contractor if a claim is made therefore as provided in Section 9.1. Such delays shall include, but not be limited to, force majeure, acts or neglect by any separate contractor employed by City, fires, floods, labor disputes, epidemics, abnormal weather conditions or acts of God. Any unauthorized work performed by the

Contractor prior to NTP shall not be the basis for a claim from the Contractor of any kind. In no event shall claims be made after the final payment is made under Final Payment of these General Conditions.

### 9.3 Excusable Delay -- Non-Excusable Delay

9.3.1 Excusable Delay –Delay which extends the completion of the Work and which is caused by circumstances beyond the control of Contractor or its Sub-Contractors, suppliers or vendors and by the City or ARCHITECT, is an Excusable Delay.

9.3.2 Contractor is entitled to a time extension of the Contract Time for each day the Work is delayed due to Excusable Delay. Contractor shall document its claim for any time extension as provided in Section 9.1 hereof, Contractor shall be entitled only to a time extension and no further compensation for delay.

9.3.3 Non-Excusable Delay -- Are delays to the critical path caused by the Contractor or du.. to the Contractor's fault or negligence or its own inefficiencies or problems, due to its inability to coordin.''.. Sub-Contractors and/or other flaws in its planning. In these types of delays, the Contractor is not e..lled to extra time and the City may be allowed to assess liquidated damages if these delays result in delayed Substantial Completion of the Work.

### 9.4    Progress and Completion

9.4.1 Contractor, City, and City's Representative acknowledge and agree that time is of the essence of this Contract

9.4.2 Contract Time is the period of time set forth in the Contract for Construction required for Substantial Completion and Final Completion for each Phase and the entire Work or portions of the Work as defined in the Contract Documents. All time limits stated in the Contract Documents are of the essence of the Contract. The Contract Time may only be changed by a Change Order. By executing the Contract, the Contractor confirms that the Contract Time is a sufficient period for performing the Work in its entirety.

9.4.3 The Contractor shall not knowingly, except by agreement or instruction of the City in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance and bonds required by Article 12 to be furnished by the Contractor.

9.4.4 The Contractor shall proceed expeditiously and diligently with adequate forces and shall achieve Substantial Completion and Final Completion within the time specified in the Contract Documents.

### 9.5    Delay In Completion

9.5.1 Contractor shall be liable for such liquidated damages as forth in Section 9.6.

### 9.6    Liquidated Damages

9.6.1 The City may deduct from the Contract Sum and retain as Liquidated Damages   nd not as penalty or forfeiture, the sum stipulated in the Contract Documents for each calendar day aft  t he date specified for completion of the Work that the entire Work is not Substantially Complete.

9.6.2 The City shall establish the date of Substantial Completion and the date of Final Completion of each phase of the Work in writing and transmit the same to the Contractor promptly.

9.6.3 Liquidated Damages or any matter related thereto shall not relieve the Contractor or his surety of any responsibility or obligation under this Contract.

### ARTICLE 10
### PAYMENTS AND COMPLETION

**10.1    Commencement, Prosecution, and Completion**

**10.1.1** The Contractor shall commence Work within ten (10) days upon the date of a "Notice to Proceed" from the City or the date fixed in the Notice to Proceed. Contractor shall prosecute the Work with faithfulness and diligence, and the Contractor shall complete the Work within the Contract Time set forth in the Contract Documents.

**10.1.2** The City will prepare and forward three (3) copies of the Contract and Performance and Payment Bonds to the Contractor to whom the Contract for the Work is awarded and such Contractor shall return two (2) properly executed prescribed copies of the Contract and Bonds to the City.

**10.1.3** The Construction Period, when specified in consecutive calendar days, shall begin when the Contractor receives notice requesting the instruments listed in below. Before the City will issue Notice to Proceed, to permit the Contractor to begin Work, the City :: all have received the following instruments, properly executed as described in the Contract Docum; ,s. The documents below shall have been received by the City within fifteen (15) days after receipt of request for documents:

   .1 Contract

   .2 Bond (See Article 12)

   .3 Insurance (See Article 12)

   .4 List of Sub-Contractors of any tier

**10.1.4** In the event Contractor fails to provide City such documents, Contractor may not enter upon the site of the Work until such documents are provided. The date the Contractor is required to commence and complete the Work shall not be affected by the City denying Contractor access to the site as a result of Contractor's failure to provide such documents and Contractor shall not be entitled to an adjustment of the Contract Time or Contract Sum as a result of its failure to comply with the provisions of this Section.

**10.1.5** Contracts executed by partnerships or joint ventures shall be signed by all general partners or Member Manages of the partnership or joint venture. Contracts signed by corporations shall be signed by the President or Vice President and the Secretary or Assistant Secretary. In case the Assistant Secretary or Vice President signs, it shall be so indicated by writing the word "Asst." or "Vice" in front of the words "Secretary" and "President". The corporate seal of the corporation shall be affixed. For all other types of entities, the Contractor and the person signing the Contract on behalf of Contractor shall represent and warrant that the person signing the Contract has the legal authority to bind Contractor to the Contract.

**10.1.6** Any successful Contractor which is a corporation organized in a state other than Florida or any Contractor doing business in the State of Florida under a fictitious name shall furnish, at no cost to the City, no later than the time at which the executed Contract for Construction, the Payment Bond, and the Performance Bond are returned, a properly certified copy of its current Certificate of Authority and License to do business in the State of Florida. No Contract will be executed by the City until such certificate is furnished by the Contractor.

**10.1.7** Within fifteen (15) calendar days of the issuance of a Notice of Award, the Contractor shall submit one (1) signed copy of the following instruments. No payment will be processed until all of these instruments are received and approved by the City's Representative.

   .1 progress and payment schedule

   .2 Contractor's Schedule of Values

   .3 List of material suppliers

   .4 Itemized breakdown of anticipated equipment rates. Overhead and profit shall not be included.

#### 10.2 Contract Sum

10.2.1 The City shall compensate Contractor for all Work described herein and in the Contract Documents, the Contract Sum set forth in the Contract for Construction, subject to additions and deletions, if any, as provided hereunder. The Contract Sum shall also be referred to in this Contract as the GMP.

#### 10.3 Schedule of Values

10.3.1 Within fifteen (15) days after the GMP Change Order, the Contractor shall submit to the City's Representative a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the City's Representative may require. This schedule of values, unless objected to by the City's Representative, shall be used as a basis for reviewing the Contractor's Applications for Payment. The values set forth in such schedule shall not be used in any manner as fixing a basis for additions to or deletions from the Contract Sum.

10.3.2 The progress and payment schedule of values shall show the following:

.1 The proposed schedule for tasks identified in the Contractor's Progress and Payment Schedule in bar chart form.

.2 Important milestones which may impact the progress schedule (such as the anticipated delivery of structural steel, completion of rough-in, completion of utility relocations, etc.).

.3 Rate of progress proposed by the Contractor in terms of cumulative percent complete, shown as an "S" curve superimposed on the bar chart schedule.

.4 Anticipated monthly payments by the City based on the rate of progress proposed by the Contractor.

.5 The dates shown for Tasks on the Contractor's progress and payment schedule shall agree with the start and finish dates provided on the Contractor's Schedule of Values.

#### 10.4 Applications for Payment

10.4.1 The Contractor shall submit monthly to the City's Representative and the ARCHITECT an itemized Application for Payment for operations completed in accordance with the Schedule of Values. Such application shall be supported by such data substantiating the Contractor's right to payment as the City's Representative or ARCHITECT may reasonably require, such as copies of requisitions from Sub-Contractors and material suppliers, and reflecting retainage as provided for herein.

10.4.2 Such applications shall not include requests for payment of amounts the Contractor does not intend to pay to a Sub-Contractor or material supplier.

10.4.3 Progress payments shall be made on account of materials and equipment delivered to the site and incorporated in the Work. No payments will be made for materials and equipment stored at the Project site but not yet incorporated into the Work except as provided in Paragraph 10.4.4.

10.4.4 If approved in advance and in writing by City, progress payments may be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. City may in its sole discretion refuse to grant approval for payments for materials and equipment stored at the Project site but not yet incorporated in the Work. Any approval by City for payment for materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work shall be conditioned upon Contractor's demonstrating that such materials and equipment are adequately protected from weather, damage, vandalism and theft and that such materials and equipment have been inventoried and stored in accordance with procedures established by or approved by the City. Nothing in this clause shall imply or create any liability on the part of the City for the Contractor's inventory and storage procedures or for any loss or damage to material, equipment or supplies stored on the site,

whether incorporated into the work or not. In the event any such loss or damage occurs, the Contractor remains solely responsible for all costs associated with replacement of the affected materials, supplies and equipment including labor and incidental costs, and shall have no claim against the City for such loss.

10.4.5 The Application for Payment shall constitute a representation by the Contractor to the City that the Work has progressed to the point indicated; the quality of the Work covered by the Application for Payment is in accordance with the Contract Documents; and the Contractor is entitled to payment in the amount requested.

10.4.6 The Contractor will be reimbursed for ninety percent (90%) of the value of all labor furnished and material installed and computed in the same manner, less all previous payments made.

## 10.5    Approval for Payment

10.5.1 The City's Representative or ARCHITECT will, within five (5) days after receipt of the Contractor's Application for Payment, either approve Contractor's Application for Payment for such amount as the City's Representative determines is properly due, or notify the Contractor in writing of the City's Representative's reasons for withholding certification in whole or in part as provided in Section 10.6.

## 10.6    Decisions to Withhold Approval

10.6.1 The City may decide not to certify payment and may withhold approval in whole or in part, based on the City's Representative's the or ARCHITECT's reasonable rejection of the pay request to the extent reasonably necessary to protect the City. If the City's Representative is unable to approve payment in the amount of the Application, the City's Representative will notify the Contractor as provided in Paragraph 10.5.1. If the Contractor and City's Representative cannot agree on a revised amount, the City's Representative will promptly issue approval for payment for the amount for which the City's Representative is able to determine is due Contractor. The City's Representative may also decide not to approve payment or, because of subsequently discovered evidence or subsequent observations, may · nullify the whole or a part of approval for payment previously issued, to such extent as may be necessary in the City's Representative opinion to protect the City from loss because of:

    .1 defective Work not remedied or damage to completed Work;

    .2 failure to supply sufficient skilled workers or suitable materials;

    .3 failure of the Contractor to make payments properly to Sub-Contractors or for labor, materials or equipment;

    .4 reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

    .5 damage to the City or a Separate Contractor caused by Contractor; or

    .6 reasonable evidence that the Work will not be completed within the Contract Time or an unsatisfactory rate of progress made by Contractor; and

    .7 installation of work, materials or equipment requiring a s⁺ ⟩ drawing without an approved·· ·· ··· ···········.·······. shop drawing,

    .8 failure to provide the monthly updates as required in the Project Management Plan, aerial photos, red-lined drawings or partial lien releases.

10.6.2 When the above reasons for withholding approval are removed, approval will be made for amounts previously withheld.

## 10.7    Progress Payments

**10.7.1** Based upon Applications for Payment submitted to the City by the Contractor and approvals issued by the City's Representative, the City shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents. Applications for Payment shall be in a format approved by the City.

**10.7.2** The period covered by each Application for Payment shall be one (1) calendar month.

**10.7.3** The City shall make payment to Contractor for amounts due and approved by City's Representative not later than thirty (30) days after the City approves a properly detailed Application for Payment which is in compliance with the Contract Documents. The City shall not have the obligation to process or pay such Application for Payment until it receives an Application for Payment satisfying such requirements.

**10.7.4** Based on the Schedule of Values submitted by Contractor, applications for Payment submitted by Contractor shall indicate the percentage of completion of each portion of Contractor's Work as of the end of the period covered by the Application for Payment.

**10.7.5** The Contractor shall promptly pay each Sub-Contractor and supplier, upon receipt of payment from the City, out of the amount paid to the Contractor on account of such Sub-Contractor's or supplier's portion of the Work, the amount to which said Sub-Contractor or supplier is entitled, reflecting percentages actually retained from payments to the Contractor on account of each Sub-Contractor's or supplier's portion of the Work. The Contractor shall, by appropriate agreement with each Sub-Contractor or supplier, require each Sub-Contractor or supplier to make payments to sub-Sub-Contractors in similar manner.

**10.7.6** Neither the City nor ARCHITECT shall have an obligation to pay or to see to the payment of money to a Sub-Contractor of any lier nor a laborer or employee of Contractor except to the extent required by law. Retainage provided for by the Contract Documents are to be retained and held for the sole protection of City, and no other person, firm or corporation shall have any claim or right whatsoever thereto.

**10.7.7** An approval for payment by City's Representative, a progress payment, or partial or entire use or occupancy of the Project by the City shall not constitute acceptance of Work not in accordance with the Contract Documents.

**10.7.8** Contractor will implement Open-book accounting procedures. The Contractor shall provide the City access to any and all books and records related to any non-lump sum line item or cost hereunder, including without limitation, change orders, savings and expenditures of contingency, or any other information reasonably necessary for the City to fully verify and confirm any aspects of the Work performed on a Cost of Work basis. Upon written request of the City, Contractor shall provide any information reasonably requested by the City in furtherance of this section and allow the City access to Contractor's books and records regarding same, within a reasonably time after such written request and allow the City to inspect such books and records, and those of any Subcontract whose cost is related to the issue which is subject to audit. If the Contractor does not provide the requested information, then the City may withhold payment on the item(s) in question.

### 10.8    Failure of Payment

**10.8.1** If the City is entitled to reimbursement or payment from the Contractor under or pursuant to the Contract Documents, such payment by Contractor shall be made promptly upon demand by the City. Notwithstanding anything contained in the Contract Documents to the contrary, if the Contractor fails to promptly make any payment due the City, or the City incurs any costs and expenses to cure any default of the Contractor or to correct defective Work, the City shall have a right to offset such amount against the Contract Sum and may, in the City's sole discretion, elect either to: (1) deduct an amount equal to that to which the City is entitled from any payment then or thereafter due the Contractor from the City,' or (2)

issue a written notice to the Contractor reducing the Contract Sum by an amount equal to that to which the City is entitled.

## 10.9 Substantial Completion

10.9.1 Substantial Completion is the stage in the progress of the Work as defined in Paragraph 1.1.21 as certified by the City. See Special Conditions for amended definition for the purpose of this Agreement.

10.9.2 When the Contractor considers the Work, or a portion thereof which the City agrees to accept separately, Substantially Complete, the Contractor shall notify the City and the ARCHITECT. The City will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the City's Inspec') n discloses any item which is not in accordance with the requirements of the Contract Documents, the 't ntractor shall complete or correct such item upon notification by the City's Representative in writing. The 'ontractor shall then submit a request for another inspection by the City to determine Substantial Completion. When the Work or designated portion thereof is substantially complete, the City will issue a Certificate of Substantial Completion. Substantial Completion shall transfer from the Contractor to the City responsibilities for security, maintenance, heat, utilities, damage to the Work and insurance. In no event shall Contractor have more than thirty (30) days to complete all items on the Punch List and achieve Final Completion. Warranties required by the Contract Documents shall commence on the date of Substantial Completion or as agreed otherwise. In the event the Contractor refuses or fails to complete any item on the Punch List by the specified time, the City has, as its option, the right to, after ten (10) days notice to the Contractor, have the work performed by others and back-charge the Contractor or delete the unfinished work from the Contract and deduct the total cost of performing the Work from the Contract.

10.9.3 All warranties and guarantees required under or pursuant to the Contract Documents shall be assembled and delivered by the Contractor to the City after the date Substantial Completion in connection with Final Completion.

## 10.10 Partial Occupancy or Use

10.10.1 The City may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate written agreement with the Contractor and all applicable insurance companies. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the City and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, security, maintenance, heat, utilities, damage to the Work and insurance. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by the City's Representative.

10.10.2 Immediately before such partial occupancy or use, the City, and Contractor shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work. Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute ac · ptance of Work not complying with the requirements of the Contract Documents.

## 10.11 Final Compl ion and Final Payment

10.11.1 Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the City and the ARCHITECT will promptly make such inspection and, when the City and ARCHITECT find the Work acceptable under the Contract Documents and the Contract fully performed, the City will promptly issue a final approval for payment; otherwise, City's will return Contractor's Final Application for Payment to Contractor, indicating in writing the reasons for refusing to recommend final payment, in which case Contractor shall make the necessary corrections and resubmit the Application. Submission of a Final Application for Payment shall constitute a further representation that conditions listed in Paragraph 10.11.2 as precedent to the Contractor's being entitled

to final payment have been fulfilled. The final approval for payment will not be issued by the City's Representative until all warranties and guarantees have been received and accepted by the City.

10.11.2 The City will request the Contractor to submit the application for final payment along with a manually signed notarized letter on the Contractor's letterhead certifying that:

.1 labor and material costs have been paid, or will be paid out of the monies which are the subject of the Application.

.2 Sub-Contractors of any tier and manufacturers furnishing materials and labor for the project have fully completed their Work and have been paid in full, or will be paid out of the monies which are the subject of the Application.

.3 the project has been fully completed in accordance with the Contract Documents as modified by Change Orders, if any.

.4 the acceptance by Contractor of its Final Payment, by check or electronic transfer, shall be and operate as a release of all claims of Contractor against City for all things done or furnished or relating to the Work and for every act or alleged neglect of City arising out of the Work, unless previously identified in writing as unsettled by Contractor to the City.

.5 a certificate evidencing that insurance required by the Contract to remain in force after final payment is currently in effect and will not be cancelled or allowed to expire until at least thirty (30) days prior written notice has been given to the City.

.6 written statement that Contractor knows of no substantial reason that Contractor's completed operations insurance will not be renewable to cover the period required by the Contract.

.7 Contractor shall provide a consent of Surety to final payment.

10.11.3 Final Payment constituting the entire unpaid balance due shall be paid by the City to the Contractor within thirty (30) days after City's receipt of Contractor's Final Application for Payment which satisfies all the requirements of the Contract Documents and City's receipt of all information and documents set forth in Section 10.11.

10.11.4 No payment under this Contract, including but not limited to, final payment, shall constitute acceptance by City of any Work not in accordance with the requirements of the Contract Documents, unless such non-conformance is called to the attention of the City before payment thereto by the City to Contractor.

10.11.5 Acceptance of final payment by the Contractor shall constitute a waiver of claims by the payee except those previously made in writing and identified by the payee as unsettled at the time of final Application for Payment.

10.12 No Interest

10.12.1 Any monies not paid by City when claimed to be due to ⸱ ntractor under this Contract, including, but not limited to, any and all claims for Contract damages of ⸱ y type, shall not be subject to interest including, but not limited to prejudgment interest. However, the provisions of Section 218.74(4), Florida Statutes as such relates to the payment of interest, shall apply to valid and proper invoices.

10.13 Purchasing Card Program

10.13.1 The City has implemented a purchasing card program through Sun Trust Bank, using the VISA network. Contractors will receive payment from the purchasing card in the same manner as other Visa purchases. The Contractor must have the ability to accept VISA or take whatever steps

necessary to implement the ability before the start of the agreement term, VISA acceptance is mandatory but is not the exclusive method of payment.

## ARTICLE 11
## PROTECTION OF PERSONS AND PROPERTY

### 11.1 Safety Precautions and Programs

11.1.1 The Contractor shall at all times conduct operations under this Contract in a manner to avoid the risk of bodily harm to persons or risk of damage to any property. The Contractor shall promptly take precautions which are necessary and adequate against conditions created during the progress of the Contractor's activities hereunder which involve a risk of bodily harm to persons and a risk of damage to property. The Contractor shall continuously inspect Work, materials, and equipment to discover and determine any such conditions and shall be solely responsible for discovery, determination, and correction of any such conditions. The Contractor shall comply with applicable safety laws, standards, codes, and regulations in the jurisdiction governing the performance of the Work in the jurisdiction where the Work is being performed, specifically, but without limiting the generality of the foregoing, with rules regulations, and standards adopted pursuant to the Williams-Steiger Occupational Safety and Health Act of 1970 and applicable amendments.

11.1.2 In the event the Contractor encounters on the site, material reasonably believed to be asbestos, polychlorinated biphenyl (PCB), lead, mercury, or other material known to be hazardous, which has not been rendered harmless, the Contractor shall immediately stop Work in the area affected and report the condition to the City's Representative and the ARCHITECT in writing. The Work in the affected area shall not thereafter be resumed except by written agreement of the City's Representative and Contractor if in fact the material is asbestos or polychlorinated biphenyl (PCB) and has not been rendered harmless. The Work in the affected area shall be resumed in the absence of asbestos or polychlorinated biphenyl (PCB), or when it has been rendered harmless by written agreement of the City's Representative and the Contractor. "Rendered Harmless" shall mean that levels of such materials are less than any applicable exposure standards, including, but not limited to, OSHA regulations, as well as all Federal, State and local environmental agencies.

### 11.2 Safety of Persons and Property

11.2.1 The Contractor shall take reasonable precautions for safety of, and shall provide protection to prevent damage, injury, or loss to:

.1 employees on the Work and other persons who may be affected thereby;

.2 the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Contractor or the Contractor's Sub-Contractors of any tier; and

.3 other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures, and utilities not designated for removal, relocation, or replacement in the course of construction.

11.2.1.1 The Contractor shall maintain suitable and sufficient guards and barriers and, at night, suitable and sufficient lighting for the prevention of accidents and all minimum safety standards required by Municipal, County, State and Federal ordinances and laws shall be strictly met by the Contractor.

11.2.2 The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations, and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury, or loss.

11.2.3 The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, safeguards for safety and protection, including, but not limited to, posting danger signs and other warnings against hazards, promulgating safety regulations, and notifying City and users of adjacent sites and utilities.

11.2.4 When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise the highest degree of care and carry on such activities under supervision of properly qualified personnel.

11.2.5 The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Article 11 caused in whole or in part by the Contractor, a Sub-Contractor of any tier, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable, and for which the Contractor is responsible under Article 11, except damage or loss attributable solely to acts or omissions of City or the ARCHITECT or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's other obligations stated elsewhere in the Contract.

11.2.6 The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents, and the maintaining, enforcing and supervising of safety precautions and programs. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the City's Representative and ARCHITECT. The Contractor shall hold regularly scheduled safety meetings to instruct Contractor's personnel on safety practices, accident avoidance and prevention, and the Project Safety Program. The Contractor shall furnish safety equipment, and enforce the use of such equipment by its employees and it's Sub-Contractors of any tier.

11.2.7 The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

11.2.8 The Contractor shall promptly report in writing to the City all accidents arising out of or in connection with the Work which cause death, lost time injury, personal injury, or property damage, giving full details and statements of any witnesses. In addition, if death, serious personal injuries, or serious property damages are caused, the accident shall be reported immediately by telephone or messenger to the City.

11.2.9 The Contractor shall promptly notify in writing to the City of any claims for injury or damage to personal property related to the work, either by or against the Contractor.

## ARTICLE 12
## INSURANCE & BONDS

**12.1    Insurance**

12.1.1 Without limiting any of the other obligations or liabilities of Contractor, at its' sole expense shall provide, insurance of such types and in such amounts specified below, to protect Contractor, City and others against all hazards or risks of loss described below. The form of such insurance together with carriers thereof, in each case, shall be approved by City, but, regardless of such approval, it shall be the responsibility of Contractor to maintain the insurance coverages set forth herein.

12.1.2 The Contractor shall not be allowed on the City's property without proof of the insurance coverages set forth herein

**12.2    Commercial General Liability**

Case 1:15-cv-23334-KMW Document 21 Entered on FLSD Docket 10/15/2015 Page 176 of 235

12.5.2 All insurance coverage procured by the Contractor shall be provided by insurance companies having a current financial rating of not lower than "A-" and a financial size category of not lower than "XI" in the Best's Insurance Guide, latest edition in effect as of the date of the Contract, and subsequently in effect at the time of renewal of any policies required by the Contract Documents.

12.5.3 Contractor shall cause its insurance carriers to waive all rights of subrogation against the City and its officers, employees and agents.

12.5.4 Contractor shall not permit any Sub-Contractor to begin work until after similar minimum insurance to cover Sub-Contractor has been obtained and approved. In the event the insurance certificate provided indicates that the insurance shall terminate and lapse during the term of this Contract, then in that event, Contractor shall furnish, at least thirty (30) calendar days prior to expiration of the date of the insurance, a renewed certificate of insurance as proof that equal and like coverage and exter on is in effect. Contractor shall not continue to perform the services required by this Contract u ' ss all required insurance remains in full force and effect.

12.5.5 With respect to all insurance coverages required to remain in force and affect after final payment, Contractor shall provide City additional certificates, policies and binders evidencing continuation of such insurance coverages along with Contractor's application for final payment and shall provide certificates, policies and binders thereafter as requested by City.

12.5.6 The maintenance in full current force and effect of such forms and amounts of insurance and bonds required by the Contract Documents shall be a condition precedent to Contractor's exercise or enforcement of any rights under the Contract Documents.

12.5.7 Failure of City to demand certificates, policies and binders evidencing insurance coverages required by the Contract Documents, approval by City of such certificates, policies and binders or failure of City to identify a deficiency from evidence that is provided by Contractor shall not be construed as a waiver of Contractor's obligations to maintain the insurance required by the Contract Documents.

12.5.8 The City shall have the right to terminate the Contract if Contractor fails to maintain the insurance required by the Contract Documents.

12.5.9 If Contractor fails to maintain the insurance required by the Contract Document, City shall have the right, but not the obligation, to purchase said insurance at Contractor's expense. If City is damaged by Contractor's failure to maintain the insurance required by the Contract Documents, Contractor shall bear all reasonable costs properly attributable to such failure.

12.5.10 By requiring the insurance set forth herein and in the Contract Documents, City does not represent or warrant that coverage and limits will necessarily be adequate to protect Contractor, and such coverages and limits shall not be deemed as a limitation on Contractor's liability under the indemnities granted to City in the Contract Documents.

12.5.11 If Contractor's liability policies do not contain a standard separation of insured's pr _sion, such policies shall be endorsed to provide cross-liability coverage.

12.5.12 If a part of the Work hereunder is to be subcontracted, the Contractor shall: (1) cover any and all Sub-Contractors in its insurance policies; (2) require each Sub-Contractor to secure insurance which will protect said Sub-Contractor and supplier against all applicable hazards or risks of loss designated in accordance with Article 12 hereunder; and (3) require each Sub-Contractor or supplier to assist in every manner possible in the reporting and investigation of any accident, and upon request, to cooperate with any insurance carrier in the handling of any claim by securing and giving evidence and obtaining the attendance of witnesses as required by any claim or suit.

12.5.13 It is understood and agreed that the insurance coverages required by the provisions of this Article 12 are required in the public interest and that the City does not assume any liability for acts of Contractor or Sub-Contractors of any tier or their employees in the performance of the Contract or Work.

### 12.6    Builder's Risk Insurance

12.6.1 The Contractor shall purchase and maintain, in a company or companies lawfully authorized to do business in the State of Florida, as an admitted carrier, builder's risk insurance on the entire Work. Such insurance shall be written on a completed value form for the entire Work. The insurance shall apply on a replacement cost basis.

12.6.2 The insurance as required herein shall name as insured the City, Contractor and all Sub-Contractors of any tier. The insurance policy shall contain a provision that the insurance will not be canceled, allowed to expire or materially changed ᴜ ; ᴊ at least thirty (30) days prior written notice has been given to City.

12.6.3 The insurance as required herein shall cover the entire Work, including reasonable compensation for ARCHITECT's services and expenses made necessary by an insured loss. Insured property shall include portions of the Work located away from the site but intended for use at the site, and shall also cover portions of the Work in transit, including ocean transit. The policy shall include as insured property scaffolding, falsework, and temporary buildings located at the site. The policy shall cover the cost of removing debris, including demolition as may be made legally necessary by the operation of any law, ordinance or regulation.

12.6.4 The insurance required herein shall be on an all risk form and shall be written to cover all risks of physical loss or damage to the insured party and shall insure at least against the perils of fire and extended coverage, theft, vandalism, malicious mischief, collapse, lightening, earthquake, flood, frost, water damage, windstorm and freezing.

12.6.5 If there are any deductibles applicable to the insurance required herein, Contractor shall pay any part of any loss not covered because of the operation of such deductibles. Deductible shall not be more than Five Thousand Dollars ($5,000.00) each claim. Deductible shall not be more than 5% of building value for wind damage.

12.6.6 The insurance as required herein shall be maintained in effect until the earliest of the following dates:

.1 the date which all persons and organization who are insured under the policy agree in writing that it shall be terminated;

.2 the date on which final payment of this Contract has been made by City to Contractor; or

.3 the date on which the insurable interests in the property of all insured other than the City have ceased.

6.7 The City and Contractor waive all rights against (1) each other and any of their Sub-Contractors of .ʏ tier, suppliers, agents and employees, each of the other, (2) the ARCHITECT and ARCHITECT's consultants, and (3) separate Contractors described in Article 6, if any, and any of their subcontractors of any tier, suppliers, agents and employees, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Section 12.6 or other insurance applicable to the Work whenever and by whomever obtained, except such rights as they have to proceeds of such insurance. The City or Contractor, as appropriate, shall require of the ARCHITECT, ARCHITECT's consultants, separate contractors described in Article 6, if any, and the Sub-Contractors of any tier, suppliers, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of

indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, was at fault or was negligent in causing the loss and whether or not the person or entity had an interest in the property damaged.

12.7    Products and Completed Operations Liability Insurance

12.7.1 Contractor shall maintain the Products and Completed Operations Liability Insurance for a period of at least two (2) years after final payment for the Work and furnish City with evidence of the continued insurance coverage at the time of final payment.

12.7.2 Each bond shall be written by a corporate surety, having a resident agent in the State of Florida and having been in business with a record of successful continuous operation for at least five (5) years. The bond required hereunder shall be executed by a responsible surety licensed in the State of Florida, and has at least the following minimum qualification in accordance with the latest edition of A.M. Best's Insurance Guide, published by Alfred M. Best Company, Inc., A. M. Best Road, Oldwick, New Jersey 08858: AA to A+. The Contractor shall require the attorney in fact who executes the required bonds on behalf of the surety to affix thereto a certified and current copy of this power of attorney indicating the monetary limit of such power.

12.7.3 If the surety on any Bond furnished by Contractor is declared bankrupt or becomes insolvent or its right to do business is terminated in the State of Florida or it ceases to meet the requirements of other applicable laws or regulations, Contractor shall within forty-five (45) days substitute another bond and surety, both of which must be acceptable to City.

12.7.4 Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds to such person or entity.

12.7.5 The Contractor shall keep the surety informed of the progress of the Work, and, where necessary, obtain the surety's consent to or waiver of: (1) notice of changes in the Work; (2) request for final payment; and (3) any other material required by the surety. The City shall be notified by the Contractor, in writing, of all communications with the surety. The City may, in the City's sole discretion, inform surety of the progress of the Work, any defects in the Work, or any defaults of Contractor under the Contract Documents and obtain consents as necessary to protect the City's rights, interest, privileges and benefits under and pursuant to any bond issued in connection with the Work.

12.8    Bonds.

12.8.1 The Contractor shall submit a performance bond and certificate of insurance in the amount specified herein.

12.8.2 The Contractor shall procure, furnish and record in the public records in Miami-Dade County a Performance Bond and a Payment Bond in the form prepared by the City, and as provided by state law, each in an amount equal to one hundred percent (100%) of the Contract Sum, as well as adjustments to the Contract Sum. The Performance Bond shall secure and guarantee Contractor's faithful performance of this Contract, including but not limited to Contractor's obligation to correct defects after final payment has been made as required by the Contract Documents. The Payment Bond shall secure and guarantee payment of all persons performing labor on the Project under this Contract and furnishing materials in connection with this Contract. These bonds shall be in effect through the duration of the Contract plus the Guaranty Period as required by the Contract Documents.

## ARTICLE 13
## UNCOVERING AND CORRECTION OF THE WORK

### 13.1    Uncovering of the Work

13.1.1 If a portion of the Work is covered contrary to the ARCHITECT's prior written request or to requirements specifically expressed in the Contract Documents, it shall, if required in writing by the ARCHITECT or the City's Representative, be uncovered for the ARCHITECT's observation and be replaced at the Contractor's expense without change in the Contract Time.

13.1.2 If a portion of the Work has been covered which the ARCHITECT or the City's Representative has not specifically requested to observe, prior to its being covered, the ARCHITECT or the City's Representative may request to see such Work, and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be charged to the City. If such Work is not in accordance with the Contract Documents, the Contractor shall pay such costs unless the condition was caused by the City or a separate contractor in which event the City will be responsible for payment of such costs.

### 13.2    Correction of the Work

13.2.1 The ARCHITECT or City shall have the right to reject Work not in full compliance with the requirements of the Contract Documents. The Contractor shall promptly correct Work rejected by the A/E or the City's Representative for failing to conform to the requirements of the Contract Documents, whether observed before or after final completion and whether or not fabricated, installed, or completed. If Work has been rejected by the ARCHITECT or City, the ARCHITECT or City shall have the right to require the Contractor to remove it from the Project site and replace it with Work that strictly conforms to the requirements of the Contract Documents regardless if such removal and replacement results in "economic waste." Contractor shall pay all claims, costs, losses and damages caused by or resulting from the correction, removal or replacement of defective Work, including, but not limited to, all costs of repair or replacement of Work of others. The Contractor shall bear costs of correcting, removing and replacing such rejected Work, including additional testing and inspections and compensation for the ARCHITECT services and expenses made necessary thereby. If prior to the date of final payment, the Contractor, a Sub-Contractor or anyone for whom either is responsible uses or damages any portion of the Work, including, without limitation, mechanical, electrical, plumbing and other building systems, machinery, equipment or other mechanical device, the Contractor shall cause such item to be restored to "like new" condition at no expense to the City.

13.2.2 If, within twelve (12) months after the date of Final Completion of the Work or designated portion thereof, or after the date for commencement of warranties, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found not to be in strict accordance with the requirements of the Contract Documents, the Contractor shall correct or remove and replace such defective Work, at the City's discretion. Such twelve (12) month period is referred to as the "Guarantee Period." The obligations under this Section 13.2.2 shall cover any repairs, removal and replacement to any part of the Work or other property caused by the defective Work.

13.2.3 The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the City.

13.2.4 If the Contractor fails to correct nonconforming Work within a reasonable time, the City may correct or remove it and replace such nonconforming Work. If the Contractor does not proceed with correction of such nonconforming Work within a reasonable time fixed by written notice from the City, the City may take action to correct or remove the nonconforming work at the Contractor's expense.

13.2.5 The Contractor shall bear the cost of correcting destroyed or damaged Work or property, whether completed or partially completed, of the City or of others caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

13.2.6 Nothing contained in Article 13 shall be construed to establish a period of limitation with respect to other obligations that the Contractor might have under the Contract Documents. Establishment of the twelve (12) month Guarantee Period as described in Article 13 relates only to the specific obligation of the Contractor to correct, remove or replace the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations under the Contract Documents. The requirements of Article 13 are in addition to and not in limitation of any of the other requirements of the Contract for warranties or conformance of the Work to the requirements of the Contract Documents.

13.3     Acceptance of Nonconforming Work

13.3.1 The City may accept Work which is not in accordance with the Contract Documents, instead of requiring its removal and correction, in its sole discretion, , such case the Contract Sum will be adjusted as appropriate and equitable.  Such adjustment shall b.  ' ade whether or not final payment has been made. Nothing contained herein shall impose any obligation upon the City to accept nonconforming or defective Work.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

### 14.1   Written Notice

14.1.1 All notices required to be given by the Contractor under the terms of this Contract shall be made in writing and given to both the City and the City's Representative. Written notice when served by the City will be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an office of the corporation for which it was intended, or if delivered at or sent to the last business address known to the party giving notice.

### 14.2   Rights and Remedies

14.2.1 Duties and obligations imposed by the Contract Documents, and rights and remedies available there under shall be in addition to and not a limitation of duties, obligations, rights, and remedies otherwise imposed or available by law.

14.2.2 No action or failure to act by the City, the ARCHITECT, or the City's Representative will constitute a waiver of a right or duty afforded to the City under the Contract Documents, nor will such action or failure to act constitute approval of or acquiescence in a breach there under, except as may be specifically agreed in writing.

14.2.3 The terms of this Contract and all representations, indemnifications, warranties and guarantees made in, required by or given in accordance with the Contract Documents, as well as all continuing obligations indicated in the Contract Documents, will survive final payment, completion and acceptance of the Work and termination or completion of the Work and shall remain in effect so long as the City is entitled to protection of its rights under applicable law.

14.2.4 Contractor shall carry out the Work and adhere to the current construction schedule during all disputes or disagreements with the City. No Work shall be delayed or postponed pending resolution of any disputes or disagreements except as the City and Contractor may otherwise agree to in writing.

### 14.3   Tests and Inspections

14.3.1 Tests, inspections, and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules or regulations shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with a testing laboratory or entity which the City has contracted with for testing. The City shall bear related costs of tests, inspections, and approvals. The Contractor shall give the ARCHITECT and the City's Representative timely notice of when and where tests and inspections are to be made so the ARCHITECT and/or the City's Representative may observe procedures. The City shall provide a threshold inspector in accordance with local practice and requirements, at the City's sole cost and expense.

14.3.2 If the ARCHITECT or the City's Representative determine that portions of the Work require additional testing, inspection or approval not included in the Contract Documents, or required by law, the ARCHITECT, or the City's representative will instruct the Contractor to make arrangements for such additional testing, inspection, or approval by an entity acceptable to the City's Representative and the Contractor shall give timely notice to the ARCHITECT, and the City's Representative, of when and where tests and inspections are to be made so the ARCHITECT and/or the City's Representative may observe such procedures. The City will bear such costs except as provided elsewhere in the Contract Documents.

14.3.3 If such procedures for testing, inspection, or approval under Article 14 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, the Contractor shall bear all costs made necessary by such failure including those of repeated procedures.. Contractor shall

bear all costs made necessary for not being prepared for inspections including but not limited to ARCHITECT's services and expenses.

14.3.4 Required certificates of testing, inspection, or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the City's Representative and ARCHITECT.

14.3.5 Contractor shall take all necessary actions to ensure that all tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

14.3.6 Contractor shall cooperate with the City in arranging for all testing required by the Contract Documents or any applicable regulations for materials to be tested or certified at or on the place or premises of the source of the material to be supplied. The City shall have the right to require testing of all materials at the place of the source of the material to be supplied if not required by the Contract Documents or any applicable regulations. The City shall bear the costs of such tests and inspections not required by the Contract Documents or by applicable regulations unless prior defective Work provides ARCHITECT or City with a reasonable belief that additional defective Work may be found, in which case Contractor shall be responsible for all costs of tests and inspections ordered by the City or ARCHITECT, whether or not such tests or inspection reveals that Work is in compliance with the Contract Documents.

14.4    Records

14.4.1 The City, or any parties it deems necessary, shall have access to and the right to examine any accounting or other records of the Contractor involving transactions and Work related to this Contract for five (5) years after final payment or five (5) years after the final resolution of any ongoing disputes at the time of final payment. All records shall be maintained in accordance with generally accepted accounting procedures, consistently applied. Sub-Contractors of any tier shall be required by Contractor to maintain records and to permit audits as required of Contractor herein.

14.5    Codes and Standards

14.5.1 The Work shall be performed to comply with the Contract Documents, and all pertinent standards, rules and/or regulations. In the event that Contractor knows that the Contract Documents are not in accordance with the applicable Florida Building Code, the Contractor shall notify the City and the ARCHITECT in writing of such non-conformance. The latest editions and supplements of Federal, State, local Codes and Standards in effect on the date of the execution of the Contract shall be applicable unless otherwise designated in the Contract Documents.

14.5.2 LEED Compliance. The Contractor shall comply with LEED Platinum-required documentation and installations requirements for the Project and completion of the Work. The Contractor shall not be responsible for the failure of the Work to be LEED certified, unless that failure results directly to the failure of the Contractor to comply with the LEED-required documentation requirements or failure for the Project or failure to perform any of its obligations under this Contract or failure to perform in accordance with required LEED Platinum protocols.

14.6    General Provisions

14.6.1 Any specific requirement in this Contract that the responsibilities or obligations of the Contractor also apply to a Sub-Contractor is added for emphasis and is also hereby deemed Sub-Contractor of any tier. The omission of a reference to a Sub-Contractor in connection with any of the Contractor's responsibilities or obligations shall not be construed to diminish, abrogate or limit any responsibilities or obligations of a Sub-Contractor of any tier under the Contract Documents or the applicable subcontract.

14.6.2 This Contract shall be interpreted, construed, enforced and regulated under and by the laws of the State of Florida. Whenever possible, each provision of this Contract shall be interpreted in a manner as to

be effective and valid under applicable law. If, however, any provision of this Contract, or a portion thereof, is prohibited by law or found invalid under any law, only such provision or portion thereof shall be ineffective, without invalidating or affecting the remaining provisions of this Contract or valid portions of such provision, which are hereby deemed severable. Contractor and City further agree that in the event any provision of this Contract, or a portion thereof, is prohibited by law or found invalid under any law, this Contract shall be reformed by mutual agreement of the parties to an agreeable provision.

14.6.3 Contractor and City each agree that the State of Florida Circuit Court, Miami-Dade County shall have exclusive jurisdiction to resolve all Claims and any issue and disputes between Contractor and City. Contractor agrees that it shall not file any petition, complaint, lawsuit or legal proceeding against City in any other court other than the State of Florida Circuit Court, Miami-Dade County.

14.6.4 Contractor agrees that City shall not be liable to Contractor for any special, indirect, incidental, or consequential damage whatsoever, whether caused by City's negligence, fault, errors or omissions, strict liability, breach of Contract, breach of warranty or other cause or causes whatsoever. Such special, indirect, incidental or consequential damages include, but are not limited to, loss of profits, loss of savings or revenue, loss of anticipated profits, labor inefficiencies, idle equipment, home office overhead, and similar types of damages.

14.6.6 Nothing contained in this Contract or the Contract Documents shall create any Contractual relationship with or cause of action in favor of a third party against the City or Contractor.

### 14.7 Anti-Discrimination

14.7.1 The Contractor certifies compliance with the non-discrimination clause contained in Section 202, Executive Order 11246, as amended by Executive Order 11375, relative to equal employment opportunity for all persons without regard to race, color, religion, sex or national origin.

### 14.8 Non-Collusion

14.8.1 By executing this Contract, Contractor certifies that its offer is made without prior understanding, agreement, or connection with any corporation, firm or person submitting an offer for the same materials, services, supplies, or equipment and is in all respects fair and without collusion or fraud. No premiums, rebates or gratuities are permitted, either with, prior to or after any delivery of material or provision of services. Any violation of this provision may result in the Contract cancellation, return of materials or discontinuation of services and the possible removal from the vendor bid list(s).

### ARTICLE 15
### TERMINATION OR SUSPENSION OF THE CONTRACT

#### 15.1    Termination by City for Cause

15.1.1 The City shall be the sole judge of nonperformance, which shall include any failure on the part of Contractor to fulfill any portion of this Contract within the time stipulated. · ···· ··· ·· ··· ··· ·····

15.1.2 Upon failure of the Contractor to comply with any material and substantial term of this Contract, the City will notify the Contractor in writing within seven (7) business days to remedy the default. Failure on the Contractor's part to correct the default within the required seven (7) days shall result in the Contract being terminated and upon the City notifying in writing the Contractor of its intentions and the effective date of the termination.

15.1.3 The following shall constitute default:

.1 refusal or Failure to perform a material obligation of the Work required under the Contract and/or within the time required;

.2 or failing to use the Sub-Contractors, entities and personnel as identified and set forth, and to the degree specified in the Contract;

.3 refusal or failure to begin the Work under this Contract within the time specified;

.4 refuses or fails to supply sufficient or proper materials;

.5 neglecting or refusing to remove materials;

.6 neglecting or refusing to correct Work rejected as non-conforming with the terms of the Contract;

.7 becoming insolvent, being declared bankrupt, or committing act of bankruptcy or insolvency, or making an assignment renders the Contractor incapable of performing the Work in accordance with and is required by the Contract;

.8 failure to comply with any of the terms of the Contract in any material respect or disregards laws, ordinances, rules, or regulations or orders of a public authority having jurisdiction;

.9 failure to make payment to Sub-Contractors for materials or labor in accordance with the respective agreements between the Contractor and the Sub-Contractors; or

.9 fails to maintain progress in accordance with the approved progress schedule.

In the event of default or termination of a Contract, the Contractor shall pay all attorney's fees and court costs incurred in collecting any damages. The Contractor shall pay the City for any and all costs reasonably incurred in the completion of the Project.

15.1.3.1 When any of the above reasons exist, the City may, subject to the requirements of the performance bond, without prejudice to any other rights or remedies of the City, terminate this Contract by delivering a written notice of termination to Contractor and Contractor's surety, and may:

.1 take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

.2 accept assignment of subcontracts pursuant to Section 5.3; and

.3 finish the Work by whatever reasonable method the City may deem expedient, including turning the Work over to the surety.

15.1.4 The Contractor, in the event of a termination under Section 15.1, shall not be entitled to receive any further payments under the Contract until the Work is completed in its entirety. Then, if the unpaid balance under the Contract shall exceed all expenses of the City in finishing the Work, such excess will be paid to the Contractor; but, if such expenses of City to finish the Work shall exceed the unpaid balance, the Contractor and its surety shall be liable for, and shall pay the difference and any damages to the City. The obligation of the Contractor and its surety for payment of said amounts shall survive proper termination of the Contract for Contractor's default.

15.1.5 In exercising t. City's right to secure completion of the Work under any of the provisions hereof, the City shall have the right to exercise the City's sole discretion as to the manner, methods, and reasonableness of costs of completing the Work.

15.1.6 The rights of the City to terminate pursuant to Article 15.1 will be cumulative and not exclusive and shall be in addition to any other remedy provided by law or the Contract Documents.

15.1.7 Should the Contractor fail to achieve Final Completion of the Work within thirty (30) calendar days following the date of Substantial Completion, the City may exercise its rights under Article 15.1.

### 15.2    Suspension by the City for Convenience

15.2.1 The City may, without cause, order the Contractor in writing to suspend, delay, or interrupt the Work in whole or in part for such period of time as the City may determine.

15.2.2 An adjustment will be made to the Contract Sum for increases in the cost of performance of the Contract caused by suspension, delay or interruption. However, in the event of a suspension under this Article 15.2, Contractor hereby waives and forfeits any claims for payment of any special, indirect, incidental or consequential damages such as lost profits, loss of savings or revenue, loss of anticipated profits, home office overhead, and similar type damages. No adjustment will be made to the extent:

> .1 that performance is, was, or would have been so suspended, delayed or interrupted by another cause for which the Contractor in whole or in part is responsible, or
>
> .2 that an equitable adjustment is made or denied under another provision of this Contract.

### 15.3    Termination by the City for Convenience

15.3.1 The City of Miami Gardens reserves the right to terminate this Contract for convenience by written notice to the Contractor effective the date specified in the notice if the City has determined that such cancellation will be in the best interest of the City to cancel the Contract for its own convenience.

15.3.2 Upon such termination for convenience, the Contractor shall recover as its sole remedy payment for costs and related expenses reasonably incurred for Work performed pursuant to the Contract Documents in connection with the terminated portion of the Work and for items properly and timely fabricated off the Project site, delivered and stored in accordance with the City's instructions and for all City approved claims, costs, losses and damages incurred in settlement of terminated contracts with Sub-Contractors and suppliers, plus one half of the remaining unpaid Contractor's Fee as of the date of termination. The Contractor hereby waives and forfeits all other claims for payment and damages, including, without limitation, anticipated profits, consequential damages and other economic losses.

15.3.3 The City shall be credited for (1) payments previously made to the Contractor for the terminated portion of the Work, (2) claims which the City has against the Contractor under the Contract and (3) the sale price of the materials, supplies, equipment or other items that are to be disposed of by the Contractor that are part of the Contract Sum.

## Special Conditions

1. **Substantial Completion** shall be defined for GMP1 Earthwork package as the following:

   *The date at which the work or building project, or a designated portion of the work or building project thereof is sufficiently complete, in accordance with the construction contract documents, so that the owner may use the work or building project or designated portion thereof for the intended use for which it is originally designed and intended for. This would include the completion of all utilizes, sewer laterals, water main extension and fire hydrants, rain-harvesting system, storm drainage system, vibro-compaction, fill and preparation of the building pad per the construction contract documents. This date is then certified by the architect to the owner or client. From this date a number of other provisions are started such as warranty, guaranties, and liabilities.*

2. **Substantial Completion** shall be defined for GMP2 - the City Hall pro ect Phase 2 (CH, Mechanical & Garage) and Phase 3 (PD):

   *The date at which the work or building project, or a designated portion of the work or building project thereof is sufficiently complete, in accordance with the construction contract documents, so that the owner may use the work or building project or designated portion thereof for the intended use for which it is originally designed and intended for. This would include the completion of all life safety systems, weathertight envelope, and adequate protection of building occupants and or equipment is ensured from hazards posed by additional or possible construction activities or other potential harmful conditions that may exist or become evident during the final work effort to complete the project per the construction contract documents. This date is then certified by the architect to the owner or client. From this date a number of other provisions are started such as warranty, guaranties, and liabilities.*

3. A Project Contingency as defined in paragraph 8.2.5 of General Conditions is not included in the CONTRACTOR'S lump sum amount in Article 4 of the Agreement for GMP1. The CITY agrees that an additional 2.5 % of GMP1 ($35,531.00) may be available to the CONTRACTOR as a Project Contingency solely for changes in the Scope of the Work or to the CITY for changes in the Scope of the Work required by third parties (e.g. inspections, permits and approvals). CONTRACTOR'S application for use of the Contingency under this provision shall occur under customary Change Order procedures in Section 8 of the General Conditions. Any Change Order issued under this provision shall include only the cost of the Work, and specifically excludes an increase in CONTRACTOR's General Conditions, Overhead or Profit associated with GMP1.

4. For the purpose the Contract Agreement (Article 4, Compensation) and General Conditions ( Section 8) the following shall apply for purpose of applicable calculations:

   a. General Conditions: an additional point Nine-Five percent (0.95%) for the cost of using the VISA pay card.

   b. Overhead: an additional one percent (1.0%) for General Liability Insurance. Overhead shall be calculated on the value of the Work (e.g. subcontracts), purchase orders and General Conditions.

   c. Profit (Fee): shall be calculated on the value of the Work (e.g. subcontracts), purchase orders, General Conditions, Overhead, and the Contingency, only when move by Change Order to the Work.

... 

5.  Builders Risk Insurance and the Payment and Performance Bond shall be invoiced separately as a 'pass through'. For purposes of Change Orders under Section 8 of General Conditions, Builder's Risk Insurance and the Payment and Performance Bond are excluded from the designated percentage.

6.  Project 'float' in the Construction Schedule shall be measured against physical performance and not my manipulation of scheduling logic.

7.  Section: 1.2.8.5 of General Conditions is modified to add: CONTRACTOR may request a Change Order for any unforeseen sub-surface conditions for approval by the CITY. The cost of any Change Order approved by the CITY for unforeseen subsurface conditions shall be separate from the then available Contingency in para No. # 3, above.

8.  Section: 9.4.1 of General Conditions is modified to add: "Time is of The Essence" shall apply to all milestones throughout the entire project.

9.  For calculating calendar days to determine the amount of an Early Completion Bonus earned, if any, by the CONTRACTOR under Article 4.6 of the Contract, the CITY shall credit back each calendar day the Schedule is extended by a delay attributable to the CITY.

## ADDENDUM TO CONSTRUCTION CONTRACT BETWEEN THE CITY OF MIAMI GARDENS and SKANSKA USA BUILDING, INC.

THIS ADDENDUM ("Addendum") is incorporated into that Construction Contract between the City of Miami Gardens ("City"), a Florida municipal corporation hereinafter referred to as "City" and Skanska USA Building, Inc., a Delaware corporation hereinafter referred to as "Contractor".

### WITNESSETH

WHEREAS, on October 11, 2011, the City entered into a contract for City Hall Municipal Complex.

WHEREAS, the City desires to amend the Contract,

NOW, THEREFORE, and consideration of the premises and mutual covenants herein named, the parties are to agree as follows:

**1. Article 3, Section 3.5 of the Contract** shall be deleted and replaced with the following language:

> 3.5 – CITY is authorized to deduct liquidated damages from monies due to CONTRACTOR for the Work under this Contract in the cumulative value not to exceed the amount of Nine Hundred Thousand Dollars ($900,000).

**2. Article 4, Section 4.6 of the Contract** shall be deleted and replaced with the following language:

> 4.6 - CONTRACTOR may earn an Early Completion Bonus. If Substantial Completion for Phase 2 (City Hall, the Council Chambers, the Mechanical Building, the Parking Garage and the Off-site Road Work) is achieved prior to three hundred fifty (350) calendar days after the Notice to Proceed, adjusted for any approved extensions, CONTRACTOR shall earn an Early Completion Bonus. The Early Completion Bonus earned shall be computed at Three Thousand dollars ($3,000.00) per calendar day multiplied by the number of calendar days Substantial Completion occurs prior to three hundred fifty (350) calendar days after the Notice to Proceed, adjusted for any approved extensions. CONTRACTOR shall receive payment of the Early Completion Bonus, less any liquidated damages due the CITY pursuant to Article 3.4 of this Agreement, at Final Payment.

**3. Article 8, Section 8.25 of the General Conditions of the Contract** shall be deleted and shall be replaced with the following language:

Exhibit "5"

8.2.5- The Project Contingency is a dollar amount equal to 2.5% of the dollar amount of GMP2 as defined in Article 4 of the Contract. The Project Contingency shall be used by the Contractor with the City's written approval, which shall not be unreasonably withheld, for changes in prices for identified allowances or discrepancies in the Construction Documents and/or Specifications, and to pay any costs incurred by the Contractor in connection with the performance of the work, which are not specifically covered by any line item in the schedule of values. Any savings from the Project Contingency shall be shared 75% to City and 25% to Contractor.

4. **Article 12, Section 12.2.1 of the General Conditions of the Contract** shall be deleted and shall be replaced with the following language:

    12.2.1 Contractor shall secure and maintain from the date of the Contract for Construction and for a period of at least three (3) years from the date of Final Completion of the entire Work commercial general liability insurance ("CGL") with a combined single limit of not less than $2,000,000 per occurrence.

5. **INCONSISTENCY.** In the event of an inconsistency or contradiction between the terms hereof and the terms of the Contract, to which this Addendum is attached, the terms hereof shall control.

6. **CONFLICT:** In the event of any conflicts between this Addendum and the Contract, this Addendum shall control. In all other respects, the Contract shall remain in full force and effect.

7. **EFFECT OF ORIGINAL CONTRACT.** All terms of the Contract not affected by this Addendum shall remain in full force and effect.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands and seals the day and year set forth below their respective signatures.

ATTEST:                                          CITY OF MIAMI GARDENS

_____        _____
Ronetta Taylor, MMC, City Clerk              Dr. Danny Crew, City Manager

Date: _2/29/12_

**WITNESS:**

_Laurie Easter_
Print Name

_____

Approved as to form and legal
Sufficiency:

_____
Sonja K. Dickens, City Attorney

**SKANSKA USA BUILDING, INC.**

By: _Russell Shepard_

Print Name: _Russell Shepard_

     

### City of Miami Gardens
1515 N.W. 167th Street: Bldg. 5, Suite 200
Miami Gardens, Florida 33169

October 10, 2011

Mr. Russ Sheppard
Skanska USA Building, Inc.
E-Mail: russ.sheppard@skanska.com

RE: RFP#10-11-064 City Hall Municipal Complex GMP Construction Contract

Dear Mr. Sheppard:

This letter shall serve as your Notice to Proceed with the above referenced project. The official start date is, Tuesday, October 11, 2011, in accordance with the contract, you shall reach substantial completion within ninety (90) calendar days and final completion fifty-six (56) calendar days thereafter, for a total of one hundred forty-six (146) calendar days from issuance of Notice to Proceed.

Looking forward to working with you and your company on this project.

Sincerely,

*Pam Thompson*

Pam Thompson, CPPO, CPPB
Procurement Manager

Cc:     Brandan DeCaro, CIP Director

1515 N.W. 167th STREET, BUILDING 5 • SUITE 200 • MIAMI GARDENS, FL 33169 • PH: 305-622-8031 • FAX: 305-474-1285





*City of Miami Gardens*
1515 N.W. 167th Street: Bldg. 5, Suite 200
Miami Gardens, Florida 33169

June 19, 2012

Mr. Russ Sheppard
Skanska USA Building, Inc.
E-Mail: russ.sheppard@skanska.com

RE:   RFP#10-11-064 City Hall Municipal Complex GMP Construction Contract –
GMP#2 change order

Dear Mr. Sheppard:

This letter shall serve as your Notice to Proceed with the above referenced project.  The
official start date is,  Wednesday, June 20, 2012 , in accordance with the contract, you
shall reach substantial completion for phase 2 within three hundred fifty (350) calendar
days and final completion fifty-six (56) calendar days thereafter for a total of four
hundred four (404) calendar days from  NTP, phase 3 substantial completion shall be
within three hundred ninety-two (392) calendar days and final completion fifty-six (56)
calendar days thereafter, for a total of four hundred forty-eight (448) calendar days from
issuance of Notice to Proceed.


Looking forward to working with you and your company on this project.

Sincerely,

*Pam Thompson*

Pam Thompson, CPPO, CPPB
Procurement Manager

Cc:     Brandan DeCaro, CIP Director
        Vernita Nelson, Assistant City Manager
        Dr. Danny Crew, City Manager
        Kevin Lawler, N & K Enterprises

Exhibit "7"

1515 N.W. 167th STREET, BUILDING 5 • SUITE 200 • MIAMI GARDENS, FL 33169 • PH: 305-622-8031 • FAX: 305-474-1285

# SKANSKA

Date: 6/28/2013                          **Prime Contract Change Order Number  026**

Miami Gardens Municipal Complex - Phase 2 and 3     Project # 2311609-GMP2                    Skanska USA Building Inc.

**To Contractor:**                                               Architect's Project No:
Skanska USA Building Inc.                                      Contract Date:
1815 Griffin Road                                             Contract Number: 0002
Suite 204
Dania Beach, FL  33004

**The Contract is hereby revised by the following items:**

Offsite Drawing Modifications per FDOT Review Comments

| AR | CE | Description | | Amount |
|----|----|----|----|----|
| | CE - 102 | Offsite Work Drawing Revisions | $ | 10,573 |

PCCO includes all labor, materials, and equipment to furnish and install drawing revisions based on offsite work drawing revisions 9 through 11.

| | | |
|---|---|---|
| The original Contract Value was............................................................................................ $ | 40,749,383 |
| Sum of changes by prior Prime Contract Change Orders............................................................ ($ | 11,533,796) |
| The Contract Value prior to this Prime Contract Change Order was.......................................... $ | 29,215,587 |
| The Contract Value will be changed by this Prime Contract Change Order in the amount of......... $ | 10,573 |
| The new Contract Value including this Prime Contract Change Order will be.............................. $ | 29,226,160 |
| The Contract duration will be changed by.......................................................................... | 0 Days |
| The revised Substantial Completion date as of this Prime Contract Change Order is................... | |

| Skanska USA Building Inc. | URS Corporation | City of Miami Gardens, Florida, The |
|---|---|---|
| CONTRACTOR | ARCHITECT | OWNER |
| 1815 Griffin Road | 7650 Corporate Center Dr. | 1515 N.W. 167th Street |
| Suite 204 | Suite 400 | Miami Gardens, FL  33169 |
| Dania Beach, FL  33004 | | |
| Address | Address | Address |
| By   Nicole Heran   *Lance Demgen* | By   Greg Johnson | By   Jimmie Allen |
| SIGNATURE   *(signature)* | SIGNATURE   *(signature)* | SIGNATURE   *(signature)* |
| DATE   7/1/13 | DATE   7/11/13 | DATE   7/11/13 |

Exhibit "8"

# SKANSKA

**Cost Events**

Detailed (with Cost Info), Grouped by Each Number

Miami Gardens Municipal Complex - Phase 2 and 3
18601 NW 27th Ave, Miami Gardens, Fl 33056

Project # 2311609-GMP2
Tel: 305-624-9193   Fax: 954-927-4671

Skanska USA Building Inc.

| CE #: CE - 102 | 3/23/2013 | Offsite Work Drawing Revisions | | | | | | Open |
|---|---|---|---|---|---|---|---|---|
| **Category** | | **Reason** | | **Reference** | AR Number | | **PCCO Number** | |
| Owner | | Architect/Consultant Directive | | | | | **Revenue Code** | |

**Notes:**
Drawing revisions for offsite work during the permit review process with FDOT.

**Summary:**

| | | | | Estimate | Proposed | Approved | | Applied |
|---|---|---|---|---|---|---|---|---|
| Requested Days: | 0 | Budget: | | 0 | 10,573 | 0 | | 10,573 |
| Approved Days: | 0 | Cost: | | 0 | 10,573 | 0 | | 10,573 |

**Itemized Details:**

| General Description | Quote Due | Quote Rec'd | Allocation | | Reference | Estimated | Proposed | Approved | Applied |
|---|---|---|---|---|---|---|---|---|---|
| 001 - - 202.02300010.5020 | 3/27/2013 | | Budget: | | Pend Rev | 0 | 9,306 | 9,306 | 9,306 |
| American - provide all labor, materials, and equipment to furnish and install all revisions based on offsite work drawing revisions 9 through 11. | | | Cost: | | Pend Commt | 0 | 9,306 | 9,306 | 9,306 |
| 002 - - 102.01112500.5010 | 3/30/2013 | | Budget: | | Pend Rev | 0 | 619 | 619 | 619 |
| General Conditions (6.65%) | | | Cost: | | Pend Commt | 0 | 619 | 619 | 619 |
| 003 - - 902.26500000.5040 | 3/30/2013 | | Budget: | | Pend Rev | 0 | 149 | 149 | 149 |
| OH (1.5%) | | | Cost: | | Pend Commt | 0 | 149 | 149 | 149 |
| 004 - - 902.01902000.5040 | 3/30/2013 | | Budget: | | Pend Rev | 0 | 99 | 99 | 99 |
| GU (1.00%) | | | Cost: | | Pend Commt | 0 | 99 | 99 | 99 |
| 005 - - 902.26500000.5040 | 3/30/2013 | | Budget: | | Pend Rev | 0 | 254 | 254 | 254 |
| Fee (2.5%) | | | Cost: | | Pend Commt | 0 | 254 | 254 | 254 |
| 006 - - 902.01901000.5040 | 3/30/2013 | | Budget: | | Pend Rev | 0 | 88 | 88 | 88 |

*Prolog Manager*      Printed on: 6/11/2013      4South

Page 1

**Cost Events**
Detailed (with Cost Info), Grouped by Each Number

| Builders Risk (0.95%) | | | | | 0 | 88 | 0 | 88 |
|---|---|---|---|---|---|---|---|---|
| 007 - - 902.01912500.5040 | 3/30/2013 | | Cost: | Pend Commt | 0 | 57 | 0 | 57 |
| P&P Bond (0.61) | | | Budget: | Pend Rev | 0 | 57 | 0 | 57 |
| | | | Cost: | Pend Commt | | | | |

## Offsite Work Drawing Revisions

| Item # | ProLog # | Description | Percentage | Amounts | Calculation | |
|---|---|---|---|---|---|---|
| a | | Cost of Work (COW) | | $ 9,306.39 | | |
| b | Level 1 | Gen Cond | 6.65% | $ 618.87 | Gen Cond * COW | Article 8.2.2: Change Orders: Page 40: General Conditions at a rate of Six point Six-Five percent (6.65%) of the Cost of the Work; |
| c | Level 2 | OH (1.5% ) | 1.50% | $ 148.88 | (COW + GC) * OH | Article 8.2.3; Page 40: CONTRACTOR'S Overhead at a rate of one point five percent (1.5%) of the Cost of the Work; See Special Conditions for clarifications and modifications . . . . . . . |
| | Level 3 | GLI (1%) | 1.00% | $ 99.25 | (COW + GC) * OH | Special Condition:Page 63: Overhead: an additional one percent (1.0%) for General Liability Insurance. Overhead shall be calculated on the value of work (e.g. subcontracts), purchase orders and General Conditions. |
| d | Level 4 | Fee (2.5%) | 2.50% | $ 254.33 | (COW + GC + OH + GLI) * 2.5% | Article 8.2.4: Page 40: CONTRACTOR'S Profit(or Fee) at a rate of two point five percent (2.5%) of the Cost of the Work; See Special Conditions for clarifications and modifications . . . . . . . |
| | | | | $ - | | Special Conditions: Page 63: Profit (Fee); Shall be calculated on the value of the work (e.g. subcontracts), purchase orders and General Conditions, Overhead, and the Contingency, only when move by Change Order to the Work. |
| e | Level 5 | Builders Risk (pass thru) | 0.95% | $ 88.41 | | Special Conditions: Page 64: Builders Risk Insurance and the Payment and Performance Bond shall be invoiced separately as a "pass through". |
| f | Level 6 | P&P Bond (pass thru) | 0.61% | $ 56.77 | | Special Conditions: Page 64: Builders Risk Insurance and the Payment and Performance Bond shall be invoiced separately as a "pass through". |
| | | | | | | |
| g | | TOTAL | | $ 10,572.91 | = SUM of Column Amounts | |
| | | | | | | |

 **American Engineering & Development Corporation**

AEDC PROJECT NO:   12-997
HCSS No.:

## CHANGE ORDER PROPOSAL

TO:   Nicole Heran
Skanska USA Building
1815 Griffin Road Suite 204
Dania Beach, FL 33004
Tel. 954-378-2028 Fax. 866-271-2930

CHANGE ORDER NO:   7 r1
DATE:   March 18, 2013
PROJECT:   12-997

We hereby propose to perform the following additional work:

Installation of Proposed Changes to the Offsite work based off of Revision 9-11 dated 1/31/13

A.   The following quantities are included:

| Description | Quantity | Unit | Unit Price | Extension |
|---|---|---|---|---|
| 6" sidewalk | 560 | SF | $ 4.48 | $2,508.80 |
| Detectable Warning | 50 | SF | $ 31.50 | $1,575.00 |
| Cut and Balance Pavement Area | -41 | SY | $ 2.15 | ($88.15) |
| Construct Stabalized Subgrade | -41 | SY | $ 5.37 | ($220.17) |
| Fine Grade Subgrade | -41 | SY | $ 2.15 | ($88.15) |
| 8" Limerock Base | -41 | SY | $ 11.26 | ($461.66) |
| 2" Asphalt Installation | -41 | SY | $ 24.08 | ($987.28) |
| Stop Sign (R01-01) | 3 | EA | $ 285.00 | $855.00 |
| Stop Sign with Right Only (R01-01)(R03-03R) | 1 | EA | $ 360.00 | $360.00 |
| One way Sign (R06-01R) | 3 | EA | $ 265.00 | $795.00 |
| RPMS | 20 | EA | $ 4.85 | $97.00 |
| Keep Right Sign (R04-07) | 3 | EA | $ 275.00 | $825.00 |
| Thermo Turn Arrow | 2 | EA | $ 95.00 | $190.00 |
| 18" White thermo lines | 100 | LF | $ 4.85 | $485.00 |
| 8" White thermo lines | 180 | LF | $ 2.25 | $405.00 |
| 6" White Thermo skip lines | 350 | LF | $ 1.40 | $490.00 |
| 6" Double Yellow Thermo | 230 | LF | $ 1.95 | $448.50 |
| 24" White Thermo Lines | 290 | LF | $ 5.75 | $1,667.50 |
| Added Temporary Striping | 1 | EA | $ 450.00 | $450.00 |

| | | | | |
|---|---|---|---|---|
| Sub-Total | | | | $ 9,306.39 |

TOTAL ADDITION FOR THIS CHANGE ORDER PROPOSAL:                    $      9,306.39

THE PARTIES HEREBY AGREE to modify the Contract by the herein Change Order, which becomes part of the contract.
All work is to be performed under the terms and conditions of the contract unless otherwise agreed in writing.
Facsimile signatures are binding as originals.

American Engineering & Development Corp.                    Accepted By:
                                                           Skanska USA Building

By:_____                        By:_____

Name:____David Guerra_____                      Name:_____

Title:_____Project Manager_____                     Title:_____

# SKANSKA

## REQUEST FOR INFORMATION

| PROJECT NAME: | Miami Gardens Municipal Complex - Phase 2 and 3 | RFI #: | 883 |
|---|---|---|---|
| PROJECT NUMBER: | 2311609-GMP2 | Date Created: | 11/22/2013 |
| Subject | PD Lobby Ceilings Construction | Date Required: | 11/27/2013 |
| Category | | Discipline | 09 Finishes |
| Answer Company | | Author Company | |

| Answer Company | Author Company |
|---|---|
| Greg Johnson<br>URS Corporation<br>7650 Corporate Drive Suite 400<br>Miami, FL  33126 | Emmanuel Okwor<br>Skanska USA Building Inc.<br>1815 Griffin Rd, Suite 204<br>Dania Beach, FL  33004 |

| Cc: | Company Name | Contact Name | Copies | Notes |
|---|---|---|---|---|
| | | | | |

## Question

REFERENCE: CFO #58 and attached documents
QUESTION: Skanska received CFO #58 for the PD hard ceilings at 1st and 3rd floor lobbies (Revised detail eliminating Compasso trim). The detail shown on CFO #58 cannot be built. The Vertical metal stud located 2'-0" from the face of the walls is interfering with ductwork in several areas. The subcontractor performing the work is proposing to use the following:
"     Installation of acoustical ceiling grid using #14 hanging wire
"     Below the acoustical ceiling grid, install a fascia consisting of 3-5/8" Vertical studs (25 Gauge) attached to the AC grid; and 3-5/8" Horizontal tracks with ½" Gypsum Board.

Note: The finished product of the system will be similar to the CFO #58 Details

## Answer

URS Response:

The Contractors proposed installation is acceptable.

RD
11-25-13

## Number of Linked Files:

| File Name | Description | Uploaded By | Date |
|---|---|---|---|
| | | | |

Exhibit "9"



INTERFERING WITH DUCTWORK AT SEVERAL AREAS.

### CEILING COVE DETAIL
SCALE: 1"=1'-0"

PROPOSED CONCEPT SKETCH:





URS CORPORATION
7650 CORPORATE CENTER DR.
SUITE 400
MIAMI, FL 33126-1220
ARCHITECTURE: AAC00001
ENGINEERING: 00000002
LANDSCAPE ARCHITECTURE: LCC 000204

PD LOBBY CEILING DETAIL AT 1ST AND 3RD FLOORS

CITY OF MIAMI GARDENS
NEW MUNICIPAL COMPLEX            PAGE 1 OF 1



$15\frac{1}{2}" \rightarrow$

$1' - 3\frac{1}{2}"$

$10"$

$8' - 6\frac{1}{2}"$

$9 - 8$

$- 1' - 0"$

$8' - 8"$

$8' - 5"$



# URS
## Miami

7650 Corporate Center Drive
Suite 400
Miami, FL 33126
305-884-8900

## Site Visit Report

Owner: City of Miami Gardens
Project: New Municipal Center Project – GMP 2
CMG Project No. 2311609
URS Project No. 38702329
Site Visit date: October 28, 2013
Issue date: October 29, 2013
Contractor: Skanska USA, Inc.
Time: 7:30 AM to 12:00 PM
Weather: Sunny | Temperature: Low 70's

---

1.  **Purpose**
    Weekly Site Visit

2.  **Exterior Concrete Tinting at CH (Urgent remedial work shall be completed prior to landscaping).**
    - Panels not cleaned of debris prior to coating. Upon review of the west face caulking, sand and other debris have been covered with the tint.
    - Damaged panel still evident after coating. This is not acceptable, additional remedial work is required.
    - Various panels have excessive pitting and shall be filled prior to coating.
    - Various roller marks on panels. These areas shall be sanded smooth and the panel re-coated.
    - Various areas where caulking was coated with tinting. No coatings are to be applied over caulking, contractor to clean with a manufacturer approved product.
    - Chamfered areas at window opening are chipped in various locations, remedial work is required.
    - Panels are chipped around drains openings, additional remedial work is required.

3.  **Soffits at Building Perimeters (Urgent work shall be completed prior to shades being installed).**
    - All exposed concrete to be cleaned of paint and any other debris.
    - All concrete to be free of form-work edges. Contractor shall smooth these types of edges. See photos.
    - Shade soffit transition shall not be feathered to exposed concrete. Need a straight line at transition between gypsum board and exposed concrete.
    - Shade soffit vertical face exposed to the building exterior shall be painted grey to match painted concrete.

4.  City Chambers
    - All exposed steel at curtain tracks shall be painted flat black.
    - Gypsum board edge at the curtain track along the north wall shall be finished.
    - **Ceiling tape is sagging in various areas, especially on the sloped sections on the north and south sides. Contractor shall take corrective action prior to installation of chambers setting.**
    - **Dais Counter is not symmetrically space between the steps on either side; counter shall be centered between the concrete steps. Also ensure that the concrete stairs are positioned so that dais is centered with the center aisle of the seating.**
    - A gap is present at both sides of the dais counter and the step face, this gap should not exist. Remedial work is required to correct this gap, see photos.

5.  City Hall
    - Door at room 348 is not within an acceptable color range, contractor shall replace this door.
    - The edge trim lips extend above and below the desk surface, this is not an acceptable condition. This condition will be a high maintenance one if not corrected.
    - 3rd floor terrace will require dens-shield over the plywood to help reduce cracking in the stucco finish
    - Densglas sheathing shall be used over the plywood to minimize cracking on the stucco finish. Please let me know if that was the intention.
    - Roofing membrane shall terminate under flashing. See photo.

Pg 1 of 2

Exhibit "10"



# Miami

7650 Corporate Center Drive
Suite 400
Miami, FL 33126
305-884-8900

6. Preparation work at PD for the Structural modifications.
   - Foundations at column's A13, B13, C13, D13 and D8 have been exposed and shoring is in place.
   - Shoring at 2nd floor at column line D8 is also in place.
   - Sand blasting has begun on bottom of the roof slab in preparation for the FRP application.

Please respond to author within 2 days with suggested modifications.

Signed: _____
URS Corporation

**Attachments:** Photolog

# URS

## PHOTOGRAPHIC LOG
Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. 1 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

CH to PG bridge



| Photo No. 2 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

CH to PG bridge



# URS

## PHOTOGRAPHIC LOG
### Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. 3 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Panels are chipped around drains openings.



| Photo No. 4 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Debris covered with sealer

Page 2 of 9

# URS

## PHOTOGRAPHIC LOG
Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. 5 | Date: 10-28-13 |
|---|---|
| **Direction Photo Taken:** N/A | |
| **Description:** Debris covered with sealer | |



| Photo No. 6 | Date: 10-28-13 |
|---|---|
| **Direction Photo Taken:** N/A | |
| **Description:** Pitting on panels | |

# URS

### PHOTOGRAPHIC LOG
Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. 7 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Pitting on panels



| Photo No. 8 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Damaged panel needs additional remedial work prior to coating.

# URS

## PHOTOGRAPHIC LOG
### Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. 9 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Sand coated over.



| Photo No. 10 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Caulking Coated over with concrete tinting.

# URS

## PHOTOGRAPHIC LOG
Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. 11 | Date: 10-28-13 |
|---|---|
| **Direction Photo Taken:** | |
| N/A | |
| **Description:** | |
| Dais counter will need to be symmetrical with seating. | |



| Photo No. 12 | Date: 10-28-13 |
|---|---|
| **Direction Photo Taken:** | |
| N/A | |
| **Description:** | |
| Gap between dais and step. | |



# URS

## PHOTOGRAPHIC LOG
Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. | Date: |
|---|---|
| 13 | 10-28-13 |

**Direction Photo Taken:**

N/A

**Description:**

Exterior area between CC lobby and CH. Contractor to correct closure details.



| Photo No. | Date: |
|---|---|
| 14 | 10-28-13 |

**Direction Photo Taken:**

N/A

**Description:**

Exterior area between CC lobby and CH. Contractor to correct closure details.



# URS

## PHOTOGRAPHIC LOG
Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. | Date: |
|---|---|
| 15 | 10-28-13 |

**Direction Photo Taken:**

N/A

**Description:**

Exterior area between CC lobby and CH. Caulking required at panel around door.



| Photo No. | Date: |
|---|---|
| 16 | 10-28-13 |

**Direction Photo Taken:**

N/A

**Description:**

Floor base at corners, not glued at various locations.

# URS

## PHOTOGRAPHIC LOG
Site Visit Report

| Client: City of Miami Gardens | Site Location: NW 27th Avenue – NW 187th Street | Project: |
|---|---|---|
| Contractor: Skanska USA | | CMG GMP 2 |

| Photo No. 17 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Wall board under window sills not finished typ.



| Photo No. 18 | Date: 10-28-13 |
|---|---|

**Direction Photo Taken:**

N/A

**Description:**

Picture shows roofing membranes stopping short of flashing.





# URS

## City of Miami Gardens New Municipal Complex Phase 2 and 3 Project (GMP-2)

City of Miami Gardens Municipal Complex

18601 NW187th Street, City of Miami Gardens, Florida

URS Project Number: 38702132   CMG Project Number: 2311609

**SUBMITTAL REVIEW FORM**   Reviewed by: RMU/MWZ   Review Date: 08-21-12

**SUBMITTAL NAME:**   Foundation Shop Drawings PD

**SUBMITTAL NUMBER:**   No. 00 03 3000 004 0

**SUBMITTAL DISPOSITION**

   No exceptions taken

 X Approved as noted

   Rejected

   Note markings

   Confirm markings in writing

   Resubmit corrected drawings

URS review is only for conformance with the design concept and compliance with the information given in the Contract Documents. Contractor is responsible for all dimensions, quantities and performance requirements to be confirmed and correlated at the job site; for all information that pertains to the fabrication processes or to techniques of construction; for all coordination of the work of all trades; and for assuring consistency with the Contract Documents.  Review of drawings or items does not relieve the Contractor of the responsibility for complying with all requirements of the Contract Documents.

| DRAWING NO. / SPEC. SECTION | COMMENT NO. | COMMENT |
|---|---|---|
| | 1 | See attached |
| | 2 | Provide record copy |
| | 3 | |
| | 4 | |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |

1 of 1

URS Corporation
7650 Corporate Center Drive
Suite 400, Miami, Fl
33126-1220
Tel: 305-984-8900
Fax: 305-984-2665
www.urscorp.com

Exhibit "11"





Titon Builders, Inc.

320 10th St.
Lake Park, FL 33403
Phone: (561) 848-4110 **Fax: (561) 848-4115

MIAMI
GARDENS
MUNICIPAL



February 3, 2014

*Via Certified Mail and e-mail (cbenson@miamigar*

Cameron Benson, City Manager
City of Miami Gardens
1515 NW 167th Street
Building 5, Suite 200
Miami Gardens, Florida 33169

      **RE:**  URS' Statement regarding Revision 20 to the Municipal Complex for the February 5, 2014
             City of Miami Gardens City Council Meeting

Dear Mr. Benson:

Thank you for your invitation for URS to attend the City Council meeting scheduled for February 5th, 2014. We understand URS has been invited so that the City Council will have the opportunity to question URS and discuss URS' work on the Municipal Complex project, specifically as it relates to the Revision 20 design modifications submitted to the City on November 25, 2013. We understand that Skanska has also been invited to discuss its January 17, 2014 preliminary cost proposal for Revision 20. URS will be pleased to attend the meeting. However, rather than answer questions during the meeting, URS' position regarding Revision 20 is as follows:

URS prepared the Revision 20 modifications as part of its design responsibilities to meet applicable portions of the Florida Building Code. The Revision 20 modifications will require Skanska to perform additional work for which Skanska is requesting additional compensation. URS is committed to working with the City and Skanska to minimize the time required for Skanska to perform the Revision 20 work as well as the costs of the work. Indeed, URS submitted its comments on Skanska's preliminary cost proposal to the City on January 19, 2014 and provided scheduling comments on January 30, 2014.

At this time, the cost and time impacts of Revision 20 are not fully known. It would be premature for URS to assess whether any costs associated with Revision 20 are URS' responsibility. Until the project is fully completed, neither URS nor the City will fully know the impact that the Revision 20 design modifications will have on the project cost or the schedule. Additionally, there are other issues, such as concurrent delay by other parties and the betterment doctrine, that will need to be addressed during discussions we expect to occur regarding a global resolution of this and any other outstanding claims.

URS' contract with the City includes specific limitations of liability which may have a significant impact on any determination of URS' responsibility and liability. The contractual limitations of liability must be fully considered along with all costs and impacts before the City and URS will be in a position to discuss URS's responsibility, if any, for costs associated with Revision 20. URS reserves its rights pursuant to the terms of the contract and applicable law.

URS will continue to cooperate with Skanska's efforts to perform the work and the City's efforts to complete the project. URS has provided the drawings and other deliverables needed to meet its contractual obligations and will

URS Corporation
7650 Corporate Center Drive
Suite 400
Miami, Florida 33126
305.262.7466

Exhibit "12"

**URS**

continue to meet its contractual obligations as the parties move forward with the project.  Further, URS will work with you as the project nears completion to schedule meetings where URS, the City, and Skanska can globally resolve the outstanding claims on this project.

Sincerely,

URS Corporation Southern

Carlos Garcia
Vice President
South Florida Office Manager

Cc (email only):  Mayor Oliver G. Gilbert III
Vice-Mayor Lisa C. Davis
Councilman Rodney Harris
Councilman Erhabor Ighodaro, Ph.D.
Councilwoman Lillie Q. Odom
Councilwoman Felicia Robinson
Councilman David Williams Jr.
Sonja Dickens, City Attorney, City of Miami Gardens
Vernita Nelson, City of Miami Gardens
Jimmie Allen, City of Miami Gardens
Greg Johnson, URS

**URS**

May 2, 2014

Jimmie Allen, RA, QMSI
Sr. Project Manager
City of Miami Gardens
1515 NW 167th Street
Miami Gardens, FL 33169

Re:     The City of Miami Gardens (the "City") Nonexclusive Continuing Professional Services
Agreement with URS Corporation Southern ("URS") dated February 25, 2009 (RFQ #08-09-006 Reso.
#2009-37-982) Notice of Award dated July 28, 2010 and the Amendment for Architectural & Engineering
Services executed October 17, 2011

Subject:    Phase 2 Substantial Completion

Dear Mr. Allen:

In accordance with paragraph 6.2 of the referenced Professional Services Agreement, URS visited the project
site and has found that the Contractor has corrected the Chilled Water Supply temperature, the lone
remaining discrepancy as listed in our April 28, 2014 (revised) letter to the City.

Therefore, URS finds Phase 2 of the Municipal Complex project to meet the requirements of Substantial
Completion effective May 2, 2014.

Sincerely,

Greg Johnson PE
**URS Corporation**
Director of Facilities
Engineering and Architectural Services
Southern Florida
URS Corporation
Direct: 305-514-2462
Mobile: 305-608-9720

Cc:     Carlos Garcia URS
        Vice President

URS Corporation
7650 Corporate Center Drive
Suite 400
Miami, FL 33126

Exhibit "13"

**URS**

August 6, 2014

*Via e-mail and U.S. mail*

Cameron Benson
City Manager
City of Miami Gardens
18605 NW 27th Avenue
Miami Gardens, FL  33056

Re:     **The City of Miami Gardens Nonexclusive Continuing Professional Services Agreement URS
        Corporation Southern dated February 25, 2009 (RFQ # 08-09-006 Reso. #2009-37-982) Notice of
        Award dated July 28, 2010 and the amendment for Architectural & Engineering Services executed
        October 17, 2011 (the "Agreement")**

Subject:     **Response to your letter dated July 29, 2014 – Phases II and III – City of Miami Gardens
             Municipal Complex (the "Project")**

Dear Mr. Benson:

URS is in receipt of your July 29, 2014 letter (received on August 1, 2014) regarding costs associated with
Revision 20 which URS submitted to the City on November 25, 2013.  As URS indicated in our letter dated
December 20, 2013, it is premature to require URS to acknowledge construction costs or impacts associated with
Revision 20 until those costs and impacts are fully known, documented, and measured.  Once those costs and
impacts are determined, URS will meet its contractual obligations, including any potential indemnification
obligations.  However, URS' indemnification obligations are limited to the extent specified in the Agreement
including the indemnification provision in Article 16.1 and the thresholds established by Article 2.5.1. URS'
indemnification obligations are also cabined by Florida law.  Section 725.08, Florida Statutes, precludes the City
from requiring URS to defend the City, and voids any such contract provisions requiring the same as against
public policy.

As it is in both parties' interest to complete the Police Department building and resolve any pending issues,
including any issues unrelated to Revision 20, URS remains willing to meet with the City to determine the costs
and impacts associated with the Project.  However, URS will need the documentation it previously requested from
the City on December 20, 2013 prior to doing so. This information includes:

- Reports, analyses and/or investigation notes from Wingerter
- Atkins' monthly reports and schedule analyses
- Analyses or notes from the City's field staff related to Skanska's  Phase 2 delay claims

URS again declines the City's repeated requests to fund Revision 20, with or without a reservation of rights.  If, in
fact, the City believes that it is not capable of funding the completion of its project, URS instead suggests that the
City look to alternative sources of funding and possibly request Skanska fund this stage of the Project.  Once a

URS Corporation
7650 Corporate Center Drive
Suite 400
Miami, Florida 33126
305.262.7466

Exhibit "14"

**URS**

determination is made and agreed to as to who is responsible for any additional costs, Skanska can be compensated for any costs not its own.  Please be clear that if the City negotiates a settlement of claims with Skanska, URS will only be responsible for any contractually obligated amount.

Your letter suggests that URS is now in a better position to fund the repairs due to the expected acquisition by AECOM.  URS' financial ability or inability to fund the City's project is in no way relevant to URS' contractual or legal obligations to the City.  As a point of information, URS has not yet been acquired by AECOM.

URS will ask its outside counsel to contact the City's outside counsel to continue their discussions regarding this Project and to consider other potential alternatives for moving forward.   URS looks forward to working with the City on the completion of this important Project, and resolving any pending issues.

Sincerely,

URS Corporation

Carlos Garcia
Vice President,
South Florida Office Manager

cc:    Vernita Nelson – City of Miami Gardens
       Sonja Dickens – City of Miami Gardens
       Tim Currey – URS

*Received 1-16-2015*

# URS

**Remittance Page**

| | |
|---|---|
| Invoice Date | 01/07/15 |
| Invoice | 6140566 |
| Project | 38702039 |
| Page | 1 |

Reference:   Contract #08-09-006

For:   City Hall Complex Project
        Basic Services PO #10-03523

Professional Services for Period Ending 11/30/14

City of Miami Gardens
Attn: Jimmie Allen
1515 N.W. 167th Street, Bldg. 5
Suite 200
Miami Gardens FL 33169

**Total Due:**        **$182,000.00  USD**
Terms:                Due upon Receipt

* Make checks payable to: URS Corporation
* Please indicate invoice number and/or project number on check
* Please include this stub with payment

**Regular Mail (USPS):**    URS Corporation
                            P.O. Box 116183
                            Atlanta GA 30368-6183
                            US

**Overnight Courier:**    URS Corporation Southern
                          Lock Box No. 116183
                          100 South Crest Drive
                          Stockbridge, GA 30281
                          Attention: Atlanta Lockbox
                          (877) 786-3333

**Electronic Funds Transfer:**
    Account:          URS Corporation Southern
    Bank:             Wells Fargo Bank
    Account No.:      4520-086471
    ABA Routing No.:  121-000-248
    Swift Code:       WFBIUS6S

Remittance information can be sent to:
    Email:    RemitTo@URS.com
    Fax:      (512) 419-6937   Attn:  Cash Applications

Please contact Wilnetha Y Thompkins at 813 675-6838 or via email at wilnetha.thompkins@aecom.com
if you have any questions regarding this invoice.

Exhibit "15"



|  |  |
|---|---|
| Invoice Date | 01/07/15 |
| Invoice | 6140566 |
| Project | 38702039 |
| Page | 2 |

City of Miami Gardens
Attn: Jimmie Allen
1515 N.W. 167th Street, Bldg. 5
Suite 200
Miami Gardens FL 33169

Reference:   Contract #08-09-006

For:   City Hall Complex Project
       Basic Services PO #10-03523

Professional Services for Period Ending 11/30/14

| PHASE | FEE | PERCENT COMPLETE | FEE EARNED | PREVIOUS BILLING | CURRENT BILLING |
|---|---|---|---|---|---|
| Program/Due Diligence Phase | 168,000.00 | 100.00% | 168,000.00 | 168,000.00 | 0.00 |
| Schematic Design Phase | 315,000.00 | 100.00% | 315,000.00 | 315,000.00 | 0.00 |
| Design Development Phase | 472,500.00 | 100.00% | 472,500.00 | 472,500.00 | 0.00 |
| LEED Components Design Dev | 52,500.00 | 100.00% | 52,500.00 | 52,500.00 | 0.00 |
| Construction Documents Phase | 925,200.00 | 100.00% | 925,200.00 | 925,200.00 | 0.00 |
| LEED Components Constr Docs | 102,800.00 | 100.00% | 102,800.00 | 102,800.00 | 0.00 |
| Construction Phase | 400,000.00 | 100.00% | 400,000.00 | 400,000.00 | 0.00 |
| **TOTALS** | 2,436,000.00 | | 2,436,000.00 | 2,436,000.00 | 0.00 |

**LUMP SUM**

| | |
|---|---|
| CA Svcs Ph III May 2014 | 26,000.00 |
| CA Svcs Ph III June 2014 | 26,000.00 |
| CA Svcs Ph III July 2014 | 26,000.00 |
| CA Svcs Ph III August 2014 | 26,000.00 |
| CA Svcs Ph III September 2014 | 26,000.00 |
| CA Svcs Ph III October 2014 | 26,000.00 |
| CA Svcs Ph III November 2014 | 26,000.00 |
| **Total Lump Sum** | **182,000.00** |

TOTAL THIS INVOICE      $182,000.00 USD

Certified true and accurate
Payment not previously received
URS Corporation Southern

By:
Lisa Frattini, Billing Center Manager

Please contact Wilnetha Y Thompkins at 813 675-6838 or via email at wilnetha.thompkins@aecom.com
if you have any questions regarding this invoice.

F5485074

# SKANSKA

May 14, 2013

Dr. Danny Crew
City Manager
City of Miami Gardens
1515 NW 167th Street,
Miami Gardens, FL 33169

Subject:  Police Department Stop Work Order Update 5/13/13

Dear Dr. Crew,

Skanska is increasingly concerned the Police Department stop work order is now entering the 45th day with no end in sight.  In our view a solution should have been presented several weeks ago.  It appears the work hold is maintained in order to continue searching for a fault in the installation condition versus focusing on the ultimate engineered repair or fix needed to rectify the problem.  Skanska has been forthright in providing the documentation requested by the Engineer, yet the focus of this elongated discovery process is to "uncover" a problem that could be faulted to the Contractor.  The rebar placement locations and concrete compressive strength were thoroughly inspected by third party Threshold Inspections and the materials were tested by the Owner's testing labs.  The review to-date has only reconfirmed concrete strength test results, reshoring practices, threshold inspections, rebar placement, shop drawings, and previous testing lab results.  All of these items were under third party scrutiny throughout the installation process; it is highly improbable that an installation error would have been made week after week in the exact same manner at an isolated section of the project.  The City Hall building has similar structural perimeters and was installed without developing this issue.  The difference in the Police Department building is the design floor spans at the affected area are the largest on the project.

The costs for equipment on hold and now extended general conditions are escalating and seemingly without any sense of urgency to resolve the issue and move forward.  Regardless of who is at fault or may share in the fault, the primary objective must be to get moving again.  Skanska has provided requested documents regarding the reshoring program, yet we have not received any results back in like kind of the Structural model results.  Considering that work has been stopped at PD in the interest of life safety, and the building is exhibiting noticeable concrete cracking, we request a copy of the model results to allow us to make a determination regarding the safety of our employees working in the building.

Please note the following cost approximations associated with this delay (this is partial list):

1.  $5,290 per day for delay impacts to Phase 2 (Offsite Work) beyond 8/5/13 for extended general conditions as a result of holding our peak staffing levels for a longer duration to complete the delayed work.  This delay is associated with the PD tower crane blocking progress along 187th street

# SKANSKA

2. $5,290 per day for delay impacts to Phase 3 (Police Department) beyond 9/30/13 for extended general conditions for holding our staffing levels beyond the ultimate completion date

3. $24,000/month for the extended tower crane rental at PD

4. The General Conditions for each trade subcontractor extended by this delay ($ value based on future claims incurred)

5. The second mobilization cost of vendors not able to execute scopes in both buildings during one mobilization. The City Hall and Police Department progress was originally phased two weeks from each other to facilitate concurrent work. This delay has opened a gap of almost two months at this point. ($ value based on future claims incurred)

6. Bulk order pricing advantages that are lost by splitting orders that were once purchased as one delivery and installation (ex; the systems furniture package)

Skanska will continue to do all we can to minimize the delay but it does not appear we are scrutinizing the apparent problem. The cracks are consistent across the eastern face of the Police building and exist at a section where the designed floor spans are the greatest. We are puzzled why the Engineer's design is not under third party scrutiny given the circumstantial evidence. In the interest of safety, please provide the structural modeling analysis of the Police Department Building for our review.

Sincerely,



Lance Dengerud
Senior Project Manager
Skanska USA Building Inc.
South Florida Operations

CC:
City Attorney
C/O City of Miami Gardens
1515 NW 167th St. Bldg. 5, Suite 200
Miami Gardens, FL 33169

Russell Sheppard
Senior Vice President, South Florida Operations
Skanska USA Building Inc.

Tim Harvey
Corporate Counsel
Skanska USA Building Inc.



# *City of Miami Gardens*

Oliver Gilbert
Mayor

September 24, 2013

Lisa C. Davis
Vice Mayor

Lillie Q. Odom
Council Member

Rodney Harris
Council Member

Felicia Robinson
Council Member

David Williams Jr.
Council Member

Erharbor Ighodaro, Ph.D.
Council Member

Lance Dengerud
Sr. Project Manager
Skanska USA, Building, Inc.
South Florida Operations
1815 Griffin Road, Suite 204
Dania Beach, Fl. 33004

Re: The City of Miami Gardens Contract Agreement with Skanska USA Building, Inc.,
RFP # 10-11-064 City Hall Municipal Complex GMP Construction dated October 11,
2011, with amendment dated February 9, 2012.

Subject: **Notice To Proceed**
City of Miami Gardens Municipal Complex Project:
Change Order Request work for URS Revisions 11 and 14- Skanska's PCCO 41/CE 177
for the Police Department Building dated September 9, 2013.

Dear Mr. Dengerude,

In accordance with the provisions of the Agreement, please find this your Notice To Proceed
effective immediately to provide all necessary tools, equipment, labor and other necessary
construction related services to execute without further delay the remedial structural construction
services covered by Revisions 11 and 14 provided by URS Southern Inc., based on the plans and
specifications submitted to the City on July 5 and 11, 2013, and approved by the City of Miami
Gardens Building Services Department on July 11 and 18, 2013 respectively. In addition, you are
authorized to proceed with removing previously installed work pursuant to the Deconstruction Plan
attached hereto as Exhibit A.

Dr. Danny O. Crew
City Manager

Ronetta Taylor, MMC
City Clerk

Sonja K. Dickens
City Attorney

Please direct all contractors under your management control to begin all necessary construction
service activities to commence and complete the work expeditiously to arrive at substantial
completion of the work within the time required for the City to gain occupancy of the facility in a
timely manner.

The City has reviewed your Change Order Proposal dated September 9, 2013 and disagrees with
the costs proposed. The City in accordance with the provisions of Articles 4, 8, and 9 of the
General Conditions for construction and the contract referred to above, herewith directs Skanska to
begin immediately to man the areas of construction with the necessary materials equipment and
services to execute the structural repairs to the building.

1

Exhibit "17"

In order to maintain an accurate accounting of all construction services and costs, the City directs Skanska to conduct the work on a time and materials basis. Skanska shall maintain a daily accounting record of all activities for use in the final negotiation of the change order including but not limited to the following:

1. Daily labor force log for all workers directly conducting the work specific to the remediation including field supervisory staff for submittal to the City.

2. Quantity survey and maintain documentation on all materials used on a daily basis for submittal to the City.

3. Collect and maintain daily delivery receipts and production tickets for all installed work for submittal to the City.

4. Provide accounting records for all hard costs expended until the work is completed including payroll records of all Skanska staff, subcontractors and vendors involved with the work.

All production records and materials shall be submitted to the City at the end of each week for recording of the work in place. Skanska shall not remove previously installed work beyond what is shown on the Deconstruction Plan without written approval from the City or URS. The City and URS will review the time and material supporting documentation for reasonableness prior to the issuance of any payment(s).

As depicted in your proposed schedule attachment the work is forecast to take eight (8) weeks to complete from commencement. The City requests a schedule alternative to accelerate the work to be complete within four (4) weeks with an estimate of the cost differential between the acceleration costs (i.e. the premium portion for overtime) versus the anticipated savings in general conditions and other time related costs. The schedule shall outline all impacts to compression of the time with regard to labor, supervision and project management. As time is of the essence to complete the required construction services to reach substantial completion in the Spring of 2014 the City requests a response to these items as soon as practical.

The City is still reviewing and investigating the concerns raised by Skanska and its consultant, Walter P. Moore Inc., with regard to structural calculation results and concerns at Column Grid A-13 at the NE corner of the building, and is also still reviewing and investigating some of the concerns raised by URS regarding alleged construction defects. The reviews may result in additional or different repairs than those set forth in Revisions 11 & 14. In the near future, the City will advise you of the additional locations still under review. Please schedule the repairs so that the locations under review are not repaired prior to the completion of the review. The City will identify the areas and forward a plan to you depicting the areas of additional concern potentially requiring repairs.

The City, URS and Skanska shall meet regularly to discuss and negotiate a resolution to Skanska's claims for additional costs and time due to alleged structural design defects as set forth in the Change Request, as well as the allegations that the cracking is due to construction defects. In the event that it is determined that construction defects were a contributing cause to the cracking, the City reserves the right to recover from Skanska all damages the City has incurred, including but not limited to repayment of all, or a portion, of the costs paid to Skanska for the repair work and time related costs.

Regards,

Danny O. Crew
City Manager

Cc. Vernita Nelson,   Sonja Dickens, Jimmie Allen

2



# City of Miami Gardens

December 12, 2013

*Oliver Gilbert*
*Mayor*

VIA U.S. MAIL &
CERTIFIED MAIL (7012 2210 0002 5077 9568)

Carlos Garcia PE
URS Corporation Southern
7650 Corporate Center Drive, Suite 401
Miami, FL 33126

*Lisa C. Davis*
*Vice Mayor*

*Lillie Q. Odom*
*Council Member*

*Rodney Harris*
*Council Member*

Re: The City of Miami Gardens Nonexclusive Continuing Professional
   Services Agreement URS Corporation Southern dated February 25,
   2009 (RFQ # 08-09-006 Reso. #2009-37-982) Notice of Award dated
   July 28,2010 and the amendment for Architectural & Engineering
   Services executed October 17, 2011

*Felicia Robinson*
*Council Member*

*David Williams Jr.*
*Council Member*

Subject: URS Signed & Sealed Revision 20 Dated November 25, 2013
        Police Department Building Structural Redesign

*Erharbor Ighodaro, Ph.D.*
*Council Member*

Dear Mr. Garcia:

The City of Miami Gardens (the "City") is in receipt of URS Corporation's
("URS") Revision 20 dated November 25, 2013, for the signed and sealed
structural drawings of the Police Department Building at the City Hall Municipal
Complex project (the "Project").

Revision 20 is in addition to previous structural revisions and it represents an
extensive re-design of several significant structural components. Based on our
review, it appears Revision 20 will have an impact all shear wall footings and
stair tower footings throughout the Police Department Building. The design
changes will also significantly impact the ground floor slabs already in place,
which must be excavated (with shoring needed to secure the back-fill), cut
and reinforced with additional concrete and rebar.

*Cameron D. Benson*
*City Manager*

*Ronetta Taylor, MMC*
*City Clerk*

*Sonja K. Dickens*
*City Attorney*

These proposed revisions were not the result of any new or additional work
requested by the City or by Skanska USA Building, Inc. ("Skanska"), but are
obviously due solely to errors and omissions in the original design. URS
provided Revision 20 as part of its ongoing internal review of the sufficiency
of its structural design of the Police Department Building.

Exhibit "18"

While the City is pleased URS is taking affirmative steps to satisfy its professional obligations as designer of record and correct its design deficiencies, at this time there are simply no available funds in the Project budget to pay for the work needed to implement the design changes in Revision 20.

Since it is clear the proposed revision was submitted to address deficiencies in URS's design, the City demands URS acknowledge responsibility for the additional construction costs and immediately reimburse the City for all expenses incurred due to the additional work required by Revision 20. The City also expects URS will cooperate with Skanska's efforts to price and perform the additional work so as to cause as little delay as possible to the overall Project.

It is our understanding from Skanska the work associated with Revision 20 must be performed immediately and as quickly as possible in order to minimize further delay to the Project caused by the other structural work being performed. Therefore, the City demands URS to acknowledge its responsibility for the additional costs within three (3) days of this letter. In the event URS refuses to agree to pay for these costs, and work on the Project is further delayed as a result, the City will take immediate legal action against URS.

Finally, Skanska has notified the City of a potential time delay and cost impacts related to the work called for in Revision 20. A copy of Skanska's notice is attached. Therefore, this letter shall also serve as notice the City demands URS indemnify, defend and hold harmless the City from any and all claims, damages or losses, including delay damages, which Skanska may ultimately seek as a result of this design change.

We look forward to your prompt attention to this matter.

Very Truly Yours,

Cameron D. Benson
City Manager

Enc.

c: Sonja Dickens
   Vernita Nelson
   Jimmie Allen
   Stuart H. Sakwa, Esq.

# URS

December 20, 2013

*Via e-mail and U.S. mail*

Cameron Benson, City Manager
City of Miami Gardens
1515 NW 167th Street
Building 5, Suite 200
Miami Gardens, FL 33169

Re:    The City of Miami Gardens Nonexclusive Continuing Professional Services Agreement URS Corporation Southern dated February 25, 2009 (RFQ # 08-09-006 Reso. #2209-37-982) Notice of Award dated July 28, 2010 and the amendment for Architectural & Engineering Services executed October 17, 2011 (the "Agreement")

Subject:    Response to your letter dated December 12, 2013 regarding URS' signed and sealed Revision 20 dated November 25, 2013

Dear Mr. Benson:

URS is in receipt of your December 12, 2013 letter regarding Revision 20. As the designer of record, URS prepared and submitted Revision 20 as part of its continuing efforts to ensure that its design is complete and meets its contractual obligations to the City. URS takes its responsibilities seriously and self-corrected the design as needed. Like the City and Skanska, URS is focused on implementing the revisions and completing the police department building. URS agrees with Skanska's position that the work associated with Revision 20 should be performed as quickly as possible to minimize delay to the project. URS will cooperate with Skanska's efforts to perform the additional work and respond to questions arising from Revision 20.

Although URS has been cooperating with the City and plans on continuing to do so, the City's demands contained within the letter are unfounded and exceed URS' contractual obligations. The Agreement does not require URS to acknowledge responsibility for additional construction costs or to immediately reimburse the City for all expenses incurred due to the additional work required by Revision 20. URS is not obligated to fund the project while Skanska and the City implement Revision 20. Nor does the Agreement require URS to indemnify, defend and hold harmless the City from "any and all claims, damages or losses, including delay damages, which Skanska may ultimately seek as a result of this design change." URS' indemnification obligations are limited to the extent specified in the Agreement including the indemnification provision in Article 16.1 and the thresholds established by Article 2.5.1.

At this time, neither URS nor the City knows fully the impact that the design modifications will have on the project scope or schedule. It is not appropriate to exaggerate the extent of the design modifications or the impact that the modifications will have on the project scope and schedule, or to demand indemnification, until those impacts are known, measured, and supported by the necessary documentation.

URS will abide by the language contained in the Agreement and expects the City to do so as well. If you have any questions, please do not hesitate to contact us.

URS Corporation
7650 Corporate Center Drive
Suite 400
Miami, Florida 33126
305.262.7466

Exhibit "19"

**URS**

Page 2 of 2

Sincerely,

**URS Corporation**

Carlos Garcia
Vice President
South Florida Office Manager

cc:    Vernita Nelson – City of Miami Gardens
       Sonja Dickens – City of Miami Gardens
       Greg Johnson – URS

# URS

August 6, 2014

*Via e-mail and U.S. mail*

Cameron Benson
City Manager
City of Miami Gardens
18605 NW 27ᵗʰ Avenue
Miami Gardens, FL  33056

Re:    **The City of Miami Gardens Nonexclusive Continuing Professional Services Agreement URS Corporation Southern dated February 25, 2009 (RFQ # 08-09-006 Reso. #2009-37-982) Notice of Award dated July 28, 2010 and the amendment for Architectural & Engineering Services executed October 17, 2011 (the "Agreement")**

Subject:    **Response to your letter dated July 29, 2014 – Phases II and III – City of Miami Gardens Municipal Complex (the "Project")**

Dear Mr. Benson:

URS is in receipt of your July 29, 2014 letter (received on August 1, 2014) regarding costs associated with Revision 20 which URS submitted to the City on November 25, 2013. As URS indicated in our letter dated December 20, 2013, it is premature to require URS to acknowledge construction costs or impacts associated with Revision 20 until those costs and impacts are fully known, documented, and measured. Once those costs and impacts are determined, URS will meet its contractual obligations, including any potential indemnification obligations. However, URS' indemnification obligations are limited to the extent specified in the Agreement including the indemnification provision in Article 16.1 and the thresholds established by Article 2.5.1. URS' indemnification obligations are also cabined by Florida law. Section 725.08, Florida Statutes, precludes the City from requiring URS to defend the City, and voids any such contract provisions requiring the same as against public policy.

As it is in both parties' interest to complete the Police Department building and resolve any pending issues, including any issues unrelated to Revision 20, URS remains willing to meet with the City to determine the costs and impacts associated with the Project. However, URS will need the documentation it previously requested from the City on December 20, 2013 prior to doing so. This information includes:

- Reports, analyses and/or investigation notes from Wingerter
- Atkins' monthly reports and schedule analyses
- Analyses or notes from the City's field staff related to Skanska's Phase 2 delay claims

URS again declines the City's repeated requests to fund Revision 20, with or without a reservation of rights. If, in fact, the City believes that it is not capable of funding the completion of its project, URS instead suggests that the City look to alternative sources of funding and possibly request Skanska fund this stage of the Project. Once a

URS Corporation
7650 Corporate Center Drive
Suite 400
Miami, Florida 33126
305.262.7466

Exhibit  "20"

**URS**

determination is made and agreed to as to who is responsible for any additional costs, Skanska can be compensated for any costs not its own.  Please be clear that if the City negotiates a settlement of claims with Skanska, URS will only be responsible for any contractually obligated amount.

Your letter suggests that URS is now in a better position to fund the repairs due to the expected acquisition by AECOM.  URS' financial ability or inability to fund the City's project is in no way relevant to URS' contractual or legal obligations to the City.  As a point of information, URS has not yet been acquired by AECOM.

URS will ask its outside counsel to contact the City's outside counsel to continue their discussions regarding this Project and to consider other potential alternatives for moving forward.   URS looks forward to working with the City on the completion of this important Project, and resolving any pending issues.

Sincerely,

**URS Corporation**

Carlos Garcia
Vice President,
South Florida Office Manager

cc:    Vernita Nelson – City of Miami Gardens
       Sonja Dickens – City of Miami Gardens
       Tim Currey – URS